No. 26-1343

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

State of Nevada *ex rel.* Nevada Gaming Control Board,

*Plaintiff-Appellee,*

*v.*

Blockratize Inc. d/b/a Polymarket; QCX LLC d/b/a Polymarket US; Adventure One QSS Inc. d/b/a Polymarket,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Nevada
(Hon. Miranda Du)
No. 3:26-cv-00089

## DEFENDANTS-APPELLANTS BLOCKRATIZE INC. D/B/A POLYMARKET; QCX LLC D/B/A POLYMARKET US; ADVENTURE ONE QSS INC. D/B/A POLYMARKET APPENDIX: VOLUME 2 OF 3

Mark A. Hutchison
Joseph C. Reynolds
HUTCHISON & STEFFEN, PLLC
100 West Liberty Street, Suite 765
Reno, Nevada 89501
Telephone: 775.853.8746
mhutchison@hutchlegal.com

Adam P. Laxalt
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, D.C. 20036
Telephone: 202.220.9600
alaxalt@cooperkirk.com

Thomas H. Dupree Jr.
Jacob T. Spencer
Adam I. Steene
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com

Orin Snyder
Matthew Benjamin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com

*Attorneys for Defendants-Appellants*

**Defendants' Reply in Support of Motion for Stay Pending Appeal
Dist. Ct. Doc. 52 (filed March 9, 2026)**

1 | Mark A. Hutchison (Nev. Bar No. 4639)
2 | Joseph C. Reynolds (Nev. Bar No. 8630)
  | HUTCHISON & STEFFEN, PLLC
3 | 100 West Liberty Street, Suite 765
  | Reno, Nevada 89501
4 | mhutchison@hutchlegal.com
  | jreynolds@hutchlegal.com
5 | (775) 853-8746
6 | (*designated local counsel*)

Orin Snyder
(*pro hac vice*)
Matthew Benjamin
(*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
OSnyder@gibsondunn.com
MBenjamin@gibsondunn.com
(212) 351-4000

7
8 | Adam P. Laxalt (Nev. Bar No. 12426)
  | COOPER & KIRK, PLLC
9 | 1523 New Hampshire Avenue NW
  | Washington, D.C. 20036
10 | alaxalt@cooperkirk.com
11 | (202) 220-9600

Thomas H. Dupree Jr.
 (*pro hac vice*)
Jacob T. Spencer
(*pro hac vice*)
 Adam I. Steene
(*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, D.C. 20036
TDupree@gibsondunn.com
JSpencer@gibsondunn.com
ASteene@gibsondunn.com
(202) 955-8500

16 | Counsel for Defendants BLOCKRATIZE INC.
   | d/b/a Polymarket; QCX LLC d/b/a Polymarket US;
17 | and ADVENTURE ONE QSS INC. d/b/a Polymarket

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD, | Case No.: 3:26-cv-00089-MMD-CLB |
|---|---|
| Plaintiff, | [Nev. Dist. Ct. No. 26OC000121B] |
| v. | DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL |
| BLOCKRATIZE INC. d/b/a Polymarket; QCX LLC d/b/a Polymarket US; ADVENTURE ONE QSS INC. d/b/a Polymarket, | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2   INTRODUCTION ........................................................................................... 1

3   ARGUMENT ................................................................................................... 2

4       I.    The Court, With Plaintiff's Consent, Has Already Entered A Short Stay. .... 2

5       II.   The *Nken* Factors Warrant A Stay Pending Appeal. ..................................... 3

6   CONCLUSION ............................................................................................... 10

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

### INTRODUCTION

Plaintiff's opposition confirms that this Court should continue to stay its remand order pending Defendants' appeal. The Court already entered, with Plaintiff's consent, a stay until April 6, 2026. That renders Plaintiff's extended argument about Rule 62(a)'s 30-day stay provision irrelevant. The only remaining question is whether the Court should exercise its discretion to ensure that Defendants' appellate rights remain meaningful and to avoid unnecessarily burdening the courts and the parties. The Court should do so: (1) Plaintiff's opposition demonstrates that Defendants will present serious legal questions worthy of appellate review; (2) Congress "authorized appellate review" of remand orders rejecting federal officer removal "and accepted the delay it can entail," *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021); and (3) Plaintiff's own dilatory conduct confirms that it will not suffer any harm—much less irreparable harm—from a stay.

Plaintiff has no answers to Defendants' actual arguments. For example, Defendants explained that Polymarket US's exercise of delegated rulemaking authority raises serious legal questions about the propriety of federal officer removal. In response, Plaintiff urges this Court to depart from the Ninth Circuit's "serious legal questions" standard, *see* Stay Opp. (ECF 50) at 5 n.1, and focuses almost exclusively on Polymarket US's authority to certify its contracts, *see id.* at 9. Similarly, Defendants explained that both the Nevada and U.S. Supreme Courts have held that a reference to "law" includes both state and federal law, thereby raising a serious question about federal-question jurisdiction. Plaintiff doubles-down on the contrary view it found in a concurrence from 1820—while continuing to mischaracterize that concurrence as a U.S. Supreme Court holding. *See id.* at 12.

With respect to irreparable harm, Plaintiff simply ignores the U.S. Supreme Court's express direction that "Congress has deemed it appropriate to allow appellate review" of federal officer remand orders "*before a district court may remand a case to state court*." *BP P.L.C.*, 141 S. Ct. at 1536 (emphasis added). Remand "would defeat the very purpose of permitting an appeal and leave a defendant who prevails on appeal holding an empty bag." *Forty Six Hundred LLC v. Cadence Educ., LLC*, 15 F.4th 70, 79 (1st Cir. 2021). Plaintiff insists that Defendants

1   will not suffer irreparable harm because they can engage in duplicative litigation in state court.

2   *See* Stay Opp. 13–15.  But that is exactly the harm a stay would avoid—not a justification for

3   rendering Defendants' appellate rights meaningless.

4        Finally, Defendants explained in their stay motion that Plaintiff's claims that it would

5   suffer daily irreparable harm are not credible given Plaintiff's inaction for much of the past year.

6   Stay Mot. (ECF 46) at 15.  Plaintiff's opposition merely repeats those claims, nearly word-for-

7   word, without addressing any of Defendants' arguments.  *See* Stay Opp. 17.  They have not

8   grown more credible with repetition.

9        The Court should grant a stay pending appeal.  The Court need not agree with

10  Defendants' *remand* arguments to recognize that Plaintiff's failure to engage meaningfully with

11  Defendants' *stay* arguments confirms their strength.

12                                **ARGUMENT**

13  **I.    The Court, With Plaintiff's Consent, Has Already Entered A Short Stay.**

14       This Court has already granted the relief Defendants sought under Rule 62(a).  By default,

15  appealable orders are stayed for 30 days under Rule 62.  *See* Fed. R. Civ. P. 62(a); Stay Mot. 5–

16  6.  Plaintiff agrees that Defendants in this case "have the statutory right to appeal the remand

17  order."  ECF 44 ¶ 3.  And Plaintiff agrees that the Court may extend or shorten Rule 62's 30-day

18  default.  *See* Stay Opp. 5–6.  For these reasons, Defendants asked the Court "to extend Rule

19  62(a)'s automatic stay to" April 6, 2026.  Stay Mot. 6.  Plaintiff "consented to" a stay "up to and

20  including that date."  ECF 44 ¶ 11.  And this Court granted the stipulated stay.  ECF 48.

21       Plaintiff's extended argument about the applicability of Rule 62 (Stay Opp. 5–8) is

22  irrelevant, because the Court already mooted this issue with Plaintiff's consent.  Plaintiff believes

23  it "notabl[e]" that Defendants did not mention *California ex rel. Harrison v. Express Scripts,*

24  *Inc.*, 139 F.4th 763 (9th Cir. 2025).  Stay Opp. 7.  But Plaintiff concedes that Defendants "rel[y]

25  on Rule 62(a)" and the short stay it supplies, *id.*—not the "automatic stay pending appeal" the

26  Ninth Circuit rejected in *Express Scripts*, 139 F.4th at 769.[1]  Plaintiff also asserts that the Court

27

28  _____
    [1] *Express Scripts* did not address Rule 62: That opinion issued more than a year after the district
    court entered its remand order, meaning that any Rule 62(a) stay would have long expired.

                                      2

1   should "evaluate a request for a stay pending appeal under the *Nken* factors."  Stay Opp. 7.

2   Defendants agree, which is why they expressly invoked *Nken* and argued that "[t]he *Nken*

3   factors" support a stay pending appeal in their opening brief.  Stay Mot. 6 (emphasis omitted;

4   capitalization altered).

5   **II.    The *Nken* Factors Warrant A Stay Pending Appeal.**

6         All four *Nken* stay factors—"serious legal questions," irreparable harm, balance of

7   equities, and the public interest—support a stay pending appeal here.  *Risinger v. SOC LLC*,

8   2015 WL 7573191, at *1 (D. Nev. Nov. 24, 2015) (Du, J.).  Plaintiff argues that Defendants are

9   "not likely to succeed on appeal" because this Court rejected Defendants' "asserted grounds for

10  removal."  Stay Opp. 8.  But, as Plaintiff concedes, that argument conflicts with precedent from

11  the Ninth Circuit and the District of Nevada.  *See id.* at 5 n.1.  Granting a stay does not "require[]

12  the court to essentially predict that it has rendered an erroneous decision."  *U.S. Bank, N.A. v.*

13  *SFR Invs. Pool 1, LLC*, 2021 WL 9316302, at *2 (D. Nev. Mar. 8, 2021) (alteration adopted).

14  Rather, "it is enough that the stay applicant has raised serious legal questions going to the

15  merits."  *Id.* (alteration adopted).

16        ***Substantial, Serious Legal Questions.***  Defendants have raised serious legal questions

17  about removal under the federal officer statute.  Plaintiff's lawsuit challenges Polymarket US's

18  exercise of regulatory authority delegated by the federal government and seeks to prohibit

19  Polymarket US from exercising that authority in Nevada entirely.  For example, Polymarket US

20  exercises delegated authority to establish and enforce market access requirements; Plaintiff seeks

21  to impose *different* access requirements.  Stay Mot. 7.  Polymarket US exercises delegated

22  authority to establish and enforce rules against manipulation and price distortion; Plaintiff claims

23  those safeguards are inadequate.  *Id.*  And Polymarket US exercises delegated authority to

24  establish and enforce rules regarding the terms and conditions of contracts and to certify those

25  contracts' compliance with federal law; Plaintiff takes aim at the terms of those contracts and

26  the decision to list them for trading.  *Id.* at 8.

27        Plaintiff generally ignores those arguments, focusing almost exclusively on the final

28  point—the authority "to self-certify compliance with the relevant regulations."  Stay Opp. 9

1 (quoting *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981 (9th Cir. 2019)).  Plaintiff offers no

2 response to, for example, Polymarket US's argument about regulation of market access.  In its

3 stay motion, Polymarket US explained that the Court erred by treating the CFTC's authority to

4 "override Polymarket's decisions regarding access" as "demonstrat[ing] compliance, not

5 assistance." ECF 41, at 5–6; *see* Stay Mot. 8–9.  Treating the CFTC's override authority as fatal

6 to federal officer removal would prevent any such removal by private entities because the

7 Constitution *requires* federal agencies to have the power to override regulatory decisions by a

8 private actor.  Stay Mot. 9 n.3.  And the Supreme Court and Ninth Circuit have held that

9 government "subjection, guidance, or control" is *indicative* of an "acting under" relationship,

10 not fatal to it.  *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237,

11 1245 (9th Cir. 2017) (quoting *Watson v. Phillip Morris Cos.*, 551 U.S. 142, 151 (2007)); *see*

12 Remand Opp. (ECF 15) at 10.  Plaintiff says nothing in response, confirming that these are

13 serious legal questions warranting "more deliberate investigation."  *U.S. Bank, N.A.*, 2021 WL

14 9316302, at *2.

15      Plaintiff insists that it "is not suing Polymarket for its regulation of third parties" and that

16 Defendants have not identified any actions Polymarket US "has taken performing a regulatory

17 function with respect to third parties."  Stay Opp. 9.  But those assertions are inconsistent with

18 Plaintiff's own arguments elsewhere in its opposition.  According to Plaintiff, judicial

19 intervention against Polymarket US is necessary "because Polymarket does not comply with

20 Nevada's consumer-protection requirements, and its platform is open to match fixing, insider

21 betting, and abuse." *Id.* at 3.  In other words, Plaintiff does not dispute that this case concerns

22 Polymarket US's role in regulating its designated contract market, including with respect to third

23 parties.  Nor could Plaintiff dispute that:  It sued precisely because it believes that Polymarket

24 US's rules—which federal law grants Polymarket US delegated authority to "establish, monitor,

25 and enforce," 7 U.S.C. § 7(d)(2)(A)—are inadequate to prevent third-party misconduct.

26      Unable to rebut Defendants' actual arguments, Plaintiff attacks a straw man.  However

27 many times Plaintiff might suggest otherwise, Defendants' position is not—and never has

28 been—that "complying with the law" is sufficient to invoke the federal officer statute. Stay Opp.

1    9; *compare id.* at 10 (complaining that Defendants have not found a case "holding that a private

2    entity can remove . . . simply because the private entity is federally regulated"), *with* Stay Mot.

3    8 (arguing that the "exercise of delegated rulemaking authority is" more than "mere

4    'compliance'" with federal law), *and* Remand Opp. 10 ("Polymarket US does far more than

5    simply comply with the CEA's highly detailed regulatory scheme."). Plaintiff's continued

6    efforts to side-step Defendants' actual arguments confirm that serious legal questions remain

7    unresolved.

8        Plaintiff's attempts to reimagine Defendants' notice of removal are equally misguided.

9    Plaintiff invites the Court to credit Plaintiff's account of why it "is suing Polymarket." Stay

10   Opp. 9. But that is not Plaintiff's prerogative. The Court must "credit the [defendants'] theory

11   of the case for purposes of [the section 1442] jurisdictional inquiry." *Jefferson Cnty. v. Acker*,

12   527 U.S. 423, 432 (1999). Defendants' theory is that Plaintiff has sued because of Polymarket

13   US's enforcement of its own market-access, consumer-protection, and dispute-resolution rules,

14   among other rules. And that is the theory the Court must credit. *Id.* Polymarket US has alleged

15   that it was in fact enforcing those rules. *E.g.*, ECF 1 ¶¶ 6, 11, 39. Plaintiff's evident

16   disagreement is not a permissible basis for remanding the case. *Compare* Stay Opp. 9 (asserting

17   Polymarket US was not "performing a regulatory function with respect to third parties"), *with*

18   *Willingham v. Morgan*, 395 U.S. 402, 407, 409 (1969) (faulting lower court for crediting

19   plaintiff's assertion that defendants' actions "had no relevancy [to] their official duties").

20       Plaintiff cannot dispute that the causal-nexus question is a serious one, given the Supreme

21   Court's current consideration of that issue. *See* Stay Mot. 10–11. Plaintiff says that "this case

22   does not involve the . . . causal-nexus test." Stay Opp. 10. But that test is the core of this dispute.

23   Plaintiff has consistently *agreed*, as it must, that self-regulatory organizations like Polymarket

24   US "exercis[e] quasi-governmental powers." *Id.* at 9 (quoting *Sparta Surgical Corp. v. Nat'l*

25   *Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998)); *accord*, *e.g.*, Remand Mot.

26   (ECF 7) at 12–13; Remand Reply (ECF 20) at 3–4. That means remand is appropriate only if

27   there is no causal nexus between the exercise of those powers and this litigation. Stay Mot. 10–

28   11. The scope and viability of the causal-nexus test—the issue before the Supreme Court—is

1  therefore central to Plaintiff's remand efforts.

2      Finally, Defendants have also raised serious legal questions about federal-question

3  jurisdiction.  Nevada's licensing statute does not apply if "law" "otherwise provide[s]."  Nev.

4  Rev. Stat. § 465.086.  The U.S. Supreme Court has held that "law" includes both federal and

5  state law.  Stay Mot. 9.  The Nevada Supreme Court has said the same.  Remand Opp. 18–19.

6  Remarkably, Plaintiff continues to assert that "the Supreme Court already ha[s] held that when

7  a statute refers to 'law' generally, the statute is presumed to refer 'only . . . to the laws of the

8  government' that passed the statute."  Stay Opp. 12 (quoting *Houston v. Moore*, 18 U.S. (5

9  Wheat.) 1, 42 (1820) (Johnson, J., concurring in judgment)).  But the only opinion it cites is a

10  *concurring* opinion, not a majority opinion of the Supreme Court.  *See* Stay Mot. 10 (identifying

11  this problem).  And even if Plaintiff's presumption were correct, the relevant Nevada statute

12  *expressly* refers to "federal" law.  Nev. Rev. Stat. § 465.086.  Again, the Court need not agree

13  with Defendants to recognize that the lopsided authority on this issue establishes a serious legal

14  question.[2]

15     ***Irreparable Injury.***  Because "removal rights under section 1442" are especially

16  "important to the federal government," *Durham*, 445 F.3d at 1253, Congress has expressed a

17  preference for "allow[ing] appellate review *before* a district court . . . remand[s] a case to state

18  court."  *BP P.L.C.*, 141 S. Ct. at 1536 (emphasis added).  *Contra* Stay Opp. 13 (asserting that

19  denial of a stay "of a remand order should be the norm").  "[D]epriv[ing]" defendants "of access

20  to a federal court" while the appeal proceeds, *Acad. of Country Music v. Cont'l Cas. Co.*, 991

21  F.3d 1059, 1070 (9th Cir. 2021), risks "defeat[ing] the very purpose of permitting an appeal" in

22  the first place, *Forty Six Hundred LLC*, 15 F.4th at 79; *see also* Stay Mot. 11–12 (collecting

23  cases).  And dual-track litigation would "impose an unfair burden on" Defendants.  *Bank of Am.,*

24  *N.A. v. El Paso Nat. Gas Co.*, 2017 WL 9478457, at *2 (W.D. Okla. Jan. 12, 2017); *see* Stay

---

[2] Given that "[t]he Court declined to reach" Plaintiff's argument that Nevada's incorporation of federal law was an "affirmative defense," Stay Opp. 11–12, Defendants were not required to address this point in their stay motion, *contra id.* at 12; *see California v. CaremarkPCS Health LLC*, 2024 WL 3770326, at *1 (9th Cir. Aug. 13, 2024) (addressing only those "findings" the district court's remand order "rested" on); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) (similar).

1    Mot. 12 (collecting cases).

2         Plaintiff's responses fail to grapple with these arguments.  *First*, because the federal

3    officer removal statute "aims to guarantee a federal forum for adjudication of federal . . .

4    defenses," *Express Scripts*, 139 F.4th at 771 n.7 (emphasis omitted), it is no answer to say that

5    Defendants "can raise any potential defense" in state court, Stay Opp. 13.

6         *Second*, because Plaintiff admits it will push in state court for "preliminary injuncti[ve]"

7    relief and for the state court to reach "the merits of [its] action," Stay Opp. 13–14, it makes no

8    difference that state and federal court both have "comprehensive discovery mechanisms," *id.*

9    (quoting *Express Scripts*, 139 F.4th at 770); *see Express Scripts*, 139 F.4th at 771 n.7 (federal

10   officer statute protects against "merits" determinations in state court); *DeFiore v. SOC LLC*, 85

11   F.4th 546, 555 (9th Cir. 2023) (federal officer statute protects against state "interference with . . .

12   'operations,'" including through pre-trial conduct such as "arres[t]").

13        *Third*, because the unfair burden arises from having to litigate in two forums at once, it

14   is nonresponsive to note that "[m]ere litigation expense" caused by proceeding in a *single* forum

15   "does not constitute irreparable injury."  Stay Opp. 13; *see Golden Gate Rest. Ass'n v. City of*

16   *San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008) (considering "otherwise avoidable financial

17   costs" to be relevant to stay analysis).

18        Plaintiff's reliance on *Express Scripts* is misplaced.  The defendants in that case "did not

19   . . . attempt to counter Plaintiffs' arguments based on *Nken*," so the Ninth Circuit did not address

20   any *Nken*-based arguments.  *Express Scripts*, 139 F.4th at 773.  While explaining its refusal to

21   extend automatic stays in arbitration cases to remand orders, the court of appeals wrote that

22   "[h]aving to continue litigation in state court for a brief period pending appeal does not cause

23   defendants to 'irretrievably lose' any benefits of the type lost when being wrongfully forced to

24   arbitrate." *Id.* (alteration adopted) (quoting *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 743 (2023)).

25   Plaintiff therefore misstates the court's holding when it claims the Ninth Circuit held that remand

26   pending appeal "does not 'cause defendants to irretrievably lose' anything."  Stay Opp. 14.  Nor

27   did (or could) the court of appeals "suggest[] that" a "court should err on the side of *denying* [a]

28   stay" in remand cases.  *Id.* at 6.  Under *Nken*, a court must make an "individualized judgment[]"

7

1    about irreparable harm "in each case," *Nken v. Holder*, 556 U.S. 418, 433 (2009), "without the

2    aid of presumptions or a 'thumb on the scale' in favor of" a particular party, *Perfect 10, Inc. v.*

3    *Google, Inc.*, 653 F.3d 976, 980–81 (9th Cir. 2011).

4         The arguments Plaintiff plans to make about irreparable harm at the preliminary-

5    injunction stage are incorrect and irrelevant at this stage.  *See* Stay Opp. 13.  Because Plaintiff is

6    generally immune from suit, the monetary harm Plaintiff seeks to impose on Defendants *would*

7    likely be irreparable.  *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).  *Contra*

8    Stay Opp. 13.  But that is beside the point for present purposes—as are Plaintiff's derogatory

9    comments about Defendants' operations.  *See* Stay Opp. 13.  The issue currently before the Court

10   is the irreparable harm of a *remand*, not of compliance with Plaintiff's preempted laws.

11        Finally, and for the same reason, Plaintiff's invocation of "the status quo" misses the

12   mark.  Stay Opp. 14.  For purposes of a stay motion, "the status quo" is "the state of affairs before

13   the [appealed] order was entered."  *Nken*, 556 U.S. at 429.  Here, that status quo is litigation in

14   federal rather than state court.  Plaintiff confuses this stay-stage test with the one used "for

15   preliminary injunction purposes."  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98

16   F.4th 1180, 1191 (9th Cir. 2024); *see* Stay Opp. 14 (quoting this portion of *Flathead*).  As *Nken*

17   itself explained in response to the dissenting justices, it is error to conflate the two.  556 U.S. at

18   429–30.

19        ***Public Interest and Balance of Equities.***  The public interest is "best served by . . .

20   concentrating resources on litigating Plaintiff's claims in the proper forum after the [Ninth]

21   Circuit determines the jurisdictional issues presented in this case."  *Delaware ex rel. Jennings v.*

22   *BP Am. Inc.*, 2022 WL 605822, at *3 (D. Del. Feb. 8, 2022) (collecting cases); *see* Stay Mot.

23   12–13.  Plaintiff has no response.  Elsewhere, though, it concedes the importance of "judicial

24   economy."  Stay Opp. 7 (quoting *Express Scripts*, 139 F.4th at 772).

25        Plaintiff focuses on Nevada's public-policy preferences against delay in returning to state

26   court.  *See* Stay Opp. 15–18.  But those preferences face two insuperable hurdles: Congress and

27   the U.S. Supreme Court.  When it comes to appeals involving federal officer removal, "Congress

28   has expressed a heightened concern for accuracy, authorized appellate review, and accepted the

1   delay it can entail." *BP P.L.C.*, 141 S. Ct at 1542. And, the Supreme Court has held, "even the

2   most formidable policy arguments cannot overcome [this] clear statutory directive." *Id.* (internal

3   quotation marks omitted); *see Blumberger v. Tilley*, 115 F.4th 1113, 1126 (9th Cir. 2024) (same).

4          Moreover, Plaintiff's policy discussion is an impermissible merits argument, premised

5   on the untested (and incorrect) view that Plaintiff may validly enforce its gambling laws against

6   Polymarket US. But a defendant "need not win his case before he can have it removed."

7   *Willingham*, 395 U.S. at 407. And, as this Court has recognized, the merits of this case are not

8   currently before the Court. *See* Transcript of Oral Argument (ECF 49) 32:3–4 ("the only issue

9   before me is whether the case should be . . . remand[ed]").

10         Plaintiff cannot shore up its policy arguments by pointing to the state court's *ex parte*

11  temporary restraining order. *See* Stay Opp. 15–16. The state court's one-sided findings of harm

12  are not controlling. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (it is

13  "inappropriate" to treat even a fully briefed preliminary injunction as "binding . . . on the merits"

14  at later stages of the case). It does a disservice to the state court judge to suggest that an *ex parte*

15  order issued quickly after one-sided briefing—and despite a preliminary response requesting an

16  opportunity to be heard—represents his "consider[ed]" views about the case. Stay Opp. 17; *see*

17  Remand Opp. 7; *Camenisch*, 451 U.S. at 395 (recognizing that these kinds of orders must be

18  made with "haste," on "evidence that is less [than] complete"). And, in any event, the state court

19  judge did not have the benefit of the CFTC's later-filed amicus brief. There, the federal agency

20  with exclusive jurisdiction and responsibility for overseeing trading on designated contract

21  markets emphasized that Plaintiff is wrong on the law and that Plaintiff's continued litigation

22  efforts "have destabilizing economic effects." ECF 19-1, at 28.

23         At any rate, Plaintiff does nothing to rehabilitate the credibility of its asserted irreparable

24  harm. Since April 2025, Plaintiff has asserted that it suffers irreparable harm every day it cannot

25  enforce its gambling laws against CFTC-regulated contract markets. Remand Opp. 7. But when

26  another judge of this Court enjoined enforcement of those laws against another contract market

27  and denied Plaintiff's own request for injunctive relief, Plaintiff did not appeal. *Id.* Plaintiff

28  waited six months before attempting to dissolve the injunction against it. *Id.* Then Plaintiff

1   waited another three months before bringing an enforcement action against that other contract

2   market, again arguing that it faced the threat of irreparable harm every day it could not enforce

3   its laws.  Stay Mot. 13.  This "confounding" conduct is "contrary to the[] position that a quick

4   disposition of this matter is needed." *Paher v. Cegavske*, 2020 WL 2748301, at *1 (D. Nev. May

5   27, 2020) (Du, C.J.).

6        Plaintiff's defense of that conduct is just as confounding.  Defendants anticipated that

7   Plaintiff would unconvincingly describe its delays as nothing more than "consistent[] and

8   equitabl[e]" "compli[ance] with [Plaintiff's] statutory mandate."  Stay Mot. 13 (quoting Remand

9   Reply 6 n.2).  Defendants also explained that Plaintiff's go-to precedent, *Arc of California v.

10  Douglas*, 757 F.3d 975 (9th Cir. 2014), is inapposite because *Arc of California* treats a delay in

11  seeking "judicial protection" as excusable only where "the magnitude of the potential harm

12  becomes apparent gradually," 757 F.3d at 990–91—the opposite of what Plaintiff has been

13  claiming for nearly a year.  Stay Mot. 13.  Instead of responding to those arguments, Plaintiff

14  simply makes the same points Defendants already rebutted in the same exact words:  That it "has

15  actively complied with its statutory mandate to consistently and equitably enforce Nevada's

16  gaming laws."  Stay Opp. 17.  And that, according to *Arc of California*, "a delay in seeking

17  'judicial protection' rarely if ever negates a showing of irreparable injury."  *Id.* (quoting *Arc of

18  California*, 757 F.3d at 990–91).  The problem with Plaintiff's argument is not merely that

19  Plaintiff's delay "*negates* a showing of irreparable injury"; it is that a year of crying wolf about

20  daily harm tells the Court everything it needs to know about the weight to afford that "showing"

21  in the first place.  *Id.* (emphasis added); *see Paher*, 2020 WL 2748301, at *1.

**CONCLUSION**

23       The Court should stay execution of the remand order pending appeal.

10

1    DATED: March 9, 2026.

2                                         HUTCHISON & STEFFEN, PLLC

3                                         /s/ Joseph C. Reynolds

4                                         _____

5                                         Mark A. Hutchison (Nev. Bar No. 4639)
                                          Joseph C. Reynolds (Nev. Bar No. 8630)
6                                         100 West Liberty Street, Suite 765
                                          Reno, Nevada 89501
7                                         mhutchison@hutchlegal.com
                                          jreynolds@hutchlegal.com
8                                         (775) 853-8746

9                                         Adam P. Laxalt (Nev. Bar No. 12426)
10                                        COOPER & KIRK, PLLC
                                          1523 New Hampshire Avenue NW
11                                        Washington, D.C. 20036
                                          alaxalt@cooperkirk.com
12                                        (202) 220-9600

13                                        Orin Snyder (*pro hac vice*)
14                                        Matt Benjamin (*pro hac vice*)
                                          GIBSON, DUNN & CRUTCHER LLP
15                                        200 Park Avenue
                                          New York, New York 10166
16                                        OSnyder@gibsondunn.com
                                          MBenjamin@gibsondunn.com
17                                        (212) 351-4000
18

19                                        Thomas H. Dupree Jr. (*pro hac vice*)
                                          Jacob T. Spencer (*pro hac vice*)
20                                        Adam I. Steene (*pro hac vice*)
                                          GIBSON, DUNN & CRUTCHER LLP
21                                        1700 M Street NW
                                          Washington, D.C. 20036
22                                        TDupree@gibsondunn.com
                                          JSpencer@gibsondunn.com
23                                        ASteene@gibsondunn.com
                                          (202) 955-8500
24

25
                                          *Counsel for Defendants BLOCKRATIZE INC.*
26                                        *d/b/a Polymarket; QCX LLC d/b/a Polymarket*
                                          *US; and ADVENTURE ONE QSS INC. d/b/a*
27                                        *Polymarket*
28

                                          11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<div align="center">CERTIFICATE OF SERVICE</div>

I hereby certify that I caused a copy of DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL to be electronically filed and served on all counsel of record using the Court's CM/ECF system.

DATED: March 9, 2026.

By: */s/ Madelyn Carnate-Peralta*
An Employee of Hutchison & Steffen, PLLC

<div align="center">12</div>

**Plaintiff's Opposition to Defendants' Motion for Stay Pending Appeal**
**Dist. Ct. Doc. 50 (filed March 6, 2026)**

AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General - Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3416 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
jmichela@ag.nv.gov

*Attorneys for Plaintiff State of Nevada ex rel.
Nevada Gaming Control Board*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BORAD,<br><br>Plaintiff,<br><br>vs.<br><br>BLOCKRATIZE, INC. d/b/a/ POLYMARKET; QCX LLC, d/b/a POLYMARKET US; ADVENTURE ONE QSS INC. d/b/a/ POLYMARKET,<br><br>Defendants. | Case No. 3:26-cv-00089-MMD-CLB |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL (ECF NO. 46)**

Plaintiff State of Nevada ex rel. Nevada Gaming Control Board (Board) files this response to the Motion for Stay Pending Appeal filed by Defendants Blockratize Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, and Adventure One QSS Inc. d/b/a Polymarket (collectively, Polymarket), ECF No. 46 (Mot.). Polymarket's merits arguments are weak, and the balance of harms strongly favors the Board. Indeed, as the state court found, every day that Polymarket is allowed to operate in the State imposes

severe and irreparable harms on the State, its gaming industry, and the public. The Court therefore should deny the Motion, which represents just another unfounded attempt by Polymarket to delay enforcement proceedings against its unlicensed gambling operations in Nevada.

## INTRODUCTION

This case involves a civil enforcement action under Nevada state law brought by the Board to enjoin Polymarket's unlawful gambling operations in Nevada. The Board brought this case in state court as state law requires and, after Polymarket removed this case to federal court, this Court concluded that Polymarket had no valid basis for removal. Polymarket now seeks to stay the Court's remand order, preventing the state court from taking further action in a case in which that court has already concluded that a temporary restraining order (TRO) is necessary to prevent Polymarket from causing irreparable harm to the State, its gaming industry, and the public. The Court should deny that request.

Polymarket first argues that the remand order should be automatically stayed for 30 days under Federal Rule of Civil Procedure 62(a). But that provision expressly grants the Court discretion not to enter a stay, and the Ninth Circuit has recently held that courts should not automatically stay remand orders pending appeal, but instead should evaluate requests for stays under the four-factor test set out in *Nken v. Holder*, 566 U.S. 418 (2009). *California ex rel. Harrison v. Express Scripts, Inc.*, 139 F.4th 763, 768 (9th Cir. 2025), *cert. denied*, 2026 WL 79931 (U.S. Jan. 12, 2026). Polymarket does not even mention that on-point, binding precedent.

Applying the *Nken* factors here, no stay is warranted. As this Court already has found, Polymarket is not likely to succeed on the merits. The Court correctly rejected Polymarket's arguments that it is acting under a federal officer and that its preemption defense supports federal-question jurisdiction. Those arguments are insubstantial and do not raise any serious legal questions; indeed, both arguments are foreclosed by binding Ninth Circuit law.

Further, the balance of equities strongly favors the Board. Polymarket just wants to keep making money from its unlicensed gambling. All of its harms are self-inflicted and therefore are not irreparable as a matter of law. Polymarket's claim that having to litigate in state court will cause it irreparable harm is foreclosed by the Ninth Circuit's decision in *Express Scripts*, which rejected the argument that litigating in state court, by itself, causes irreparable harm. Being subject to a state enforcement action is

not an irreparable injury, because Polymarket can raise any defense (and indeed, it has raised its preemption defense in state court).

On the other hand, if the TRO were permitted to expire, then every day that Polymarket were permitted to offer unlicensed gambling would cause severe and irreparable injury to the State, its gaming industry, and the public. The state court expressly made that finding in granting the TRO, and Chief Judge Gordon came to the same conclusion with respect to the operations of Polymarket's competitor Kalshi.

Nevada has a sovereign interest in enforcing its gaming laws. If Polymarket were to resume its unlicensed operations pending appeal, that would severely disrupt Nevada's regulated gaming industry by giving it an unfair advantage over licensed competitors. It would harm Nevada's economy and public fisc by depriving the State of critical tax revenues. And it would harm the public, because Polymarket does not comply with Nevada's consumer-protection requirements, and its platform is open to match fixing, insider betting, and abuse. Given these documented harms that the Board and others would face, the balance of the hardships and the public interest weigh decisively against Polymarket's request for a stay.

## BACKGROUND

The Board brought this state-law civil enforcement action against Polymarket, a private company, for offering unlicensed sports betting in violation of Nevada's gaming laws. The state court issued a TRO, determining that Polymarket likely offers unlicensed gambling in violation of state law and that Polymarket's actions cause immediate and irreparable harm to the Board, Nevada's gaming industry, and the public each day that they continue. ECF No. 2-4, at 67–68. The state court found that Polymarket is not likely to succeed on the merits, because it is offering unlicensed gaming in violation of Nevada law, and its defense (that federal law preempts Nevada gaming law) fails. *Id.* at 65–67. In particular, the state court found the "reasoning" of Chief Judge Gordon's decision on the federal preemption question "persuasive." *Id.* at 66. The court also found that every day that Polymarket' s unlicensed operations continue, they irreparably harm the State, its gaming industry, and the public. *Id.* at 67–68. These harms "cannot be mitigated" once incurred. *Id.* at 67. "A day means more consumers. More consumers mean more transactions. More transactions means more potential harm." *Id.* "[E]very day matters in this case

in a literal sense." *Id.* The court entered a TRO that lasted 14 days, until February 12, 2026. *Id.* at 46, 69. The parties have since agreed to extend the TRO to April 6, 2026. ECF No. 47, ¶ 10.

In the state court, Polymarket agreed to an expedited briefing schedule on the Board's preliminary-injunction motion. But the day its brief was due on the preliminary injunction motion, Polymarket removed the case to this Court—thereby preventing the state court from deciding the preliminary-injunction motion. *See* ECF No. 1. Polymarket asserts that this state-law case can only be heard in federal court—supposedly because Polymarket (a private company) can avail itself of the federal officer removal statute and because Polymarket's federal defense makes the case "arise under" federal law. *See* ECF No. 2-1, ¶¶ 24–60.

On March 2, 2026, this Court rejected both of Polymarket's asserted grounds for removal and ordered this case remanded to the state court. With respect to federal officer removal, the Court explained that the relevant question is whether Polymarket is "acting under" a federal officer, 28 U.S.C. § 1442(a)(1), when it was offering its sports and other event contracts on its market. *See* ECF No. 41, at 3. The Court concluded that Polymarket was not acting under any federal officer. *Id.* at 3–6. Polymarket had argued that it exercised delegated authority from the Commodity Futures Trading Commission (CFTC) when it self-certified that its contracts complied with the Commodity Exchange Act (CEA). *Id.* The Court rejected that argument, explaining that Polymarket's conduct simply represented the "simple compliance with the law" and does not give rise to federal officer removal. *Id.* at 5–6 (quoting *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981 (9th Cir. 2019)).

With respect to federal question jurisdiction, the Court rejected Polymarket's argument that the Board's complaint necessarily raised a substantial federal issue. ECF No. 41, at 6–9. The Court recognized that Polymarket's claimed federal issue—whether the CEA preempts Nevada gaming law—is a federal defense, and federal defenses do not create federal-question jurisdiction. *Id.* at 9. The Court explained that a court does not need to interpret federal law to determine whether Polymarket's conduct violates Nevada's gaming laws because those laws do not incorporate federal law, and the Board's claims focus on Polymarket's failure to obtain a Nevada license and comply with Nevada-specific requirements, not any failure on Polymarket's part to obtain a federal license. *Id.* at 8.

/ / /

The Court forwarded its remand order to the state court on March 2, 2026. *See* ECF No. 41 (docket entry). The next day, Polymarket filed its motion for a stay pending appeal. *See* ECF No. 46. On March 4, the Court recalled its remand order. *See* ECF No. 48.

## LEGAL STANDARD

The Ninth Circuit recently addressed the standard for a stay of a remand order pending appeal in *Express Scripts*. The Court held that a case should not automatically be stayed pending an appeal of a district court's order remanding the case to state court; rather, the court should evaluate whether a stay is warranted using the factors set out in *Nken v. Holder*, 566 U.S. 418 (2009). 139 F.4th at 770.

Thus, in determining whether to grant a stay of a remand order pending appeal, a court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Express Scripts*, 139 F.4th at 768 (quoting *Nken*, 556 U.S. at 434). "Where the government is the opposing party, the balancing of the harm and the public interest merge." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025).

Here, this Court has already determined that Polymarket is not likely to succeed on the merits. The Ninth Circuit has indicated that a stay pending appeal nonetheless may be appropriate if a movant shows that it has raised "serious legal questions" and that the balance of hardships "tips sharply" in its favor. *Leiva-Perez v. Holder*, 640 F.3d 962, 968, 970 (9th Cir. 2011) (internal question marks omitted); *see Express Scripts*, 139 F.4th at 772 n.8.[1]

## ARGUMENT

### I.    This Court Should Not Enter a Stay Under Rule 62(a)

Polymarket first argues (Mot. 5–6) that this Court should enter an automatic stay of the remand order under Federal Rule of Civil Procedure 62(a). That rule provides that (with exceptions not relevant here) "execution on a judgment and proceedings to enforce it are stayed for 30 days after its entry, *unless*

---

[1]    This approach appears inconsistent with *Nken* and *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), both of which require showing a likelihood of success on the merits, not merely a serious question. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 & n.12 (9th Cir. 2024).

*the court orders otherwise*." Fed. R. Civ. P. 62(a) (emphasis added). As an initial matter, Rule 62(a) is inapt, both because Kalshi seeks a stay for the duration of the appeal and not just for 30 days, and because it is not clear that Rule 62(a) even applies to remand orders. *See Arnold v. Garlock, Inc.*, 278 F.3d 426, 437 (5th Cir. 2001) (limiting Rule 62(a) to only "judgments for money"). But assuming Rule 62(a) has some relevance here, it does not set out an invariable rule—the court can "order otherwise" and not enter a stay. And in the exact context here, the Ninth Circuit has rejected the view that an automatic stay applies to remand orders and instead has held that a request for a stay should be evaluated under the *Nken* factors. *See Express Scripts*, 139 F.4th at 768.

Specifically, in *Express Scripts*, the Ninth Circuit considered whether a district court should automatically stay a remand order. 139 F.4th at 767–68. The defendants in that case had removed the case to federal court on grounds of federal officer removal. *Id.* at 766. When the federal court remanded the case, the defendants appealed the remand order and argued that the remand order should be stayed pending appeal. *Id.* at 766–67. In particular, the defendants argued that an automatic stay was warranted under *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), where the Supreme Court held that when a party exercises its statutory right to appeal the denial of a motion to compel arbitration under the Federal Arbitration Act, the district court should automatically stay all proceedings during the appeal. *Id.* at 741.

In *Express Scripts,* the Ninth Circuit rejected the defendants' arguments for an automatic stay of a remand order. The Court held that the district court should *not* automatically stay the remand order but instead should decide whether a stay is warranted using the four-factor test set out in *Nken*. *Express Scripts*, 139 F.4th at 771–72. The Court explained that removal implicates important federalism principles that are "not at issue where parties seek to compel arbitration." *Id.* at 768. When cases are improperly removed, that "deprive[s] [the] state courts of jurisdiction over cases that should rightfully be heard in their fora, in violation of comity principles." *Id.* at 769. Requiring district courts to then automatically stay all litigation pending appeal would only exacerbate this "federal infringement on state courts' rights." *Id.*

The better course, the Court explained, is for the district court to evaluate whether to stay the remand order in each case under *Nken. Express Scripts*, 139 F.4th at 769. The Court further suggested that, if anything, the district court should err on the side of *denying* the stay, because state courts also are

empowered to enter stays. *Id.* (noting that "a state court could decide to stay a remanded case if, in its opinion, it thinks the defendants who removed based on the federal officer removal statute do have a strong likelihood of success on appeal"). Thus, the Court concluded that "an automatic stay pending appeal of a federal officer removal remand order would run afoul of the delicate balance of federalism." *Id.*

The Court further explained that an automatic stay is not required to vindicate a defendant's rights under the federal officer removal statute. The federal officer removal statute gives a defendant only a right to "have its federal immunity defenses adjudicated and, if necessary, a trial held in federal court," not a right to avoid litigation altogether. *Express Scripts*, 139 F.4th at 771–72 & n.7. This right can be vindicated without a stay because if the court of appeals determines that removal was warranted, the district court can recall the remand order and resume adjudicating the case post-appeal. *Id.* at 771.

Finally, the Court noted, requiring an automatic stay would "encourage gamesmanship by defendants that would frustrate principles of judicial economy." *Express Scripts*, 139 F.4th at 771–72. If an automatic stay applied, "[a]ny defendant seeking to delay . . . could craft an argument for federal officer removal then appeal a district court's remand order." *Id.* at 772. Thus, an automatic stay rule would encourage defendants to file meritless removal motions and then appeal just to delay adjudication on the merits. *Id.* For all these reasons, the Court held that a district court should not automatically stay litigation pending the appeal of a remand order, but instead should evaluate a request for a stay pending appeal under the *Nken* factors. *Id.*

Although Polymarket relies on Rule 62(a) instead of *Coinbase*, *Express Scripts*' reasoning applies equally here. Rule 62(a) expressly gives the Court discretion not to enter a stay, by providing that the Court should enter a stay unless the Court "orders otherwise." Fed. R. Civ. P. 62(a); *see Maranino v. Cabrini of Westchester*, 2022 WL 17995107, at *1 (S.D.N.Y. Dec. 29, 2022). *Express Scripts* makes clear that an automatic stay is *not* warranted in the context of an appeal of a remand order, given the important federalism principles involved, the lack of any harm from a remand, and the potential for gamesmanship from entering an automatic stay. 139 F.4th at 768–72.

Notably, Polymarket does not even cite *Express Scripts*. Instead, it cites (Mot. 6) decisions where district courts entered automatic stays under Rule 62(a) upon entering remand orders. But all of these

decisions predate *Express Scripts*, and none acknowledges (much less addresses) the significant federalism interests implicated. The cited in-circuit decisions are no longer good law after *Express Scripts*, and the cited out-of-circuit decisions have no persuasive force because they do not address the reasoning in *Express Scripts*. The Court accordingly should not enter an automatic stay under Rule 62(a), but instead should evaluate whether a stay is warranted under *Nken. See* 139 F.4th at 769.

## II. The *Nken* Factors Do Not Warrant a Stay Pending Appeal

This Court correctly concluded that this case should be remanded to state court. Polymarket has not identified any error in the Court's decision or otherwise shown that it has any likelihood of success on the merits of its appeal, and the balance of hardships and public interest weigh heavily against allowing it to continue its unlicensed gambling operations in Nevada pending its appeal of the remand order in this case.

### A. Polymarket has not made a strong showing of success on the merits or raised serious questions

This Court thoroughly considered, and rejected, all of Polymarket's asserted grounds for removal. *See* ECF No. 41. Polymarket thus is not likely to succeed on appeal. Notably, the most Polymarket argues is that it has raised "serious legal questions" on the merits. Mot. 6.

A "serious question[]" is one that is "substantial, difficult, and doubtful," and which "make[s] [for] a fair ground for litigation." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (internal quotation marks omitted). There must be a "fair chance of success on the merits." *Id.* (internal quotation marks omitted). A merely "plausible" or novel argument is insufficient. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022). Polymarket has not identified any serious legal questions here. Indeed, both of Polymarket's arguments are foreclosed by binding precedent.

#### 1. Federal officer removal jurisdiction

First, Polymarket argues that it has raised a serious legal question with respect to federal officer removal jurisdiction. It has not. Polymarket's federal-officer theory is based on the fact that it operates a designated contract market (DCM) registered with the Commodity Futures Trading Commission (CFTC). Mot. 7–8. Polymarket asserts that because it is regulated by a federal agency, and the federal

agency allows it to self-certify its event contracts, Polymarket actually is acting on behalf of the federal agency when it conducts its own business operations. *Id.*

This Court correctly rejected that argument. All of Polymarket's claimed activities relevant to the Board's enforcement action are simply complying with the law, and both the Supreme Court and the Ninth Circuit have held that complying with a federal regulatory scheme, even a highly detailed one, does not bring a private party within the scope of the federal officer removal statute. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 145–53 (2007); *Riggs*, 939 F.3d at 985.

As the Court recognized, the Board's claims focus on Polymarket's actions self-certifying its own contracts and regulating access to these contracts. ECF No. 41, at 4. The Ninth Circuit has held that the "delegation of authority 'to self-certify compliance with the relevant regulations' " is insufficient to show that the person is acting under the direction of a federal officer. *Riggs*, 939 F.3d at 988 (internal quotation marks omitted). And the Court correctly held that Polymarket's permitting access to its markets similarly does not establish acting under jurisdiction, because this again is just Polymarket's own compliance with the law. ECF No. 41, at 5–6. The Board is not suing Polymarket for its regulation of third parties, for enforcing (or not enforcing) its rules, or for its rules' compliance with the CEA. The Board is suing Polymarket because Polymarket's own contracts violate Nevada law.

Polymarket suggests (Mot. 8) that this removal question turns on a "factual dispute," but it identifies no such dispute. It does not dispute that the contracts at issue on Polymarket's markets are its own contracts. It has identified no at-issue actions it has taken performing a regulatory function with respect to third parties. The only relevant conduct is Polymarket's own conduct. And the issue before the Court is a purely legal issue, where binding law forecloses Polymarket's arguments. Indeed, the Ninth Circuit has specifically held that the "delegation of authority 'to self-certify compliance with the relevant regulations'" is insufficient to show that someone is acting under the direction of a federal officer. *Riggs*, 939 F.3d at 988 (quoting *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1100 (9th Cir. 2018)). Polymarket repeats (Mot. 8) its argument that other self-regulatory organizations have been determined to be "exercising quasi-governmental powers" in other circumstances. *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016). But *Sparta Surgical* involved

governmental immunity, not federal officer removal, and the facts are completely distinguishable. There, the National Association of Securities Dealers (NASD), which operates the NASDAQ stock exchange and has the power to regulate trading on that exchange, delisted the plaintiff company's stock from the NASDAQ SmallCap market on the grounds that the listing violated the market's rules. *Sparta Surgical*, 159 F.3d at 1210–11. The plaintiff brought state and federal claims against NASD, and NASD claimed government immunity on the ground that it was "exercising quasi-governmental powers." *Id.* at 1213. The Ninth Circuit explained that NASD was entitled to governmental immunity on the plaintiff's non-federal claims because NASD was "acting in an adjudicatory, prosecutorial, arbitrative or regulatory capacity" with respect to the plaintiff's stock. *Id.* at 1214–15. The key point is that NASD was regulating third parties on behalf of the government. As the Court explained, NASD would not have been entitled to immunity if the case involved only NASD's "private business." *Id.* at 1214. Polymarket continues to have no response to this point, and it still has not identified any decision holding that a private entity can remove a state enforcement action to federal court simply because the private entity is federally regulated.

Finally, Polymarket argues (Mot. 10–11) that the federal officer removal argument raises a serious legal question because of a pending Supreme Court case, *Chevron USA, Inc. v. Plaquemines Parish*, No. 24-813 (U.S.). For federal officer removal to apply, a removing defendant must (1) demonstrate that it is a federal officer or person "acting under" a federal officer, (2) demonstrate that the plaintiff's claims are "for or relating to" an act under color of federal office, and (3) raise a colorable federal defense. *See Fidelitad*, 904 F.3d at 1099. *Chevron* addresses only (2)—and specifically, whether the removal statute requires showing a "causal nexus" to show that the suit is "for or relating to" an action taken by the defendant under color of federal office. But this case does not involve the second requirement or the causal-nexus test at all. As the Court recognized, the parties' dispute in this case centers on whether Polymarket is "acting under" a federal officer in the first place, ECF No. 41, at 3, not whether there is a nexus between its actions taken in that capacity and this suit. Polymarket identifies no basis to think the Supreme Court's decision would alter the analysis on appeal in any way, much less do so in a way that would suggest a stay pending appeal is warranted.

/ / /

/ / /

Thus, the key facts are undisputed, and Polymarket's federal officer removal arguments fail under binding Ninth Circuit precedent. It therefore has not presented any "serious questions" for appeal on this asserted ground of removal.

### a.    Federal-question jurisdiction

Second, Polymarket argues (Mot. 9) that it has raised a serious legal question with respect to federal question jurisdiction. That is incorrect. The Board filed this action in Nevada state court, seeking to enforce state gaming law and asserting only state-law causes of action. ECF No. 2-4, ¶¶ 60–80. There is no federal claim on the face of the well-pleaded complaint. If Polymarket believes federal law supplies a defense to those claims, it is free to raise that defense in state court. It may not transform a state-law enforcement action into a federal case through removal.

Polymarket repeats its argument that NRS § 465.086 incorporates federal law by requiring entities offering gaming in Nevada to obtain a Nevada gaming license except as "otherwise provided by law." Mot. 4. This Court correctly concluded that this statutory language in a Nevada statute should be understood to refer to Nevada law. *See* ECF No. 41 at 8; *Houston v. Moore*, 18 U.S. (5. Wheat.) 1, 42 (1820). Polymarket argues (Mot. 10) that the Board "forfeited" this argument, but that is incorrect. The Board noted in its remand motion that the relevant Nevada statute "does not directly refer to any federal law, let alone the CEA." ECF No. 7, at 17. In any event, the argument implicates the Court's subject-matter jurisdiction, so it cannot be forfeited. Polymarket notes (Mot. 10) that in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court concluded that an argument was forfeited even though it "concerned jurisdiction." But that involved an argument raised by the plaintiff asserting that the court had jurisdiction. *See id.* As the D.C. Circuit has explained, forfeiture only works one way in this situation: "Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction." *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016).

Anyway, even if the Nevada statute were understood to incorporate federal law, that would at most provide a federal affirmative defense. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025). It is black-letter law that an affirmative defense cannot form the basis of federal-question jurisdiction, "even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987). The Court declined to reach this argument given its determination

that the statute does not implicate federal law at all, but it is another reason why Polymarket fails to show any serious legal question on appeal. Polymarket has no answer on this point.

In response to the Court's finding that the statute references only Nevada law, Polymarket cites (Mot. 9) *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157 (1982), for the proposition that the Supremacy Clause makes federal law a part of each State's law. But *Fidelity Federal* was not about how to read a state statute's reference to "law" language. On that point, the Supreme Court already had held that when a statute refers to "law" generally, the statute is presumed to refer "only . . . to the laws of the government" that passed the statute, *Houston*, 18 U.S. at 42—here, Nevada law. *Fidelity Federal* was about interpreting a regulation, and the question was whether the regulation's incorporation of state law precluded application of federal law; the Supreme Court said "no," because federal law always applies. That decision regarding the interpretation of a federal regulation has nothing to do with how a reference to "law" in a Nevada statute should be interpreted as a matter of Nevada law. Further, no one disputes that federal law applies to the States; that is why Polymarket may assert a preemption defense in state court. But that does not transform that preemption defense into a basis for removal or otherwise suggest that Nevada must prove the absence of a federal conflict to show a state-law violation. *See Caterpillar*, 482 U.S. at 393.

Polymarket continues (Mot. 9–10) to rely on *Georgia Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375 (M.D. Ga. Feb. 3, 2026), but as the Court recognized, the state law at issue in that case is nothing like the Nevada law at issue here, *see* ECF No. 41, at 8. The Georgia law in *Georgia Gambling* provided that "[g]ambling contracts" were "void," and authorized recovery of "[m]oney paid . . . upon a gambling consideration" in connection with such contracts, O.C.G.A. § 13-8-3(b), and the Georgia Supreme Court had stated that whether a gambling contract was void under this provision "depends on whether the contract is unlawful under the law governing its validity," *Georgia Gambling*, 2026 WL 279375, at *3 (citing *Talley v. Mathis*, 453 S.E.2d 704 (Ga. 1995)). As a result, to succeed on its state-law claim, the plaintiff had to prove that the challenged contracts were illegal under federal law. *See id.* at *2–3. Polymarket can identify no similar incorporation of federal law into the elements of the Board's state-law claims here.

/ / /

### b.    Polymarket would not be irreparably harmed without a stay

Polymarket argues (Mot. 11–14) that it would face irreparable harm without a stay pending appeal, whereas the Board would not be harmed. That has it exactly backwards: Polymarket has not shown any irreparable harm, whereas the Board would face substantial and irreparable harm if the Court were to grant a stay pending appeal.

Polymarket has no right to operate in violation of state law to try to make more profits. All other companies offering lawful sports betting comply with state law, either by becoming licensed or by geofencing their operations to avoid Nevada, and Polymarket can do that too. Polymarket just wants to make more money; all of its harms are self-inflicted and therefore are not irreparable. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020). Further, Polymarket cannot claim that a civil enforcement proceeding  would cause it irreparable harm, because it can raise any potential defense. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017).

Polymarket argues that it would suffer irreparable injury absent a stay because it "would be forced to engage in parallel litigation by simultaneously briefing jurisdictional issues in the Ninth Circuit and merits issues in the Nevada state court." Mot. 11; *see id.* at 12 (suggesting that parallel litigation would impose an "unfair burden"). But it is well established that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 735 n.20 (9th Cir. 2017) (internal quotation marks omitted). Notably, there is no risk of inconsistent decisions, because the state court and the Ninth Circuit would be addressing different issues—the state court would be considering the merits of the Board's state-law enforcement action, not the propriety of removal, whereas the reverse would be true of the Ninth Circuit.

Notably, *Express Scripts* makes clear that continuing litigation in state court during the pendency of an appeal of a remand order should be the norm, and does not impose any sort of harm. *See* 139 F.4th at 768–70. The Ninth Circuit explained that a stay of a remand order pending appeal is an "extraordinary remedy" and should be granted sparingly "when the case involves another sovereign" (here, the State of Nevada). *Id.* at 768. The Ninth Circuit further explained that although state and federal courts "may operate in slightly different ways," both provide "forums for litigation with roughly similar levels of efficiency, expense, and comprehensive discovery mechanisms." *Id.* at 770. Thus, having to continue

litigation in state court "for a brief period pending appeal" does not "cause defendants to irretrievably lose" anything. *Id.* (internal quotation marks and brackets omitted).

Polymarket cites (Mot. 11–12) *Academy of Country Music v. Continental Casualty Company*, 991 F.3d 1059 (9th Cir. 2021), where the Ninth Circuit held that, for a remand order that is reviewable under 28 U.S.C. § 1447, "the transmittal of the remand order to the state court did not deprive [the Ninth Circuit] of jurisdiction." *Id.* at 1070. Polymarket suggests that the decision shows that a stay is necessary for the appeal to be meaningful, but it reflects the opposite: The decision instead confirms that, even if a remand order is not stayed and the Court's remand order is transmitted to the state court, the Ninth Circuit still can perform appellate review. *Id.* And if the appeal is successful, the Court can issue an order recalling the remand and notifying the state court that the Court has resumed jurisdiction over the action. *See id.* That confirms that there is no harm from proceeding in state court.

Polymarket next argues (Mot. 12) that it faces a particular harm from proceeding in state court in this case because the Board has pursued "frequent and unwarranted . . . emergency, often-*ex parte* relief against Defendants." But it was Polymarket that chose to remove this case to federal court rather than file a response to the Board's preliminary injunction motion, which prevented the state court from holding a hearing on that motion. Polymarket cannot credibly try to lay the results of its litigation gamesmanship at the feet of the state court. Anyway, Polymarket's arguments about *ex parte* relief are meritless. *Ex parte* relief also is available in federal court. *See* Fed. R. Civ. P. 65(b). Further, Polymarket was able to file a preliminary response to the Board's application for a TRO in the state court, and that court took Polymarket's response into account before issuing the TRO. ECF No. 2-4 at 59, 63, 67. As for further proceedings, Polymarket is well aware of the Board's arguments and has had weeks to prepare its opposition to the Board's motion for preliminary injunction.

Finally, a stay is not required to preserve the status quo. As the Ninth Circuit has explained, the status quo is not the situation immediately before the filing of the lawsuit, but instead is "the last uncontested status which preceded the pending controversy." *Flathead*, 98 F.4th at 1191 (internal quotation marks omitted). Since the Founding, the regulation of gambling has been the prerogative of the States. *Flynt v. Bonta*, 131 F.4th 918, 932 (9th Cir. 2025); *see Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905). That includes sports betting, which Nevada has regulated for decades. *See Murphy v. NCAA*, 584

U.S. 453, 461-62 (2018). Thus, the status quo here is the Board enforcing Nevada's gaming laws against anyone who offers unlicensed gambling—including sports betting—within its borders.

The bottom line is that Polymarket just wants to be able to profit off of unlicensed gambling. The Board is statutorily charged with seeking to enjoin that illegal conduct, and "having to submit oneself to an enforcement proceeding typically does not constitute irreparable harm." *John Doe Co.*, 235 F. Supp. 3d at 203.

## 2.    The balance of hardships and public interest weigh heavily against a stay pending appeal

Polymarket asserts (Mot. 13) that staying the remand order "would not prejudice" the Board. While Polymarket currently is not operating in Nevada under the Court's TRO, that TRO is set to expire on April 6, 2026, and cannot be renewed indefinitely. *See O.L. v. City of El Monte*, 2020 WL 2477686, at *1 (C.D. Cal. Mar. 2, 2020). It likely will take months for the parties to brief and argue Polymarket's appeal in the Ninth Circuit, and then even more time for the Ninth Circuit to issue its decision. Polymarket's clear aim in seeking a stay pending appeal is to be able to resume its operations in Nevada while the appeal is pending.

But the state court has already determined that the Board suffers immediate and irreparable harm when Polymarket allows persons within Nevada to wager on sports and other events through event-based contracts in violation of Nevada law. ECF No. 2-4, at 67–68. As the court explained, "every day" matters "in a literal sense" in these cases: "A day means more consumers. More consumers mean more transactions. More transactions mean more potential harm." *Id.* at 68. Chief Judge Gordon has come to a similar conclusion with respect to Kalshi, concluding that every day Kalshi operates in violation of Nevada law imposes "substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest." *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *13 (D. Nev. Nov. 24, 2025), *appeal pending*, No. 25-7516 (9th Cir. filed Nov. 25, 2025).

Those conclusions are correct. A State "suffers a form of irreparable injury" "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025)). As the state court recognized, the Board has a statutory obligation to

"consistently and equitably" enforce Nevada gaming law to "protect the health, safety, morals, good order, and general welfare of gaming consumers." ECF No. 2-4, at 67. Preventing the Board from doing so poses an affront to Nevada's sovereignty and intrudes on the democratic will of the people.

Licensed gaming is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). In 2024, Nevada collected $2 billion in gaming taxes, which fund core public services. Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* 65 (2025), perma.cc/NRH9-5NGV. Unlicensed gaming threatens that revenue by evading taxes and diverting business from licensed sportsbooks that pay taxes. *See Sacco v. State*, 105 Nev. 844, 847 (1989).

Many provisions of Nevada gaming law protect the public. Only people who are at least 21 years old may gamble. NRS § 463.350(1)(a). Licensees must allow patrons to set betting limits, conspicuously display information about responsible-gaming resources, train employees to identify signs of problem gaming, and refrain from marketing to customers who have excluded themselves. Nev. Gaming Reg. 5.170. Polymarket does not follow any of those requirements.

Polymarket, as "[a]n unlicensed participant beyond the BOARD's control," obstructs the Board's ability to fulfill its statutory duties and protect the public. ECF No. 2-4, at 67. The resulting unlicensed and unregulated gambling means underage people can gamble, allows unsuitable persons to run gaming operations, and distorts the gaming industry. *Id*. These harms "cannot be mitigated" once incurred. *Id*.

Nevada has a sovereign interest in ensuring a fair and competitive gaming industry. NRS § 463.0129(1)(b)–(c); *see Sports Form, Inc. v. Leroy's Horse & Sports Place*, 108 Nev. 37, 41 (1992). If Polymarket were allowed to operate in Nevada, its failure to comply with Nevada gaming law would give it a massive and unfair competitive advantage over its competitors, which would greatly disrupt the gaming industry. That advantage would be both pecuniary, in that Polymarket would not need to spend the money its competitors need to spend on licensing fees, taxes, and compliance (including maintaining a physical location in Nevada), as well as strategic, in that Polymarket would be offering products that are not subject to the same requirements as its competitors. The Board would suffer irreparable harm if Polymarket were able to distort the playing field and disrupt the industry in this manner. *KalshiEX*, 2025 WL 3286282, at *13–14; *see Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509 (9th Cir. 1993).

The harm only would increase the longer Polymarket is allowed to operate unfettered. Polymarket's ability to profit from unlicensed gaming will incentivize others to enter into prediction markets instead of becoming (or remaining) licensed by the State. Indeed, that already has started to happen: DraftKings and FanDuel have decided to forgo licensing in Nevada so that they can enter the prediction-markets business in other States. *See KalshiEX*, 2025 WL 3286282, at *14. Other sportsbooks could follow suit, "unleashing even more unregulated gambling." *Id.*

Polymarket suggests (Mot. 13) that the Board is not suffering irreparable harm as a result of Polymarket's activities because the Board has purportedly delayed enforcing Nevada gaming laws against Kalshi, one of Polymarket's competitors. Polymarket is wrong. The Board has actively complied with its statutory mandate to consistently and equitably enforce Nevada's gaming laws and consistently has sought to resolve its litigation against unlicensed gaming operations. The Board filed this enforcement action in state court as soon as it became aware of Polymarket's operations in Nevada. The Board likewise has vigorously enforced state gaming law against Kalshi: When Kalshi "greatly expanded" its operations, the Board obtained dissolution of a preliminary injunction, *KalshiEX*, 2025 WL 3286282, at *13, and then filed an enforcement action against Kalshi in state court, *see State of Nevada ex rel. Nevada Gaming Control Board v. KalshiEX LLC*, No. 2600000501B (Nev. 1st JD filed Feb. 17, 2026). In any event, a delay in seeking "judicial protection" rarely if ever negates a showing of irreparable injury, especially "in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014)—which is the situation here.

Finally, Polymarket suggests (Mot. 14) that the *ex parte* nature of the Board's initial request for a temporary restraining order is a reason to disregard the state court's determination that the Board would suffer significant and irreparable harm if Polymarket is permitted to resume its operations. But the state court issued its order after considering Polymarket's preliminary response to the Board's renewed application for a TRO. ECF No. 2-4 at 59, 63, 67. And the state court's conclusion that the Board is irreparably harmed by Polymarket's conduct is entirely consistent with Chief Judge Gordon's conclusions regarding the effects of the unlicensed activity of Kalshi, made after a full opportunity for briefing. *KalshiEX*, 2025 WL 3286282, at *13.

\* \* \* \* \*

Every day that Polymarket operates in Nevada without complying with Nevada law would cause significant and irreparable harm to the State, its residents, its gaming industry, and its broader economy. There is no justification for allowing Polymarket to avoid an enforcement action in state court while it appeals the remand order.

## CONCLUSION

The Court should deny Polymarket's motion for a stay pending appeal.

DATED this 6th day of March, 2026.

AARON D. FORD
Attorney General

By: */s/ Jessica E. Whelan*
    Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General - Litigation
    Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
    John S. Michela (Bar No. 8189)
     Senior Deputy Attorney General
    State of Nevada
    Office of the Attorney General
    jwhelan@ag.nv.gov
    sclinton@ag.nv.gov
    jmichela@ag.nv.gov

    *Attorneys for State of Nevada ex rel. Nevada Gaming Control Board*

**Defendants' Motion for Stay Pending Appeal**
**Dist. Ct. Doc. 46 (filed March 3, 2026)**

1   Mark A. Hutchison (Nev. Bar No. 4639)              Orin Snyder
    Joseph C. Reynolds (Nev. Bar No. 8630)             (*pro hac vice*)
2   HUTCHISON & STEFFEN, PLLC                          Matthew Benjamin
3   100 West Liberty Street, Suite 765                 (*pro hac vice*)
    Reno, Nevada 89501                                 GIBSON, DUNN & CRUTCHER LLP
4   mhutchison@hutchlegal.com                          200 Park Avenue
    jreynolds@hutchlegal.com                           New York, New York 10166
5   (775) 853-8746                                     OSnyder@gibsondunn.com
6   (*designated local counsel*)                       MBenjamin@gibsondunn.com
                                                       (212) 351-4000
7
8   Adam P. Laxalt (Nev. Bar No. 12426)                Thomas H. Dupree Jr.
    COOPER & KIRK, PLLC                                 (*pro hac vice*)
9   1523 New Hampshire Avenue NW                       Jacob T. Spencer
    Washington, D.C. 20036                              (*pro hac vice*)
10  alaxalt@cooperkirk.com                              Adam I. Steene
11  (202) 220-9600                                      (*pro hac vice*)
                                                       GIBSON, DUNN & CRUTCHER LLP
12                                                     1700 M Street NW
                                                       Washington, D.C. 20036
13                                                     TDupree@gibsondunn.com
14                                                     JSpencer@gibsondunn.com
                                                       ASteene@gibsondunn.com
15                                                     (202) 955-8500
16  Counsel for Defendants BLOCKRATIZE INC.
    d/b/a Polymarket; QCX LLC d/b/a Polymarket US;
17  and ADVENTURE ONE QSS INC. d/b/a Polymarket

18              UNITED STATES DISTRICT COURT

19                  DISTRICT OF NEVADA

20
    STATE OF NEVADA ex rel. NEVADA          Case No.: 3:26-cv-00089-MMD-CLB
21  GAMING CONTROL BOARD,
                                            [Nev. Dist. Ct. No. 26OC000121B]
22          Plaintiffs,
                                            DEFENDANTS' MOTION FOR
23  v.                                      STAY PENDING APPEAL

24  BLOCKRATIZE INC. d/b/a Polymarket; QCX
25  LLC d/b/a Polymarket US; ADVENTURE
    ONE QSS INC. d/b/a Polymarket,
26
            Defendants.
27

28

1

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES.........................................................1

INTRODUCTION..........................................................................................................1

BACKGROUND............................................................................................................2

LEGAL STANDARD .....................................................................................................4

ARGUMENT ................................................................................................................5

     I.     The Court Should Enter A Rule 62(a) Automatic Stay....................................5

     II.    The *Nken* Factors Warrant A Stay Pending Appeal. ......................................6

CONCLUSION ...........................................................................................................15

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

1    Defendants Blockratize Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, and

2   Adventure One QSS Inc. d/b/a Polymarket submit this motion to stay the execution of the Court's

3   remand order pending Defendants' appeal to the Ninth Circuit.[1]

4                      **MEMORANDUM OF POINTS AND AUTHORITIES**

5                                      **INTRODUCTION**

6         Yesterday, the Court ordered that this case be remanded to state court, concluding that it

7   lacks federal-officer and federal-question jurisdiction.  *See* 28 U.S.C. §§ 1331, 1442(a); ECF 41

8   ("Remand Order").  Defendants have a statutory right to appeal that order:  Unlike a typical

9   remand order, "an order remanding a case" that "was removed pursuant to section 1442" is

10  "reviewable by appeal."   28 U.S.C. § 1447(d).   The Supreme Court has confirmed that

11  section 1447(d) authorizes the Court of Appeals to review "*all* of the defendants' grounds for

12  removal," even those that are not based on § 1442.  *BP P.L.C. v. Mayor & City Council of*

13  *Baltimore*, 141 S. Ct. 1532, 1538 (2021) (emphasis added).  Defendants have exercised that right:

14  Defendants filed a notice of appeal earlier today, *see* ECF 45, and intend to ask the Ninth Circuit

15  to decide whether this case is removable under either the federal officer removal statute or federal

16  question jurisdiction.[2]

17        The Court retains "jurisdiction to review th[e remand] order," *Acad. of Country Music v.*

18  *Cont'l Cas. Co.*, 991 F.3d 1059, 1065 (9th Cir. 2021), and it should stay the order pending appeal.

19        *First*, the Court should apply the automatic stay under Federal Rule of Civil Procedure

20  62(a) to the remand order.  *See* Fed. R. Civ. P. 62(a).

21

22  [1] This motion is not—and should not be construed as—a general appearance or appearance on
    the merits by Defendants.  By filing this motion, Defendants do not waive any defenses, whether
23  in state or federal court, including, without limitation, improper service of process or lack of
    personal jurisdiction.
24

25  [2] The notice of appeal does not deprive the Court of "jurisdiction to rule on the motion for a stay
    of its judgment pending appeal."  *Wyatt v. Syrian Arab Republic*, 800 F.3d 331, 341 n.4 (7th Cir.
26  2015); *see* Fed. R. App. P. 8(a), (a)(1) (even when appeal is pending, a "party must ordinarily
    move first in the district court for . . . a stay . . . pending appeal"); *In re Padilla*, 222 F.3d 1184,
27  1190 (9th Cir. 2000) ("[A] district court has jurisdiction to take actions that preserve the status
    quo during the pendency of an appeal."); *United States v. Real Prop. Located at 475 Martin*
28  *Lane*, 2007 WL 9759973, at *1 n.1 (C.D. Cal. Nov. 1, 2007) ("[U]nder Fed. R. App. P. 8(a)(1)(A)
    and (a)(2)(A), the Court has jurisdiction to stay its own judgment after an appeal is taken.").

1    *Second*, the Court should also grant a discretionary stay pending appeal.  The issues

2  Defendants intend to raise on appeal—including the application of the federal officer removal

3  statute to self-regulatory organizations—are serious and novel.  Being forced to engage in state-

4  court litigation while the appeal is pending would render Defendants' appellate rights

5  meaningless and unnecessarily burden the courts and the parties.  And despite Plaintiff's repeated

6  insistence that this case must be litigated in an emergency posture, its well-documented decision

7  to sit on its rights for the better part of a year undermines any urgency or immediate harm

8  Plaintiff might again claim.  Besides, Congress was well aware of—and "accepted"—"the delay"

9  caused by meaningful "appellate review" of orders remanding "cases removed pursuant to

10  § 1442."  *BP P.L.C.*, 141 S. Ct. at 1542.  It is not Plaintiff's place to second-guess that

11  determination.

12    At a minimum, and for the same reasons, Defendants respectfully request that the Court

13  pause execution of its remand order to allow Defendants to seek an emergency stay from the

14  Ninth Circuit.  *See Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 WL 5221947, at *5–6 (D. Nev.

15  Aug. 15, 2023) (Du, C.J.) (granting "temporary, administrative stay" despite denying stay

16  pending appeal).

17    The parties have met and conferred on the relief requested by this Motion.  Although

18  Plaintiff opposes Defendants' request for a stay pending appeal, the parties agree that the Court

19  should administratively stay execution of its remand order to and including **April 6, 2026**, to

20  permit Defendants to seek relief from this Court and, if necessary, from the Ninth Circuit.  The

21  parties respectfully request a ruling on this Motion by **March 12, 2026**, to permit Defendants

22  time to seek relief from the Ninth Circuit, if necessary.

23                                **BACKGROUND**

24    Defendant Polymarket US operates a national, federally licensed designated contract

25  market on which users trade derivatives known as event contracts.  Notice of Removal (ECF 1)

26  ¶¶ 1–2, 8.  As the Commodity Futures Trading Commission ("CFTC") recently reaffirmed,

27  regulation of event contracts is governed by the Commodity Exchange Act ("CEA") and subject

28  to the "exclusive jurisdiction" of the CFTC.  7 U.S.C. § 2(a)(1)(A); *see* ECF 19, at 2–3.

1   The CEA establishes "a system of effective self-regulation of trading facilities." 7 U.S.C.

2   § 5(b).  After establishing their ability to comply with nearly two dozen comprehensive "Core

3   Principles," *id.* § 7(d)(2), contract markets function as "self-regulatory organizations" entrusted

4   with "a form of delegated [government] discretion" to adopt, implement and enforce regulatory

5   protections, *Barry v. Cboe Glob. Markets, Inc.*, 42 F.4th 619, 625 (7th Cir. 2022); *see Sparta*

6   *Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998)

7   (recognizing that "self-regulatory organization[s] . . . exercis[e] quasi-governmental powers").

8   That includes, for example, the delegated authority to "establish, monitor, and enforce

9   compliance with" market "access requirements," "the terms and conditions of any contracts to

10  be traded on the contract market," and "rules prohibiting abusive trade practices on the contract

11  market." 7 U.S.C. § 7(d)(2)(A).  Subject to CFTC oversight, Congress has authorized contract

12  markets to amend their rules and to list new event contracts by first certifying that the amendment

13  or contract complies with federal law.  *Id.* § 7a-2(c)(1).

14  Polymarket US operates in full compliance with this comprehensive federal scheme.  It

15  has established rules governing market access, the terms of the contracts that may be traded, and

16  protections against abusive trade practices.  It has certified that event contracts it intends to list

17  comply with federal law.  And, consistent with the CEA and Polymarket US's own rules, it has

18  made trading on those contracts available to consumers nationwide.  Notice ¶¶ 11, 28–39.

19  On January 16, 2026, Plaintiff the Nevada Gaming Control Board sued Polymarket US

20  and the other Defendants.  Plaintiff claimed that Defendants had violated Nevada Revised

21  Statutes §§ 463.160, 463.343, 463.346, 463.350, 465.086, and 465.092—Nevada's gaming

22  statutes—by making trading of event contracts "accessible in the State of Nevada" and by failing

23  to abide by other state-specific gaming requirements.  Compl. (ECF 1-3) ¶¶ 20–28, 36–80.

24  Plaintiff sought and obtained an *ex parte* temporary restraining order enjoining

25  Polymarket US "from operating or offering a market in Nevada that involves 'event-based

26  contracts.'" ECF 1-4, at 72; *see* Compl. ¶ 80.  Though this appears to have been the first time a

27  state court has shuttered a federally licensed event-contract market, Defendants were not

28  afforded a meaningful opportunity to respond to Plaintiff's *ex parte* motion.

1       On February 5, 2026, Defendants removed to this Court, invoking the federal officer

2   removal statute, 28 U.S.C. § 1442(a), and federal-question jurisdiction, 28 U.S.C. § 1331.

3   Notice at 2.

4       On March 2, 2026, this Court granted the Board's motion to remand the case to Nevada

5   state court. *First*, the Court held that Plaintiff's claims did not concern conduct Polymarket US

6   performed while "'acting under' the CFTC," meaning section 1442 was unavailable. Remand

7   Order at 3. The Court reasoned that, when enforcing its access requirements and certifying event

8   contracts for listing, Polymarket US was "simpl[y] compl[ying] with the law" and was not

9   engaged in "an effort to assist, or to help carry out, the duties or tasks of the" CFTC. *Id.* at 3, 6

10  (citations and emphases omitted). *Second*, the Court concluded that there was no federal-

11  question jurisdiction, holding that Plaintiff's "claims [did not] necessarily raise a substantial

12  federal issue." *Id.* at 7. Although Nevada requires a gaming license only if not "otherwise

13  provided by law," Nev. Rev. Stat. § 465.086(1), the Court determined "that 'law' as used in NRS

14  § 465.086(1) refers to the law of Nevada," and not to federal law, Remand Order at 8.

15      On March 2, Defendants filed an emergency motion to administratively stay the remand

16  order pending this Court's consideration of this motion to stay pending appeal to the Ninth

17  Circuit. *See* ECF 42. On March 3, the parties filed a joint stipulation requesting that the Court

18  administratively stay the remand order to and including **April 6, 2026**, to permit Defendants to

19  seek relief from this Court and, if necessary, from the Ninth Circuit. *See* ECF 44.

<div align="center"><strong>LEGAL STANDARD</strong></div>

21      Subject to certain exceptions not applicable here, Rule 62 directs that "execution on a

22  judgment and proceedings to enforce it are stayed for 30 days after its entry." Fed. R. Civ. P.

23  62(a). Outside that 30-day window, the issuance of a stay pending appeal is an "exercise of

24  judicial discretion," and whether a stay should be granted depends "upon the circumstances of

25  the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009).

26      "The party requesting a stay bears the burden of showing that the circumstances justify

27  an exercise of that discretion." *Nken*, 556 U.S. at 433–34. Courts consider four factors in

28  determining whether to issue a stay pending appeal: "(1) whether the stay applicant has made a

<div align="center">4</div>

1    strong showing that he is likely to succeed on the merits; (2) whether the applicant will be
2    irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the
3    other parties interested in the proceeding; and (4) where the public interest lies." *Sierra Club v.*
4    *Trump*, 929 F.3d 670, 687 (9th Cir. 2019). Because "the Government is the opposing party," the
5    last two "factors merge." *Nken*, 556 U.S. at 435.

6         "On a motion for a stay . . . pending appeal, a likelihood of success on the merits is a
7    particularly troublesome factor because it requires the court to essentially predict that it has
8    rendered an erroneous decision." *U.S. Bank, N.A. v. SFR Invs. Pool 1, LLC*, 2021 WL 9316302,
9    at *2 (D. Nev. Mar. 8, 2021) (internal quotation marks omitted; alteration adopted). "Thus, in
10   this context, it is enough that the stay applicant has raised serious legal questions going to the
11   merits, so serious, substantial, and difficult as to make them a fair ground of litigation and thus
12   for more deliberate investigation." *Id.*; *see Risinger v. SOC LLC*, 2015 WL 7573191, at *1 (D.
13   Nev. Nov. 24, 2015) (Du, J.) ("To satisfy the first prong, . . . it is enough to show that serious
14   legal questions are involved."). "[I]ssues of first impression are considered serious legal
15   questions within the Ninth Circuit." *McGhee v. N. Am. Bancard, LLC*, 2018 WL 11267348, at
16   *1 (S.D. Cal. Feb. 6, 2018).

17                                                    **ARGUMENT**

18        For two independent reasons, the Court should stay the remand order. *First*, Rule 62(a)'s
19   automatic stay applies to the remand order for the first 30 days following its entry. *Second*, the
20   *Nken* factors weigh in favor of granting a stay until the Ninth Circuit decides whether this action
21   was properly removed—or at least until Defendants have had the opportunity to seek a stay from
22   the Ninth Circuit.

23   **I.     The Court Should Enter A Rule 62(a) Automatic Stay.**

24        Rule 62(a)'s automatic-stay provision applies to the remand order. Rule 62 "stay[s] the
25   execution or enforcement of a district court judgment for . . . 30 days after its entry." *City of San*
26   *Antonio v. Hotels.com, L.P.*, 593 U.S. 330, 333 (2021). An "order" counts as a "judgment" for
27   Rule 62 purposes if "an appeal lies" from it. Fed. R. Civ. P. 54(a); *see* 11 Wright & Miller's
28   Federal Practice & Procedure § 2902 (3d ed. 2025) ("Th[e] automatic 30-day stay applies only

to judgments as defined in Rule 54(a).").  Because an appeal lies from an order remanding a case

removed under section 1442, *see* 28 U.S.C. § 1447(d), Rule 62(a) applies to this Court's remand

order.

Courts routinely apply Rule 62(a)'s automatic-stay rule to orders remanding an action to

state court.  *See, e.g., Town of Pine Hill v. 3M Co.*, 2025 WL 994187, at *1 (S.D. Ala. Apr. 2,

2025) (staying remand order pursuant to Rule 62(a) after defendant removed on federal officer

removal grounds); *Grosch v. Tyco Fire Prods. LP*, 2023 WL 5993548, at *8 (D. Ariz. Sept. 15,

2023) (same); *Doe v. Sarah Bush Lincoln Health Ctr.*, 2023 WL 12144306, at *2 (C.D. Ill. Nov.

20, 2023) (same); *Martin v. LCMC Health Holdings, Inc.*, 2023 WL 5173791, at *1–3 (E.D. La.

Aug. 11, 2023) (same); *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 2020 WL

3053542, at *1 (S.D.W. Va. June 8, 2020) (same); *Northrop Grumman Tech. Servs., Inc. v.

DynCorp Int'l LLC*, 2016 WL 3180775, at *1 (E.D. Va. June 7, 2016) (same).

This Court should do the same here and enter a 30-day stay pursuant to Rule 62(a)'s

automatic-stay provision.  In addition, given the parties' agreement that the Court should stay its

remand order to and including **April 6, 2026**, the Court should find good cause to extend Rule

62(a)'s automatic stay to that date.

## II.    The *Nken* Factors Warrant A Stay Pending Appeal.

The Court should also grant a discretionary stay pending the outcome of Defendants'

appeal.  All four stay factors are satisfied here.

***Substantial, Serious Legal Questions.***  Defendants have raised, at the very least, "serious

legal questions" going to the scope of the federal officer removal statute.  *U.S. Bank*, 2021 WL

9316302, at *2.  Removal under the statute is appropriate where (a) the defendant "is a 'person'

within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant

to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal

defense.'"  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006).  As the

Court explained, "[t]he parties dispute the second factor."  Remand Order at 3.  Although the

Court disagreed that there is a sufficient causal nexus between Polymarket US's regulatory

1    functions and Plaintiff's claims, *id.* at 6, that question remains a serious and substantial one, *cf.*

2    *id.* at 9 (holding that Defendants had an objectively reasonable basis for removal).

3            Plaintiff asserts that Polymarket US is violating state law by allowing Nevadans to access

4    and trade derivatives on its federally regulated designated contract market.  Plaintiff alleges, for

5    example, that Polymarket US has improperly granted Nevadans access to its trading platform.

6    Compl. ¶¶ 20–24.  It seeks to hold Polymarket US liable for "making its market available to

7    persons located in Nevada who are under the age of 21."  *Id.* ¶ 45; *see id.* ¶¶ 33, 42–43, 70, 72.

8    And it has sought and obtained a temporary restraining order enjoining Polymarket US "from

9    *operating or offering a market in Nevada* that involves 'event-based contracts.'"  ECF 1-4, at 72

10   (emphasis added); *see* Compl. ¶ 80.

11           Those challenged activities all fall squarely within the scope of Polymarket US's

12   delegated regulatory authority.  For example:

13           *First*, the CEA delegates authority to designated contract markets to "establish, monitor,

14   and enforce compliance with" market "access requirements."  7 U.S.C. § 7(d)(2)(A); *see*

15   17 C.F.R. § 38.151(c) (similar).  But Plaintiff contends that Polymarket US must impose

16   additional or different access requirements on third parties by preventing Nevadans from trading

17   on its market.

18           *Second*, Plaintiff alleges that Polymarket US violates state law because it "do[es] not

19   employ adequate safeguards to ensure that wagers are not being placed on an event from owners,

20   coaches, players, or officials participating in the event."  *E.g.*, Compl. ¶ 35.  But the CEA

21   delegates to designated contract markets the front-line "responsibility to prevent manipulation,

22   price distortion, and disruptions . . . through market surveillance, compliance, and enforcement

23   practices and procedures."  7 U.S.C. § 7(d)(14); *see also id.* § 7(d)(13) (designated contract

24   markets "shall establish and enforce disciplinary procedures that authorize the board of trade to

25   discipline, suspend, or expel members or market participants that violate the rules" of the

26   contract market).  Plaintiff's lawsuit directly challenges how Polymarket US exercises its

27   delegated authority to supervise and regulate third-party conduct.

28

1    *Third*, Plaintiff seeks to prohibit contracts Polymarket US offers for listing on its market.

2    But again, the CEA expressly delegates regulatory authority to "establish, monitor, and enforce

3    compliance with the rules of the contract market, including . . . the terms and conditions of any

4    contracts to be traded on the contract market." 7 U.S.C. § 7(d)(2)(A). And in self-certifying

5    contracts for listing, designated contract markets must ensure they comply with federal law and

6    the Commission's requirements. *Id.* § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a),

7    40.11(c). The crux of Plaintiff's claims, then, is that Polymarket US has violated state law in

8    carrying out that delegated federal authority.

9    Because Plaintiff directly challenges Polymarket US's exercise of the core regulatory

10    authority delegated by the federal government, the federal officer removal statute supports

11    removal to this Court. *See Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*,

12    865 F.3d 1237, 1244 (9th Cir. 2017) (the causal-nexus "requirement is quite low"). Though

13    Plaintiff sees things differently, a "motion to remand is not the proper vehicle" to resolve that

14    factual dispute. *A.W.S. v. Johnston*, 2022 WL 5027429, at *3 (N.D. Cal. Oct. 4, 2022); *see

15    Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999) ("[W]e credit the [defendants'] theory of the

16    case for purposes of [the section 1442] jurisdictional inquiry."); *Willingham v. Morgan*, 395 U.S.

17    402, 409 (1969) (factual dispute over whether defendant acted within "official authority" should

18    be litigated in "a federal, not a state, court").

19    The CFTC's power to supervise Polymarket US does not alter this conclusion. *But see*

20    Remand Order at 4, 6 (suggesting that government authority "to rescind any action taken by the

21    defendant" means exercise of delegated rulemaking authority is mere "compliance," not

22    "assistance" to the government). In *Sparta Surgical*, for instance, the Ninth Circuit held that a

23    self-regulatory organization was "acting in a quasi-governmental capacity" and exercising

24    "delegated regulatory authority"—and therefore entitled to governmental immunity—when the

25    organization promulgated and enforced its "own rules" "govern[ing] its decision to list, not to

26    list, or to de-list an offering." 159 F.3d at 1212, 1214–15. This was the case even though the

27    rules were subject to government approval, and even though the government could "abrogate,

28    add to, and delete from" those rules "as it deem[ed] necessary or appropriate." *Id.* at 1212

1  (internal quotation marks omitted). *Sparta Surgical* therefore bears directly on this case. And

2  because "the test for [federal officer] removal" is "*broader* . . . than the test for official

3  immunity," *Willingham*, 395 U.S. at 405 (emphasis added), it follows that Polymarket US

4  satisfies the federal officer removal statute's "acting under" requirement.[3]

5       Defendants have also raised "serious legal questions" going to the scope of the federal

6  question jurisdiction. *U.S. Bank*, 2021 WL 9316302, at *2. Federal question jurisdiction extends

7  to state-law claims embedding a federal issue that is "(1) necessarily raised, (2) actually disputed,

8  (3) substantial, and (4) capable of resolution in federal court without disrupting" the

9  congressionally approved balance of "federal and state judicial responsibilities." *Gunn v.*

10 *Minton*, 568 U.S. 251, 258, 264 (2013); *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g &*

11 *Mfg.*, 545 U.S. 308, 314 (2005). Plaintiff's claims satisfy that standard because they cannot be

12 adjudicated without resolving contested questions of federal law. By its own terms, Nevada's

13 licensing statute does not apply if federal "law" "otherwise provide[s]." Nev. Rev. Stat.

14 § 465.086. To decide Plaintiff's state-law claims, then, the Court must interpret the scope and

15 effect of the CFTC's exclusive jurisdiction under the CEA—which is a federal question. *See*

16 *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157 (1982) ("[T]he Constitution,

17 laws, and treaties of the United States are as much a part of the law of every State as its own

18 local laws and Constitution.").

19       *Georgia Gambling Recovery LLC v. Kalshi Inc.* is directly on point. There, the plaintiff

20 sued under Georgia law, seeking to recover money lost from event-contract trading, which the

21 plaintiff characterized as "unlawful gambling." 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026).

22 Under Georgia law, however, the money was recoverable only if the "contract [was] unlawful

23 under the law governing its validity." *Id*. Thus, "whether the challenged event contracts" were

24 "unlawful gambling contracts cannot be determined by reference to Georgia law alone." *Id*.

25

26 _____

27 [3] The CFTC's supervisory powers are not dispositive for yet another reason: The Constitution
*requires* that the government "retain[] decision-making power" over *all* private entities
exercising delegated government authority. *FCC v. Consumers' Research*, 606 U.S. 656, 692

28 (2025). And it cannot be the law that private entities may remove under section 1442 only when
their conduct raises serious constitutional concerns.

9

1    Instead, "Plaintiff's ability to sustain a claim upon which relief may be granted necessarily
2    depend[ed] on the interpretation and application of the CEA and the scope of the CFTC's
3    exclusive jurisdiction"—and the case was properly removed to federal court.  *Id*.  This case is
4    no different.

5        Plaintiff's late-raised efforts to distinguish *Georgia Gambling* fail.  Plaintiff argued for
6    the first time in its reply brief that the word "law" in Nevada Revised Statutes § 465.086(1) must
7    "refer 'only . . . to the laws of [Nevada].'"  ECF 20, at 8 (quoting *Houston v. Moore*, 18 U.S. (5
8    Wheat.) 1, 42 (1820) (Johnson, J., concurring in judgment)); *cf. TransUnion LLC v. Ramirez*,
9    594 U.S. 413, 434 n.6 (2021) (late-raised "new argument" was "forfeited" even though it
10   concerned jurisdiction).  But the Supreme Court has rejected a materially identical argument,
11   explaining that "the Constitution, laws, and treaties of the United States are as much a part of the
12   law of every State as its own local laws and Constitution."  *de la Cuesta*, 458 U.S. at 157 (citation
13   omitted) (addressing argument that regulation "incorporat[ed] state contract law," making
14   "federal law" "inapplicab[le]").  The CEA is just as much the "law" as any Nevada statute.

15       That the Court ultimately disagreed with Defendants does not alter the seriousness of the
16   legal questions.  *See Roe v. SFBSC Mgmt., LLC*, 2015 WL 1798926, at *2 (N.D. Cal. Apr. 17,
17   2015) (holding that appealing party "raised 'serious legal questions'" even though "[t]he court
18   does not agree that it got the order wrong").  As the Court implicitly recognized when it held that
19   Defendants had a reasonable basis for removal, *see* Remand Order at 9, the issues Defendants
20   raised are questions "of first impression" within this Circuit, *Lussier v. Dollar Tree Stores, Inc.*,
21   518 F.3d 1062, 1066 (9th Cir. 2008).  The novelty and complexity of the issues are indicative of
22   a serious legal question.  *McGhee*, 2018 WL 11267348, at *1; *see also Romero v. Securus Techs.,
23   Inc.*, 383 F. Supp. 3d 1069, 1074 (S.D. Cal. 2019) ("District courts in this circuit often find that
24   serious legal questions are presented when novel issues or matters of first impression are
25   raised.").

26       The shifting legal landscape further confirms that a stay is warranted.  On appeal, the
27   Ninth Circuit will have to address the Supreme Court's forthcoming decision in *Chevron USA,
28   Inc. v. Plaquemines Parish*, No. 24-813 (U.S.).  That decision will determine whether the Ninth

1    Circuit's causal-nexus test is too restrictive given section 1442's broad "relating to" language.

2    Br. for Petitioners at 22, No. 24-813 (U.S.)  If the Supreme Court rejects a causal-connection

3    requirement, it would call into question this Court's decision.  The prospect that the Supreme

4    Court may overturn existing Ninth Circuit precedent counsels in favor of a cautious approach

5    here.  *See Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010) (possibility

6    that a recent Supreme Court decision would alter analysis on appeal "sufficiently demonstrated

7    a likelihood of success on the merits").  And, whichever way the Supreme Court rules, its grant

8    of certiorari is a strong indication that the correct application of the causal-nexus standard is "an

9    important federal question."  Sup. Ct. R. 10(a); *see, e.g.*, *McArdle v. AT&T Mobility LLC*, 2010

10   WL 2867305, at *3 (N.D. Cal. July 20, 2010) ("the Supreme Court's recent" grant of certiorari

11   "raised substantial questions," satisfying the first stay factor); *cf. Romero*, 383 F. Supp. 3d at

12   1074 ("The Ninth Circuit's acceptance of [a] Rule 23(f) petition for appeal demonstrates that

13   serious legal questions are at issue.").

14        ***Irreparable Injury.***  A stay is necessary to prevent irreparable injury.  Defendants have

15   the statutory right to appeal "all of the . . . grounds for removal" addressed in the Court's remand

16   order, and they intend to exercise that right.  *BP P.L.C.*, 141 S. Ct. at 1538; *see* 28 U.S.C.

17   § 1447(d).  But if this Court remands without a stay, Defendants would be forced to engage in

18   parallel litigation by simultaneously briefing jurisdictional issues in the Ninth Circuit and merits

19   issues in the Nevada state court.

20        This parallel litigation would "effectively eliminat[e] (or at least seriously jeopardiz[e])"

21   "Defendants' statutory right to appeal."  *Delaware ex rel. Jennings v. BP Am. Inc.*, 2022 WL

22   605822, at *2 (D. Del. Feb. 8, 2022).  Because a "district court's order remanding a civil action

23   to state court deprives the removing party of access to a federal court," *Acad. of Country Music*,

24   991 F.3d at 1070, remand "would defeat the very purpose of permitting an appeal and leave a

25   defendant who prevails on appeal holding an empty bag," *Forty Six Hundred LLC v. Cadence

26   Educ., LLC*, 15 F.4th 70, 79 (1st Cir. 2021); *see Zielinski v. First Nat'l Ins. Co. of Am.*, 2020 WL

27   2507993, at *1 (W.D. Wash. May 15, 2020) (a "provision allowing defendants to appeal remand

28   orders would be somewhat toothless if they were unable to obtain a stay from the district court").

1  Nothing "demands so illogical a result." *Forty Six Hundred LLC*, 15 F.4th at 79; *cf. Acad. of*
2  *Country Music*, 991 F.3d at 1059 (the Supreme Court has "suggest[ed] that it would not
3  countenance a district court evading review by immediately transmitting its remand order to the
4  state court").[4]

5       Parallel litigation would be irreparably burdensome, too.  It is well established that
6  litigating in state court while "pursu[ing] [a] request for appellate review of the Court's remand
7  order" would "impose an unfair burden on" Defendants.  *Bank of Am., N.A. v. El Paso Nat. Gas*
8  *Co.*, 2017 WL 9478457, at *2 (W.D. Okla. Jan. 12, 2017) (collecting cases); *see Jock*, 738 F.
9  Supp. 2d at 448 (similar).  That burden would be especially "severe" here given Plaintiff's
10  frequent and unwarranted pursuit of emergency, often-*ex parte* relief against Defendants.
11  *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 2016 WL 3346349, at *4 (E.D. Va.
12  June 16, 2016); *see, e.g.*, ECF 1-4, at 2, 15, 27, 35, 58; ECF 10 ¶¶ 3, 5; ECF 15, at 7–8; ECF 37
13  ¶ 8; *cf. Risinger*, 2015 WL 7573191, at *2 (recognizing that "potentially unnecessary" litigation
14  costs may "constitute irreparable harm").

15       ***Public Interest and Balance of Equities.***  The public interest is "best served by . . .
16  concentrating resources on litigating Plaintiff's claims in the proper forum after the [Ninth]
17  Circuit determines the jurisdictional issues presented in this case." *Delaware*, 2022 WL 605822,
18  at *3 (collecting cases); *see Zielinski*, 2020 WL 2507993, at *2 ("[T]he Court finds that the
19  likelihood of saving judicial resources means that a stay is in the public interest."); *Del Rio v.*
20  *Creditanswers, LLC*, 2010 WL 3418430, at *5 (S.D. Cal. Aug. 26, 2010) (similar).  If the Ninth
21  Circuit "decide[s] that the Remand Order was improvidently granted and the state court ha[s]
22  entered rulings or judgments in the interim period," it would lead to a "rat's nest of comity and
23  federalism issues."  *Northrop Grumman*, 2016 WL 3346349, at *4.  "[T]he potential for
24  nightmarish procedural complications arising from parallel proceedings in state and federal

25
26
27  ─────────────
[4] For this reason, even if this Court declines to grant a stay pending appeal, it should extend the administrative stay so that Defendants may present their stay request to the Ninth Circuit.  *See*
28  *Oracle*, 2023 WL 5221947, at *5 (granting such a stay given that the movant's "right to appeal w[ould] not be meaningful" otherwise).

1  court" therefore counsels strongly in favor of a stay as well. *Id.*; *cf. Risinger*, 2015 WL 7573191,

2  at *2 ("granting a stay will prevent the possibility of confusion").

3       Staying any remand order would not prejudice Plaintiff. Plaintiff's claims of urgency

4  are not credible given Plaintiff's past conduct. Nearly a year ago, when this District enjoined

5  Plaintiff from enforcing its gambling laws against Kalshi, another contract market, Plaintiff sat

6  on its hands for six months. It did not "seek[] expedited appellate review"—or *any* appellate

7  review—of the preliminary injunction, or of the denial of its own preliminary-injunction motion.

8  *Paher v. Cegavske*, 2020 WL 2748301, at *1 (D. Nev. May 27, 2020) (Du, C.J.). Even after the

9  injunction was dissolved, Plaintiff waited nearly three months before bringing an enforcement

10 action against Kalshi. ECF 20, at 6 n.2. Plaintiff describes these unexplained delays as

11 "consistent[] and equitabl[e]" "compli[ance] with its statutory mandate." *Id.* More accurate is

12 this Court's description of similar delays: "confounding and contrary to the[] position that a

13 quick disposition of this matter is needed." *Paher*, 2020 WL 2748301, at *1.[5]

14      Plaintiff has previously maintained that its delay means little "in the context of ongoing,

15 worsening injuries." ECF 20, at 6 n.2 (quoting *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th

16 Cir. 2014)). As *Arc* explained, however, "waiting" to seek relief "is prudent rather than dilatory"

17 only where "the magnitude of the potential harm becomes apparent gradually." 757 F.3d at 990–

18 91. Plaintiff has never claimed that any harms have emerged only gradually—it has been making

19 the same irreparable-harm arguments since April 2025. *See* Defendants' Opposition to

20 Plaintiff's Motion for a TRO and Prelim. Inj. at 23–24, *KalshiEx, LLC v. Hendrick*, No. 2:25-

21 cv-00575 (D. Nev. Apr. 4, 2025), ECF 35. Plaintiff's failure to act promptly to prevent those

22 supposed harms confirms that its claims of urgency should be given no weight.

23

24 

                   ————————————

25 [5] *Accord, e.g.*, *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and

26 irreparable harm."); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) ("delay" of "months" "undercut [plaintiff's] claim of irreparable harm"); *Prestige Transp., Inc. v. U.S.*

27 *Small Bus. Admin.*, 850 F. App'x 551, 551 (9th Cir. 2021) ("unreasonable two-month delay" "belied" assertion of irreparable harm); *Mary Ferrell Found., Inc. v. Biden*, 2024 WL 4880527,

28 at *4 (9th Cir. Nov. 25, 2024) ("By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.").

1    Plaintiff's public-policy arguments are also misguided.  Throughout its remand briefing,

2    Plaintiff has relied heavily on the *ex parte* temporary restraining order—an order issued without

3    affording Defendants a meaningful opportunity to be heard—as support for those arguments.

4    *See* ECF 7, at 2, 8, 10; ECF 20, at 1, 6.  Given that "*ex parte* proceedings are anathema in our

5    system of justice," *Guenther v. Comm'r of Internal Rev.*, 889 F.2d 882, 884 (9th Cir. 1989),

6    Plaintiff's reliance on that order is entirely misplaced, *see Liang v. Nguyen*, 2009 WL 514073,

7    at *2 (C.D. Cal. Feb. 26, 2009) ("Ex parte motions have great potential to debilitate the adversary

8    system.").  Regardless, Plaintiff's preference for an immediate return to state court "must yield"

9    to Congress's contrary—but definitive—public-interest determination.  *Liner v. Jafco, Inc.*, 375

10   U.S. 301, 309 (1964).  When it comes to cases removed under section 1442, "Congress has

11   expressed a heightened concern for accuracy, authorized appellate review, and accepted the

12   delay it can entail."  *BP P.L.C.*, 141 S. Ct. at 1542.  Only a stay respects that concern.

13                                    *        *        *

14        All four factors favor a stay pending appeal.  Defendants have raised serious legal

15   questions the Ninth Circuit has not yet answered.  Without a stay, Defendants' statutory right to

16   appeal would be rendered meaningless.  Preventing duplicative litigation serves judicial

17   economy.  And Plaintiff's demand for urgency does not withstand scrutiny or Congress's

18   command.[6]

19

20

21   _____

22   [6] If the Court has already transmitted its remand order to the state court, the Court should "recall[]
     the remand."  *Acad. of Country Music*, 991 F.3d at 1070.  Where, as here, a remand order is

23   appealable, a federal court retains jurisdiction to reconsider or stay its remand order.  *See id.* at
     1065; *Perez-Reyes v. Nat'l Distrib. Ctrs.*, LLC, 2018 WL 7077183, at *2 (C.D. Cal. Feb. 8, 2018)

24   (collecting cases).  As courts around the country have held—and the Ninth Circuit has
     confirmed—when a case is prematurely transmitted "back to state court" before the defendant

25   has an opportunity to respond to the remand order, the appropriate remedy is to direct the Clerk
     of Court to "enter an order recalling the remand and [to] notify the [state court] that the district

26   court has resumed jurisdiction over the action."  *Acad. of Country Music*, 991 F.3d at 1068, 1070;

27   *see*, *e.g.*, *Forty Six Hundred LLC*, 15 F.4th at 80 (collecting cases); *Town of Pine Hill*, 2025 WL
     994187, at *1 (recalling case remanded before defendant could file its "motion to stay the court's

28   remand order pending appeal"); *Bank of Am.*, 2017 WL 9478457, at *3 (same).  To the extent
     necessary, the Court should do the same here.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

The Court should stay execution of the remand order pending appeal. At a minimum, the Court should enter an administrative stay until April 6, 2026, to permit Defendants to seek an emergency stay from the Ninth Circuit.

DATED: March 3, 2026.

HUTCHISON & STEFFEN, PLLC

*/s/ Joseph C. Reynolds*

Mark A. Hutchison (Nev. Bar No. 4639)
Joseph C. Reynolds (Nev. Bar No. 8630)
100 West Liberty Street, Suite 765
Reno, Nevada 89501
mhutchison@hutchlegal.com
jreynolds@hutchlegal.com
(775) 853-8746

Adam P. Laxalt (Nev. Bar No. 12426)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, D.C. 20036
alaxalt@cooperkirk.com
(202) 220-9600

Orin Snyder (*pro hac vice*)
Matt Benjamin (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
OSnyder@gibsondunn.com
MBenjamin@gibsondunn.com
(212) 351-4000

Thomas H. Dupree Jr. (*pro hac vice*)
Jacob T. Spencer (*pro hac vice*)
Adam I. Steene (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, D.C. 20036
TDupree@gibsondunn.com
JSpencer@gibsondunn.com
ASteene@gibsondunn.com
(202) 955-8500

*Counsel for Defendants BLOCKRATIZE INC.
d/b/a Polymarket; QCX LLC d/b/a Polymarket
US; and ADVENTURE ONE QSS INC. d/b/a
Polymarket*

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of DEFENDANTS' MOTION FOR STAY PENDING APPEAL to be electronically filed and served on all counsel of record using the Court's CM/ECF system.

DATED: March 3, 2026.

By: */s/ Madelyn Carnate-Peralta*
An Employee of Hutchison & Steffen, PLLC

17

**Transcript of Hearing on Plaintiff's
Motion to Remand
Dist. Ct. Doc. 36 (filed February 24, 2026)**

1

```
 1                UNITED STATES DISTRICT COURT
                       DISTRICT OF NEVADA
 2        BEFORE THE HONORABLE MIRANDA M. DU, DISTRICT JUDGE
                          ---o0o---
 3

 4   STATE OF NEVADA, ex rel.   :
     NEVADA GAMING CONTROL       : No. 2:26-cv-00406-MMD
 5   BOARD,                      :
                                 :
 6              Plaintiff,       :
                                 : February 24, 2026
 7        -vs-                   :
                                 :
 8   KalshiEX, LLC.,             :
                                 : United States District Court
 9              Defendant.        333 Las Vegas Boulevard
                                  Las Vegas, Nevada
10   _____:

11

12

                     TRANSCRIPT OF MOTIONS HEARING
13

14

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFF:     Jessica Whelan
                            Chief Deputy Solicitor General
17

18

     FOR DEFENDANT KalshiEX: Matthew LaRoche
19                           Joshua Sterling
                             Nicole Valente
20                           Rick Heaslip
                             Dennis Kennedy
21                           Paul Williams
                             Attorneys at Law
22

     Proceedings recorded by mechanical stenography produced
23   by computer-aided transcript

24

     Reported by:            KATHRYN M. FRENCH, RPR, CCR
25                           NEVADA LICENSE NO. 392
                             CALIFORNIA LICENSE NO. 8536
```

2

1    Las Vegas, Nevada, Tuesday, February 24, 2025, 9:10 a.m.

2                              ---OoO---

3

4              THE CLERK:  This is the date and time

5    set for Virtual Motion Hearing in case number

6    2:26-cv-406-MMD-MDC, State of Nevada, ex rel,

7    Nevada Gaming Control Board versus KalshiEX; and

8    case number 3:26-cv-089-MMD-CLB, State of Nevada,

9    ex rel, Nevada Gaming Control Board versus Blockratize,

10   Inc., dba, as Polymarket, et al.

11             Counsel for the plaintiff, can you please

12   state your appearance.

13             MS. WHELAN:  Good morning, Your Honor.

14   Jessica Whelan, Chief Deputy Solicitor General for

15   the State, here on behalf of the Nevada Gaming Control

16   Board.

17             THE CLERK:  And counsel for Kalshi?

18             MR. LaROCHE:  Good morning, Your Honor,

19   Matt LaRoche on behalf of Kalshi.  And also with me on

20   Zoom is Josh Sterling, Andrew Porter and Nicole Valente.

21             MR. KENNEDY:  And hear in the courtroom

22   from the Bailey Kennedy Law Firm in Las Vegas, Javier

23   Sothers, Paul Williams.  And I'm Dennis Kennedy for

24   Kalshi.

25             THE CLERK:  And defendant Blockratize.

3

```
 1            MR. DUPREE:  Good morning.  This is
 2   Tom Dupree.  I'm here on behalf of Polymarket
 3   defendants.  And I'm joined by several of my colleagues
 4   on the Zoom.  They can identify themselves.
 5            MR. LAXALT: This is Adam Laxalt.
 6            MR. HUTCHISON: Good morning.  This is
 7   Mark Hutchison.
 8            MR. SNYDER: Good morning.  Orin Snyder for
 9   Blockratize and Polymarket.
10            Good morning, Your Honor.  This is
11   Joe Reynolds as local counsel for Blockratize, with
12   the law firm Hutchison and Steffen.
13            THE COURT:  All right.  That completes
14   counsels' appearances.
15            So I, as counsel know, the 2:26-406 case,
16   I'm going to refer to as the 406 case, was reassigned to
17   me after I examined the filing in that case, along with
18   Chief Judge Gordon, because the case was initially
19   assigned to him; and then my own case that was filed
20   first is 3:26-89.  I will refer to that as the 89 case.
21            After reviewing the initial Notice of
22   Removal in both cases, as well as the Motion to Remand,
23   I realized that there are common issues raised in both
24   cases, which is why I set the Minute Order the way I did
25   to structure this oral argument.
```

4

```
 1              I have an extremely full calendar today, so
 2   I've designated some time for this case.  If I fall
 3   behind, I'm going to fall behind in every hearing and I
 4   don't want to fall behind, so, counsel, you need to stay
 5   on time.
 6              So I note that in the 89 case, Polymark
 7   argues that the removal is based on Section 2241(a)(1),
 8   I believe.  It's the federal officer removal.  That's
 9   really the only basis that's different than what was
10   raised in the 406 case.
11              The 406 case mainly asserts complete
12   preemption, as well as the argument that the CFTC is the
13   necessary party.  So where the arguments overlap mainly
14   relates to the special federal question under Grable.
15   So I hope counsel organize your arguments in that way.
16              I should clarify that the arguments raised
17   are different.  There's some overlap.  So the decisions
18   in each case will be based on the arguments presented by
19   the party seeking removal.
20              So, with that, let me hear from the State.
21              MS. WHELAN:  Good morning, Your Honor.
22   Jessica Whelan here on behalf of the Nevada Gaming
23   Control Board.
24              As Your Honor notes, we're here today on
25   motions to remand against Polymarket and Kalshi, two
```

5

1    companies who have operating so-called prediction

2    markets in the State of Nevada.  The cases are in a

3    slightly different posture. Polymarket currently has a

4    Temporary Restraining Order against it, which prohibits

5    it from offering event contracts in Nevada.  That TRO

6    was issued by the State Court First Judicial District,

7    and that TRO has been extended by consent of the parties

8    through February 26th.

9         THE COURT:  So both parties, though, in both

10   cases, while the postures are different, they both raise

11   the same arguments as to the urgency which warrants this

12   motion being heard on an emergency basis.

13        MS. WHELAN:  Yes.

14        THE COURT:  I want the State to explain or

15   respond to that because as I -- I realize that in the --

16   I didn't realize until I read everything again -- in the

17   89 case, while the State Court issued a TRO and extended

18   -- or the parties agreed to extend it to this Friday, I

19   believe, the question is why the action was filed when

20   it was, particularly given that Chief Judge Gordon -- I

21   think you rely on Chief Judge Gordon's decision in one

22   of his cases.  There were two cases.  But in one of

23   his cases involving the defendant in the 406 case here,

24   allowing -- basically he dissolved the injunction,

25   allowing the State to seek enforcement action, but,

6

1    there's some delay.  There's, apparently, some agreement

2    to stay enforcement.  But, ultimately, there's some, I

3    think, delay on the State's part in bringing the 89

4    case, as well as the 406 case.  But because of that,

5    you are now asking me to consider some very -- these

6    issues, some of which the parties argue are complicated

7    and novel, on a very short basis.

8              What's the reason?  How do you want to

9    respond?

10             MS. WHELAN:  So just to go back to some of

11   the background, there are three cases currently pending

12   in Federal District Court, all of which have been

13   assigned to Chief Judge Gordon.  The plaintiffs in

14   those cases are Kalshi, Crypto.com, and Robinhood.  In

15   those cases, there was initially a preliminary

16   injunction granted against Kalshi, which was dissolved

17   by Chief Judge Gordon around November of 2025.

18             THE COURT:  November 24th.

19             MS. WHELAN:  Yes.  Thank you.

20             So Kalshi moved for a stay or injunction

21   pending appeal because it was taking that preliminary

22   injunction ruling up to the Ninth Circuit.  The other

23   two parties, Crypto.com and Robinhood did the same

24   thing; however, the State was able to reach a compromise

25   with Crypto.com and Robinhood, so that those companies

7

1  would not be operating in the State while the appeal is
2  pending.

3          Kalshi, however, would not agree to any sort
4  of compromise, so the moved, first, Chief Judge Gordon,
5  and then the Ninth Circuit for stays or injunctions
6  pending appeal.  Both of those were denied and -- or
7  I'm sorry.  Chief Judge Gordon denied his.  The Ninth
8  Circuit has deferred the ruling on the motion for
9  injunction pending appeal to the merits panel.

10          So what happens then, is the State filed a
11  status report with the Ninth Circuit saying that it can
12  no longer agree to hold off on enforcement while the
13  Ninth Circuit considers that motion.  And there are a
14  couple things that happened.  One of the main things
15  was, frankly, the Super Bowl.  We got results from
16  revenues generated from the Super Bowl.  Licensees in
17  Nevada hit a 10-year low for the amount of revenue that
18  was generated off of the Super Bowl; whereas, Kalshi
19  reported something like 25 billion in revenues from
20  the Super Bowl, which was a significant uptick from
21  the 2025 Super Bowl.  And the Board, ultimately, made
22  the decision that it could no longer hold off on
23  enforcement.

24          To our knowledge, Kalshi is the prediction
25  market currently operating in the State of Nevada.  It's

8

1    entrenching itself in the market.  And as both Chief
2    Judge Gordon and Judge Woodbury in the First Judicial
3    District have found, every day that these prediction
4    markets continue to operate, the State of Nevada suffers
5    significant harm.  So for that reason, we asked that
6    these be heard on an emergency basis.
7              In Polymarket, we wanted to ensure that the
8    TRO did not expire before this could be heard.  And in
9    Kalshi, quite frankly, we need to take action before the
10   next major betting event in the State, which would be
11   March Madness.
12             THE COURT:  All right.
13             So me move on then.  Why don't you
14   address -- why don't you just briefly address the
15   officer removal argument, and then address the other
16   arguments that you want to focus on.
17             I should note for the record that I have
18   reviewed all the filings, most of the cases cited by the
19   parties.  I may get them all mixed up, but I reviewed
20   them.  So I know, kind of, the context and the legal
21   landscape enough to proceed with the hearing.  So you
22   don't have to repeat the background of what's already
23   stated.  I reviewed Chief Judge Gordon's order in both
24   cases.
25             MS. WHELAN:  Sure.

9

```
1              THE COURT:  I forget the name of the cases,
2    but I've reviewed both of his orders.
3              MS. WHELAN:  I have that same issue, Your
4    Honor.
5              So the most obvious one, Polymarket's
6    argument for a federal officer removal is that
7    Polymarket is not acting under the authority of a
8    federal officer.  It's a private company regulated by
9    the CFTC.  It's not employed by the CFTC or bestowed
10   by the CFTC with any regulatory authority over anyone
11   but itself.  So even though the CFTC has delegated
12   Polymarket and other regulated entities some level of
13   authority over self-certification of listings on their
14   derivatives market, this does not, somehow, transform
15   Polymarket into a federal officer, or even acting under
16   a federal officer.  And I think --
17             THE COURT:  So on page -- at ECF 15, page
18   17, of Polymarket's Response -- and I'm going to ask
19   them the same question -- Polymarket described that as
20   a self-regulatory organization, what it does.
21             MS. WHELAN:  Uh-huh.
22             THE COURT:  And it says that -- it kind of
23   lists, in general, the language of the statute about
24   how it established rules for the market, including by
25   setting access requirements, the terms and conditions
```

10

1    of any contracts to be traded on the market, and rules

2    prohibiting abusive trade practices on the contract

3    market.  And it cites to 7 USC Section 7(d)(2).

4            So, it cites to authority that it has to

5    basically self-regulate --

6            MS. WHELAN:  Yes.

7            THE COURT:  -- itself, as well as contracts

8    offered on its exchange.  I assume that's the argument.

9            MS. WHELAN:  Uh-huh.  So it is

10    self-regulating, but I think the important distinction

11    here is that it's not regulating any third parties.

12    And, this isn't a case challenging Polymarket's exercise

13    of any delegated powers, any self-regulatory powers.

14    It's about the legality of their contracts under state

15    law, period.  And so this isn't, you know -- I think

16    that in the Watson v. Philip Morris case, 551 US 142,

17    the U.S. Supreme Court held that a person is not acting

18    under a federal officer merely because that person is

19    regulated by a federal agency, even if it is highly

20    regulated and there's a detailed regulatory scheme.

21    It has -- that regulated entity has to show a, quote,

22    unusually close relationship with the federal officer

23    that is, quote, distinct from the usual regulator

24    regulated relationship, and Polymarket has not shown

25    that here.  All they've shown is that they have

1   self-regulatory powers to regulate themselves.  They're

2   not setting these limits, these rules for other

3   parties -- or I'm sorry -- for other CFTC regulated

4   entities.  They're not acting as a quasi-governmental

5   official.  They are simply duty-bound to follow the

6   self-regulatory rules that the CFTC has laid out for

7   them.  And so for that reason, they're not acting under

8   a federal officer.

9           THE COURT:  So then on the next page of the

10  same Response brief, Polymarket indicated it does more

11  than merely comply with the FTC's regulatory framework,

12  and that it exercises delegated authority to help the

13  CFTC implement the bedrock purposes of the statute.

14          So, it's the State's argument that when you

15  said earlier, I think, that the action here does not

16  challenge any delegated authority, would you expand on

17  that argument?

18          MS. WHELAN:  Sure.

19          So in order for the State Court to make a

20  ruling on the Board's action in State Court, all that

21  it has to find is that Polymarket is offering sports

22  betting, wagers, operating a sports pool without Nevada

23  licensure.  That's it.

24          So, the Board's position has always been

25  that these prediction markets can hold both federal

12

1  licenses and state licenses at the same time; that can

2  -- that there's no issue with concurrent jurisdiction.

3  So the federal court is not even going -- to determine

4  the cause of action that the state brings, the federal

5  court is not going to have to go into any action of

6  Polymarket that it claims it's exercising on behalf of

7  the CFTC.

8          And I would note when Polymarket says that

9  they are helping the CFTC execute the bedrock purposes

10 of the CEA, they say that the purpose of the CEA is to,

11 quote, establish a system of effective self-regulation

12 of trading facilities under the oversight of the

13 Commission.  So even in furthering the purposes of

14 the CEA, they're only talking about self-regulation.

15 They're not talking about regulating third parties.

16 And I think if you look at the Watson case, it's pretty

17 clear that there needs to be some enforcement or

18 regulation of third parties for there to be an "acting

19 under a federal officer" basis for removal.

20          THE COURT:  Let's move on to the Substantial

21 Federal Question Doctrine argument under Grable.  And I

22 guess my question is whether resolution of the State's

23 claims, the state law claims, would require the Court to

24 interpret the Commodity Exchange Act, including whether

25 the sporting events contracts offered by either of

13

1   the defendants here are covered under the Act, or is

2   regulated by the CFTC.

3           MS. WHELAN:  Sure.  So the presence or

4   absence of a federal question is governed by the

5   well-pleaded complaint rule, so federal jurisdiction

6   exists only when a federal question is presented on the

7   face of a properly pleaded Complaint.  And, here, the

8   Board's Complaints, on their face, do not invoke federal

9   law; rather, they cite to and seek to enforce only

10  Nevada Gaming Law.  And the only question for the Court

11  to decide is whether the defendants are violating state

12  law.

13          Now, certainly, defendants will raise

14  federal preemption as a defense to the state law

15  action.  In a third state enforcement action, coin-based

16  financial markets has raised that federal defense.

17          Now, Judge (indecipherable) of the first JD

18  has rejected that and issued a preliminary injunction in

19  favor of the Board.  But, it's black-letter law that a

20  federal defense, even if anticipated, and even if it's

21  the only issue at play, even if both sides agree,

22  yeah, the only issue here is whether there's federal

23  preemption.  That is not sufficient to support removal.

24  And that statement of law comes from the Caterpillar v.

25  Williams case, 482 U.S. 386.

1          So, you know, defendants attempt to argue

2     that certain language in NRS 463.160 and NRS 465.086

3     raises a federal question.  And those are two state

4     statutory provisions that the Board brings in its state

5     law Complaints.

6          Now, those two provisions both reference the

7     fact that it's unlawful for a person to operate a sports

8     pool without having procured all federal, state, county

9     and municipal gaming licenses.  And then NRS 465.086

10    also contains sort of a prefatory clause, "except as

11    otherwise provided by law," it's unlawful for someone to

12    do that.

13         So the defendants claim that these

14    provisions somehow incorporate federal law into the

15    state statute, and that the Board must prove as an

16    element of its claim that defendants both have the

17    appropriate federal license.  But this argument contorts

18    the statutory language.

19         When a statute is preceded by "except as

20    otherwise provided by law," courts have held that will

21    generally refer to the law of the statute itself; which,

22    here, is state law.  And, that signals the availability

23    of an affirmative defense.  So what they --

24         THE COURT:  Is there a more recent Nevada

25    Supreme Court case than I think the case that

15

```
 1   defendants -- plaintiff cites to?  I think it's from
 2   the 1800s.
 3           MS. WHELAN:  I don't have one readily
 4   available, but I would be happy to supplement if we're
 5   able to, if we locate one.
 6           THE COURT:  I don't think it's needed.  I
 7   think, in a way, the principle is obvious.  Perhaps
 8   that's the reason why there's not recent case law.
 9           MS. WHELAN:  Sure.  Yeah, because if the
10   defendant is charged with a violation of the statute, it
11   can raise as a defense that its actions were permitted
12   under other law.  I mean it would be absurd to say that
13   as an element of the claim, the Board has to show that
14   no other law, you know, applies here.
15           The same goes for the reference to federal
16   licenses; that doesn't give rise to federal question
17   jurisdiction.  And because the licensure requirement is
18   cumulative, the possession of a federal license doesn't
19   exempt possession of a state license.
20           Further, the federal license that defendants
21   possess is not a gaming license, which is the license
22   that the statutes refer to, the license that the
23   defendants hold as a license to operate a federal
24   derivatives market.
25           So, what defendants are really arguing is
```

1    federal preemption as an affirmative defense.  To accept

2    their argument, would have far-reaching consequences

3    because, essentially, anytime the Board would want to

4    bring an enforcement action against a run-of-the-mill

5    illegal gambling operation, which isn't operating on

6    any federal exchange, it would have to bring the

7    case in federal court, contrary to the jurisdiction

8    requirements of NRS 463.343, because it would have

9    to prove as an element of its claim that the illegal

10   gambling operation was not subject to any federal

11   licensure.  And that's an untenable result and,

12   certainly, not what the Nevada legislature contemplated

13   when it passed the enforcement statute.

14           THE COURT:  So I don't -- I'm not -- I had

15   intended, and still intend to proceed that way, for the

16   State to address all the arguments of both defendants;

17   so, I don't know if you want to move on to address -- it

18   may be a good point to address complete preemption

19   because complete preemption would be different.

20           MS. WHELAN:  Sure.  So I'll turn and move

21   quickly for complete preemption because I see there's

22   about 15 minutes, and I would like to save a little bit

23   of time for rebuttal, if possible.

24           So, federal case law describes complete

25   preemption as a corollary to the well-pleaded complaint

1   rule.  Once an area of state law has been completely

2   preempted, any claim purportedly based on that preempted

3   state law is considered, from its inception, to be a

4   federal claim, and therefore arises under federal law.

5   I'll note that the doctrine is invoked exceedingly

6   rarely.  The Supreme Court has identified only three

7   statutes that have completely preempted state law.

8   Section 301 is the Labor Management Relations Act;

9   Section 502 of ERISA; and Sections 85 and 86 of the

10  National Bank Act.

11          The CEA has never been held to completely

12  preempt state law, and, in fact, that argument was

13  rejected both in <u>Farmers Co-Op Elevator v. Woden case</u>,

14  from the Northern District of Iowa in 1996; and, more

15  recently in the <u>Massachusetts v. Kalshi</u> case out of the

16  District of Massachusetts.

17          THE COURT:  I think in Kalshiex's Response,

18  they pointed to other statutes that are found to

19  completely preempt state law, although I don't think

20  those decisions were issued by the Supreme Court.  But,

21  they cite to other statutes in one of the footnotes.

22          MS. WHELAN:  Yes.  Absolutely.  And we

23  recognize that.  But, you know, that the U.S. Supreme

24  Court has only invoked this doctrine three times, I

25  think, is telling.  And when you look at the

1    requirements for what needs to be present for

2    complete preemption to apply, you can see why.

3            So, first, the statutory language must

4    indicate that Congress intended to preempt every state

5    law cause of action within the scope of the relevant

6    statute.  That's a very heavy burden.  It goes well

7    beyond field preemption, which is at issue in this case

8    and hasn't thus far been successful.

9            Then second, the statute must provide the

10   plaintiff with a substitute cause of action that would

11   allow the plaintiff to remedy the wrong they assert they

12   suffered.

13           So starting with the second requirement,

14   there is nothing in the CEA that would provide the

15   Nevada Gaming Control Board to remedy the wrongs that

16   it asserts it is suffering.  You know, I think Kalshi

17   points out that the CFTC can disapprove contracts,

18   revoke licenses.  But, there's nothing that allows the

19   Board to do that.

20           And then going on to the statutory language,

21   Kalshi points only to the language in Section 2(a)of the

22   CEA, that the CFTC has, quote, exclusive jurisdiction

23   over swaps traded on a registered exchange.  So even if

24   Section 2(a) does apply -- and Chief Judge Gordon has

25   found it's unlikely that it does -- this is certainly

1    not the type of clear congressional intent needed to

2    completely preempt state law causes of action

3    challenging unlawful gambling.  And I think the clearest

4    indicator of that is further down in Section 2(a)(1)(a),

5    the savings clause that states, "Nothing in this section

6    shall supersede or limit the jurisdiction conferred on

7    courts of the United States or any state."

8              So, Congress clearly did not intend complete

9    presumption because if all state causes of action were

10   preempted, there would be nothing to save in the savings

11   clause.

12             THE CLERK:  You have two minutes left.

13             MS. WHELAN:  Okay.  I would just say that

14   what Kalshi and Polymarket are asking this Court to do

15   is to vastly expand the circumstances under which

16   removal is proper, and the Court should reject those

17   meritless arguments.

18             I'll reserve the rest of my time for

19   rebuttal.

20             THE COURT:  All right.  Thank you.

21             Counsel, give me one moment.  I think I

22   need to plug in my surface.

23             All right. Let me hear from Polymarket.

24             MR. DUPREE:  Good morning, Your Honor.  This

25   is Tom Dupree.  I represent the QCX and Polymarket

20

1   defendants in case number 89.  And may it please the

2   Court.

3            Today, I want to touch on both of our

4   grounds for removal of federal office jurisdiction and

5   federal question jurisdiction.  But, let me start just

6   by saying a few words about what event contracts are,

7   and what Polymarket does because I think it's helpful

8   and it informs the removal analysis here.

9            Polymarket U.S. operates a national event

10  contract market that is regulated by the Commodity

11  Futures Trading Commission pursuant to the Commodity

12  Exchange Act.  Event contracts, those are contracts

13  that allow people to trade on objective real word

14  events:  Whether the Supreme Court will strike down

15  President Trump's tariffs; whether Reno records another

16  measurable snowfall; or whether the Vegas Golden Knights

17  win the Stanley Cup.  And it's important to understand

18  that these financial instruments are not state law

19  wagers; rather, they are federally regulated

20  derivatives.  They produce valuable public information.

21  And in many cases, they allow market participants to

22  hedge their exposure to real world uncertainty.  And

23  these markets function only because trading occurs on a

24  transparent nationwide exchange that operates within a

25  single federal regulatory structure.  And this structure

1    was not accidental. Rather, this is a deliberate

2    policy choice by Congress in the Commodity Exchange Act.

3    Derivatives trading, and whether that involves the

4    agricultural commodities, or energy products, or event

5    contracts, it must occur on federally designated markets

6    that are supervised at a national level. And if each

7    state, as the Board envisions, if each state could

8    superimpose its own regulatory prohibition, the result

9    wouldn't be complementary regulation. It would be the

10    opposite. It would be market fragmentation. A single

11    nationwide derivative market simply could not operate

12    under a patchwork of 50 competing state regimes.

13            And that, Your Honor, that was the exact

14    point that the CFTC made in its filing the other day

15    to the Ninth Circuit. The Commission explained that

16    state-by-state intervention would have profoundly

17    destabilizing economic effects, and it would inject

18    uncertainty in an area where Congress has sought

19    uniformity and regulatory clarity.

20            Congress was very explicit about exactly

21    what it was doing when it created this national market.

22    The Commodity Exchange Act declares that it serves

23    the American public interest to maintain a system of

24    effective self-regulation of contract markets that

25    operate under commission oversight.

```
 1              And that's how it works.  Your Honor had a
 2    very good question, I thought, for the attorney general
 3    about whether or not Polymarket and the other markets
 4    were actually exercising regulatory authority.  And Your
 5    Honor correctly pointed to Section 7 of Title 7.  That's
 6    the provision of federal law and the Commodity Exchange
 7    Act that requires designated contract markets to adopt,
 8    implement, and enforce, literally, dozens of mandatory
 9    regulatory protections that go directly to things like
10    market integrity, trade surveillance, anti-manipulation,
11    enforcement, position limits, financial safeguards.  So
12    this is --
13              THE COURT:  So let me interrupt you for a
14    moment.
15              Which of Polymarket's self-regulating
16    functions, that go beyond just simple compliance,
17    that are relevant to the State's claims.
18              MR. DUPREE:  Sure.  We do many things that
19    involve regulation of third parties, rather than if the
20    safe claims were simply regulating ourselves.  So, for
21    example, Polymarket issues -- again, pursuant to the
22    Commodity Exchange Act -- issues and enforces rules
23    governing things like market access, governing things
24    like dispute resolution, disciplinary authority.  There
25    is a host of things that involve enforcing, developing,
```

23

```
 1  implementing and enforcing rules against third parties,
 2  people who trade on the platform.  The State focuses,
 3  like a laser, on the idea that we self-certify contracts
 4  for listing on the market, which is true.  But, that's
 5  just the tip of the iceberg.  As the Court knows from
 6  Section 7, there are, literally, dozens of different
 7  things that we do directly regulating third parties.
 8             And Your Honor doesn't need to take my word
 9  for it.  I would direct the Court to --
10             THE COURT:  But the State is not challenging
11  Polymarket's regulation of third party conduct.  The
12  State, here, is focusing on Polymarket's conduct and its
13  alleged failure to register, for example, for a gaming
14  license.
15             Is that right?  So that's why I'm focusing
16  on what -- I have to tie -- because the officer
17  removal statute requires that the party seeking
18  removal demonstrates that they're acting under the
19  authority of a federal officer, and that they're doing
20  more than just complying with what the law requires.
21             So, you list a number of functions that
22  Polymarket has, and it's been delegated.  But I'm
23  trying to find out which of those functions goes beyond
24  compliance that relates to the actions here.  And I
25  seem to -- that seems to be rather elusive.
```

24

```
 1              MR. DUPREE:  Sure.  Well, the core theme
 2    in the State's Complaint -- and this is the Complaint
 3    they filed in state court -- is that, in their view, we
 4    are unlawfully allowing access to our platform from
 5    people in Nevada.  That's the core of their Complaint.
 6    That particular allegation appears throughout their
 7    Complaint.  And that goes directly to our role,
 8    exercising delegated federal authority to establish
 9    rules governing market access.  That is a core
10    regulatory function that we perform under the Commodity
11    Exchange Act that involves third parties.  What third
12    parties -- when they can access our platform, and their
13    roles for engaging in trading on our platform.  That is
14    the core of the State's Complaint, and it goes to one of
15    our core regulatory functions in operating this national
16    market.
17              THE COURT:  So for your core regulatory
18    function, does the FTC have the authority to override
19    whatever decision that Polymarket makes?
20              MR. DUPREE:  The CFTC does have the
21    authority to override pretty much everything, if not
22    everything, including decisions to list particular
23    event contracts in terms of the rules that we develop
24    and that we adopt.  In some cases, we can self-certify
25    these event contracts and these rules alternatively.  We
```

25

1   can go directly to the CFTC for approval.  But at the

2   end of the day, it's the federal agency that supervises

3   it and directly regulates and monitors what we do.

4           The point, Your Honor, I was going to make

5   about this Sparta Surgical case, because I think this is

6   very relevant to the question that's before the Court,

7   the Sparta Surgical case, of course, is the somewhat

8   famous Ninth Circuit case, where the Court held that

9   self-regulatory organizations exercise the very powers

10  and duties and responsibilities that the federal

11  government would otherwise carryout itself.  That's

12  what the Ninth Circuit said speaking specifically of

13  SROs.  That is, of course, pretty much the same test

14  for federal officer removal.

15          As the Supreme Court said in Watson, as

16  the Ninth Circuit has said many times, the test is

17  whether or not the private company is carrying out

18  responsibilities that the federal government otherwise

19  would perform itself.  And the Ninth Circuit answered

20  that exact question in Sparta Surgical, where it said

21  that SROs do the very things the government would

22  otherwise do itself.

23          So let me also just say a word about the

24  purpose of federal officer removal.  The Supreme Court,

25  I thought, gave a great historical (indecipherable),

26

1    some of the reasons underlying the removal provision.

2    It basically said that, look, when you have an entity

3    that is exercising power that is delegated from

4    Congress, and that entity raises a federal defense,

5    Congress said that entity must be allowed to vindicate

6    its defense in a federal forum.  And you have many

7    canons of construction involving them federal officer

8    removal from the Supreme Court, which says that you

9    need to construe this provision liberally. You have to

10   accept the defendant's framing of the case.  All doubts

11   are resolved in favor of allowing federal officer

12   removal.  That actually makes federal officer removal

13   qualitatively different from all the other sorts of

14   federal removal that you find in the U.S. Code.  And

15   that with regard to federal officer removal, the wind

16   is at the defendant's back.  The Supreme Court has

17   said err on the side of allowing removal if there's any

18   doubt removal is permissible.

19            And we think that the facts of this case, as

20   Your Honor pointed out, the structure, the text of the

21   Commodity Exchange Act, clearly demonstrates that we

22   are acting as a regulator.  We are a regulated party

23   to be sure.  But more importantly, more relevantly

24   for purposes of federal officer removal, we are the

25   regulator.

1        If I could say a few words about federal

2   question jurisdiction as well.  This is the Grable case

3   that Your Honor mentioned.  Here, we think that there is

4   another separate, independent ground for federal

5   removal, and that's because the plaintiff, the attorney

6   general's, state law claims necessarily raise

7   substantial federal questions.

8        My friend on the other side said that, well,

9   when you look at the face of our Complaint, well, we

10  don't plead any federal claims.  So that's true as far

11  as it goes but, of course, Grable removal is an

12  exception to the well pleaded Complaint rule.  That's

13  the whole purpose of Grable.  If you have an embedded

14  federal question that must be decided in order to

15  adjudicate the plaintiff's state law claims, federal

16  jurisdiction is permissible and warranted.

17       Here, we have a situation where Nevada's

18  claims necessarily turn on the construction of federal

19  law.  The state licensing statute that they're preceding

20  under, it begins with the phrase, where it says "unless

21  law, the law, federal law otherwise provides, then

22  there's the requirement to get a state gaming license."

23       THE COURT:  So what if the Court disagrees,

24  and the Court agrees with the State that the reference

25  to law in NRS 465.0861 does not incorporate federal law?

28

1    How, then, does the State's claims necessarily raise a

2    federal -- a substantial federal question, other than

3    preemption as a defense?

4          MR. DUPREE:  Well, I think in the universe,

5    Your Honor, I would commend to the Court's attention to

6    the very recent decision from Judge Land, in the Middle

7    District of Georgia.  That's the Georgia Gambling

8    Recovery case.  And I thought Judge Land really hit it

9    out of the park at the end of his opinion, where he

10    says, look, in analyzing the question of Grable removal

11    -- this case, of course, is in the context of a

12    prediction market -- but in the context of  Grable

13    removal, Judge Land said courts are kind of getting them

14    tied up in their shoelaces, trying to figure out is this

15    part of the claim?  Is this an affirmative defense?

16    Where does it all fit in?

17          And what he ultimately said is he said,

18    look, the question presented here for deciding whether

19    Grable removal is appropriate, is simply, in order

20    to decide the state's claims, do we have to make a

21    resolution of federal law?

22          THE COURT:  I'm sorry.  You're referring

23    to the Georgia Gaming Recovery, LLC?  Is that what you

24    said?

25          MR. DUPREE:  Yes, Your Honor.

29

1          THE COURT:  That case is different because,

2     in that case, didn't it involve interpretation of

3     different law?

4          MR. DUPREE:  Well, it did involve an

5     interpretation of federal law, but we think that's

6     what makes that case similar to this case, if not

7     indistinguishable from this case.

8              In other words, the Court cannot adjudicate

9     whether or not we are acting unlawfully, without

10    deciding the federal question that is at the heart of

11    this case; namely, whether or not the CFTC has exclusive

12    jurisdiction over these prediction markets; or, rather,

13    as the State would have it, whether or not the state

14    has the authority to shut down these markets entirely.

15    That's a question of federal law.  That's why Grable

16    exists because it requires federal courts to decide

17    questions that are properly consigned to the federal

18    courts.

19             The one presented here is a quintessential

20    classic textbook example of a federal question; namely,

21    the scope and authority of a federal agency of the

22    United States Government to regulate conduct that is a

23    question that is inherently federal in nature, and why

24    it's exactly proper and warranted for a federal court --

25    this court -- to decide, rather than consign that

1    question out to a state court for resolution.  That's
2    just not how the federal system works.

3              Allowing a state court to decide this would,
4    in fact, turn the structure on its head.  This is the
5    sort of question that federal courts, including in
6    this district and throughout the country, had been
7    deciding on a regular basis; whether or not the CFTC's
8    jurisdiction here is exclusive, or whether or not
9    there's a role for the state to play.

10             THE CLERK:  You have two minutes.

11             MR. DUPREE:  Okay.  The other points I just
12   wanted to mention, on the question about delay -- and
13   this may apply more to the 406 defendants than to us --
14   but in the 406 case, first of all, the State really was
15   dragging its heels in going up to the Ninth Circuit,
16   seeking to -- they did not seek immediate shut down of
17   operations.  In that case, they allowed months and
18   months and months to pass.  But in our case, there is
19   really no reason for an expedited resolution.  It's not
20   necessary.  The attorney general says, well, we want to
21   be able to take advantage before the TRO expires, but
22   that's a problem of the attorney general's own making.
23   We, in fact, as courtesy, agreed to extend the TRO for
24   several days, precisely to allow the attorney general to
25   come to this court, mitigate the remand.  But as far as

31

1   the state is concerned, as far as we're concerned, you

2   know, all the delay, or any alleged delay is entirely

3   attributable to the state.  Certainly not anything done

4   by any of the private parties in this case.

5                   THE COURT:  All right.  Thank you.

6                   Let me hear from Kalshiex's counsel.

7                   MR. LaROCHE:  Thank you, Your Honor.

8   Matt LaRoche, again, on behalf of Kalshi.

9                   We've raised three grounds for removal;

10  arguments based on Grable, based on complete preemption;

11  inartful pleading.  Plaintiff need to run the table on

12  all three of those for us to be remanded back to state

13  court.  We don't believe they could do so.

14                  At a high level, though, Your Honor,

15  this case is about the State trying to use its

16  gaming laws to band Kalshi from operating a federally

17  regulated exchange in Nevada.  The State is targeting,

18  essentially all --

19                  THE COURT:  Well, it doesn't because Kalshi

20  just has to register as a gaming license to comply with

21  gaming regulations.

22                  MR. LaROCHE:  And we've made the point, and

23  the CFTC has made the point, Your Honor, that that is

24  impossible for us to do.

25                  But even if they're saying we just have

32

1    to --

2            THE COURT:  But I have to say I don't get

3    into that issue because the only issue before me is

4    whether the case should be removed or remand.  Whether

5    the case should be remanded after removal.

6            MR. LaROCHE:  Understood, Your Honor.

7            THE COURT:  Because it seems like Chief

8    Judge Gordon's other cases deal more with the

9    substantive issue.

10           But, I don't want to interrupt.  I know you

11   have time limits, so I'll let you read.

12           MR. LaROCHE:  No, understood, Your Honor.  I

13   do think it is relevant to the removal analysis, as I'll

14   explain, because this is broader than just sports event

15   contracts.  This is --

16           THE COURT:  Well, let me ask you this.  So

17   moving on to the complete preemption argument.  Even

18   if -- regardless of whether I agree with Chief Judge

19   Gordon -- and in fact I do agree -- but setting aside

20   that, his order, I think complete preemption is rare,

21   and the State has pointed out to only statutes where

22   the Supreme Court has found complete preemption exists.

23   And as I understand it, there's no dispute that there's

24   no case finding that complete preemption exists with

25   respect to the CEA.

33

```
 1                    Is that correct?
 2              MR. LaROCHE:  That's correct, Your Honor.
 3              If I can address just, first, Chief Judge
 4  Gordon's opinion, though, because I do think there are
 5  few points that are worth noting.  One is Chief Judge
 6  Gordon did find preemption.  It concluded that the CEA
 7  granted the CFTC exclusive jurisdiction over designated
 8  contract parties --
 9              THE COURT:  Well, it's distinguishable from
10  complete preemption because --
11              MR. LaROCHE:  Absolutely, Your Honor.
12              THE COURT:  -- preemption is --
13              MR. LaROCHE:  Absolutely.
14              THE COURT: -- as the State acknowledges.
15              MR. LaROCHE:  Absolutely, Your Honor.  I
16  think that's point two about the decision.  It was not
17  addressing the analysis of complete presumption, which
18  is a distinct --
19              THE COURT:  Correct.
20              MR. LaROCHE:  It's not defensive
21  presumption.
22              I'd also say that Judge Gordon did not
23  address -- he was only addressing sports event
24  contracts. He was not addressing all event contracts,
25  which is what the State is targeting in this case.
```

34

1   And as we've made out with the statutory history is

2   here, with the statutory text, a legislative history,

3   it's very clear that this was not what was intended by

4   the CEA, and that Congress intended to displace a state

5   law cause of action in these circumstances.  We've cited

6   the text, the explicit text, which says that the CFDC

7   has exclusive jurisdiction over conduct in trading

8   on DCMs.  We've cited extensive legislative history

9   that makes that point.  And for decades, courts have

10  recognized that Congress created, created a pervasive

11  and comprehensive regulatory scheme, which was supposed

12  to displace exactly what's occurring here.

13          THE COURT:  But I'm not sure that Kalshi

14  really addresses the savings clause in Section

15  2(a)(1)(A), the last sentence of that clause.  It says,

16  "Nothing in this section shall supersede or limit the

17  jurisdiction conferred the courts of the United States

18  or any state."

19          MR. LaROCHE:  Well, the savings clause we

20  don't think hurts us as all, Your Honor, because what

21  the savings clause is saying is the CFDC has exclusive

22  jurisdiction over conduct that occurs on DCMs.  And

23  then the savings clause says that states can continue

24  regulating conduct that occurs off DCMs.  So our point

25  is that the complete preemption here refers to conduct

35

1   is occurring on DCMs.  That --

2            THE COURT:  But the State's argument is that

3   that phrase does not apply to the final sentence, the

4   phrase before that you rely on.  And I'm not sure that I

5   understand the argument in response that addresses that

6   issue.  So, I'm going to let you repeat what you just

7   indicated.

8            MR. LaROCHE:  Yes, Your Honor.  I think

9   that's inconsistent with Judge Gordon's decision.  He

10  found that there was exclusive jurisdiction over conduct

11  that occurred on DCMs.  Now, he ruled on a slightly

12  different issue.  He ruled on whether they were swaps

13  or not, but that's a different issues as to whether

14  there's exclusive jurisdiction over the DCMs.  And what

15  the State is saying today is that that savings clause

16  allows them to regulate conduct on DCMs.  We think

17  that's inconsistent with the plain language, and

18  inconsistent with what Chief Judge Gordon held.  So,

19  we don't think that the savings clause helps them.  We

20  think it helps us.  And that's consistent with Judge

21  Gordon's decision.

22           The second aspect of the complete preemption

23  analysis is whether the CEA provides a cause of action

24  that supersedes the claims raised here.  We believe it

25  does.  The CEA provides a claim for failing to have the

36

1    appropriate licenses.  We've cited that section.  The

2    CEA provides means for testing, whether an event

3    contract is gaming, we've cited that special rule.

4            Plaintiffs made arguments here that the

5    Board has no remedy.  We don't think that's correct

6    because the Board does have mechanisms to raise these

7    issues directly with CFDC.  Regardless, it's not enough

8    to defeat complete preemption to say that plaintiff

9    doesn't have a cause of action under the CEA.  The

10   Supreme Court has acknowledged that it may foreclose

11   the relief sought by plaintiff.  That the Caterpillar

12   case, and that the claims need not be strictly

13   duplicative.

14           The Thayer case, the First Circuit case

15   we've cited says that a federal claim need not be

16   coextensive with the ousted state claim.  So, we think

17   there is basis for complete preemption here.

18           I would like it go back to the Grable

19   argument, if I may, Your Honor, because I think it's

20   important.  We think this case fits comfortably within

21   the Grable rubric.  And we also think that the Georgia

22   case is directly analogous to this.  And I know Your

23   Honor asked about the differences in that case.  I'm

24   also counsel for Kalshi in that case.  The arguments

25   that were pressed there are identical to the arguments

1    that are being pressed here, and they were rejected.

2    And there's no reason to treat those two cases as

3    different.  In the Georgia case, the plaintiff was using

4    a state law that said that, basically, gambling

5    transactions are lawful.  And it didn't even say

6    anything about federal law.  It's even different than

7    the statute that you're looking at here.  And what the

8    court said is that in order to -- that plaintiff's claim

9    necessarily depended on an application of federal law

10   because you had to look at the interplay with the CEA to

11   determine whether those gambling contracts were lawful.

12           Now, all the same arguments that Ms. Whelan

13   is raising, has raised, and the State has raised, were

14   rejected there.  The plaintiff in the Georgia case said

15   this is just simply defensive preemption.  Well, that's

16   now not our argument.  Our argument is that the state

17   gaming laws do not apply on their own terms to Kalshi.

18   Of course Kalshi is going to make a defensive preemption

19   argument in this case, but that doesn't change the fact

20   that the statute at issue requires an analysis of

21   federal law.  You need to determine whether Kalshi

22   needed a state gaming license.  To determine that, you

23   have to look at whether Kalshiex's designation as a DCM

24   means it did not need to get a state gaming license.

25           And this is very similar to what the Georgia

1    plaintiff argued.  He said I don't need to go to federal

2    law.  I can go to state law, look at state law and say

3    that's unlawful, and that should be enough.  And the

4    Court rejected that argument.

5            Your Honor asked about whether if we lose

6    on the point about "otherwise provided by law" does that

7    mean we lose our case?

8            No, I don't think it does.  As we pointed

9    out, the statute also has language about federal

10   licenses.  And what Ms. Whelan has said, well, that's

11   cumulative because we can just show they didn't have a

12   state license and that should be enough.  We don't think

13   that's a correct reading of the statute.  NRS 460.160

14   speaks in terms of what is required by statute. Kalshi

15   is not required to obtain a state gaming license because

16   it's a federally regulated DCM, subject to the CFDC's

17   exclusive jurisdiction.  Here, again, this argument was

18   rejected in Georgia gambling, where the plaintiff said I

19   don't need to look at federal law.  I can just look to

20   state law and say that's unlawful gambling.  This is

21   what the court said, quote, courts have consistently

22   rejected in oversimplified interpretation that would

23   require a federal statute to be the sole basis for the

24   claim for a federal court to have jurisdiction.  So we

25   think that's directly analogous to the arguments that

39

1   are being here and should be rejected.

2            To get to the point about "except as

3   otherwise provided by law," as Your Honor pointed out,

4   the one case we have here is a case from 1820.  The

5   statute in that case -- first, that was a congruent

6   opinion.  The statute in that case gave no indication

7   that it referenced laws of another sovereign.  We're

8   at totally different circumstance here.  NRS 465.86

9   explicitly references federal gaming licenses, showing

10  that the Nevada legislature intended to incorporate

11  federal law.  This textural reference overcomes any

12  presumption that law excludes federal law.

13           Now, Ms. Whelan has said that well, what

14  Kalshi has is not a quote, unquote, gaming license.

15  Well, the State can't have it both ways.  Either event

16  contracts are gaming and subject to their laws, in which

17  case the CFDC regulates gaming; or, the CFDC does not

18  have gaming licenses and event contracts are not gaming.

19  But whatever rubric that the State is bringing this

20  case, this license authorizes Kalshi to offer the

21  specific event contracts at issue, and it's directly

22  relevant here.

23           The other argument that Ms. Whelan has made

24  is that this is an affirmative defense.  They've cited

25  the Kari case.  That case essentially says that if you

1      have this, you know, an exception, in order for that to

2      form a part of the cause of action, rather than being an

3      affirmative defense, the defense can't being accurately

4      and clearly described if the exception is omitted.

5               Well, that's exactly the case here.  The

6      way the statute works is it speaks in terms of what

7      licenses are required by statute or regulation, and then

8      identifies federal licenses.

9               The State might not like that the Nevada

10     legislature decided to identify federal licenses as a

11     basis for its claim, but it did.  And they have to

12     address that in order to state a claim, which is exactly

13     what Grable said you have to look at.  And so we think

14     the factual circumstances here are very, very analysis.

15              The Georgia case talked about a plaintiff

16     overcomplicating the analysis, Your Honor.  We think

17     that's exactly what they're doing here.  Ultimately,

18     plaintiff's right to relief is dependent on a resolution

19     of the substantial question of federal law.  You have

20     plaintiff arguing that Kalshi has violated state gaming

21     license laws.  They looked at a federal law, despite

22     Kalshi being a CFDC regulated DCM.  And what we're

23     saying is we don't have to get a state gaming license

24     because under Nevada's rubric, we have a federal license

25     that allows us to offer these contracts, and therefore

41

1    we're subject to the CFDC's exclusive jurisdiction.  So,
2    the crux of plaintiff's claim here necessarily depends
3    on application of federal law.  The other Grable factors
4    apply.
5              I do want to make one note because the
6    State has made the argument, Your Honor, that it has a
7    sovereign interest in enforcing its gaming laws.  The
8    core issue here is not whether Kalshi has a gaming
9    license under state law.  No one disputes that, Your
10   Honor.  Kalshi does not have a state license.  The core
11   issue here that's being considered by this court, by
12   Judge Gordon, by the Ninth Circuit, is whether state
13   gaming laws can be used to regulate conduct occurring on
14   a federally regulated DCM.  That's a circumstance in
15   which adjudication in federal court makes total sense.
16             For plaintiff to prevail, Kalshiex's conduct
17   would simultaneously be lawful under federal law as a
18   DCM operating lawfully in 50 states, and unlawful in
19   Nevada.  That's raises a substantial question regarding
20   the balance between state and federal law.  The proper
21   interpretation of which should be considered in federal
22   court.
23             I do want to make just one point, because
24   Your Honor raised it first, if I may, about -- about the
25   timing of this --

42

```
 1              THE CLERK:  You have two minutes left.
 2              MR. LaROCHE:  Thank you.
 3              One point about the timing of this, and
 4    why it's come about at the time it has.  This case,
 5    obviously, particularly with Kalshi, didn't come about
 6    in a vacuum.  Kalshi has been litigating the core issues
 7    of this action for almost a year in this court.  The
 8    Ninth Circuit is now considering those issues on appeal.
 9    When we appealed, the State said it would not enforce
10    until the Ninth Circuit decided its stay motion.  The
11    State has now said to you, Your Honor, that there were,
12    essentially, two things driving it.  One is 25 billion
13    in revenue on Kalshi.  That is just simply false.  I
14    don't know where that number is coming from, but that's
15    not true.  And more broadly, the State knew, when they
16    agreed not to enforce, that the Super Bowl was coming
17    up.  And it's no secret that the Super Bowl drives
18    activity on Kalshi and other markets.  The State also
19    said that we're the only prediction market currently
20    operating in Nevada.  Again, that's not true.  Crypto
21    and Robinhood, other entities, are still operating
22    within the state, just not offering sports event
23    contracts.
24              So instead of allowing this case to play
25    out, the State changed course.  It reneged.  It brought
```

43

1    this action.  But I think that highlights, again, why

2    it's important this case is in federal court.  If it

3    gets remanded, Kalshi is going to be litigating the same

4    core issues in Nevada State Court, in Nevada Federal

5    Court, and the Ninth Circuit.  This is exactly the type

6    of total chaos that Congress sought to avoid when it

7    enacted the CEA, and granted the CFTC exclusive

8    jurisdiction.

9          So, in short, Your Honor, this case raises

10   an important issue of federal law that sensibly belongs

11   in federal court.

12         THE COURT:  Well, so, if the posture of this

13   case is slightly different than the 89 case.  In the 89

14   case, the parties stipulated to a briefing schedule and

15   stipulated to extension of the TRO, and asking the Court

16   to try to issue a decision by the end of this week.

17         And then in this case, the State filed -- in

18   the 406 case, the State filed an emergency motion.  So,

19   ultimately, while I noted and questioned how urgent the

20   matter is, generally, motions to remand, I prioritize so

21   that I don't delay the case should I remand the case to

22   state court.  Of course, I don't prioritize it to this

23   extent.  Usually it's decide within a month from full

24   briefing is my goal.  So, in response, though, Kalshi is

25   not asking for more time.  You -- I know that you

44

1  dispute the emergency but, ultimately, you responded.

2  And as I said, I find all the issues thoroughly briefed.

3           Are you asking for more time, or are you

4  just objecting to the State's request, knowing that the

5  Court has already granted it?

6           MR. LaROCHE:  No, I'm not -- I'm -- we're

7  happy to proceed on a quick schedule if Your Honor

8  likes that.  I think we do just want to make sure that

9  the record is clear that we don't think there is any

10  emergency basis for this.  And it's important to us to

11  say that because as Your Honor pointed out, these are

12  complicated issues that we -- we're certain Your Honor

13  will give due consideration.  But, there's no reason to

14  rush through them.  And the State didn't want to make

15  the Ninth Circuit rush through them.  It's changed

16  course and rushed to file an action against us.  But

17  our basic point is there is no emergency here.  And

18  given the complicated nature of these issues, they

19  should be given due consideration before finally ruling.

20           THE COURT:  All right.  Thank you.

21           MR. LaROCHE:  Thank you, Your Honor.

22           THE COURT: So the State has, I think,

23  reserved a couple minutes.  Do you want to conclude

24  your argument, Ms. Whelan?

25           MS. WHELAN:  Yes, Your Honor.  I first

45

1     would like to correct a slip of the tongue I made when

2     I mentioned the 25 billion number --

3                     THE COURT:  It's not important.

4                     MS. WHELAN:  I don't think that --

5                     THE COURT:  I don't consider it.

6                     MS. WHELAN:  In candor to the Court, --

7                     THE COURT:  At least for my decision it's

8     not important.

9                     MS. WHELAN:  I appreciate that.

10                    The number numbers one billion.  It was 25

11    times more than the revenue that they reported the

12    prior year.  So that's where the -- that was my error.

13                    But, substantively, I just want to point out

14    that binding precedence rejects every argument that the

15    defendants make.  Self-regulation does not transform a

16    regulating entity into a federal officer.  A federal

17    defense does not create federal question jurisdiction.

18    And make no mistake, this is a federal defense.  They've

19    called it a federal defense all along before Chief

20    Gordon and the Ninth Circuit.  Polymarket has called

21    it a preemption defense in its preliminary opposition

22    in state court.  And every court but two that has

23    considered whether the CEA -- I'm sorry -- every court

24    that has considered whether there's complete preemption

25    of the CEA has rejected it, including most recently

 1    Massachusetts.  The defendants can make their merits

 2    argument in state court.  The state court is perfectly

 3    capable of, and empowered to consider the preemption

 4    defense the defendants are trying to make here today.

 5             The question before the Court today is

 6    whether this case can be heard only in federal court?

 7    Accepting Polymarket and Kalshiex's arguments would

 8    massively expand federal question jurisdiction, and

 9    federal officer removal jurisdiction, and would be a

10    huge affront to state sovereignty.

11             Just one word on the Georgia case that's

12    been brought up.  As Your Honor noted, that's different

13    substantive laws, different substantive state law that

14    that case arose under.  Not only that, it's two private

15    parties in litigation.  It's not a state regulator

16    pursuing a state enforcement action in state court.

17    And I think those principles are very important.  The

18    Board's position is that these cases should be remanded

19    to state court, to allow that court to determine whether

20    Polymarket and Kalshi are operating in violation of

21    state law.

22             Thank you.

23             THE COURT:  All right.

24             So thank you, counsel.  As I noted in the

25    89 case, the parties stipulated to this briefing

1    scheduled, and asking for the Court to set a hearing

2    either for yesterday or today.  I don't know -- and

3    asking for me to have a decision issued by this Friday.

4    Certainly, now that I've reviewed everything, it's a

5    matter of writing the order.  It's possible I could get

6    it issued on Friday, but likely it may go into next

7    week.  Primarily, because I just don't know what other

8    urgent matters may come up in the next week.

9            So, I will endeavor to have an order issued

10   by Friday, but more likely early next week is what I can

11   commit to for both cases.

12           But I thank you, counsel, for arguments.  As

13   I said, I thought the issues were thoroughly briefed.

14   And I will have a written decision, separate written

15   decision in both cases.

16           Thank you.

17           MS. WHELAN:  Your Honor, just -- I'm sorry.

18   Just one question.  I know that Polymarket and the State

19   had previously stipulated to February 26th.  I'm hoping

20   that I can get with counsel and stipulate to a consent

21   to a further extension.  If not, there may be a motion

22   coming to Your Honor.  I just want to preview that.

23           THE COURT:  Perhaps counsel could stipulate

24   to extend pending a decision by this court, which will

25   be issued no later than next week.  That's a suggestion.

48

1            MR. DUPREE:  We'll connect immediately after

2    that hearing.

3            MS. WHELAN:  Okay.  Thank you.

4            THE COURT:  All right.  Thank you.

5            I'll conclude the hearing then.

6

7        (Court Adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -oOo-

2

3          I certify that the foregoing is a correct
           transcript from the record of proceedings
4          in the above-entitled matter.

5

           \s\ Kathryn M. French          March 4, 2026
6          _____       _____

7          KATHRYN M. FRENCH, RPR, CCR            DATE
           Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**State Plaintiff's Reply in Support of
Motion to Remand
Dist. Ct. Doc. 20 (filed February 18, 2026)**

AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General - Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3416 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
jmichela@ag.nv.gov

*Attorneys for Plaintiff State of Nevada ex rel.*
*Nevada Gaming Control Board*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BORAD, | Case No. 3:26-cv-00089-MMD-CLB |
| Plaintiff, | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND (ECF NO. 17)** |
| vs. | |
| BLOCKRATIZE, INC. d/b/a/ POLYMARKET; QCX LLC, d/b/a POLYMARKET US; ADVENTURE ONE QSS INC. d/b/a POLYMARKET, | |
| Defendants. | |

## INTRODUCTION

The Nevada Gaming Control Board brought this state-law civil enforcement action against Polymarket, a private company, for offering unlicensed sports betting in violation of Nevada's gaming laws. A state court determined that Polymarket likely offers unlicensed gambling in violation of state law and that Polymarket's actions cause immediate and irreparable harm to the Board, Nevada's gaming industry, and the public each day that it continues. ECF No. 2-4, at 67–68. The court issued an *ex parte* TRO, set the case for

Page **1** of **13**

1  expedited briefing, and scheduled an expedited hearing on the Board's preliminary-
2  injunction motion, so that the court could decide the motion before the TRO expired. But
3  instead of filing a response, Polymarket removed the case to this Court. As the Board
4  explained, Polymarket's two asserted bases for removal lack merit.

5       First, Polymarket asserts that it is "acting under" a federal officer in offering
6  unlicensed sports wagers in Nevada, because its exchange is a designated contract market
7  registered with the CFTC. But Polymarket is not a federal officer, and it is not acting under
8  any federal officer—it is a private entity conducting a private business subject to federal
9  regulation. Polymarket points to decisions where courts determined that self-regulating
10  organizations exercised quasi-governmental functions because they used their delegated
11  authority to regulate *third parties*. But here, Polymarket is not regulating anyone else—
12  the Board's suit challenges Polymarket's offering of its *own* contracts. Polymarket notes
13  that it can self-certify that its contracts comply with the CEA, but the Ninth Circuit has
14  squarely rejected self-certification as a basis for federal officer removal. Polymarket's
15  position, if accepted, would dramatically expand the federal officer removal statute.

16       Second, Polymarket argues that Nevada's state-law complaint necessarily presents
17  the federal question whether its actions are authorized under the CEA. But as the Board
18  explained, federal law appears *nowhere* on the face of the complaint. The only federal
19  question here is the preemption defense Polymarket asserted in the state court, and it is
20  black-letter law that a federal preemption defense does not create federal-question
21  jurisdiction. Polymarket attempts to avoid that straightforward outcome by arguing that
22  one Nevada gaming statute incorporates federal law. Not only does the statute not do that,
23  but if it did, federal law would only be an affirmative defense—and it is settled law that a
24  federal affirmative defense does not create "arising under" jurisdiction. Again, accepting
25  Polymarket's position would massively expand the scope of federal court jurisdiction.

26       The Court should remand this case to state court by February 26, 2026, and award
27  the Board fees and costs incurred responding to Polymarket's removal of this case.

28

1    **I.      ARGUMENT**

2          **A.      Polymarket Is Not "Acting Under" Any Federal Officer**

3          The Supreme Court and the Ninth Circuit have explained that the federal officer

4    removal statute requires more than being regulated by a federal agency, and that mere

5    compliance with even a highly detailed regulatory scheme is not enough. Mot. 11; *see*

6    *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 145 (2007); *Riggs v. Airbus Helicopters,*

7    *Inc.*, 939 F.3d 981, 985 (9th Cir. 2019). The standard requires an "unusually close"

8    relationship between the defendant and a federal officer that is "distinct from the usual

9    regulator/regulated relationship" and that "typically involves subjection, guidance, or

10   control." *Watson*, 551 U.S. at 151, 153, 157. Polymarket does not dispute that this is the

11   governing standard. ECF No. 15 (Opp.) at 12. But it does not come close to showing that its

12   actions as a private entity meet the standard.

13         Polymarket argues (Opp. 10–11) that it is "acting under" the CFTC because, as a

14   CFTC-registered DCM, it is a "self-regulatory organization" and exercises certain

15   "regulatory authority delegated from the CFTC in overseeing the trading of event

16   contracts." But compliance with federal law or regulation is insufficient to establish federal

17   officer removal. And as the Board explained, this case does not involve Polymarket's

18   exercise of delegated authority to regulate the conduct of a third party: the contracts that

19   the Board contends violate Nevada's gaming laws *are Polymarket's own contracts*. Mot. 13.

20   Polymarket does not dispute this point, and that is dispositive under Ninth Circuit law.

21   Any regulatory authority Polymarket may have as a self-regulatory organization is

22   irrelevant to the federal officer issue, because Polymarket is acting only to ensure its *own*

23   compliance with federal law. That is what all federally regulated entities must do, and it is

24   not enough to support federal officer removal. *Watson*, 551 U.S. at 151.

25         Polymarket cites (Opp. 10–12) cases in which courts have concluded that certain self-

26   regulatory organizations may be entitled to governmental immunity when they are sued in

27   connection with their exercise of "quasi-governmental powers." *E.g.*, *Sparta Surgical Corp.*

28   *v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998), *abrogated on other*

Page **3** of **13**

*grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016). But, as the Board explained (Mot. 12–13), Polymarket's cases are distinguishable because they involved governmental immunity rather than the federal officer removal statute, and because they involved the defendant's exercise of regulatory authority over *the plaintiff* (not over itself). *See Sparta Surgical*, 159 F.3d at 1213 (defendant's delisting of the plaintiff's stock offering); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (defendant's administration of the licensing exam for registered securities dealers that plaintiffs took); *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) (defendant's cancellation of plaintiff's trades). That distinction makes sense: When a self-regulatory organization regulates someone else on behalf of the government, the organization is performing a government function and thus should receive governmental immunity for that function. *Sparta Surgical*, 159 F.3d at 1214. But no decision holds that a self-regulatory organization receives government immunity when it is conducting its own business to benefit itself; on the contrary, the Ninth Circuit made clear that a self-regulatory organization does not receive government immunity "[w]hen conducting private business." *Id.*

Polymarket's response is to note (Opp. 11, 13) that, under the CEA, it must establish, monitor, and enforce compliance rules for third parties that wish to trade on its market, including rules that ensure impartial access to its market. But this case does not involve a third party suing Polymarket because it enforced its rules against that third party. *See Sparta Surgical*, 159 F.3d at 1214. Further, the Board is not suing because it believes that Polymarket's rules violate the CEA or that Polymarket fails to monitor compliance with its rules as required by the CEA. Instead, the Board brought this civil enforcement action because Polymarket's own contracts that it lists on its market violate Nevada law. That is Polymarket's "private business," not its regulatory activity, *id.*, and the immunity cases on which Polymarket relies therefore do not apply. Indeed, Polymarket has not asserted an immunity defense, but only one of federal preemption.

Polymarket next argues (Op. 11–12, 15) that it is "acting under the guidance and

1    control of the CFTC" in operating its DCM, citing *Goncalves ex rel. Goncalves v. Rady*
2    *Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017). But again, Polymarket is
3    talking about its own compliance with the law. And this case is nothing like *Goncalves*.
4    There, the Ninth Circuit held that a private insurer acted under a federal officer in bringing
5    claims against third parties to pursue subrogation benefits on behalf of the Office of
6    Personnel Management. *Goncalves*, 865 F.3d at 1246–47. The private insurer was under
7    an obligation to pursue subrogation on behalf of the federal government, which the federal
8    agency had emphasized in a letter to insurers, consistent with a long history of
9    "interconnectedness" between the federal agency and the insurers in this area. *Id.* at 1247.
10   Polymarket identifies no similar "direction" here. Opp. 11 (quoting *Goncalves*, 865 F.3d at
11   1245). And to the extent that Polymarket points to the CFTC's authority to reject actions
12   Polymarket has taken, the Ninth Circuit has made clear that such authority is insufficient
13   to support federal officer removal. *See Riggs*, 939 F.3d at 989. Tellingly, Polymarket
14   identifies no case in which a court allowed a DCM (or any other self-regulatory
15   organization) to remove an action to federal court under these circumstances.[1]

16          Polymarket also points (Opp. 12) to its authority to self-certify that its contracts
17   comply with the CEA. But as the Board explained (Mot. 12), the Ninth Circuit has expressly
18   rejected that sort of self-certification as a basis for federal officer removal. *Riggs*, 939 F.3d
19   at 988–89. Polymarket claims that *Riggs* involved a delegation of self-certification
20   authority that was more "highly constrained" than Polymarket's authority here, Opp. 14,
21   but that is not true: The key constraint for the Ninth Circuit was that the agency had "the
22   authority to rescind any action taken by [the defendant] in connection with the certification
23   process." *Id.* at 989. The CFTC has the same authority here, as Polymarket recognizes. *See*
24   Opp. 6, 11. Polymarket also suggests (Opp. 14) that *Riggs* would have come out differently

25          [1]    Polymarket asserts that there are no cases because a provision of the CEA
26   bars States from bringing suits against DCMs in state court, unless the suit involves a
     violation of a civil or criminal fraud statute. *See* Opp. 14–15 (citing 7 U.S.C. § 13a-2(7)).
27   But that provision is about violations of the CEA or rules implementing it, 7 U.S.C. § 13a-
     2(1)–(2), and the Board is not seeking to enforce the CEA. It seeks only to enforce Nevada
28   gaming law. Besides, States are not the only potential plaintiffs here—a DCM could be
     sued by its users or its partners.

1   if the defendant had had the "power to design the rules," but the Ninth Circuit expressly

2   declined to adopt that distinction. *Riggs*, 939 F.3d at 988 (quoting *Lu Junhong v. Boeing*

3   *Co.*, 792 F.3d 805, 810 (7th Cir. 2015)). In any case, Polymarket does not contend that, in

4   certifying that a contract complies with the CEA and the CFTC's regulations, it is

5   authorized to alter the relevant statutory and regulatory requirements. As in

6   *Riggs*, Polymarket has demonstrated nothing more than "mere compliance with a

7   regulation." 939 F.3d at 985.

8       Finally, Polymarket suggests that it has been prejudiced by the state court issuing

9   a TRO based on the Board's showing of irreparable harm "without an opportunity for

10   Polymarket US even to present its federal defense." Opp. 17. But the state court expressly

11   considered and rejected the same preemption defense Polymarket presents in its briefing

12   to this Court, relying on Judge Gordon's decisions rejecting identical arguments made by

13   Polymarket's competitors. ECF No. 2-4, at 65–67. Further, if Polymarket had filed its

14   preliminary-injunction brief in state court on February 5, it would have had an additional

15   opportunity to present its preemption argument in state court. Instead, Polymarket

16   ignored that deadline and filed a notice of removal in this Court. Polymarket cannot

17   credibly try to lay the results of its litigation gamesmanship at the feet of the state court.[2]

18       At bottom, Polymarket's position is that any DCM could always use its status as a

19   self-regulatory organization to remove any case to federal court, regardless of the conduct

20   at issue in the suit or the capacity in which the DCM was acting. *See* Opp. 14. That view,

21   if accepted, would massively expand the scope of the federal officer removal statute. It

---

22   [2]   Polymarket suggests (Opp. 7–8) that the Board is not suffering irreparable

23   harm as a result of Polymarket's activities because the Board has purportedly delayed in
enforcing against Kalshi, one of Polymarket's competitors. Although the issue is not

24   relevant to the Board's remand motion, Polymarket is wrong. The Board has actively
complied with its statutory mandate to consistently and equitably enforce Nevada's gaming

25   laws, and the state court's decision outlines the irreparable harms that the Board and the
State are suffering from Polymarket's activities. ECF No. 2-4, at 68. Besides, after

26   previously being subject to an injunction that prevented enforcement against Kalshi, the
Board filed an enforcement action against Kalshi in state court on February 17, 2026. *See*

27   *State of Nevada ex rel. Nevada Gaming Control Board v. KalshiEX LLC*, No. 2600000501B
(Nev. 1st JD filed Feb. 17, 2026). In any event, a delay in seeking "judicial protection" rarely

28   if ever negates a showing of irreparable injury, especially "in the context of ongoing,
worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014).

1   would make federal district courts the only venue to pursue state civil and criminal

2   enforcement actions against self-regulatory organizations. That would be a vast expansion

3   of federal power that would impact areas of traditional state police power. This Court

4   should reject application of the federal officer removal statute to Polymarket, a private

5   actor engaged in its own private business.

6   **B.    The Board's State-Law Claims Do Not Support Federal-Question**
        **Jurisdiction**
7

8        Polymarket also fails to establish that this case "arises under" federal law. The

9   Board's complaint raises only state-law claims, and this is not one of the "rare" cases in

10  which a complaint asserting only state-law claims nonetheless "necessarily raise[s]" a

11  "substantial" and "actually disputed" federal issue. *Royal Canin U. S. A., Inc. v.*

12  *Wullschleger*, 604 U.S. 22, 26 (2025). Polymarket makes essentially two arguments: First,

13  that its preemption defense is not a defense at all, and second, that the language "except

14  as otherwise provided by law" in one Nevada statute means that its federal defense must

15  be decided as part of Nevada's cause of action. Both are mistaken.

16       First, as the Board explained (Mot. 16), the only federal question that Polymarket

17  identifies is its asserted preemption defense. But Polymarket does not dispute that, under

18  long-established black-letter law, a preemption defense cannot be the basis for removal,

19  "even if the defense is anticipated in the plaintiff's complaint, and even if both parties

20  concede that the federal defense is the only question truly at issue." *Caterpillar Inc. v.*

21  *Williams*, 482 U.S. 386, 393 (1987); *see* Mot. 16. Polymarket now seeks to characterize what

22  it previously acknowledged is a "preempt[ion]" argument in state court, ECF No. 2-4, at 6,

23  and even calls a "preemption defense" in its federal officer removal argument, Opp. 16, as

24  something *other than* a preemption defense for purposes of federal-question removal. Its

25  arguments lack merit.

26       According to Polymarket, the "core" federal question in this case is whether Nevada

27  may "impose its own licensing and enforcement regime" in light of "the CFTC's exclusive

28  jurisdiction under the CEA." Opp. 18. That is the same preemption argument Polymarket

1    presents as its federal defense in support of its federal officer removal argument. *See* Opp.

2    16. Indeed, Polymarket places heavy reliance (Opp. 1–2, 5, 8, 20–21) on a motion filed by

3    the CFTC in the pending appeal in *North American Derivatives Exchange, Inc. v. Nevada*

4    *Gaming Control Board*, No. 25-7187 (9th Cir.), where the CFTC indicated that plans to file

5    an *amicus* brief to address the CEA's asserted "preemption of state laws attempting to

6    regulate trading on CFTC-registered contract markets." ECF No. 3-1 at 2. So everyone

7    knows this argument is a preemption defense. Whether meritorious or (as Judge Gordon

8    has twice concluded) not, that preemption defense provides no basis for removal.

9        Second, Polymarket points to one statute cited in the Board's complaint, NRS

10   § 465.086(1), to say that this case necessarily involves federal law. That statute provides

11   that, "[e]xcept as otherwise provided by law, it is unlawful for a person to receive, directly

12   or indirectly, any compensation or reward, or any percentage or share of the money or

13   property played, for accepting any bet or wager upon the result of any . . . sporting event

14   or other event" without obtaining "all federal, state, county and municipal gaming licenses"

15   required. *Id.* Resolving a state-law claim based on this statute does not require resolution

16   of a substantial federal issue.

17       Polymarket argues that "[e]xcept as otherwise provided by law" necessarily

18   incorporates federal law. But the clause does not expressly refer to any federal law, much

19   less the CEA specifically. Polymarket does not dispute that; instead, its argument

20   presupposes that it is right about preemption and that the CEA applies here. But when a

21   statute refers to "law" generally, the statue is presumed to refer "only . . . to the laws of the

22   government" that passed the statute, *Houston v. Moore*, 18 U.S. (5. Wheat.) 1, 42 (1820)—

23   here, meaning Nevada law. Accordingly, Nevada law does not require the Board to show

24   noncompliance with the CEA in order to establish a violation of NRS § 465.086. That

25   distinguishes this case from *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545

26   U.S. 308 (2005) (cited at Opp. 17), where the plaintiff expressly incorporated federal law

27   into the cause of action; the state law in that case required the plaintiff to specify "the facts

28   */ / /*

1  establishing the superiority of [its] claim," and the plaintiff had premised superiority "on a

2  failure by the IRS to give it adequate notice, as defined by federal law." *Id.* at 314–15.[3]

3      Further, as the Board explained (Mot. 17), even if the "[e]xcept as otherwise

4  provided" language were understood to incorporate federal law, that would only establish

5  an affirmative defense to be raised and proved by the defendant, not an element of a

6  statutory claim that could serve as a basis for removal. Polymarket argues that this would

7  not be an affirmative defense, because a statute creates affirmative defenses "only when

8  the statute lists them in a separate section from the statutory prohibitions and the

9  exemptions 'expressly refer to the prohibited conduct as such.'" Opp. 19 (quoting

10  *Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025)). Polymarket misreads

11  *Cunningham*: The Supreme Court did not say that *only* statutes that list exceptions

12  separately and label them as exceptions create affirmative defenses. Instead, the Court

13  explained that the "general rule of statutory construction" is that "a special exception to

14  the prohibitions of a statute" is an affirmative defense. *Cunningham*, 604 U.S. at 701

15  (internal quotation marks omitted). The Nevada Supreme Court likewise has explained

16  that an exception to a prohibition generally is an affirmative defense, as opposed to the

17  element of a cause of action. *See Haddad v. State*, 2011 WL 1225795 (Nev. Jan. 13, 2011)

18  ("[A] statutory exception is an affirmative defense where the statute first defines an offense

19  in unconditional terms and then specifies an exception to its operation.").[4] Here, "except as

20  otherwise provided" plainly sets out an exception to the statutory prohibition and thus

21  creates an affirmative defense.

22  _____

[3]    Polymarket argues (Opp. 18–19) that the Nevada Supreme Court interpreted
23  "[e]xcept as otherwise provided by law" in the federal Telephone Consumer Protection Act
   (TCPA) to incorporate state statutes of limitations when a TCPA suit is brought in state
24  court. *See Edwards v. Emperor's Garden Rest.*, 130 P.3d 1280, 1286 (Nev. 2006).
   Polymarket misreads *Edwards*; the Nevada Supreme Court concluded that a *separate*
25  provision of the TCPA, which authorizes suits in statute courts "if otherwise permitted by
   the laws or rules of court of State," 47 U.S.C. § 227(b)(3), incorporated the relevant Nevada
26  statute of limitations, *see* 130 P.3d at 1286–87.

[4]    Polymarket does not identify any Nevada case rejecting this principle.
27  Instead, it cites (Opp. 18) *Harmon v. Tanner Motor Tours of Nevada, Ltd.*, 377 P.2d 622
   (Nev. 1963), where the Nevada Supreme Court came to the unremarkable conclusion that,
28  when two statutes are in conflict and one says "[e]xcept as otherwise provided," that statute
   should give way to the other one. *See id.* at 626.

Page **9** of 13

1    Citing *United States v. Vuitch*, 402 U.S. 62 (1971), Polymarket argues (Opp. 19) that
2    an exception is not an affirmative defense when it is part of the same "provision" of a
3    criminal statute. But the statute in *Vuitch* set out the requirements for the exception within
4    the statute itself: It prohibited any person from "procur[ing] . . . an abortion or miscarriage
5    on any woman, *unless the same were done as necessary for the preservation of the mother's*
6    *life or health and under the direction of a competent licensed practitioner of medicine*." *See*
7    402 U.S. at 68–69 (emphasis added; internal quotation marks omitted)). The statute did
8    not merely refer to other unspecified laws in other statutes, unlike NRS § 465.086.

9    As the Ninth Circuit has explained, *Vuitch* is an example of a situation in which an
10   exception forms part of the cause of action because it "is so incorporated with the language
11   defining the offence that the ingredients of the offence cannot be accurately and clearly
12   described if the exception is omitted." *United States v. Carey*, 929 F.3d 1092, 1100 (9th Cir.
13   2019) (quoting *United States v. Cook*, 84 U.S. (17 Wall.) 168, 173 (1872)). Where, by
14   contrast, a statute "broadly prohibits a set of activities" which clearly describe the offense,
15   "and then offers a limited exception," the exception should be construed as an affirmative
16   defense. *Id.* at 1100. That latter situation describes NRS § 465.086: The statute broadly
17   prohibits an unlicensed entity receiving any compensation for accepting a wager on a
18   sporting event and then provides a limited exception for when that conduct is allowed by
19   other law. *See* NRS § 465.086. That is, the statutory prohibition can be "accurately and
20   clearly described," *Cook*, 84 U.S. at 173, without reference to the "[e]xcept as otherwise
21   provided" clause, NRS § 465.086. That language thus only provides an affirmative defense.

22   Polymarket also argues (Opp. 19) that because NRS § 465.086 "refers to 'federal'
23   licensing," the statute incorporates federal law. But as the Board explained (Mot. 17), the
24   statute prohibits a person from receiving compensation from sports wagers unless the
25   person possesses the necessary "federal, state, county, *and* municipal gaming licenses."
26   NRS § 465.086(1) (emphasis added). Thus, the requirement of a federal license is in
27   addition to the state license; possessing one license does not excuse the absence of another.
28   As a result, it is irrelevant to the Board's state-law claim whether Polymarket has a

Page **10** of 13

1   "federal" license for its activities. Polymarket's receipt of compensation for accepting
2   wagers from persons within Nevada is unlawful because it does not possess a state license,
3   regardless of whether it possesses a valid federal license.

4           Next, Polymarket contends (Opp. 17–18) that removal is warranted under *Georgia*
5   *Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375 (M.D. Ga. Feb. 3, 2026). That case
6   also involved a state-law claim against a prediction market. But as the Board explained
7   (Mot. 18), the state law at issue there is nothing like the Nevada law at issue here. The
8   Georgia law in *Georgia Gambling* provided that "[g]ambling contracts" were "void," and
9   authorized recovery of "[m]oney paid . . . upon a gambling consideration" in connection with
10  such contracts, O.C.G.A. § 13-8-3, and the Georgia Supreme Court had stated that whether
11  a gambling contract was void under this provision "depends on whether the contract is
12  unlawful under the law governing its validity," *Georgia Gambling*, 2026 WL 279375, at *3
13  (citing *Talley v. Mathis*, 453 S.E.2d 704 (Ga. 1995)). As a result, to succeed on its state-law
14  claim, the plaintiff had to prove that the challenged contracts were illegal under federal
15  law. *See id.* at *2–3. Polymarket can identify no similar incorporation of federal law into
16  the elements of the Board's state-law claims here.

17          Finally, as the Board explained (Mot. 17–18), accepting Polymarket's view of federal-
18  question jurisdiction would offend principles of federalism and would dramatically expand
19  federal-question jurisdiction. As the Ninth Circuit has explained, a federal court should be
20  particularly reluctant to adjudicate a state-law enforcement action brought by the State to
21  protect the State's residents in light of the State's "strong sovereign interest in enforcing
22  its state laws," *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012)—which is
23  exactly the situation here.

24          Polymarket's response (Opp. 20–21) is to argue that the CEA must be uniformly
25  applied. It cites *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990), but its reliance is
26  misplaced—*Ingersoll-Rand* involved ERISA, *see id.* at 142, which is one of the exceedingly
27  rare federal statutes that courts have held completely preempt state law, meaning that it
28  "entirely replace[s] any state-law claim," *Marin Gen. Hosp. v. Modesto & Empire Traction*

1    *Co.*, 581 F.3d 941, 945 (9th Cir. 2009) (internal quotation marks omitted). The CEA is not

2    one of those statutes. *See, e.g.*, *Farmers Co-op Elevator v. Doden*, 946 F. Supp. 718, 728–29

3    & n.4 (N.D. Iowa 1996). Further, the Board's suit seeks to enforce Nevada's state gambling

4    regulations, not to enforce the CEA or otherwise regulate DCMs, much less challenge "the

5    decisions and authority of the CFTC in 'administering and enforcing' the CEA." Opp. 20.

6        Exercising jurisdiction over state-law claims in an area of core state regulation

7    merely because of a federal preemption defense "would 'herald a potentially enormous shift

8    of traditionally state cases into federal courts.'" *Nevada*, 672 F.3d at 676. It also would

9    allow any DCM (and indeed, any federally regulated entity) to remove any state-court case

10   to federal court on the basis of a federal preemption defense, thus dramatically expanding

11   the scope of federal jurisdiction.

12       **C.    An Award of Attorneys' Fees is Appropriate**

13       As explained in the Board's motion and this reply, Polymarket lacked an objectively

14   reasonable basis to remove the Board's suit to this Court. *See* Mot. 18–19. For federal officer

15   removal, the cases on which Polymarket relies make clear it was not acting under a federal

16   officer in connection with the actions challenged in this suit. For federal-question

17   jurisdiction, a long line of cases holds that a federal defense is not a basis for removal, and

18   Polymarket has twice acknowledged that its argument about the CEA is a federal

19   preemption defense.

20       Polymarket responds that a removing party has an objectively reasonable basis for

21   removal as long as "a 'circuit court of appeals' has not 'rejected' the removing party's

22   'argument.'" Opp. 21 (quoting *Lussier v. Dollar Tree Stores, Inc.*, 518 F.3d 1062, 1066 (9th

23   Cir. 2008)). But a court need not have rejected the precise basis for removal offered by a

24   removing party for the removal to be objectively unreasonable. A party's position can be

25   objectively unreasonable where, for example, it relies on a case as an asserted basis for

26   removal notwithstanding "clear factual distinctions" between its case and the case on which

27   it relied. *Grancare, LLC v. Thrower by & through Mills*, 889 F.3d 543, 552 (9th Cir. 2018).

28   Where "it is obvious that [the removing party] would not have been entitled to removal in

Page **12** of 13

1  this case even if [its preferred] standard had been applied," an award of fees is appropriate.

2  *Id.*

3        Polymarket's removal was not objectively reasonable on either asserted ground.

4  Established precedent holds that merely being a federally regulated entity and self-

5  certifying compliance with federal law does not create federal officer removal jurisdiction.

6  Polymarket has identified no authority permitting a DCM to remove a case based on its

7  status as a DCM. It attempts to analogize this lawsuit to cases in which a court concluded

8  a self-regulatory organization had quasi-governmental immunity, but that analogy fails

9  because this is not an immunity case, and Polymarket's actions concern its own private

10  business, not its regulation of third parties. Further, ample binding precedent establishes

11  that a federal defense is not a basis for federal-question removal. Polymarket has not

12  established any reasonable ground to conclude that its CEA argument is anything other

13  than a preemption defense—indeed, Polymarket has argued that it *is* a preemption defense

14  for purposes of federal officer removal.

15        The Court should award the Board costs and fees associated with responding to

16  Polymarket's objectively unreasonable removal of this case from the state court that should

17  resolve the Board's state-law complaint.

18                                **CONCLUSION**

19        The Court should remand this matter to the First Judicial District Court of Nevada,

20  Carson City prior to the expiration of the TRO on February 26, 2026, and should award

21  attorney's fees to the Board.

22        DATED this 18th day of February, 2026.

23                              AARON D. FORD
                               Attorney General
24

25                              By: */s/ Jessica E. Whelan*
                                 Jessica E. Whelan (Bar No. 14781)
26                                 Chief Deputy Solicitor General - Litigation
                                 jwhelan@ag.nv.gov
27                                 *Attorneys for State of Nevada ex rel. Nevada*
                                 *Gaming Control Board*
28

                          Page **13** of **13**

**Amicus Brief of CFTC, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026)**

No. 25-7187

## In The United States Court of Appeals
## for the Ninth Circuit

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D / B / A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*

v.

THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees,*

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:25-cv-00978-APG-BNW

## SUPPLEMENT TO THE MOTION OF THE COMMODITY FUTURES TRADING COMMISSION, A FEDERAL GOVERNMENT AGENCY, FOR LEAVE TO FILE AN OUT-OF-TIME AMICUS CURIAE BRIEF

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5129

*Counsel for Amicus Curiae*
*Commodity Futures Trading Commission*

On February 5, 2026, pending amicus curiae the Commodity Futures Trading Commission ("CFTC"), moved this Court for leave to file an amicus brief out of time in support of North American Derivatives Exchange, Inc. d/b/a Crypto.com and to modify the briefing schedule. That motion remains pending.

The CFTC hereby supplements its motion with the amicus brief that it proposes to file. For the reasons previously submitted, and such others as may appear just and reasonable to this Court, the CFTC respectfully requests that this Court grant its motion for leave to file the attached amicus curiae brief out of time, and to modify the briefing schedule to accommodate this filing.

Dated: February 17, 2026      Respectfully Submitted,

Anne Stukes_____
D.C. Bar 469446

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127

## CERTIFICATE OF SERVICE

I certify that on February 17, 2026, I electronically filed this Supplement with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ Anne Stukes

## CERTIFICATE OF COMPLIANCE TYPE-VOLUME LIMITATIONS

I hereby certify that the foregoing document complies with the type limitations set in Fed. R. App. P. 27(d)(E) and 32(a)(5) and (6) because it is in Times New Roman 14-point type.  I further certify that this motion complies with the volume limitations of Fed. R. App. P. 27(d)(2) because it contains 112 words, as counted by the word processing software Microsoft Word.

/s/ Anne Stukes

No. 25-7187
In The United States Court of Appeals
for the Ninth Circuit

_____

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D / B / A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*
v.
THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*
_____

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:25-cv-00978-APG-BNW
_____

**AMICUS BRIEF OF COMMODITY FUTURES TRADING
COMMISSION, A FEDERAL GOVERNMENT AGENCY,
IN SUPPORT OF APPELLANT AND IN SUPPORT OF REVERSAL**

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127
*Counsel for Amicus Curiae*
*Commodity Futures Trading Commission*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................1

BACKGROUND ...............................................................................3

I.   The Commodity Exchange Act Provides the Regulatory Framework
     for Commodity Derivatives Market in the United States. ................3

II.  The Development of Federal Regulation of U.S. Futures and
     Swaps Markets. .......................................................................5

     A.  The Origins of Federal Oversight of Derivatives Regulation. ....5

     B.  Congress Gave the CFTC "Exclusive" Jurisdiction over Futures
         Trading in 1974. ...............................................................8

     C.  Congress Reinforced and Clarified the CFTC's Exclusive
         Jurisdiction after 1974. ......................................................9

     D.  Congress Embraced Preemption as to Swaps Transactions
         in the Dodd Frank Act. ....................................................13

ARGUMENT ................................................................................14

I.   Event Contracts Trading on CFTC-Regulated Markets Is Subject
     to the CFTC's Exclusive Jurisdiction..........................................14

     A.  Under the Plain Language of CEA Section 1(a)(47), Event
         Contracts Are "Swaps."....................................................14

     B.  Sports Event Contracts Are Associated with Potential Financial,
         Economic, and Commercial Consequences. ..........................19

II.  The CEA Preempts Other Federal and State Actors from Exercising
     Regulatory Authority over Swaps, Including Event Contracts, on
     CFTC-Regulated Markets. ......................................................21

A.  The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges. ...........................................21

B.  The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify Its Field Preemptive Effect; It Preserves Traditional State Powers over State-Regulated Gambling. .................................................24

C.  State Gambling Laws Are Conflict Preempted. ........................................26

III.  Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects. ....................28

CONCLUSION ......................................................................................29

# TABLE OF AUTHORITIES

Cases

*Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1979)...................................................................19

*Ali v. Federal Bureau of Prisons*,
552 U.S. 214 (2008)......................................................................................14

*Altria Group, Inc. v. Good*,
555 U.S. 70 (2008)...................................................................................22, 27

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992)....................................................................22

*Arizona v. United States*,
567 U.S. 387 (2012)......................................................................................21

*Board of Trade of Chicago v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905)....................................................................................2, 6

*Bostock v. Clayton County, Ga.*,
590 U.S. 644 (2020)......................................................................................15

*Chicago Mercantile Exchange v. SEC*,
883 F.2d 537 (7th Cir. 1989).......................................................................23

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888)..................................................................................6

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000)......................................................................................26

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
622 F.2d 216 (6th Cir. 1980),
*aff'd Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)......................................................................................23

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933).......................................................................................7

*Duke Energy Trading & Marketing, LLC v. Davis*,
  267 F.3d 1042 (9th Cir. 2001) ...............................................................21

*Effex Capital, LLC v. National Futures Association*,
  933 F.3d 882 (7th Cir. 2019) ................................................................22

*English v. General Electric Co.*,
  496 U.S. 72 (1990) ...............................................................................26

*Florida Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) .............................................................................26

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) .............................................................25

*Hillman v. Maretta*,
  569 U.S. 483 (2013) .............................................................................26

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ...............................................................................26

*Hughes v. Talen Energy Marketing, LLC*,
  578 U.S. 150 (2016) .............................................................................21

*Hunter v. FERC*,
  711 F.3d 155 (D.C. Cir. 2013) .............................................................25

*International Trading, Ltd. v. Bell*,
  556 S.W.2d 420 (Ark. 1977) ................................................................23

*Irwin v. Williar*,
  110 U.S. 499 (1884) ...............................................................................5

*Leist v. Simplot*.
  638 F.2d 283 (2d Cir. 1980) .................................................................22

*Los Angeles Memorial Coliseum Commission v. NFL*,
  726 F.2d 1381 (9th Cir. 1984) .............................................................19

*Nevada, et al. v. Coinbase Financial Markets, Inc.*,
  No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) .................. 2-3

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
    515 F. Supp. 202 (N.D. Ala. 1981) ....................................................23

*Pennsylvania v. National Collegiate Athletic Association*,
    948 F. Supp. 2d 416 (M.D. Pa. 2013) ........................................ 19-20

*Point Landing, Inc. v. Omni Capital International, Ltd.*,
    795 F.2d 415, 422 (5th Cir. 1986)*,*
*aff'd sub nom. Omni Capital International, Ltd. v. Rudolf Wolff & Co.*,
    484 U.S. 97 (1987) ..............................................................................23

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ............................................................................27

*Richardson v. Kruchko & Fries*,
    966 F.2d 153 (4th Cir. 1992) ............................................................21

*Rumsey v. Berry*,
    65 Me. 570 (Me. 1876) .........................................................................6

*Stuber v. Hill*,
    170 F. Supp. 2d 1146 (D. Kan. 2001) ..............................................23

*Texas v. Monex International, Ltd.*,
    527 S.W.2d 804 (Tex. Civ. App. 1975),
    *writ refused* (Dec. 17, 1975) .............................................................23

*Time Warner Cable v. Doyle*,
    66 F.3d 867 (7th Cir. 1995) ..............................................................22

*Transcontinental Gas Pipe Line Co. v. Pennsylvania Environmental Hearing Board*,
    108 F.4th 144 (3d Cir. 2024) ............................................................21

Statutes

7 U.S.C. §§ 1-26, CEA §§ 1-23 ..............................................................1

7 U.S.C. § 1a(9), CEA § 1a(9) .............................................................16

7 U.S.C. § 1a(47), CEA § 1a(47) .........................................................14

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A) .............................................14

7 U.S.C. § 1a(47)(A)(i), CEA § 1a(47)(A)(i) ....................................14

7 U.S.C. § 1a(47)(A)(ii), CEA § 1a(47)(A)(ii) ..................................14

7 U.S.C. § 1a(47)(A)(iv), CEA § 1a(47)(A)(iv) .................................14

7 U.S.C. § 1a(47)(A)(vi), CEA § 1a(47)(A)(vi) ................................14

7 U.S.C. § 1a(47)(B), CEA § 1a(47)(B) .............................................16

7 U.S.C. § 2(a)(1), CEA § 2(a)(1) ..................................................1, 19

7 U.S.C. § 2(a)(1)(A), CEA § 2(a)(1)(A) ............................ 1, 4, 13, 21-25

7 U.S.C. § 2(d), CEA § 2(d) ...............................................................13

7 U.S.C. § 5, CEA § 3 ...........................................................................1

7 U.S.C. § 6(a), CEA § 4(a) ..................................................................4

7 U.S.C. § 13a-2, CEA § 6d ................................................................10

31 U.S.C. § 5362(1)(E)(ii) ..................................................................24

Commodity Exchange Act,
    Pub. L. No. 74-675, 49 Stat. 1491 (1936).......................................7

Commodity Futures Trading Commission Act of 1974,
    Pub. L. No. 93-463, 88 Stat. 1389 (1974) .......................................8

Commodity Futures Modernization Act of 2000,
    Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000)...........................12

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) ...................................13

Future Trading Act of 1921,
    Pub. L. No. 67-66, 42 Stat. 187 (1921)...........................................6

Futures Trading Act of 1978,
    Pub. L. No. 95-405, 92 Stat. 865 (1978).........................................10

Futures Trading Act of 1982,
   Pub. L. No. 97-444, 96 Stat. 2294 (1982)........................................................11

Futures Trading Practices Act of 1992,
   Pub. L. No. 102-546, 106 Stat. 3590 (1992)....................................................11

Grain Futures Act of 1922,
   Pub. L. No. 67-331, 42 Stat. 998 (1922).......................................................6-7

<u>Regulations</u>

17 C.F.R. § 1.3 .........................................................................................................16

17 C.F.R. § 32.2(a) ..................................................................................................16

17 C.F.R. § 38.151(b)...............................................................................................26

17 C.F.R. § 40.2 .......................................................................................................28

CFTC Commodity Options,
   77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) .................................................16

CFTC Further Definition of "Swap", "Security Based-Swap", and
"Security-Based Swap Agreement"; Mixed Swaps; Security Based-Swap
Agreement Recordkeeping,
   77 Fed. Reg. 48208, 48209 (Aug. 13, 2012) ......................................................18

CFTC Concept Release on the Appropriate Regulatory Treatment of
Event Contracts,
   73 Fed. Reg. 25669, 25671 (May 7, 2008)..........................................................18

<u>Legislative Materials</u>

H. Rep. No. 67-1095 (1922) (Conf. Rep.) ................................................................7

H.R. Rep. No. 93-975 (1974).....................................................................................1

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
   *as reprinted in* 1974 U.S.C.C.A.N. 5894............................................................9

H.R. Rep. No. 97-565 (1982), pt 1,
   *as reprinted in* 1982 U.S.C.C.A.N. 3871.....................................................10, 11

H.R. Rep. No. 102-978 (1992) (Conf. Rep.),
*as reprinted in* 1992 U.S.C.C.A.N. 3179 ............................................................12

S. Rep. No. 67-871 (1922) .....................................................................................5

S. Rep. No. 93-1131 (1974),
*as reprinted in* 1974 U.S.C.C.A.N. 5843 ..............................................................1

S. Rep. No. 95-850 (1978),
*as reprinted in* 1978 U.S.C.C.A.N. 2087 ............................................................10

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
(statement of Sen. Curtis) .........................................................................9

156 Cong. Rec. S5923 (daily ed. July 15, 2010)
(statement of Sen. Lincoln).................................................................18

Review of Commodity Exchange Act and Discussion of Possible Changes:
Hearings Before the H. Comm. on Agric.*,* 93d Cong., 1st Sess. 121 (1973) ........ 7-8

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric.
& Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685
(1974) (statement of Sen. Clark).................................................................9

Other Authorities

CFTC, Designated Contracts Markets (DCMs),
https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?St
atus=Designated&Date_From=&Date_To=&Show_All=1 .............................5, 20

CFTC, Futures Glossary,
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
CFTCGlossary/index.htm ...........................................................................16

CFTC, History of the CFTC,
https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html ..................5

*Event*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/event .............................................15

*Contingency*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/contingency .................................15

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*,
  6 Hofstra L. Rev. 1, 6 (1977) ....................................................................6

Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports
Gambling Based on Securities Style Mandatory Disclosure*,
  41 Cardozo L. Rev. 1229, 1247 (2000)................................................19

William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848
(U.M. Rose ed., 1884)..................................................................................6

# INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1-26.  Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the existing patchwork of state-by-state regulation had critically impaired the development and functioning of national commodities markets.  *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.  "[T]ransactions subject to [the CEA] are entered into regularly in interstate and international commerce and are affected with a national public interest," including in "liquid, fair, and financially secure trading facilities."  7 U.S.C. § 5.

Congress vested the CFTC with "exclusive jurisdiction" to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  The CFTC's jurisdiction "supersedes State as well as Federal agencies" because commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case.  *See* S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 5848.

Appellees' views and the district court's decision, if accepted, present a fundamental threat to Congress's statutory design. As Justice Holmes presciently noted in 1905:

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905).

States cannot invade the CFTC's exclusive jurisdiction over CFTC-regulated designated contract markets ("DCMs") by re-characterizing swaps trading on DCMs as illegal gambling. The decision below is inconsistent with the text, structure, and history of the CEA and, if affirmed, would reintroduce precisely the regulatory fragmentation Congress deliberately displaced.

It is Appellees' theory of the case that presents a seismic shift in the longstanding status quo between CFTC and state authority. This court need only look at many of these same parties' temporary restraining order against Coinbase, where they requested, and received, an injunction barring the offering of "event-based contracts relating to sporting *and other events*." Ex Parte Temporary

Restraining Order at 2, 7 *Nevada, et al. v. Coinbase Financial Markets, Inc.*, No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) (emphasis added) (prohibiting Coinbase "from offering or facilitating the offering of event contract[s] in Nevada"). Unable to articulate any limiting principle to their theory, they have upended decades of well-settled and Congressionally-mandated exclusive jurisdiction across the full spectrum of event contracts.

While subsequent litigation may require resolution of complicated follow-on questions, this case presents two narrow, yet exceptionally important, questions: (1) are Appellant's CFTC exchange-traded event contracts swaps, and (2) may such swaps also be regulated, or prohibited, under state law, thereby displacing the CEA's express preemption of state and other federal laws or rules? The CFTC submits this brief to assist the Court in resolving these fundamental issues.

## BACKGROUND

## I. The Commodity Exchange Act Provides the Regulatory Framework for Commodity Derivatives Markets in the United States.

The CEA is a federal statute that provides the comprehensive federal framework governing transactions in United States commodity derivatives markets. A derivative is a financial instrument, the value of which depends on (*i.e.*, is derived from) the value of some underlying asset, index, or other measure. In general, market participants use derivatives to hedge risks or speculate on commodity price movements. The most common derivatives are "futures

contracts" and "swaps."  While derivatives markets are distinct from "cash" or "physical" markets in which the assets themselves are bought and sold, the prices of those assets and derivatives are typically closely linked.  If a price disparity arises, arbitrageurs will take advantage of the difference, and the gap disappears. In the ordinary course, these price movements contribute to "price discovery," the mechanism by which supply and demand set the price of a commodity.

A futures contract is a standardized agreement to purchase or sell a "commodity" at a future date for a price determined at the contract's inception. Although the CEA uses the term of art "contract[] of sale of a commodity for future delivery," most contracts are structured for financial settlement and are discharged by executing a contract that reverses the obligation to purchase or sell. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A).  Under the CEA, a futures contract must be traded on a DCM, the statutory term for a registered derivatives exchange.  7 U.S.C. § 6(a).  A swap includes a broad array of financial instruments, such as "event contracts."  Swap transactions are also traded on CFTC-registered DCMs.

Futures markets originated in the United States at transportation hubs for agricultural products like grain, butter, and eggs.  Over time, exchanges began to offer contracts for other physical commodities like metals, oil, and gas, and later introduced cash-settled futures linked to less tangible measures like interest rates and price indices.  While the range of underlying commodities has expanded (and

continues to do so) over time, the fundamental regulatory structure governing futures markets has remained consistent. Today there are 24 exchanges (DCMs) in the United States, including North American Derivatives Exchange d/b/a Crypto.com.[1]

## II.     The Development of Federal Regulation of U.S. Futures and Swaps Markets.

### A. *The Origins of Federal Oversight of Derivatives Regulation.*

By the mid-nineteenth century, exchanges in major commodity trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation.[2] But there was tension between state regulation of gambling and the growth of futures markets. States and courts often failed to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a

---

[1] *See* CFTC, Designated Contracts Markets (DCMs), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?Status=Designated&Date_From=&Date_To=&Show_All=1 (last visited February 8, 2026).

[2] *See* CFTC, History of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html (last visited February 8, 2026); *see also Regulating Transactions on Grain-Future Exchanges*, S. Rep. No. 67-871, at 3 (1922): "Transactions in grain futures are utilized by the public for speculation and by the grain trade for the purpose of eliminating or reducing, as far as practicable, the hazards in the merchandising of grain and its products and by-products due to price fluctuations. Public speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions."

form of gambling.  *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884)

(describing futures contracts as "nothing more than a wager"); *see also Cothran v.*

*Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain"); s*ee*

*also Rumsey v. Berry*, 65 Me. 570, 574 (Me. 1876) (finding futures contracts to be

void as contrary to public policy).  For example, an Arkansas law declared that

"[t]he buying or selling or otherwise dealing in what is known as futures . . . with a

view to profit, is hereby declared to be gambling" and made dealing in futures

illegal.  *See* William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848

(U.M. Rose ed., 1884).

        Nevertheless, the Supreme Court and Congress acknowledged that futures

markets served a valuable economic function and should be given room to develop.

A futures contract's "value [is] well known as a means of avoiding or mitigating

catastrophes, equalizing prices and providing for periods of want." *Bd. of Trade of*

*Chi.*, 198 U.S. 236 at 247-48.[3]  And Congress ultimately centralized the oversight

and regulation of futures trading on federally regulated contract markets.  The first

federal legislation designed to create a comprehensive federal regulatory

framework for futures markets was the Future Trading Act of 1921, Pub. L. No.

---

    [3] Even after the Supreme Court recognized the legitimacy of futures trading
on organized exchanges, states continued to characterize commodity futures
markets as illegal gambling.  *See* John V. Rainbolt II, *Regulating the Grain*
*Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977).

67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922,

Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws,

Congress recognized the importance of uniform federal regulation of futures

markets, despite concerns by some members of Congress who objected to the

proposed law because it would interfere with state police powers. H.R. Rep. No.

67-1095, at 5 (1922) (Conf. Rep.).

But the Supreme Court found that this preemptive design was not

sufficiently explicit in the statute, which resulted in states continuing to regulate or

even prohibit futures trading. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198-

99 (1933) (rejecting "the contention that Congress occupied the field in respect to

contracts for future delivery; and that necessarily all state legislation in any way

dealing with that subject is superseded.") And when Congress expanded federal

oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L.

No. 74-675, 49 Stat. 1491 (1936), the boundary between federal and state authority

remained unsettled as futures markets expanded beyond their agricultural origins.

Market participants continued to face the persistent threat of state prosecution

through a patchwork of state laws and regulations.

In 1973, futures exchanges recommended that "federal policy . . . be uniform

throughout the United States" and not "subject to the vagaries" of different

obligations in "different jurisdictions." Review of Commodity Exch. Act and

Discussion of Possible Change: Hearings Before the H. Comm. on Agric., 93d

Cong., 1st Sess. 121 (1973). And the very next year, Congress explicitly spoke on

the question in the Commodity Futures Trading Commission Act of 1974, Pub. L.

93-463, 88 Stat. 1389 (1974) ("74 Act").

### B. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974.

The 74 Act amendments to the CEA worked a sea change in the regulation

of U.S. derivatives markets in three critical ways. First, Congress established the

CFTC, vesting in it the authority to administer the CEA. Second, Congress

expanded the scope of the CEA to cover "all commodities." Third, Congress

expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures

and options markets. The 74 Act amended Section 2 of the CEA to provide that

"the Commission shall have exclusive jurisdiction with respect to accounts,

agreements (including any transaction which is of the character of, or is commonly

known to the trade as, an 'option' . . ., and transactions involving contracts of sale

of a commodity for future delivery, traded or executed on a contract market

designated pursuant to section 5 of this Act or any other board of trade, exchange,

or market." 74 Act, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C.

§ 2(a)(1)).

Preemption was an express goal of the 74 Act. Congress recognized the

need for uniform nationwide regulation of futures and options markets because

concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos."[4] Potential limiting language was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). All commodity futures markets were to be under the CFTC's exclusive jurisdiction. The 74 Act "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.

### C. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974.

Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options. In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-registered DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated exchanges. The 78 Act added a section to the CEA authorizing

---

[4] See Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

states to bring actions for injunctive or monetary relief for specified violations of

the CEA and to enforce their "general civil or criminal antifraud" statutes.  *See* 78

Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978).[5]  Other than this explicit

authorization of state authority, the CEA retained the broad preemption of state

laws put in place in 1974.  Proposals to carve off pieces of the CFTC's "exclusive"

jurisdiction were rejected, because "[t]he nature of the underlying commodity is

not an adequate basis to divide regulatory authority."  S. Rep. No. 95-850, at 111-

12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.  Just because "a futures

contract market does not fit into the traditional mold where there are both hedging

and price-discovery functions should not be the determining factor in whether the

contract is to be regulated by the CFTC."  *Id*.  Congress also further added to the

list of justifications supporting exclusive jurisdiction citing concerns over "costly

duplication and possible conflict of regulation or over-regulation."  *Id.*

The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of

the CEA's preemption of other federal and state laws and the role of the states in

pursuing illegal or fraudulent off-exchange transactions, while still recognizing

"the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the

---

[5] This "Jurisdiction of the States" provision is now found in CEA Section 6d, 7 U.S.C. § 13a-2.  The language of subsection (7) remains the same in the current version of the CEA.

provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep.

No. 97-565, at 44-45 & 102-03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871,

3893-94 & 3951-52. First, the 82 Act clarified the procedures for states to pursue

violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act

clarified the role of states with respect to off-exchange futures transactions.

Language was added to permit "criminal prosecution under any federal criminal

statute" or the application of federal or state laws to *off-exchange* transactions or

*unregistered* market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294,

2318 (1982). The broad preemption of other potentially applicable state or federal

laws remained as to transactions *on* DCMs and as to market participants registered

with the CFTC. *See* H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982

U.S.C.C.A.N. at 3893-94, 3951-52. Adding again to the reasons for exclusive

jurisdiction, the Committee report noted it "was done in recognition of the

somewhat esoteric nature of the commodity futures markets and the desire to have

knowledgeable and uniform enforcement of the Act" before ultimately concluding

that "[t]he Committee . . . continues to support the idea of a single unified program

of regulation and exclusive CFTC jurisdiction over exchange-traded futures."

In 1992, Congress began grappling with the advent of a new type of

derivative financial product, swaps. In the Futures Trading Practices Act of 1992

("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC

authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e) to preempt the application of state gambling and bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC exempted pursuant to its new authority in CEA Section 4(c). While the 82 Act allowed the states authority to apply state and local laws to off-exchange transactions, the 92 Act limited this authority at least as to off-exchange swaps that received an exemption from the CFTC. The goal was to provide "legal certainty under both the Act and state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212.

The next evolution of the scope of the CEA occurred in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000). The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements. However, in so doing, the CFMA also preempted the application of state and local laws to those "excluded" swap transactions. The preemption of state and local laws as to on-exchange transactions remained as is, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

### D. Congress Embraced Preemption as to Swaps Transactions in the Dodd Frank Act.

In the wake of the 2008 financial crisis, Congress created a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of the previously "OTC" swaps markets. In the 2010 Dodd-Frank Act, Congress expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps."[6] The Dodd-Frank Act also added a new subsection, 2(d), which specifies that certain CEA provisions do not apply to swaps. Section 2(d) eliminated the concurrent jurisdiction of states as to off-exchange swap transactions. The authority for state regulation of swaps (whether on- or off-exchange) is now based on Section 12(e)(2), which applies to any swap that the CFTC may exempt pursuant to Section 4(c). This new preemption model is consistent with the one originally created in 1974 for commodity futures, *except* this model was even broader. Congress did not carve out a role for states to regulate off-exchange swaps through a grant of concurrent jurisdiction, despite having done so for off-exchange commodity futures in 1982.

\*       \*       \*

[6] *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).

# ARGUMENT

## I. Event Contracts Trading on CFTC-Regulated Markets Is Subject to the CFTC's Exclusive Jurisdiction.

### A. Under the Plain Language of CEA Section 1(a)(47), Event Contracts Are "Swaps."

After Dodd-Frank, the statutory definition of "swap" is deliberately broad. As such, it encompasses event contracts within multiple sub-definitions of CEA § 1a(47)(A). CEA § 1a(47)(A)(i) defines the term "swap," in relevant part, to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . quantitative measures, or other financial or economic interests or property of any kind," and CEA § 1a(47)(A)(ii) defines swap to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[7]

Congress's use of the word "any" in multiple sub-definitions of § 1a(47) confirms the statute's breadth. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) (observing that the word "any," read naturally carries an expansive

---

[7] *See also* §§ 1a(47)(A)(iv) (including transactions "commonly known to the trade as swaps") and (vi) ("any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)").

meaning).  The word "*any*" in the swap definition reflects a conscious decision to avoid a narrow construction that could limit the purpose of derivatives markets. Thus, as an example, an event contract that is settled based on the outcome of a sporting event is therefore an agreement providing for a payment dependent on a future occurrence, and nothing in the statutory text excludes such instruments.

The plain meaning of the statute includes event contracts even though the terms "event" and "contingency" are undefined.  Where a statute does not define a term, courts interpret it according to its ordinary meaning.  *Bostock v. Clayton County, Ga.,* 590 U.S. 644, 654-55 (2020).  Dictionary definitions confirm the breadth of the relevant terms "event" and "contingency."  An event is "something that happens: occurrence,"[8] and a "contingency" is an "event that may but is not certain to occur."[9]  The final score of a sporting event is a future occurrence whose outcome is uncertain until the game concludes and falls easily within the broad language of the swap definition as well as the broad definitions of "event" or "contingency."  Moreover, Congress did not limit covered swaps to binary outcomes; instead, it expressly encompassed contracts measured by the *extent* of the occurrence of an event.  This broad language encompasses contracts based on the margin of victory or any other quantifiable result of a sports event.

---

[8] https://www.merriam-webster.com/dictionary/event.
[9] https://www.merriam-webster.com/dictionary/contingency.

An event contract is also a binary option. See 17 C.F.R. 1.3 (defining commodity option). A binary option is a "type of option whose payoff is either a fixed amount or zero. For example, there could be a binary option that pays $100 if a hurricane makes landfall in Florida before a specified date and zero otherwise." CFTC Futures Glossary, https://www.cftc.gov/LearnAndProtect/Advis oriesAndArticles/CFTCGlossary/index.htm#B (last visited Feb. 17, 2026). Commodity option transactions must be conducted in compliance with the CEA and the Commission's regulations related to swaps. 17 C.F.R. 32.2(a); *see also* Commodity Options, 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("the swap definition . . . includes options . . . (whether or not traded on a DCM)").

Importantly, when Congress has limited the Commission's jurisdiction over derivatives it has only done so by expressly embedding narrow exclusions in the statutory commodity definition itself (*i.e.*, onions and movie box office receipts).[10] Here, Congress wrote specific, enumerated exclusions into the definition of swap in § 1a(47)(B), confirming that when it intended to limit the Commission's jurisdiction, it did so expressly, not by inviting courts or states to create additional, atextual carve-outs.[11]

---

[10] *See* 7 U.S.C. § 1a(9).
[11] 7 U.S.C. § 1a(47)(B) (excluding, inter alia, physically settled forward transactions, certain insurance and consumer arrangements, and other ordinary-course commercial agreements).

The CEA's text is designed to account for financial innovation. Futures were novel at one point. But even as financial derivatives markets have developed and grown, Congress has chosen to vest the CFTC with broad jurisdiction. That a derivative is novel or different cannot be an excuse for a Court to re-write existing law. The law should be faithfully applied. And if it needs to be amended, that is the job of Congress, not the Courts.

Excluding event contracts from the definition of swap would leave no principled boundary preventing any other event-based derivatives, including currently listed contracts tied to weather, energy, economic indices, and political outcome contracts, from falling outside the CEA. The consequences of such a ruling would be immediate and substantial. States could characterize any derivative as prohibited gambling, thereby subjecting nationally (and internationally) traded swaps to a patchwork of state restrictions. This concern is not hypothetical. Nevada's cease and desist letter to KalshiEX LLC at issue in a related case orders it to "immediately cease and desist from offering any event-based contracts in Nevada," without limitation to sports. If Nevada's approach were permitted to stand, event contracts referencing agricultural, metal, energy, and financial outcomes could likewise all become subject to state-by-state bans across the country. The resulting market fragmentation would erode the nationally uniform framework Congress established to reduce risk, promote transparency, and

safeguard market integrity within the financial system. *See* Further Definition of "Swap", "Security-Based Swap", and "Security-Based Swap Agreement"; Mixed Swaps; Security Based-Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48209 (Aug. 13, 2012).

The CFTC has treated event contracts as measuring the level of the outcome of an event for nearly two decades.[12]  Moreover, Congress deliberately adopted an expansive definition of "swap" following the 2008 financial crisis to ensure a comprehensive regulatory oversight of derivatives markets. *See* 156 Cong. Rec. S5923 (daily ed. July 15, 2010) (Statement of Sen. Lincoln) ("Section 721 includes a broad and expansive definition of the term 'swap' that is subject to the new regulatory regime established in Title VII.").  Nothing in the statutory text or legislative history suggests that the occurrence of an event, or extent of its occurrence, excludes an event's outcome.  The swap definition is written broadly to capture contracts that shift risk based on uncertain future developments.  Event contracts do exactly that.

---

[12] *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25671 (May 7, 2008).

## B. Sports Event Contracts Are Associated with Potential Financial, Economic, and Commercial Consequences.

As the statutory definition makes clear, the relevant inquiry is intentionally broad. The statute is framed in expansive terms, requiring only that the contract be "associated with *potential* financial, economic, or commercial consequence." That definitional framework reflects Congress's recognition that derivatives markets serve a wide spectrum of market participants whose economic exposures are not limited to any specific market participant. *See Alabama Power Co. v Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential . . . will always and inherently exceed actual"). Because the statute does not demand certainty, sports event contracts fall comfortably within the statute's reach.

Broadly speaking, sporting events are economic enterprises that generate billions of dollars in economic activity and materially affect both regional and national markets. *See* Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports Gambling Based on Securities-Style Mandatory Disclosure*, 41 Cardozo L. Rev. 1229, 1247 (2020). Stadiums function as regional economic anchors around a network of businesses, including hotels, restaurants, transportation providers, retailers, and event management firms. *See, e.g.*, *Los Angeles Mem'l Coliseum Comm'n v. NFL,* 726 F.2d 1381, 1397 (9th Cir.1984) (discussing claim that a professional sporting team's presence generates local business activity) and *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp.

2d 416, 433 (M.D. Pa. 2013) (summarizing the Commonwealth's allegations that

the sanctions would cause a loss of football-related hospitality revenue for

surrounding businesses). For these reasons, hotels likely adjust pricing models,

restaurants expand staffing to accommodate increased demand, vendors increase

supply orders, and cities allocate resources to accommodate projected crowds. All

of these decisions pose economic risk, which is precisely the type of economic

exposure that derivatives markets are designed to mitigate.[13]

The issues presented on appeal do not require this Court to resolve the outer

limits of the definition of a swap or engage in line drawing between a swap and a

wager. That line drawing exercise presents complicated fact questions concerning

the exact structure and mechanics of the instruments, who is the price maker, the

difference between an open exchange and a bilateral arrangement, and unrelated

legal questions, including the applicability of the CEA to purely intrastate

transactions, among others. It is sufficient to resolve this case that the transactions

conducted on a CFTC-registered DCM qualify as swaps under the CEA.

---

[13] *See, e.g.,* KalshiEx's "February 2026 Sportsbook Hedging Rebate
Program" filing with the CFTC, available on the CFTC's website at:
https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationRules
/59640 (last visited 2/17/2026).

## II. The CEA Preempts Other Federal and State Actors from Exercising Regulatory Authority Over Swaps, Including Event Contracts, on CFTC-Regulated Markets.

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" includes "transactions involving swaps" trading on a CFTC-registered DCM. The "exclusive jurisdiction" provision of 7 U.S.C. § 2(a)(1) preempts application of state gambling laws to event contracts trading on DCMs governed by the CEA, whether the question is evaluated as a matter of field preemption or conflict preemption. Congress intended the CFTC to have exclusive jurisdiction over federally registered DCMs and transactions conducted on those exchanges, displacing state gambling laws that would otherwise apply.

### A. The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges.

Where Congress has declared federal authority to be exclusive, state laws attempting to regulate the same subject matter must give way. *See Arizona v. United States*, 567 U.S. 387, 399 (2012); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Duke Energy Trading & Mktg., L.L.C. v. Davis,* 267 F.3d 1042, 1057 (9th Cir. 2001); *see also Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024) (an "explicit statutory conferral of exclusive jurisdiction . . . withdraws any concurrent jurisdiction"), *Richardson v. Kruchko & Fries,* 966 F.2d 153, 158 (4th Cir. 1992) (state-law claims preempted where they fell within federal agency's "exclusive jurisdiction").

The inquiry does not turn on whether Congress anticipated every possible form of state interference; it turns on whether state law intrudes into a field Congress has reserved to federal regulation. While not needed given the explicit statutory language, preemptive intent may be inferred "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" over futures and swaps traded on a DCM "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "Precisely, preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n,* 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Agric. Movement, Inc v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995)). Offering event contracts on a DCM cannot, in and of itself,

be an activity that is unlawful under any state law. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

This is not a new or novel concept. For decades courts have recognized that the CEA preempts application of other federal or state laws to instruments trading on CFTC-regulated markets.[14] Again, this is part and parcel of Congress's intent

---

[14] *See Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 544, 548 (7th Cir. 1989) (recognizing that the CFTC is "the sole lawful regulator" where "its jurisdiction is exclusive"--i.e., if the at-issue derivative falls within Section 2(a)(1)(A)'s reach); *Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 422 (5th Cir. 1986), *aff'd sub nom. Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987) (finding the CEA preempted private rights of action under securities laws because "[a]ny other result would frustrate the intent of Congress to preempt the field insofar as futures regulation is concerned."); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ("[T]he thrust of the [CEA's exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation."); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981) (holding that the CEA preempted private plaintiff's counterclaim under Alabama gambling statute purporting to void all futures transactions in which delivery of the commodity is not intended); *Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (1977) (finding the "vesting of exclusive jurisdiction is a clear indication that Congress intended no regulation in this field except under the authority of the [A]ct"); *Texas v. Monex Int'l, Ltd.*, 527 S.W.2d 804, 806 (Tex. Civ. App. 1975), *writ refused* (Dec. 17, 1975) (holding the CEA preempted Texas securities laws over margined commodity transactions).

for the CEA to occupy the field of commodity derivatives, as the very purpose of the 74 Act was to "assure that Federal preemption is complete." 120 Cong. Rec. S. 30,458, 30,464 (daily ed. Sept. 9, 1974) (statement of Sen. Curtis). That the instruments at issue here involve swaps on sports events does not change the preemption framework.[15]

## B. The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify its Field Preemptive Effect; It Preserves Traditional State Powers Over State-Regulated Gambling.

The grant of "exclusive jurisdiction" in § 2(a)(1)(A) does not permit a state to define federally regulated derivatives transactions as illegal under state law. The "savings clause" in § 2(a)(1)(A) does not nullify this conclusion. Specifically, that subsection provides, "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred . . . on . . . other regulatory authorities under the laws of the United States or of any State," or "(II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws," or "supersede or limit the jurisdiction conferred on courts of the United States or any State."

---

[15] Notably, the Unlawful Internet Gambling Enforcement Act of 2006 specifically excludes transactions "conducted on or subject to the rules of a registered entity" under the CEA, reinforcing the field-preemptive effect of the CFTC's exclusive jurisdiction. 31 U.S.C. § 5362(1)(E)(ii).

As a matter of plain language interpretation, this "savings clause" only applies "[e]xcept as hereinabove provided" in CEA § 2(a)(1)(A). That means other laws that would ordinarily apply outside the field of "accounts, agreements . . . and transactions . . . traded or executed on a contract market" still apply, just not to transactions that are trading on CEA-governed markets. *FTC v. Ken Roberts Co*., 276 F.3d 583, 591 (D.C. Cir. 2001) (observing that other agencies like the FTC "retain their jurisdiction over all matters beyond the confines" of "accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery") (quoting CEA § 2(a)(1)(A)). The "savings clause" preserves traditional, non-conflicting state powers, but does not empower states to use state powers against transactions on CEA-governed markets. *Hunter v. FERC*, 711 F.3d 155, 159 (D.C. Cir. 2013) ("To be clear, there are limits to what comes within CEA section 2(a)(1)(A)'s orbit, but once a scheme crosses the statute's event horizon, the CFTC has exclusive jurisdiction."). Thus the "savings clause" does not allow states to prohibit the very types of contracts that the CFTC is exclusively empowered to regulate.

Properly interpreted, the "savings clause" means that the CEA does not displace traditional state authority to enforce state criminal or civil antifraud laws, nor does it displace state authority to regulate purely intrastate conduct or transactions. But the CEA explicitly displaces state attempts to regulate swaps that

are conducted on a CFTC-registered contract market. To the specific question in this case, the CEA expressly bars state laws from regulating or prohibiting these transactions that are conducted on CFTC-regulated DCM.

### C. State Gambling Laws Are Conflict Preempted.

Application of gambling laws is also preempted under the concept of conflict preemption. State law is pre-empted "to the extent of any conflict with a federal statute." *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). Conflict preemption occurs when compliance with both federal and state law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941). Field preemption can be understood as a type of conflict preemption, because a state law falling within a preempted field conflicts with Congress's intent to exclude state regulation, making the categories not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990).

Here, gambling laws are preempted under both impossibility and obstacle conflict preemption. As for impossibility, a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal

mandate to provide impartial national access. As for obstacle preemption, gambling laws often require local licensing, fees, and specific hardware (like localized servers). Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent.

Nor does the presumption against preemption alter this conclusion. Even accepting arguendo that regulation of gambling is a historic police power of the states, the Court should not apply a presumption against preemption. The entire purpose of the exclusive jurisdictional provision in CEA § 2(a)(1)(A) is to provide national uniformity for derivatives trading and to prevent 50 different states from undermining this national regulatory structure by claiming derivatives markets are subject to state gambling laws. Congress's "clear and manifest purpose" was indeed to preempt these historic police powers. *Altria Grp., Inc.*, 555 U.S. at 77 (noting "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The plain language of the text, underscored by the consistent legislative history to preempt states from applying 50 state requirements on national markets, indicates this "clear and manifest purpose" to preempt state police powers.

## III. Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects.

If this Court holds that sports event contracts listed on CFTC-registered DCMs do not qualify as swaps or are outside the CFTC's exclusive jurisdiction within the meaning of the statute, the consequences would not be confined to a single category of event contracts. The interpretation would redraw the statutory boundary Congress established to ensure a comprehensive federal oversight of derivatives markets, inviting the public to characterize an expanding universe of event contracts as beyond the CEA's reach. At least eight DCMs have collectively self-certified with the CFTC more than 3,000 event based contracts with the CFTC pursuant to CFTC Rule 17 C.F.R. § 40.2, with a notable increase in such filings during the last two years.[16] Importantly, the vast majority of these contracts are tied to non-sport outcomes involving measurable commodity indicators, including cryptocurrency price levels and related indices, GDP releases, benchmark interest-rate decisions, election outcomes, temperature forecasts, electricity usage, and the price movements of precious metals. *Id*. These event contracts rest on objectively measurable outcomes no less than sports event contracts. A finding excluding such

---

[16] *See* CFTC Designated Contact Market Products, *available at* https://www.cftc.gov/IndustryOversight/Industry Filings/TradingOrganizationProducts?Organization=CM (last visited February 13, 2026).

contracts from the definition of swap would therefore risk destabilizing the settled

expectations upon which these markets depend, fostering uncertainty in an area

where Congress sought uniformity and regulatory clarity.  It could introduce the

"chaos" Congress sought to prevent by providing the CFTC with exclusive

jurisdiction over futures trading in 1974.  Because even modest ambiguity in the

scope of the CEA can move rapidly through interconnected financial markets, the

CFTC respectfully requests that the Court not adopt a construction that could

generate systemic consequences for CEA preemption far removed from the case at

hand.

## CONCLUSION

For the foregoing reasons, the CFTC respectfully submits that this Court

should reverse and remand the judgment of the district court.

Dated: February 17, 2026       Respectfully Submitted,

<div style="margin-left: 3em;">

/s/  Anne Stukes              
D.C. Bar 469446
Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127

</div>

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. 29(a)(5), the foregoing brief complies with the type-volume limitations, in that it has 6,652 words, excluding the parts of the brief, exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Times New Roman type style.

/s/  Anne Stukes

**CERTIFICATE OF SERVICE**

I certify that on February 17, 2026, I electronically filed this Brief with the

Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by

using the ACMS system.  I certify that all participants in the case are registered

ACMS users and that service will be accomplished by the ACMS system.

/s/  Anne Stukes
_____

**Defendants' Opposition to Plaintiffs'
Motion to Remand
Dist. Ct. Doc. 15 (filed February 13, 2026)**

| | | |
|---|---|---|
| 1 | Mark A. Hutchison (Nev. Bar No. 4639) | Orin Snyder |
| 2 | Joseph C. Reynolds (Nev. Bar No. 8630) | *(pro hac vice forthcoming)* |
|   | HUTCHISON & STEFFEN, PLLC | Matthew Benjamin |
| 3 | 100 West Liberty Street, Suite 765 | *(pro hac vice pending)* |
|   | Reno, Nevada 89501 | GIBSON, DUNN & CRUTCHER LLP |
| 4 | mhutchison@hutchlegal.com | 200 Park Avenue |
|   | jreynolds@hutchlegal.com | New York, New York 10166 |
| 5 | (775) 853-8746 | OSnyder@gibsondunn.com |
| 6 | *(designated local counsel)* | MBenjamin@gibsondunn.com |
|   | | (212) 351-4000 |

1  Mark A. Hutchison (Nev. Bar No. 4639)              Orin Snyder
2  Joseph C. Reynolds (Nev. Bar No. 8630)             *(pro hac vice forthcoming)*
   HUTCHISON & STEFFEN, PLLC                          Matthew Benjamin
3  100 West Liberty Street, Suite 765                 *(pro hac vice pending)*
   Reno, Nevada 89501                                 GIBSON, DUNN & CRUTCHER LLP
4  mhutchison@hutchlegal.com                          200 Park Avenue
   jreynolds@hutchlegal.com                           New York, New York 10166
5  (775) 853-8746                                     OSnyder@gibsondunn.com
6  *(designated local counsel)*                       MBenjamin@gibsondunn.com
                                                      (212) 351-4000
7
8  Adam P. Laxalt (Nev. Bar No. 12426)                Thomas H. Dupree Jr.
   COOPER & KIRK, PLLC                                *(pro hac vice pending)*
9  1523 New Hampshire Avenue NW                       Jacob T. Spencer
   Washington, D.C. 20036                             *(pro hac vice pending)*
10 alaxalt@cooperkirk.com                             Adam I. Steene
   (202) 220-9600                                     *(pro hac vice forthcoming)*
11                                                    GIBSON, DUNN & CRUTCHER LLP
12                                                    1700 M Street NW
                                                      Washington, D.C. 20036
13                                                    TDupree@gibsondunn.com
14                                                    JSpencer@gibsondunn.com
                                                      ASteene@gibsondunn.com
15                                                    (202) 955-8500

16 Counsel for Defendants BLOCKRATIZE INC.
   d/b/a Polymarket; QCX LLC d/b/a Polymarket US;
17 and ADVENTURE ONE QSS INC. d/b/a Polymarket

18                    UNITED STATES DISTRICT COURT
19                         DISTRICT OF NEVADA
20
21 STATE OF NEVADA ex rel. NEVADA            Case No.: 3:26-cv-00089-MMD-CLB
   GAMING CONTROL BOARD,
22                                           [Nev. Dist. Ct. No. 26OC000121B]
            Plaintiffs,
23
24 v.                                        DEFENDANTS' OPPOSITION TO
                                             PLAINTIFF'S MOTION TO REMAND
   BLOCKRATIZE INC. d/b/a Polymarket; QCX
25 LLX d/b/a Polymarket US; ADVENTURE
   ONE QSS INC. d/b/a Polymarket,
26
            Defendants.
27
28

1

**TABLE OF CONTENTS**

2

Page

3

INTRODUCTION ............................................................................................ 1

4

BACKGROUND .............................................................................................. 4

5

         A.    Polymarket US Is A Designated Contract Market Exercising

6

             Delegated Federal Authority Under Federal Law ............................. 5

         B.    Nevada Files Suit, Seeking Emergency Relief To Bar Polymarket

7

             US From Exercising Its Delegated Authority In Nevada .................. 6

8

ARGUMENT .................................................................................................... 8

9

   I.    This Court Has Federal Officer Jurisdiction .................................................. 8

10

         A.    Polymarket US Is A "Person" Under § 1442(a)(1) .......................... 10

11

         B.    There Is A Causal Nexus Between Plaintiff's Claims And

             Polymarket US's Actions Taken Under The CFTC ......................... 10

12

               1.    As A Self-Regulatory Organization, Polymarket US

13

                    Exercises Government-Delegated Authority ......................... 10

14

               2.    Plaintiff's Claims Directly Target Actions Polymarket US

                    Takes As A Self-Regulatory Organization ........................... 14

15

         C.    Polymarket US's Preemption Defense Is Manifestly "Colorable." . 16

16

   II.   This Court Also Has Federal Question Jurisdiction Under the *Grable*

      Doctrine ....................................................................................................... 17

17

         A.    Plaintiff's Claim Necessarily Raises A Federal Issue ..................... 17

18

         B.    The Federal Issues Are Disputed and Substantial ........................... 20

19

         C.    The Federal-State Balance Confirms This Case Belongs In Federal

             Court ................................................................................................. 20

20

   III.   The Court Should Deny The State's Demand For Fees ............................... 21

21

CONCLUSION ................................................................................................ 22

22

23

24

25

26

27

28

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

CASES

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
  977 F.2d 1147 (7th Cir. 1992) .................................................................. 20

*Arizona v. Manypenny*,
  451 U.S. 232 (1981) ................................................................................... 9

*Barbara v. New York Stock Exchange*,
  99 F.3d 49 (2d Cir. 1996) ......................................................................... 21

*Barry v. Cboe Glob. Mkts., Inc.*,
  42 F.4th 619 (7th Cir. 2022) .............................................................. 11, 14

*Chevron USA Inc. v. Plaquemines Parish*,
  No. 24-813 (U.S.) ...................................................................................... 14

*In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
  390 F. Supp. 3d 916 (N.D. Ill. 2019) ...................................................... 10

*City of Oakland v. BP PLC*,
  969 F.3d 895 (9th Cir. 2020) .................................................................... 20

*Cunningham v. Cornell Univ.*,
  604 U.S. 693 (2025) .................................................................................. 19

*DeFiore v. SOC LLC*,
  85 F.4th 546 (9th Cir. 2023) ............................................... 9, 10, 12, 16

*DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*,
  409 F.3d 93 (2d Cir. 2005) ....................................................................... 11

*Durham v. Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006) ...................................................... 9, 17, 21, 22

*Edwards v. Emperor's Garden Rest.*,
  122 Nev. 317, 130 P.3d 1280 (2006) ...................................................... 18

*Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*,
  644 F.2d 1310 (9th Cir. 1981) ................................................................... 9

*Georgia Gambling Recovery LLC v. Kalshi Inc.*,
  2026 WL 279375 (M.D. Ga. Feb. 3, 2026) ....................................... 3, 17, 18, 19

*Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*,
  865 F.3d 1237 (9th Cir. 2017) ............................................. 2, 9, 10, 11, 12, 14, 15

*Gov't of P.R. v. Express Scripts, Inc.*,
  119 F.4th 174 (1st Cir. 2024) ................................................................... 12

ii

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005) ........................................................................ 3, 17, 20

*Gunn v. Minton*,
  568 U.S. 251 (2013) ....................................................................... 17, 19, 20

*Harmon v. Tanner Motor Tours of Nev., Ltd.*,
  79 Nev. 4, 377 P.2d 622 (1963) ................................................................ 18

*Hornish v. King Cnty.*,
  899 F.3d 680 (9th Cir. 2018) ............................................................... 17, 21

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) ................................................................................ 21

*Jefferson Cnty. v. Acker*,
  527 U.S. 423 (1999) ...................................................................... 9, 15, 16

*KalshiEX, LLC v. Hendrick*,
  No. 25-7516 (9th Cir.) ............................................................................ 20

*KalshiEX, LLC v. Hendrick*,
  2025 WL 3286282 (D. Nev. Nov. 24, 2025) ................................................. 8

*Lussier v. Dollar Tree Stores, Inc.*,
  518 F.3d 1062 (9th Cir. 2008) .................................................................. 21

*Martin v. Franklin Cap. Corp.*,
  546 U.S. 132 (2005) ................................................................................ 21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) .......................................................................... 11, 16

*N. Am. Derivatives Exch. Inc. v. Nevada*,
  No. 25-7187 (9th Cir.) ............................................................................ 20

*Paher v. Cegavske*,
  2020 WL 2748301 (D. Nev. May 27, 2020) ................................................. 8

*Riggs v. Airbus Helicopters, Inc.*,
  939 F.3d 981 (9th Cir. 2019) ............................................................... 13, 14

*Robinhood Derivatives, LLC v. Dreitzer*,
  No. 25-7831 (9th Cir.) ............................................................................ 20

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
  548 F.3d 110 (D.C. Cir. 2008) ................................................................. 10

*Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  159 F.3d 1209 (9th Cir. 1998) .................................................. 2, 10, 12, 13

*Sprint Commc'ns, Inc. v. Jacobs*,
  571 U.S. 69 (2013) .................................................................................... 4

iii

*United States v. Vuitch*,
   402 U.S. 62 (1971) ........................................................................... 19

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) ....................................2, 3, 9, 10, 13, 14

*Willingham v. Morgan*,
   95 U.S. 402 (1969) ................................................................. 13, 16

**STATUTES**

7 U.S.C. § 2(a)(1)(A) ......................................................................... 5, 16

7 U.S.C. § 5 ........................................................................... 5, 12, 16, 21

7 U.S.C. § 7(a) ............................................................................................ 5

7 U.S.C. § 7(d) ................................................................. 5, 6, 11, 13, 14

7 U.S.C. § 7a-2 ........................................................................... 6, 11, 16

7 U.S.C. § 8(a) ............................................................................................ 5

7 U.S.C. § 13a-2 .................................................................................. 15, 16

28 U.S.C. § 1442 .............................2, 9, 10, 12, 14, 17, 21

Nev. Rev. Stat. § 463.160 ...................................................................... 6

Nev. Rev. Stat. § 463.343 ...................................................................... 6

Nev. Rev. Stat. § 463.346 ...................................................................... 6

Nev. Rev. Stat. § 463.350 ...................................................................... 6

Nev. Rev. Stat. § 465.086 ................................................................ 3, 6, 18

Nev. Rev. Stat. § 465.092 ...................................................................... 6

**REGULATIONS**

17 C.F.R. § 1.3 .................................................................................... 5, 10

17 C.F.R. § 38.151(b) ......................................................................... 6, 13

17 C.F.R. § 38.651 .................................................................................. 15

17 C.F.R. § 40.2(a) ............................................................................... 6, 11

17 C.F.R. § 40.3(a) ................................................................................... 6

17 C.F.R. § 40.11(c) ................................................................................ 6

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TREATISES

14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
  § 3733 (4th ed. 2025) ............................................................9

OTHER AUTHORITIES

CFTC Chairman Michael S. Selig, *The Next Phase of Project Crypto:
  Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026)..........................1, 4

CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*
  https://tinyurl.com/2e7nuutw (last visited Feb. 8, 2026)..........................................4

Status Report, *KalshiEX, LLC v. Hendrick*,
  No. 25-7516 (9th Cir. Feb. 10, 2026), Doc. No. 60.1 ..........................................8

Response to TRO, *KalshiEX, LLC v. Hendrick*,
  No. 2:25-cv-00575 (D. Nev. Apr. 4, 2025), Doc. No. 34......................................7

v

### INTRODUCTION

1
2   This Court should retain jurisdiction and deny Plaintiff's motion to remand.  This case
3 necessarily raises substantial, disputed questions of federal law concerning Congress' grant of
4 exclusive regulatory authority to the Commodity Futures Trading Commission ("CFTC") and
5 implicates the Constitution's allocation of power between the federal government and the States.
6 Allowing a state court to adjudicate—and enjoin—conduct undertaken pursuant to the CFTC's
7 comprehensive and exclusive regulatory regime would invert the Supremacy Clause, fracture
8 national markets, and nullify Congress' considered judgment that derivatives trading be
9 governed by a single, uniform federal authority.  Because Nevada seeks to shut down Defendant
10 QCX LLC d/b/a Polymarket US's federally licensed and regulated derivatives market through
11 state law, in direct conflict with the Commodity Exchange Act ("CEA"), this action must remain
12 in federal court.[1]

13   The CFTC itself has reaffirmed that disputes of this kind fall squarely within its exclusive
14 jurisdiction and core institutional responsibility.  On January 29, the CFTC's Chairman directed
15 the Commission to reassess its litigation posture in cases implicating jurisdictional boundaries,
16 emphasizing that where "jurisdictional questions" arise, "the Commission has the expertise and
17 responsibility to defend its exclusive jurisdiction over commodity derivatives."[2]  The Chairman's
18 directive reflects the agency's judgment that state efforts to regulate or shutter federally regulated
19 derivatives markets threaten the uniform national framework Congress mandated.

20   The CFTC acted decisively in fulfilling that responsibility.  On February 5, the CFTC
21 sought leave to file an amicus brief in the Ninth Circuit appeal seeking to enjoin Nevada's
22 threatened enforcement action against another designated contract market.  *See* ECF 3-1 ("*CFTC*

23

24

---

25 [1] This Opposition is not—and should not be construed as—a general appearance or appearance
26 on the merits by Defendants.  By filing this Opposition, Defendants do not waive any defenses,
whether in state or federal court, including, without limitation, improper service of process or
lack of personal jurisdiction.

27 [2] *See* Remarks of CFTC Chairman Michael S. Selig, *The Next Phase of Project Crypto:*
28 *Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026) ("*Unleashing*
*Innovation*").

<div align="center">1</div>

1   *Motion*").  The CFTC explained that its participation was necessary to protect and defend the

2   agency's "exclusive jurisdiction" over federally regulated derivatives trading.  And the CFTC

3   expressly pointed to *this case* as a reason for participating.  *See id.* at 3.  When the "federal

4   agency charged with administering and enforcing" the CEA seeks to defend its exclusive

5   authority in closely related litigation, there can be no serious dispute about where adjudication

6   properly belongs.  *Id.* at 1.

7        These jurisdictional questions must be resolved in federal court on two separate and

8   independent grounds for removal: federal officer jurisdiction and federal question jurisdiction.

9        **Federal officer jurisdiction applies.**  Under 28 U.S.C. § 1442, persons "acting under"

10  federal officers are entitled to a federal forum when a plaintiff's suit is causally connected to

11  actions they took under federal authority.  The Supreme Court and the Ninth Circuit have

12  repeatedly emphasized that the federal officer removal statute must be "liberally construed" to

13  implement Congress' "policy favoring removal."  *Goncalves ex rel. Goncalves v. Rady*

14  *Children's Hosp. San Diego*, 865 F.3d 1237, 1244–45 (9th Cir. 2017).  Polymarket US is a self-

15  regulatory organization operating a designated contract market under the CFTC's

16  comprehensive and exclusive supervision.  In that capacity, it "act[s] under" the CFTC by

17  "assist[ing]" and "help[ing] carry out" responsibilities that the CFTC itself would otherwise

18  perform.  *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007).  Specifically, Polymarket US

19  exercises delegated authority in certifying contracts for listing, regulating market access,

20  resolving disputes, and promulgating, monitoring, and enforcing market rules.  Plaintiff's suit—

21  which seeks to shut down Polymarket US in Nevada—directly targets those federally delegated

22  functions.  That direct attack easily satisfies the Ninth Circuit's "quite low" causal-connection

23  requirement.  *Goncalves*, 865 F.3d at 1244.

24       Plaintiff argues that complying with federal regulations is not enough for federal officer

25  removal.  *See*, *e.g.*, Mot. (ECF 7) 2, 10, 11, 12, 13, 15.  That is not Defendants' basis for removal.

26  Rather, Polymarket US exercises delegated federal authority as a self-regulatory organization

27  "performing a variety of regulatory functions that would, in other circumstances, be performed

28  by" the CFTC.  *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1214

2

1    (9th Cir. 1998).  This case exemplifies the precise danger federal officer removal was designed

2    to prevent.  Through a series of one-sided and inaccurate filings alleging a manufactured

3    emergency, Nevada obtained an *ex parte* temporary restraining order without notice, without full

4    briefing, and without affording Polymarket US or the CFTC a meaningful opportunity to be

5    heard.  Congress enacted federal officer removal precisely to "protect the Federal Government"

6    and those "'who lawfully assist'" it from such "interference with [their] operations."  *Watson*,

7    551 U.S. at 150 (citation omitted).

8              **Federal question jurisdiction independently compels the same result.**  Federal courts

9    have jurisdiction when a plaintiff's state-law claims necessarily raise disputed and substantial

10   federal questions that should be resolved in federal court.  *See Grable & Sons Metal Prods., Inc.*

11   *v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  This case fully and easily satisfies that

12   standard.  Although Plaintiff styles its claims as arising under state law, those claims cannot be

13   adjudicated without resolving foundational and contested questions of federal law.  By its own

14   terms, Nevada's licensing statute does not apply if federal law "otherwise provide[s]."  Nev.

15   Rev. Stat. § 465.086.  Deciding Nevada's state-law claims therefore requires the Court to

16   undertake precisely the federal-law analysis the CFTC has identified as central to its exclusive

17   authority, including "a detailed examination of the CEA," a determination "whether financial

18   instruments satisfying the CEA's definition of a 'swap' may also be regulated, or prohibited,

19   under state law," and a decision "whether those laws displace the CEA's express preemption

20   provisions."  *CFTC Motion*, at 1.  These are not peripheral or hypothetical issues; they are the

21   heart of this case.

22           Plaintiff says that the lack of a "federal claim on the face of the well-pleaded complaint"

23   is "the end of the jurisdictional inquiry."  Mot. 15.  That argument conflicts with *Grable* and

24   *Georgia Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375 (M.D. Ga. Feb. 3, 2026),

25   where the federal court exercised jurisdiction to decide the same embedded federal issues

26   presented here.  Those issues are substantial, disputed, and of nationwide consequence.  They

27   implicate Congress' decision to vest exclusive authority over derivatives markets in a single

28   federal regulator to ensure uniformity, predictability, and stability in national markets.  Allowing

3

1    state courts to impose parallel or conflicting regulatory regimes would undermine that

2    framework and create precisely the fragmentation Congress sought to avoid.  Under *Grable*, such

3    questions belong in federal court.

4        This Court has a "virtually unflagging" obligation to exercise the jurisdiction Congress

5    has conferred and to resolve the important federal questions squarely presented here.  *Sprint*

6    *Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013).  Both federal officer and federal question

7    jurisdiction independently establish removal.  The CFTC's own statements confirm the national

8    and federal character of the dispute.  The Constitution, the CEA, and Congress' removal statutes

9    all point in the same direction.  This Court should retain jurisdiction and deny Plaintiff's motion.

10                                    **BACKGROUND**

11       Event contract markets are a core component of the modern, federally regulated financial

12    system.  Notice of Removal (ECF 1) ¶ 1.  Hundreds of thousands of U.S. consumers—and

13    millions worldwide—rely on these markets to obtain real-time, accurate information about

14    consequential events in politics, finance, technology, news, and sports.  *Id.*  Event contracts are

15    a type of "swap," a financial instrument where the parties agree to swap payments based on an

16    agreed formula, such as interest rates or the outcome of real-world events.  *Id.* ¶ 2.  For event

17    contracts, the "payoff is based on a specified event or occurrence such as the release of a

18    macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages

19    caused by a hurricane."  CFTC, *Futures Glossary: A Guide to the Language of the Futures*

20    *Industry.*[3]

21       As the CFTC Chairman explained, event contract markets are "not new" and "have

22    operated within the CFTC's regulatory perimeter for more than two decades."  *Unleashing*

23    *Innovation*, *supra*.  The Chairman expressed his "support" for "event contract markets and the

24    important role they play in the broader financial system."  *Id.*  He emphasized that the CFTC

25    "has the expertise and responsibility to defend its exclusive jurisdiction over commodity

26    derivatives," including event contracts.  And he directed CFTC Staff "to reassess the

27    _____

28    [3] https://tinyurl.com/2e7nuutw (last visited Feb. 8, 2026).

                                        4

1    Commission's participation in matters currently pending" in courts and to defend and protect the

2    CFTC's federal regulatory authority "[w]here jurisdictional questions are at issue." *Id.*

3         On February 5, the CFTC carried out that directive by seeking leave to file a Ninth Circuit

4    amicus brief in support of a designated contract market.  The CFTC made clear it "has a

5    substantial interest in presenting its view of the proper interpretation of the scope of its exclusive

6    jurisdiction and the correct application of CEA's statutory definition of a swap." *CFTC Motion*,

7    at 1–2.   State laws purporting to regulate or prohibit trading on CFTC-licensed markets,

8    according to the CFTC, impermissibly "displace" the federal regulatory framework and conflict

9    with the CEA's express preemption provisions. *Id.* at 1.  The CFTC pointed to *this case* as an

10   example of improper state intrusion on federal authority necessitating leave to file an amicus

11   brief.  *Id.* at 3.

12
       **A.    Polymarket US Is A Designated Contract Market Exercising Delegated**
13             **Federal Authority Under Federal Law.**

14        Defendant Polymarket US operates a federally licensed designated contract market on

15   which users nationwide trade event contracts.  *See* Notice ¶ 2.  On July 9, 2025, the CFTC

16   formally approved Polymarket US as a designated contract market under the CEA; that

17   designation reflects a rigorous federal finding that Polymarket US satisfies stringent

18   requirements governing market integrity, transparency, financial safeguards, surveillance, and

19   customer protection.   *See* 7 U.S.C. §§ 7(a), 7(d), 8(a); Notice ¶ 9.   The CFTC exercises

20   "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated

21   contract market.  7 U.S.C. § 2(a)(1)(A).

22        The CFTC-designation process is demanding because contract markets like Polymarket

23   US are charged with a broad array of functions that the CFTC itself would otherwise have to

24   perform.  The CEA's purpose is to "serve the public interests" through "a system of effective

25   self-regulation . . . under the oversight of the Commission."  7 U.S.C. § 5(b).  In operating a

26   designated contract market, Polymarket US exercises delegated authority from the CFTC as a

27   "[s]elf-regulatory organization." 17 C.F.R. § 1.3; *see* Notice ¶¶ 24, 30.  That means it undertakes

28   numerous obligations to assist the CFTC in carrying out the federal agency's congressionally

5

1    assigned role of "administering and enforcing" the CEA.  *CFTC Motion*, at 1.

2        For example, Polymarket US must "establish, monitor, and enforce compliance with the

3    rules of the contract market," including "access requirements," "the terms and conditions of any

4    contracts to be traded," and "rules prohibiting abusive trade practices on the contract market."

5    7 U.S.C. § 7(d)(2)(A); *see also* 17 C.F.R. § 38.151(b) (requiring a contract market to implement

6    and enforce "impartial access" requirements for "its markets and services"); Notice ¶ 32.  It has

7    the delegated "responsibility to prevent manipulation, price distortion, and disruptions . . .

8    through market surveillance, compliance, and enforcement practices and procedures."  7 U.S.C.

9    § 7(d)(4).  And it must "establish and enforce rules regarding . . . alternative dispute resolution."

10   *Id.* § 7(d)(14); *see* Notice ¶¶ 34–35.   In performing those functions, Polymarket US has

11   considerable discretion in how it exercises delegated federal authority.

12       Polymarket US's self-regulatory obligations apply to the listing of event contracts.  To

13   list new contracts, the entity must either submit the contract for CFTC approval or certify the

14   contract complies with federal law and the Commission's requirements.  7 U.S.C. § 7a-2(c)(1),

15   (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c).  The CFTC may investigate, stay, or

16   amend the contract after it has been listed.  17 C.F.R. § 40.2(c).  If the CFTC determines that a

17   proposed "[e]vent contract" involves certain subjects, including "gaming," it may prohibit the

18   listing if the contract would be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C); *see*

19   Notice ¶ 37.

20       **B.    Nevada Files Suit, Seeking Emergency Relief To Bar Polymarket US From
21              Exercising Its Delegated Authority In Nevada.**

22       The Nevada Gaming Control Board filed this suit on January 16, 2026.  The Complaint

23   purports to state a claim against Defendants under Nevada Revised Statutes §§ 463.160, 463.343,

24   463.346, 463.350, 465.086, and 465.092—Nevada's gaming statutes—for Polymarket US's

25   offering of federally regulated event contracts subject to the CFTC's exclusive jurisdiction.

26   Compl. (ECF 1-3) ¶¶ 36–80.

27       Plaintiff's theory is that contracts for "sporting events and other events" constitute

28   "wagers" under Nevada law.  Compl. ¶¶ 20–21.  In Plaintiff's view, making trading on those

6

1   event contracts "accessible in the State of Nevada" is unlawful because Defendants do not have

2   a state license.  *Id.* ¶ 25.  Plaintiff asserts that Polymarket US "does not employ adequate

3   safeguards to ensure that wagers are not being placed on an event from owners, coaches, players,

4   or officials participating in the event." *Id.* ¶ 35. And Plaintiff alleges that Polymarket US allows

5   "persons under the age of 21 years" to trade and does "not pay taxes" to "Nevada." *Id.* ¶¶ 28, 33.

6         Plaintiff sought an *ex parte* temporary restraining order and preliminary injunction from

7   the state court.  It urged the state court to enter the temporary restraining order immediately

8   without allowing Defendants to "be heard in opposition." ECF 1-4, at 18.  Plaintiff insisted that

9   it suffers "serious, ongoing, and irreparable harms" "every day" Defendants operate in Nevada.

10  *Id.* at 19.

11        After initially denying Plaintiff's request as procedurally "deficient," ECF 1-4, at 32–33;

12  *see generally id.* at 23–28 (Defendants' preliminary response), the state court granted Plaintiff's

13  renewed request for an *ex parte* temporary restraining order on January 29—thereby becoming

14  the first court to shutter a federally licensed event contract market, *id.* at 73.  In doing so, the

15  state court denied Defendants' request for an opportunity to file a full opposition brief on an

16  expedited schedule and for a hearing to consider Plaintiff's "requests for injunctive relief on a

17  full and adversarial record." *Id.* at 57–63.  The parties agreed that any response to Plaintiff's

18  preliminary-injunction motion would be due February 5.  *See* Mot. Ex. 1.  That same day,

19  Defendants removed to this Court.  To avoid burdening the Court with emergency motions

20  practice, Defendants consented to extend the temporary restraining order through February 26

21  and agreed to expedited briefing on Plaintiff's motion to remand.  *See* ECF 10.

22        Plaintiff's insistence that it must litigate this case in an emergency posture—because it

23  suffers irreparable harm each day Defendants are not enjoined—is not credible.  For almost a

24  year, the State has been litigating in federal court against KalshiEX, another CFTC-designated

25  contract market.  When Kalshi sought a preliminary injunction, the State filed a countermotion,

26  claiming "immediate and irreparable harm" every day KalshiEX continued its CFTC-regulated

27  activities in Nevada.  Resp. to TRO at 23, *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575

28  (D. Nev. Apr. 4, 2025), Doc. No. 34.  But after another judge in this District granted KalshiEX's

7

1   motion and denied the State's, Plaintiff did not even attempt to appeal.  Instead, Plaintiff waited

2   for six months to ask the court to dissolve the preliminary injunction.  *See KalshiEX*, 2025 WL

3   3286282, at *1–2 (D. Nev. Nov. 24, 2025).  And after the injunction was dissolved, Plaintiff

4   voluntarily decided not to bring an enforcement action while the Ninth Circuit decided whether

5   to grant a stay pending appeal.  *See* Status Report at 1, *KalshiEX, LLC v. Hendrick*, No. 25-7516

6   (9th Cir. Feb. 10, 2026), Doc. No. 60.1.  On February 10, nearly three months after the injunction

7   was dissolved, Plaintiff told the Ninth Circuit that it intends to begin enforcement on February

8   17.  *Id.* at 2.  As this Court has previously held, Plaintiff's failure to "seek[] expedited appellate

9   review"—or take any other action for nearly a year—"is confounding and contrary to the[]

10  position that a quick disposition of this matter is needed."  *Paher v. Cegavske*, 2020 WL

11  2748301, at *1 (D. Nev. May 27, 2020) (Du, C.J.).

12                                    **ARGUMENT**

13          The CFTC has recently reaffirmed what was already evident:  This case must be

14  adjudicated by a federal court given the important federal questions presented and federal

15  interests at stake.  Congress vested the CFTC with "exclusive jurisdiction . . . to oversee the

16  operators of, and participants on" designated contract markets.  *CFTC Motion*, at 1.  The CFTC

17  delegated this oversight authority, in part, to the operators themselves, making them the textbook

18  example of self-regulatory organizations "acting under" a federal agency for purposes of the

19  federal officer removal statute.  And the CFTC has confirmed that the substantial federal issues

20  necessarily raised by this lawsuit—"questions about the scope and applicability of the CEA"—

21  are "question[s] of exceptional importance" to the federal scheme.  *Id.* Were this Court to decline

22  to exercise jurisdiction and remand this matter while the Ninth Circuit is exercising its

23  jurisdiction to resolve these same, nationally important questions, it would turn the removal

24  statutes upside down.

25  **I.      This Court Has Federal Officer Jurisdiction.**

26          Plaintiff's lawsuit directly targets conduct Polymarket US engaged in under the

27  comprehensive jurisdiction of the CFTC and while exercising delegated authority from the

28  CFTC to assist the CFTC in "administering and enforcing" the CEA.  *CFTC Motion*, at 1.

                                            8

1      The federal officer removal statute allows removal of an action against "any officer (or

2   *any person acting under that officer*) of the United States or of any agency thereof . . . for or

3   relating to any act under color of such office."  28 U.S.C. § 1442(a)(1) (emphasis added).  The

4   statute makes removal available not just to federal officers and agencies but also to "private

5   entit[ies]" that act under government supervision. *DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th

6   Cir. 2023).

7      Federal officer removal is different from other forms of removal.  Originally passed "to

8   protect" against States' "attempt[s] to nullify federal . . . laws," section 1442 confers "removal

9   rights" that "are much broader than those under" other removal statutes. *Durham v. Lockheed*

10  *Martin Corp.*, 445 F.3d 1247, 1252–53 (9th Cir. 2006).  "[S]uits against federal officers may be

11  removed despite the nonfederal cast of the complaint." *Jefferson Cnty. v. Acker*, 527 U.S. 423,

12  431 (1999).  And courts must "credit" the *defendant's* "theory of the case for purposes of" the

13  "jurisdictional inquiry," *id.* at 432, applying to the notice of removal "the same liberal rules

14  employed in testing the sufficiency of a pleading," 14C Wright & Miller's Federal Practice &

15  Procedure § 3733 (4th ed. 2025) (footnote omitted).

16     The "statute must be 'liberally construed.'" *Goncalves*, 865 F.3d at 1244 (citation

17  omitted).  "The words 'acting under' are broad," when considering the kinds of private entities

18  that may remove, *id.* at 1245 (quoting *Watson*, 551 U.S. at 147), because "[t]he general policy

19  underlying" section 1442 "is to permit removal when there is a federal interest in allowing access

20  to a federal forum," *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1313

21  (9th Cir. 1981).  Congress' "policy favoring removal," the Supreme Court and Ninth Circuit

22  have admonished, "should not be frustrated by a narrow, grudging interpretation of

23  § 1442(a)(1)." *Goncalves*, 865 F.3d at 1244 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241

24  (1981)).

25     Polymarket US satisfies the test for federal officer removal because "(a) it is a 'person'

26  within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant

27  to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal

28  defense.'" *Durham*, 445 F.3d at 1251 (citations omitted).  And because Polymarket US is

9

1  "entitled to remove under § 1442, . . . the entire case is remov[able] to the federal court." *Ely*

2  *Valley*, 644 F.2d at 1315.

3        **A.**    **Polymarket US Is A "Person" Under § 1442(a)(1).**

4        It is well-established (and Plaintiff does not dispute) that "corporations" like Polymarket

5  US "are 'person[s]' under § 1442(a)(1)."  *Goncalves*, 865 F.3d at 1244 (citation omitted)

6  (collecting cases).

7        **B.**    **There Is A Causal Nexus Between Plaintiff's Claims And Polymarket US's**
              **Actions Taken Under The CFTC.**

8

9        **1.**    **As A Self-Regulatory Organization, Polymarket US Exercises**
              **Government-Delegated Authority.**

10        **a.** Polymarket US "acts under" the CFTC in its role as a self-regulatory organization

11  exercising delegated authority in operating a designated contract market.  "For a private entity

12  to be 'acting under' a federal officer, the private entity must be involved in 'an effort to *assist*,

13  or to help *carry out*, the duties or tasks of the federal superior.'"  *Goncalves*, 865 F.3d at 1245

14  (quoting *Watson*, 551 U.S. at 152).  The "relationship" between the federal officer and the private

15  entity need not satisfy a "common-law agency" test.  *DeFiore*, 85 F.4th at 556.  Instead, "[t]he

16  relationship typically involves subjection, guidance, or control."  *Goncalves*, 865 F.3d at 1245

17  (internal quotation marks omitted).  The private entity must do more than "simply comply[] with

18  the law"—it must "help officers fulfill other basic governmental tasks." *Id.* (alteration adopted).

19        Polymarket US does far more than simply comply with the CEA's highly detailed

20  regulatory scheme.  In operating a designated contract market, Polymarket US's relationship

21  with the CFTC is "an unusually close one involving detailed regulation, monitoring, and

22  supervision."  *Goncalves*, 865 F.3d at 1245.  Designated contract markets function as "[s]elf-

23  regulatory organization[s]," 17 C.F.R. § 1.3, a term of art given to certain "organizations [that]

24  perform 'a variety of regulatory functions that would, in other circumstances, be performed by a

25  government agency,'" *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust*

26  *Litig.*, 390 F. Supp. 3d 916, 929 (N.D. Ill. 2019) (citation omitted).

27        Courts, including the Ninth Circuit, have consistently held that self-regulatory

28  organizations "exercis[e] quasi-governmental powers" and "authority delegated by Congress" or

<div align="center">10</div>

1    federal agencies.  *Sparta Surgical*, 159 F.3d at 1213–14 (granting "quasi-governmental"
2    "immunity" to self-regulatory organization because of regulatory functions organization
3    performed under the SEC), *abrogated on other grounds*, 578 U.S. 374 (2016); *see also, e.g.*, *In*
4    *re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (self-
5    regulatory organization was immune when exercising authority "delegated by the SEC"); *DL*
6    *Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) (similar).

7          As a self-regulatory organization, Polymarket US exercises regulatory authority
8    delegated from the CFTC in overseeing the trading of event contracts.  It establishes rules for
9    the market, including by setting "access requirements," "the terms and conditions of any
10   contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on
11   the contract market."  7 U.S.C. § 7(d)(2).  It acts to "prevent manipulation, price distortion, and
12   disruptions."  *Id.* § 7(d)(4).  And it "establish[es] and enforce[s] rules" "to protect markets and
13   market participants from abusive practices committed by any party."  *Id.* § 7(d)(12); *see* Notice
14   ¶¶ 32–35.

15         In exercising these delegated responsibilities, Polymarket US acts under the "direction"
16   of the CFTC.  *Goncalves*, 865 F.3d at 1245.  To implement or revise a rule, for example,
17   Polymarket US must either submit it to the CFTC for approval or certify that the rule complies
18   with federal law and the Commission's requirements.  7 U.S.C. § 7a-2(c)(1), (4)(A).  The CFTC
19   may allow the rule to go into effect, or it may stay the rule pending further review.
20   *Id.* § 7a-2(c)(2)–(3).  Likewise, when Polymarket US seeks to list new event contracts for trading
21   within its market, it must submit the event contract for CFTC approval or certify that the contract
22   complies with federal law and the Commission's requirements.  *Id.* § 7a-2(c)(1), (4)(A), (5)(C);
23   17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c).  The CFTC retains authority to investigate, stay, or
24   amend the contract after it has been listed.  17 C.F.R. § 40.2(c); *see* Notice ¶¶ 35–37.  And self-
25   certification is permissible only because "self-regulatory organizations such as contract markets
26   possess a form of delegated" government authority.  *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th
27   619, 625 (7th Cir. 2022).

28         All told, Polymarket US is "involved in 'an effort to assist, or to help carry out, the duties

11

1    or tasks of the federal superior.'" *Goncalves*, 865 F.3d at 1245 (emphases and citation omitted).

2    Through the CEA, "Congress 'established a comprehensive program'" for exchange trading.

3    *Id.* at 1245 (citation omitted); *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456

4    U.S. 353, 356 (1982) (describing the CEA as "a comprehensive regulatory structure"). In doing

5    so, "Congress envisioned the creation of a system whereby" the CFTC "is responsible for the

6    overall administration of the program while sharing the day-to-day operating responsibility with"

7    designated contract markets and other self-regulatory organizations. *Goncalves*, 865 F.3d at

8    1245–46 (internal quotation marks omitted). Indeed, the express "purpose" of the CEA is to

9    establish "a system of effective self-regulation of trading facilities . . . under the oversight of the

10   Commission." 7 U.S.C. § 5(b). This is a textbook example of an acting-under relationship.

11        **b.** Plaintiff's responses ignore plain statutory text, black-letter law, and the allegations

12   in Defendants' Notice of Removal. Plaintiff repeatedly suggests, for example, that Polymarket

13   US cannot remove because it "is a private company trying to make a profit" and "[i]ts employees

14   are not federal officers." Mot. 2; *see, e.g., id.* 13 ("This case involves only Polymarket's private

15   business."). But the point of the statute's "acting under" provision is to allow private persons

16   who are *not* federal officers to remove. 28 U.S.C. § 1442(a)(1). That is why the Ninth Circuit

17   and other courts of appeals have held that private, for-profit business may invoke federal officer

18   removal. *See, e.g., DeFiore*, 85 F.4th at 551 (district court "erroneous[ly]" remanded suit against

19   "private contractors"); *Goncalves*, 865 F.3d at 1242 (Blue Cross Blue Shield properly removed);

20   *Gov't of P.R. v. Express Scripts, Inc.*, 119 F.4th 174, 181 (1st Cir. 2024) (private pharmaceutical

21   benefit managers properly removed case claiming they "lin[ed] their pockets with more profits").

22        Plaintiff notes that "acting under" requires more than being "regulated by a federal

23   agency" and that mere compliance with even a "highly detailed" regulatory scheme is not

24   enough. Mot. 11. Polymarket US does far more than merely comply with the CFTC's

25   comprehensive regulatory framework—as a self-regulatory organization, it exercises delegated

26   authority to help the CFTC implement the bedrock purposes of the CEA. Plaintiff concedes, and

27   the Ninth Circuit has held, that self-regulatory organizations "exercis[e] quasi-governmental

28   powers." Mot. 12 (quoting *Sparta Surgical*, 159 F.3d at 1214). Those powers include

                                                    12

1   rulemaking, rule enforcement, dispute resolution, and access requirements.  Notice ¶¶ 32–36.

2   And Plaintiff does not dispute that self-regulatory organizations are entitled to "governmental

3   immunity" when performing similar functions.  Mot. 13.  So it defies logic to say that self-

4   regulatory organizations are not also "acting under" the federal government.  After all, the reason

5   the Ninth Circuit extended governmental immunity to self-regulatory organizations is that they

6   "perform[] a variety of regulatory functions that would, in other circumstances, be performed by

7   a government agency." *Sparta Surgical*, 159 F.3d at 1214.  And the Supreme Court held decades

8   ago that "the test for [federal officer] removal" is "*broader* . . . than the test for official

9   immunity." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969) (emphasis added).

10          Plaintiff overlooks multiple self-regulatory functions alleged in the Notice of Removal

11  and directly targeted by its Complaint.  This entire lawsuit turns on whether Polymarket US

12  impermissibly makes what Plaintiff calls "gaming activity" "accessible in the State of Nevada."

13  Compl. ¶ 25.  And Plaintiff alleges that Polymarket US offers access to its platform in violation

14  of Nevada law.  *E.g.*, *id.* ¶¶ 30–33.   Yet "establish[ing], monitor[ing], and enforc[ing]

15  compliance" with "the rules of the contract market," including "access requirements"—and

16  providing "impartial access to its markets and services"—are core self-regulatory functions

17  under the CEA.  7 U.S.C. § 7(d)(2); 17 C.F.R. § 38.151(b); *see* Notice ¶¶ 32, 39(b).   In

18  establishing, monitoring, and enforcing compliance with rules governing access requirements—

19  as well as rules governing adequate safeguards (Notice ¶ 39(c)) and dispute-resolution

20  procedures  (*id.* ¶ 39(d))—Polymarket US is "regulating *third parties* on behalf of the

21  government."  Mot. 13.  In all of those ways, Polymarket US is performing a task that "the

22  Government itself would [otherwise] have had to perform." *Watson*, 551 U.S. at 154.  Plaintiff

23  offers no response.

24          Instead, Plaintiff focuses exclusively on whether Polymarket US is acting under the

25  CFTC when it "self-certif[ies] its contracts as complying with the CEA and then lists them for

26  trading." Mot. 12; *see also id.* at 13–15.  Even there, Plaintiff's "key case" supports *Polymarket*

27  *US*.  Mot. 12 (citing *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981 (9th Cir. 2019)).  The

28  defendant helicopter manufacturer in *Riggs* "contend[ed] that it was formally delegated legal

13

1   authority from the FAA." 939 F.3d at 984–85.  The only delegated authority the defendant could

2   identify, however, was the highly constrained "authority to issue" airworthiness "certifications,"

3   which the Ninth Circuit held to be insufficient.  *Id.* at 985; *see id.* at 988 (describing the

4   certification as merely the "power to certify *compliance*").  The result would have been different

5   if the defendant had been delegated "a power to design the rules." *Id.* at 988.  And the defendant

6   had no discretion in how it "perform[ed] [its] delegated functions"—it was "duty-bound to

7   follow prescriptive rules set forth" by the FAA.  *Id.* at 988–89.  Here, Polymarket US *has* been

8   delegated express authority to "establish" rules governing "the terms and conditions of any

9   contracts to be traded on the contract market"—authority it has considerable discretion to

10  exercise.  7 U.S.C. § 7(d)(2)(A)(*ii*).  And, again, self-certification is permissible only *because*

11  Polymarket US "possess[es] a form of delegated" government authority. *Barry*, 42 F.4th at 625.

12          Polymarket US is one of many self-regulatory organizations—entities that work so

13  closely with the federal government they are undisputedly entitled to governmental immunity

14  for their self-regulatory activities.  Under Plaintiff's ill-conceived approach to the "acting under"

15  requirement, those organizations could never remove to federal court for full and fair

16  consideration of their federal immunity or any other federal defense.  That is not the law.  *See*

17  *Watson*, 551 U.S. at 150 (one "basic purpose" of section 1442 is to supply "a federal forum in

18  which to assert federal immunity defenses" (internal quotation marks omitted)).

19          **2.    Plaintiff's Claims Directly Target Actions Polymarket US Takes As A Self-**
20                 **Regulatory Organization.**

21          The "hurdle erected by the causal-connection requirement is quite low." *Goncalves*, 865

22  F.3d at 1244 (alteration adopted).  To satisfy this requirement, Polymarket US "need show only

23  that the challenged acts occurred *because of*" its actions under color of federal authority.  *Id.* at

24  1245 (internal quotation marks omitted).  That test is easily satisfied here.[4]

25

26          _____

27  [4] On January 12, 2026, the Supreme Court heard argument in *Chevron USA Inc. v. Plaquemines
    Parish*, No. 24-813 (U.S.), which presents the question whether the Ninth Circuit's causal-
28  connection requirement remains good law after Congress amended the federal officer removal
    statute to ensure a federal forum for claims "relating to" actions taken under a federal officer.

                                            14

1    Plaintiff alleges that Polymarket US's offering of federally regulated event contracts and

2    operation of its designated contract market has violated a battery of state laws. Those claims

3    directly target the ways Polymarket US exercises its delegated authority and assists the CFTC in

4    supervising federally regulated markets. For example, Plaintiff seeks to impose liability on

5    Polymarket US based on event contracts that are allegedly illegal under state law. *See* Compl.

6    ¶¶ 60–80. But Polymarket US, acting under the guidance and control of the CFTC, certified

7    those contracts as *lawful*. Similarly, while Plaintiff claims that Polymarket US "does not employ

8    adequate safeguards" to ensure lawful transactions, *id.* ¶ 35, the safeguards Polymarket US

9    employs stem from its delegated authority to "have and enforce rules that are designed to

10   promote fair and equitable trading and to protect the market and market participants." 17 C.F.R.

11   § 38.651; *see* Notice ¶¶ 32, 34, 37. And, as explained, Plaintiff's entire theory challenges the

12   way in which Polymarket US exercises its delegated authority to adopt access requirements.

13   *Supra* p.13. In short, the core allegations on which Plaintiff bases its state-law claims are a direct

14   assault on how Polymarket US functions as a self-regulatory organization. *Id.* ¶ 39. They easily

15   clear the "causal-connection requirement." *Goncalves*, 865 F.3d at 1249 (alterations omitted).[5]

16   Plaintiff does not cite a single case rejecting federal officer removal by a designated

17   contract market. *See* Mot. 12. Yet Plaintiff says that, if the Court recognizes its jurisdiction over

18   this case, "*every* [contract market] across the country would be able to remove any [state-law]

19   case." *Id.* That misplaced policy argument ignores that the CEA sharply limits the types of

20   claims States may bring against designated contract markets in state court. *See* 7 U.S.C.

21   § 13a-2(7) (limiting such claims to those based on "alleged violation[s] of a[] general civil or

22   _____

23   Because the Ninth Circuit's current test is satisfied here, removal would necessarily be
24   appropriate if the Supreme Court rules in favor of a more lenient test.

25   [5] Plaintiff scarcely mentions this requirement. It offers one conclusory sentence suggesting that
     "the Board's claims do not relate to any actions taken at the direction of a federal officer."
26   Mot. 11; *cf. id.* at 14 n.1 (professing ignorance about "how the conduct in this case involves the
     sort of governmental tasks that the government would have to perform if Polymarket did not").
27   Crediting Plaintiff's efforts to downplay its intrusion into federal affairs—rather than
     Defendants' "theory of the case"—"would defeat the purpose of the removal statute." *Jefferson*
28   *Cnty.*, 527 U.S. at 432.

15

1   criminal antifraud statute").  And it ignores the extraordinary nature of this suit:  Plaintiff does

2   not merely challenge a particular event contract or regulatory decision—Plaintiff sought and

3   obtained an *ex parte* temporary restraining order to force Polymarket US to cease operating in

4   the State entirely.  ECF 1-4, at 72.  A suit attempting to shut down a federally licensed and

5   regulated market and to forbid a self-regulatory organization from exercising *any* delegated

6   federal authority in Nevada falls squarely within the heartland of federal officer removal.

7   **C.**     **Polymarket US's Preemption Defense Is Manifestly "Colorable."**

8         For federal officer removal, Polymarket US need advance only one "colorable" federal

9   defense.  *Jefferson Cnty.*, 527 U.S. at 431.  Because litigating federal defenses in federal court is

10   "'one of the most important reasons for removal,'" the Supreme Court has "rejected" a

11   requirement for a defendant "virtually to 'win his case before he can have it removed.'"  *Id.*

12   (quoting *Willingham*, 395 U.S. at 407); *cf.* Mot. 16 (attempting to litigate preemption on the

13   merits).  Courts have therefore consistently held that a defense is colorable so long as it is not

14   immaterial or "wholly insubstantial and frivolous."  *DeFiore*, 85 F.4th at 560.

15         Polymarket US will demonstrate that its preemption defense is not merely colorable but

16   correct.  Preemption follows from the express language of the CEA.  When it comes to exchange-

17   traded event contracts, the CFTC exercises "exclusive jurisdiction" over transactions involving

18   swaps traded or executed on a designated contract market.  7 U.S.C. § 2(a)(1)(A).  That exclusive

19   jurisdiction leaves no room to target federally regulated markets with state licensing regimes,

20   enforcement actions, or injunctive relief.  Congress authorized the CFTC—not the States—to

21   determine whether event contracts involve "gaming" and whether they may be listed or must be

22   prohibited in the public interest.  7 U.S.C. § 7a-2(c)(5)(C).  It stripped States of power to bring

23   almost any claim against CFTC-designated markets.  *See* 7 U.S.C. § 13a-2.  And it did so to

24   ensure that regulation of "market participants" remains "under the oversight of the *Commission*,"

25   7 U.S.C. § 5(b) (emphasis added)—not "other regulatory agencies," *Merrill Lynch*, 456 U.S. at

26   386.

27                              *     *     *

28         This case falls within the core of the federal officer removal statute.  The CEA establishes

<div align="center">16</div>

1   "a system of effective self-regulation" by contract markets "under the oversight of the [CFTC]."

2   7 U.S.C. § 5(b). Unhappy with the results of that self-regulation and CFTC oversight, Nevada

3   has weaponized its courts in an "attempt to nullify federal . . . law[]"—securing an *ex parte*

4   temporary restraining order issued without an opportunity for Polymarket US even to present its

5   federal defense. *Durham*, 445 F.3d at 1252. This Court should recognize its jurisdiction under

6   section 1442(a)(1) to halt Plaintiff's unlawful intrusion and to prevent a single State from

7   disrupting federally regulated markets that Congress placed exclusively under federal

8   supervision.

9   **II.    This Court Also Has Federal Question Jurisdiction Under the *Grable* Doctrine.**

10          Federal question jurisdiction does not require "federal law" to appear "on the face of the

11  complaint." *Contra* Mot. 10. Rather, the Supreme Court has long held "that in certain cases

12  federal-question jurisdiction will lie over state-law claims that implicate significant federal

13  issues." *Grable*, 545 U.S. at 312. Federal question jurisdiction extends to state-law claims

14  embedding a federal issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial,

15  and (4) capable of resolution in federal court without disrupting" the congressionally approved

16  balance of "federal and state judicial responsibilities." *Gunn v. Minton*, 568 U.S. 251, 258

17  (2013). This case belongs in federal court because it necessarily turns on disputed and substantial

18  questions of federal law.

19          **A.    Plaintiff's Claim Necessarily Raises A Federal Issue.**

20          A federal law issue is "necessarily raised" when "the vindication of [the plaintiff's]

21  right[s] under state law necessarily turn[s] on some construction of federal law." *Hornish v.*

22  *King Cnty.*, 899 F.3d 680, 689–90 (9th Cir. 2018). A court looks to the "elements" of the

23  plaintiff's claim and asks whether any element requires the plaintiff to apply federal law to the

24  "facts of [its] case" in order "[t]o prevail." *Gunn*, 568 U.S. at 259.

25          *Georgia Gambling Recovery LLC v. Kalshi Inc.* is directly on point. The plaintiff there

26  sued under Georgia law, seeking to recover money lost from event-contract trading, which the

27  plaintiff characterized as "unlawful gambling." 2026 WL 279375, at *3. Under Georgia law,

28  however, the money was recoverable only if the "contract [was] unlawful under the law

17

1    governing its validity." *Id.* Thus, "whether the challenged event contracts" were "unlawful

2    gambling contracts cannot be determined by reference to Georgia law alone." *Id.* Instead,

3    "Plaintiff's ability to sustain a claim upon which relief may be granted necessarily depend[ed]

4    on the interpretation and application of the CEA and the scope of the CFTC's exclusive

5    jurisdiction." *Id.*

6         Plaintiff's claims likewise necessarily require proof that the event contracts at issue are

7    illegal gambling. Plaintiff acknowledges that Polymarket US "operates a derivatives exchange"

8    offering "event contracts." Compl. ¶ 2. Thus, the core question is whether Nevada may

9    nonetheless impose its own licensing and enforcement regime. That question cannot be

10   answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under

11   the CEA.

12        Take, for example, Plaintiff's claim that Polymarket US has violated Nevada Revised

13   Statute § 465.086. *See* Compl. ¶¶ 46, 52, 75, 79. That section states, "*Except as otherwise

14   provided by law*, it is unlawful" to accept wagers "without having first procured, and thereafter

15   maintaining in effect, all *federal*, state, county and municipal gaming licenses as required by

16   statute." Nev. Rev. Stat. § 465.086(1) (emphases added). Plaintiff's claim thus raises:

17   (1) whether the "law" "otherwise provide[s]" that Polymarket US need not "procure[]" and

18   "maintain[]" a Nevada license; and (2) whether Polymarket US holds the necessary "federal . . .

19   licenses." *Id.*

20        Plaintiff's *state-law* case for liability, therefore, necessarily turns on *federal* questions.

21   As the Nevada Supreme Court has explained, when a Nevada statute governs "[e]xcept as

22   otherwise provided by law," it does *not* apply if the conduct at issue is "squarely within the

23   applicable provisions" of a different statute. *Harmon v. Tanner Motor Tours of Nev., Ltd.*, 79

24   Nev. 4, 11–12, 377 P.2d 622, 626 (1963). So, whether Polymarket US's conduct is permitted

25   by the Nevada statute "cannot be determined by reference to [Nevada] law alone." *Ga. Gambling

26   Recovery*, 2026 WL 279375, at *3. Plaintiff speculates that the relevant language might not

27   "refer to . . . federal law." Mot. 17. But the Nevada Supreme Court has interpreted identical

28   language to refer to both "federal" *and* "state" law. *Edwards v. Emperor's Garden Rest.*, 122

18

1    Nev. 317, 327, 130 P.3d 1280, 1286 (2006).  And the statute itself refers to "federal" licensing.

2    Nev. Rev. Stat. § 465.086(1).  Thus, as in *Georgia Gambling Recovery*, the question here is

3    "whether the contracts at issue" are "federally authorized event contracts."  2026 WL 279375,

4    at *3.  And "Plaintiff's ability to sustain a claim upon which relief may be granted necessarily

5    depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive

6    jurisdiction." *Id.*

7         Plaintiff says that "the CEA does not say anything about compliance with Nevada gaming

8    law." Mot. 17.  Plaintiff might dispute whether the CFTC's exclusive jurisdiction eliminates the

9    need for a state gambling license—but that is something Plaintiff will have to establish on the

10   merits of its *affirmative* state-law case.  If the CEA governs Polymarket US's alleged conduct—

11   and it does—Nevada's licensing statute does not apply by its own terms.

12        Plaintiff muses that the "except as otherwise provided" clause might "be an affirmative

13   defense," but cites no Nevada decision to support that suggestion. Mot. 17.  The federal case it

14   cites explains that "exemptions ordinarily constitute 'affirmative defenses'" only when the

15   statute lists them in a separate section from the statutory prohibitions and the exemptions

16   "'expressly refer to the prohibited conduct as such.'" *Cunningham v. Cornell Univ.*, 604 U.S.

17   693, 701 (2025) (alterations adopted; citation omitted).  But where, as here, "an exception is

18   incorporated in" the *same* provision of a "statute, the burden is on the *prosecution* to plead and

19   prove that the defendant is not within the exception." *United States v. Vuitch*, 402 U.S. 62, 70

20   (1971) (emphasis added).

21        Defendants' federal question "argument" is *not* that they may remove based on their

22   federal preemption defense.  Mot. 16.  Plaintiff has little to say about Defendants' *actual*

23   argument: Here, as in *Georgia Gambling Recovery*, a court cannot resolve Plaintiff's state-law

24   claims without confronting federal law.  That conclusion follows from the way the Nevada

25   legislature drafted its gambling laws, not from Polymarket US's (meritorious) preemption

26   defense.  Because Plaintiff's claims necessarily raise federal-law issues, they belong in federal

27   court.

28

                                        19

1    **B.    The Federal Issues Are Disputed and Substantial.**

2         The federal issues are "actually disputed." *Gunn*, 568 U.S. at 258.  To prevail, Plaintiff

3    must prove that federal law does not permit these event contracts.  Defendants will argue the

4    opposite.  This is exactly the sort of federal-law dispute "that *Grable* envisioned." *Id.* at 259.

5         The federal-law dispute is substantial because it is "importan[t]" to "the federal system

6    as a whole." *Gunn*, 568 U.S. at 260.  As the CFTC told the Ninth Circuit, "whether states can

7    regulate or license trading on CFTC-registered Designated Contract Markets despite the CEA's

8    grant of 'exclusive jurisdiction' to the CFTC to oversee the operators of, and participants on,

9    these markets" is a "question of *exceptional* importance" to the uniform regulatory framework

10   Congress designed. *CFTC Motion*, at 1 (emphasis added).  Plaintiff attempts to characterize this

11   case as a mere state-law enforcement action that will decide the rights of a private party.  Mot.

12   18.  But the dispute "directly draw[s] in question" the decisions and authority of the CFTC in

13   "administering and enforcing" the CEA. *Gunn*, 568 U.S. at 261; *CFTC Motion*, at 1.  Just as the

14   CFTC would have a "direct interest in . . . a federal forum to vindicate its own administrative

15   action," resolution of these federal issues "sensibly belongs in a federal court." *Grable*, 545 U.S.

16   at 315.

17        These questions implicate the legality of *millions* of transactions across the country.

18   They present "pure issue[s] of law" that are "dispositive of the case and would be controlling in

19   numerous other cases." *City of Oakland v. BP PLC*, 969 F.3d 895, 905 (9th Cir. 2020).  And

20   there are already *dozens* of lawsuits presenting the same issues in federal courts nationwide,

21   including three cases pending in the Ninth Circuit alone. *KalshiEX, LLC v. Hendrick*,

22   No. 25-7516 (9th Cir.); *N. Am. Derivatives Exch. Inc. v. Nevada*, No. 25-7187 (9th Cir.);

23   *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831 (9th Cir.).  There is a strong federal

24   interest in ensuring all these cases are governed by a uniform body of federal law decided by

25   federal courts.

26   **C.    The Federal-State Balance Confirms This Case Belongs In Federal Court.**

27        The "congressionally approved balance of federal and state judicial responsibilities"

28   overwhelmingly favors federal jurisdiction. *Grable*, 545 U.S. at 314.  Congress enacted the CEA

20

1  to provide a "'comprehensive regulatory structure to oversee'" the derivatives markets and "to

2  bring the markets under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade*

3  *of Chi.*, 977 F.2d 1147, 1155–56 (7th Cir. 1992) (citation omitted).  Congress gave the CFTC

4  "exclusive jurisdiction" to regulate derivatives trading on designated exchanges to "implement"

5  its "goal of uniformity." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990).

6  Exercising federal jurisdiction here preserves the "'congressionally approved balance' of federal

7  and state" judicial responsibilities by providing a federal forum for uniform application of federal

8  law.  *Hornish*, 899 F.3d at 688 (citation omitted).

9         Plaintiff insists that its sovereign interest in suing a federally regulated market should

10  control.  *See* Mot. 18.  But Congress has already determined otherwise.  Congress has determined

11  that contract markets' "self-regulation of [their] trading facilities" is "affected with a *national*

12  *public interest*."  7 U.S.C. § 5 (emphasis added).  Allowing a State to interfere with federally

13  regulated trading would fracture the national derivatives market and undermine the uniformity

14  Congress deemed essential.  The CFTC Chairman's clear guidance confirms the supremacy of

15  the federal government in regulating exchange-traded swaps.  Upholding federal jurisdiction

16  here does not disrupt the federal-state balance; it enforces it.

17  **III.     The Court Should Deny The State's Demand For Fees.**

18         "[W]hen an objectively reasonable basis" for removal "exists, fees should be denied."

19  *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005).  A reasonable basis exists where a

20  "circuit court of appeals" has not "rejected" the removing party's "argument." *Lussier v. Dollar*

21  *Tree Stores, Inc.*, 518 F.3d 1062, 1066 (9th Cir. 2008); *see id.* at 1065 ("removal is not

22  objectively unreasonable solely because the removing party's arguments lack merit").

23         Both of Polymarket US's bases for removal are not just objectively reasonable—they are

24  correct.  Circuit courts have consistently recognized that self-regulatory organizations like

25  Polymarket US perform delegated government functions; these holdings firmly support

26  Polymarket US's reliance on federal officer removal.  *See supra* pp.10–11.  Plaintiff might

27  disagree, but it does not cite any case rejecting that argument.  *See* Mot. 12.  Fee awards are

28

21

1   inappropriate for issues "of first impression." *Lussier*, 518 F.3d at 1066.[6]

2        As for federal question jurisdiction, Plaintiff cannot distinguish *Georgia Gambling*

3   *Recovery*, cites no contrary Nevada or Ninth Circuit case law, and instead reimagines Polymarket

4   US's state-law arguments as "a preemption defense." Mot. 19. Plaintiff's continued refusal to

5   address the arguments presented is telling—and forecloses Plaintiff's contention that removal

6   was objectively unreasonable.

7                                    **CONCLUSION**

8        The Court should deny Plaintiff's motion and exercise jurisdiction over this case.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  _____

26  [6] In *Barbara v. New York Stock Exchange*, 99 F.3d 49 (2d Cir. 1996), the Second Circuit held
    that NYSE could not remove on federal officer grounds. That case applied "a prior version of
27  section 1442," under which "federal agencies didn't have any removal rights." *Durham*, 445
    F.3d at 1252. Congress later "amended the statute to reverse" the Supreme Court decision on
28  which *Barbara* had relied. *Id.*

                                        22

1          DATED: February 13, 2026.

2                                              HUTCHISON & STEFFEN, PLLC

3                                              /s/ Joseph C. Reynolds

4                                              _____
                                               Mark A. Hutchison (Nev. Bar No. 4639)
5                                              Joseph C. Reynolds (Nev. Bar No. 8630)
                                               100 West Liberty Street, Suite 765
6                                              Reno, Nevada 89501
                                               mhutchison@hutchlegal.com
7                                              jreynolds@hutchlegal.com
                                               (775) 853-8746
8

9                                              Adam P. Laxalt (Nev. Bar No. 12426)
                                               COOPER & KIRK, PLLC
10                                             1523 New Hampshire Avenue NW
                                               Washington, D.C. 20036
11                                             alaxalt@cooperkirk.com
                                               (202) 220-9600
12

13                                             Orin Snyder (pro hac vice forthcoming)
                                               Matt Benjamin (pro hac vice pending)
14                                             GIBSON, DUNN & CRUTCHER LLP
                                               200 Park Avenue
15                                             New York, New York 10166
                                               OSnyder@gibsondunn.com
16                                             MBenjamin@gibsondunn.com
                                               (212) 351-4000
17

18                                             Thomas H. Dupree Jr. (pro hac vice pending)
19                                             Jacob T. Spencer (pro hac vice pending)
                                               Adam I. Steene (pro hac vice forthcoming)
20                                             GIBSON, DUNN & CRUTCHER LLP
                                               1700 M Street NW
21                                             Washington, D.C. 20036
                                               TDupree@gibsondunn.com
22                                             JSpencer@gibsondunn.com
                                               ASteene@gibsondunn.com
23                                             (202) 955-8500

24

25                                             Counsel for Defendants BLOCKRATIZE INC.
26                                             d/b/a Polymarket; QCX LLC d/b/a Polymarket
                                               US; and ADVENTURE ONE QSS INC. d/b/a
27                                             Polymarket

28

                                               23

2App228

1

CERTIFICATE OF SERVICE

2

3        I hereby certify that I caused a copy of DEFENDANTS' OPPOSITION TO

4   PLAINTIFF'S MOTION TO REMAND to be electronically filed and served on all counsel of

    record using the Court's CM/ECF system.
5

6        DATED: February 13, 2026.

7

                              By:
8                                    /s/ Madelyn Carnate-Peralta
9                                    An Employee of Hutchison & Steffen, PLLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

**State Plaintiff's Motion to Remand**
**Dist. Ct. Doc. 7 (filed February 9, 2026)**

1  AARON D. FORD
    Attorney General
2  Jessica E. Whelan (Bar No. 14781)
    Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
    Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
    Senior Deputy Attorney General
5  State of Nevada,
    Office of the Attorney General
6  1 State of Nevada Way, Suite 100
    Las Vegas, NV 89119
7  (702) 486-3420 (phone)
    (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
    jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10  *Attorneys for Plaintiff State of Nevada ex rel.*
    *Nevada Gaming Control Board*

11

12  **UNITED STATES DISTRICT COURT**

13  **DISTRICT OF NEVADA**

14  STATE OF NEVADA ex rel. NEVADA | Case No.: 3:26-cv-00089
    GAMING CONTROL BOARD,

15 | [Nev. Dist. Ct. No. 26OC000121B]
    Plaintiff,

16  v.

17  BLOCKRATIZE INC. d/b/a Polymarket; QCX | **PLAINTIFF'S MOTION TO REMAND**
    LLC d/b/a Polymarket US; ADVENTURE
18  ONE QSS INC. d/b/a Polymarket,

19     Defendants,

20

21     Plaintiff the State of Nevada on relation of the Nevada Gaming Control Board (the Board)

22  respectfully asks the Court to remand this case to state court. As explained below, the parties respect-

23  fully request a ruling from this Court by February 26, 2026. The parties are simultaneously filing a

24  stipulation to a condensed briefing schedule, so that the Court is able to rule by that date.

25  This motion is based on the following memorandum of points and authorities, the referenced plead-

26  ings and exhibits, and any oral argument the Court may entertain.

27  / / /

28  / / /

Page **1** of **19**

1   **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.    INTRODUCTION**

3   Defendants Blockratize Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, and Adven-

4   ture One QSS Inc. d/b/a Polymarket (collectively, Polymarket) offer unlicensed sports betting in Ne-

5   vada. The Board brought this civil enforcement action under Nevada state law to enjoin Polymarket's

6   unlawful gambling operations in Nevada until Polymarket obtains a Nevada gaming license and com-

7   plies with Nevada's gaming laws. As state law requires, the Board filed this action in state court.

8   On January 29, 2026, the state court issued a TRO. It found that Polymarket's unlicensed

9   operations likely violate Nevada's gaming laws. It also found that every day that those unlicensed

10   operations continue, they irreparably harm the State, its gaming industry, and the public. These harms

11   "cannot be mitigated" once incurred. ECF No. 2-4, at 68. "A day means more consumers. More con-

12   sumers mean more transactions. More transactions means more potential harm." *Id*. "[E]very day

13   matters in this case in a literal sense." *Id*. The court entered a TRO that lasts 14 days, until February

14   12, 2026. The court then set the case for expedited briefing on the Board's motion for a preliminary

15   injunction, so that motion could be decided by February 12.

16   Polymarket told the state court it would respond by noon on February 5, 2026. But when that

17   time came, Polymarket blew the deadline and instead filed a notice of removal. Polymarket asserts

18   that this state-law case can only be heard in federal court—supposedly because Polymarket (a private

19   company) can avail itself of the federal officer removal statute and because Polymarket's federal

20   defense makes the case "arise under" federal law.

21   Polymarket's removal arguments are specious. Its federal-officer theory is based on the fact

22   that it operates a designated contract market (DCM) registered with the Commodity Futures Trading

23   Commission (CFTC). Polymarket asserts that because it is regulated by a federal agency, and the

24   federal agency allows it to self-certify its event contracts, Polymarket actually is acting on behalf of

25   the federal agency when it conducts its own business operations. That is wrong. Polymarket is a

26   private company trying to make a profit. Its employees are not federal officers, and they are not acting

27   on behalf of federal officers. The law on this is clear: Both the Supreme Court and the Ninth Circuit

28   have held that complying with a federal regulatory scheme, even a highly detailed one, does not bring

1    a private party within the scope of the federal officer removal statute. Further, the Ninth Circuit has

2    specifically held that it does not change the analysis if a federal agency has delegated authority to a

3    private company to self-certify compliance with federal law. Polymarket cites no authority holding

4    that a private entity can remove a state enforcement action to federal court simply because the private

5    entity is federally regulated.

6          Polymarket's alternative basis for removal—that the Board's state law claims purportedly

7    "arise under" federal law—likewise lacks merit. Polymarket seeks to raise a federal preemption *de-*

8    *fense*, and it is well established that a federal defense does not provide a basis for removal. If Poly-

9    market were correct, then state courts would never be able to adjudicate federal defenses. Yet it is

10    black-letter law that state courts are competent to—and expected to—decide questions of federal law.

11          This Court therefore should remand this case. In light of the limited duration of the existing

12    TRO, the parties intend to enter a stipulation to extend the existing TRO by 14 days, to February 26,

13    2026. The parties therefore respectfully request that the Court rule on this motion by February 26. To

14    ensure that the Court can rule by that date, the parties are simultaneously filing a stipulation to a

15    condensed briefing schedule. Under that condensed briefing schedule, Polymarket will file its oppo-

16    sition to this motion by February 13, 2026, and the Board will file its reply by February 18, 2026.

17    The parties then respectfully suggest that, if the Court wishes to hear oral argument on the motion, it

18    hold that argument on February 23 or 24, 2026.

19    Finally, given the lack of any objectively reasonable basis for removal, the Court also should award

20    the Board its attorneys' fees and costs.

21    **II.      BACKGROUND**

22          **A.     Nevada Law Comprehensively Regulates Gaming**

23          Nevada's gaming industry is "vitally important to the economy of the State and the general

24    welfare of the inhabitants." NRS § 463.0129(1)(a). All entities that conduct gaming in Nevada must

25    "be licensed, controlled and assisted to protect the public health, safety, morals, good order and gen-

26    eral welfare of the inhabitants of the State." *Id.* § 463.0129(1)(d).

27          The Nevada Legislature has found that the continued growth and success of gaming "is de-

28    pendent upon public confidence and trust that licensed gaming" is "conducted honestly and

Page **3** of **19**

1    competitively." NRS § 463.0129(1)(b). Further, the Legislature has made clear the judgment that

2    "public confidence and trust can only be maintained by strict regulation of all persons, locations,

3    practices, associations, and activities related" to the operation of gaming in Nevada. *Id.*

4    § 463.0129(1)(c). The Board is statutorily charged with administering and enforcing Nevada gaming

5    law. *Id.* § 463.140(1).

6          "Gaming" in Nevada is synonymous with "gambling" and includes any regulated game. NRS

7    § 463.0153. A "gambling game" subject to regulation in Nevada includes "any game played with . .

8    . equipment or any . . . electronic device or machine for money . . . or any representative of value"

9    that is accessible in Nevada. *Id.* § 463.0152. The games subject to regulation in Nevada include "per-

10   centage games," *id.*, which exist when the "house" does not directly participate in a wager and its

11   only stake is a commission derived from the wager, *see Hughes Props., Inc. v. State*, 100 Nev. 295,

12   297 (1984). Gaming also includes operating a "sports pool," which is "the business of accepting

13   wagers on sporting events or other events by any system or method of wagering," NRS § 463.0193;

14   a "wager" is a "sum of money or representative of value that is risked on an occurrence for which the

15   outcome is uncertain," *id.* § 463.01962.

16         Nevada law comprehensively regulates entities that conduct gaming activities in the State.

17   Each entity that makes gaming activities accessible in Nevada is subject to a rigorous licensing pro-

18   cess. NRS § 463.160(1). Entities conducting gaming activities in Nevada must pay taxes on gross

19   gaming revenue derived from gaming activities accessible in the State. *Id.* § 463.373. Licensed enti-

20   ties accepting wagers from persons in the State must have a physical location in Nevada. Nev. Gam-

21   ing Reg. 22.060(2). Licensed entities may not accept wagers from those under 21 years of age. NRS

22   § 463.350. Further, licensed entities accepting wagers on sporting events must employ safeguards to

23   ensure that wagers are not being placed on an event by owners, coaches, players, or officials partici-

24   pating in the event, and must communicate with Nevada gaming regulatory authorities about potential

25   evidence of match fixing or point shaving. *See* Nev. Gaming Regs. 22.1205(2), 22.121.

26         To stop the unlawful operation of a gaming entity in Nevada, the Board is authorized to bring

27   a civil action in state court. NRS § 463.343. Such an action must be brought in the district court for

28   / / /

1   Carson City, Nevada, or the place where the company does business. *Id.* The Board may ask the state

2   court to enter a declaratory judgment or injunction to enforce state gaming law. *Id.*

3        **B.**       **The CFTC Regulates Commodities Trading**

4          The CFTC regulates trading in commodity derivatives—financial instruments that compa-

5   nies use to manage risk. It is not a gaming regulator.

6          In 1936, Congress enacted the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*, to

7   regulate trading in futures in wheat, corn, and other agricultural commodities. Pub. L. No. 74–675, §

8   3, 40 Stat. 1491, 1491 (1936). A "future" is a contract to buy or sell a quantity of a commodity at a

9   specified price on a future date. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995).

10   Businesses use futures to hedge against price volatility. *Id.* The CEA initially authorized the Secretary

11   of Agriculture to register "designated contract markets" (DCMs) for futures trading. 7 U.S.C. § 7

12   (1936).

13          In 1974, Congress expanded the CEA to cover additional commodities, including non-agri-

14   cultural commodities, and to cover other derivatives, including "options." Pub. L. No. 93–463,

15   § 201(b), 88 Stat. 1389 (1974). A "derivative" is a contract whose value depends on the performance

16   of an underlying asset, such as a commodity. *Black's Law Dictionary* (12th ed. 2024). An "option"

17   is a contract that "grants to the purchaser the right, for a specified period of time, to either buy or sell

18   the subject of the option at a predetermined price." *CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219,

19   1226 (9th Cir. 2009) (internal quotation marks omitted).

20          Also in 1974, Congress created the CFTC "to consolidate federal regulation of commodity

21   futures trading" in one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353,

22   386–87 (1982). To that end, Congress gave the CFTC "exclusive jurisdiction" over futures and op-

23   tions that are traded on DCMs or other markets. *Id.*; *see* 7 U.S.C. § 2(a) (1974).

24          In 2010, Congress enacted the Dodd-Frank Act, which expanded the CEA to cover "swaps."

25   Pub. L. No. 111–203, pt. II, 124 Stat. 1376, 1658–754 (2010). A "swap" is an agreement between

26   two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to

27   hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039,

28   1042–43 (9th Cir. 2003). Congress added "swaps" to the CEA because certain swaps, known as

Page **5** of **19**

1    "credit default swaps," had exacerbated the financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-*

2    *Frank Wall Street Reform and Consumer Protection Act* 3 (2017).

3            Thus, after the Dodd-Frank Act, the CFTC has "exclusive jurisdiction" over commodity de-

4    rivatives, including "swaps," "'option[s]' " and "contracts of sale of a commodity for future delivery"

5    (*i.e.,* futures), that are "traded or executed on a [designated] contract market" or "any other board of

6    trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A). The mere fact that a contract is traded on a DCM

7    does not make it subject to the CFTC's "exclusive jurisdiction"; it also must qualify as one of the

8    listed types of commodity derivatives. *Id.* Further, if a consumer contract qualifies as a swap, option,

9    or future, it *only* can be traded on a CFTC-registered DCM. *See id.* § 2(e) (swaps); *id.* § 6(a) (futures);

10   17 C.F.R. § 33.3(a) (options).

11           To offer a contract for trading, a DCM can self-certify that the contract complies with the

12   CEA and immediately start trading, without any action by the CFTC. 7 U.S.C. § 7a-2(c)(1)-(2). In its

13   self-certification, the DCM must identify whether the contract is a swap, option, or future. *See* 17

14   C.F.R. § 38.4(b). The CFTC can review a self-certification and disallow a contract that fails to comply

15   with the CEA's requirements. 7 U.S.C. § 7a-2(c)(3).

16           Further, under the "Special Rule," the CFTC may disallow a contract that involves "activity

17   that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." 7

18   U.S.C. § 7a-2(c)(5). Exercising its authority under the Special Rule, the CFTC categorically prohib-

19   ited contracts "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a).

20           **C.    The Board Brought Suit To Stop Polymarket's Unlicensed Gaming**

21           Polymarket operates a prediction market that allowed users in Nevada to wager on the out-

22   come of events, including sporting events such as college basketball and professional football games.

23   *See* ECF No. 2-3 (Compl.) ¶¶ 2, 25. For example, as of January 16, 2026, a user could buy an event

24   contract for $0.36 that would pay out $1 if the Chicago Bears won their January 18, 2026, NFL

25   playoff game against the Los Angeles Rams—essentially, approximately 3/1 odds. *Id.* ¶ 21. Poly-

26   market takes a percentage of money wagered through its market in the form of commissions styled

27   as "trading fees." *Id.* ¶ 23.

28   / / /

1      Polymarket's sports-based contracts are "wagers" under Nevada law because they allow a

2  person located in Nevada to risk a "sum of money" on "an occurrence for which the outcome is

3  uncertain." NRS § 463.01962. Polymarket thus is operating a "sports pool" under Nevada law, be-

4  cause it is in the business of accepting wagers on sporting events or other events. *Id.* § 463.0193; *see*

5  Compl. ¶¶ 19–21, 44. And because Polymarket takes a commission from the wagers placed, it also

6  runs "percentage games." NRS § 463.0152; *Hughes*, 100 Nev. at 297; *see* Compl. ¶¶ 22–23, 44. Op-

7  erating sports pools or percentage games in Nevada requires a gaming license. NRS §§ 463.0152(1),

8  463.160(1). But Polymarket is not licensed to operate either a sports pool or a percentage game in

9  Nevada and does not otherwise comply with Nevada gaming law. Compl. ¶ 25.

10      On January 16, 2026, the Board initiated enforcement proceedings against Polymarket by

11  filing a complaint in state court, as NRS § 463.343 requires. The Board alleged that Polymarket is

12  operating an unlicensed sports pool and unlicensed percentage games in violation of Nevada law.

13  Compl. ¶¶ 36–59. The Board brought two claims for relief: The first seeks declaratory and injunctive

14  relief under NRS §§ 463.343 and 463.346, Compl. ¶¶ 60–72; and the second seeks declaratory and

15  injunctive relief under NRS § 30.030, Compl. ¶¶ 73–80.

16      In addition to filing the complaint, the Board moved for a TRO and a preliminary injunction.

17  *See* ECF No. 2-4, at 2. The Board explained that Polymarket is offering unlicensed sports and other

18  wagering in violation of Nevada law, and that Polymarket's unlicensed operations cause severe and

19  irreparable harm to the State, its gaming industry, and the public. *Id.* at 7–13. In particular, the Board

20  explained that Polymarket has not undergone Nevada's rigorous licensing process and does not pay

21  taxes on gaming revenue, as state law requires. *Id.* at 9, 12–13. Polymarket also does not comply with

22  the many state regulations that protect the public, including a prohibition on wagering by those under

23  age 21, protections to address problem gaming, and measures designed to prevent criminal activity.

24  *Id.* at 11–12.

25      Polymarket filed a preliminary response. *See* ECF No. 2-4, at 23. Polymarket did not dispute

26  that it is offering unlicensed gaming in Nevada. Instead, Polymarket contended that it does not need

27  to comply with state law because they offer their sports and other event contracts for trading on a

28  DCM that has been registered with the CFTC. *Id.* at 27–28. According to Polymarket, "Federal law"

Page **7** of **19**

1    (the CEA) "preempts the application of state gambling laws to federally regulated contract markets"

2    like its DCM. *Id.* at 28.

3          On January 29, 2026, the state court granted the Board a TRO. ECF No. 2-4, at 69. The TRO

4    enjoins Polymarket from "operating or offering a market in Nevada that involves 'events-based con-

5    tracts' without a valid license" to conduct gaming in Nevada. *Id.* at 72–73.

6    The state court noted that "gaming in Nevada is expansively and strictly regulated," and it found that

7    Polymarket's activities likely violate Nevada's gaming laws. ECF No. 2-4, at 65–67. The court re-

8    jected Polymarket's preemption defense, explaining that "the balance of convincing legal authority

9    weighs against federal preemption." *Id.* at 66 (citing *KalshiEX LLC v. Hendrick*, 2025 WL 3286282

10    (D. Nev. Nov. 24, 2025); *N. Am Derivatives Exch. Inc. v. Nevada* (*Crypto.com*), 2025 WL 2916151

11    (D. Nev. Oct. 14, 2025); and *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025)). In par-

12    ticular, the state court found the reasoning of Judge Gordon in Nevada federal district court in

13    *KalshiEX* "persuasive" on this point. *Id.* The state court thus concluded that "the Commodit[y] Ex-

14    change Act, more specifically 7 U.S.C. § 2(a)(1)(A), fairly interpreted, does not vest exclusive juris-

15    diction over POLYMARKET'S contracts with the Commodity Futures Trading Commission." *Id.*

16          The state court also found that Polymarket's unlicensed operations cause immediate and ir-

17    reparable injury to State Defendants, Nevada's gaming industry, and the public. ECF No. 2-4, at 67.

18    Among other harms, underage individuals can gamble; players, coaches, and other insiders could be

19    betting on their own events; and "unsuitable individuals" could be involved in gaming. *Id.* These

20    harms, by their nature, "cannot be mitigated" once incurred. *Id.* at 67–68. The court found that each

21    day a prediction market operates in violation of Nevada law causes additional harm: "A day means

22    more consumers. More consumers mean more transactions. More transactions means more potential

23    harm." *Id.* at 68. "[E]very day matters in this case in a literal sense." *Id.*

24          The court set the TRO to expire on February 12, 2026, and scheduled a hearing on the motion

25    for a preliminary injunction for February 11, 2026. ECF No. 2-4, at 69, 73. The court entered an

26    expedited briefing schedule so that it could decide whether to grant the preliminary-injunction motion

27    (or extend the TRO) before the TRO expired. *See id.* At Polymarket's request, the Board agreed to a

28    / / /

1  deadline of noon PT on February 5, 2026, for Polymarket's opposition and noon PT on February 10,

2  2026, for the Board's reply. *See* Ex. 1.

3  On February 5, 2026, Polymarket did not file its brief in state court. Instead, it filed a notice of re-

4  moval, asserting that the state law enforcement action must be heard by this Court. *See* ECF No. 2-1

5  (Notice).

6       Because the TRO will expire on February 12, 2026, Polymarket has agreed that the Court

7  should extend the TRO until February 26, 2026. The parties intend to imminently file a stipulation to

8  extend the TRO to that date. The parties therefore respectfully request that this Court rule on this

9  motion by February 26. To ensure that the Court can rule by that date, the parties are simultaneously

10 filing a stipulation to a condensed briefing schedule. Under that condensed briefing schedule, Poly-

11 market will file its opposition to this motion by February 13, 2026, and the Board will file its reply

12 by February 18, 2026. The parties then respectfully suggest that the Court hold any oral argument on

13 this motion on February 23 or 24, 2026.

14 **III.    LEGAL STANDARD**

15      It is black-letter law that state courts have both the power and the duty to address federal

16 issues that arise in state court. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78 (1981).

17 It also is black-letter law that the mere presence of a possible federal defense to a state law enforce-

18 ment action does not make a case removable to federal court. *See Caterpillar Inc. v. Williams*, 482

19 U.S. 386, 393 (1987).

20      A defendant can remove to federal court a "civil action . . . commenced in a State Court and

21 that is against . . . any officer (or any person acting under that officer) of the United States or of any

22 agency thereof," 28 U.S.C. § 1442(a), as well as "any civil action brought in a State court of which

23 the district courts of the United States have original jurisdiction," *id.* § 1441(a). But if those predicates

24 do not exist—and thus the "case is improperly removed"—then "the federal court must remand the

25 action because it has no subject-matter jurisdiction to decide the case." *ARCO Envt'l Remediation,*

26 *L.L.C. v. Dep't of Health & Envt'l Quality of Mont.*, 213 F.3d 1108, 1113 (9th Cir. 2000).

27 / / /

28 / / /

1   **IV.    ARGUMENT**

2          When Polymarket began offering unlicensed sports betting in violation of Nevada law, the

3   Board promptly brought suit in state court to stop that unlawful activity. The state court, recognizing

4   the clear violation of state law, entered a TRO. In so doing, it preliminarily rejected Polymarket's

5   asserted federal defense. The state court was well within its authority to do that. But apparently dis-

6   satisfied with the state court, Polymarket came running to this Court, asserting two truly extreme

7   theories of removal jurisdiction.

8          Polymarket's first asserted ground for removal is federal-officer jurisdiction under 28 U.S.C.

9   § 1442(a). But Polymarket is not a federal officer, and it is not acting under any federal officer—it is

10  a private entity that conducts a private business subject to federal regulation. It is well established

11  that merely being regulated by a federal agency does not create federal-officer jurisdiction. Poly-

12  market's theory, if accepted, would turn many run-of-the-mill state enforcement actions into federal

13  cases simply because the defendants are federally regulated, which would dramatically expand fed-

14  eral jurisdiction.

15         Polymarket's second theory is that there is federal-question jurisdiction under 28 U.S.C.

16  § 1331 because adjudicating the Board's claims necessarily requires deciding a question of federal

17  law. But federal law appears *nowhere* on the face of the complaint; the only federal question here is

18  one that Polymarket asserts as a defense. It is well established that a federal defense does not create

19  federal-question jurisdiction.

20  This Court therefore should remand this case to the state court.

21         **A.    Polymarket Is Not "Acting Under" Any Federal Officer**

22         The federal officer removal statute allows removal to federal court of cases brought against

23  "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of

24  the United States or of any agency thereof, in an official or individual capacity, for or relating to any

25  act under color of such office." 28 U.S.C. § 1442(a)(1). This statute is intended to give federal officers

26  a federal forum, in order to ensure that state courts do not interfere with federal officers' performance

27  of their federal duties. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007). Although this

28  / / /

1   statute is "liberally construed" to give federal officers the ability to have their cases heard in federal

2   court, *Colorado v. Symes*, 286 U.S. 510, 517 (1932), it is "not limitless," *Watson*, 551 U.S. at 147.

3       To show a basis for removal under this statute, a removing defendant must (1) demonstrate

4   that it is a federal officer or person "acting under" a federal officer, (2) demonstrate that the plaintiff's

5   claims are "for, or relating to" an act under color of federal office, and (3) raise a colorable federal

6   defense. *See Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018). Here, Polymarket

7   fails to establish the first element—it is not a person "acting under" a federal officer. It also cannot

8   establish the second element—the Board's claims do not relate to any actions taken at the direction

9   of a federal officer, because no such action exists.

10       "Acting under" a federal officer means acting at the direction of a federal officer, to carry

11   out federal law. *Watson*, 551 U.S. at 151–52. As the Supreme Court has held, a person is not "acting

12   under" a federal officer merely because the person is regulated by a federal agency. In *Watson*, the

13   Supreme Court held that a tobacco company could not avail itself of the federal officer removal statute

14   based on "the fact that a federal regulatory agency directs, supervises, and monitors a company's

15   activities in considerable detail." *Id.* at 145. The Court explained that the term "under" refers to a

16   relationship of subservience that "typically involves subjection, guidance, or control." *Id.* at 151. "In

17   addition," a private person "acting under" a federal officer must be involved in "an effort to *assist*, or

18   to help *carry out*, the duties or tasks of the federal superior." *Id.* at 151–52. To show that a defendant

19   is carrying out the government's tasks, the defendant must identify an "unusually close" relationship

20   with a federal officer that is "distinct from the usual regulator/regulated relationship." *Id.* at 157.

21   Anything less, the Supreme Court warned, would impermissibly "expand the scope of th[is] [re-

22   moval] statute considerably, potentially bringing within its scope state-court actions filed against pri-

23   vate firms in many highly regulated industries." *Id.* at 153.

24       Following this guidance, the Ninth Circuit has recognized that federal officer removal re-

25   quires more than "mere compliance with a regulation," even if that regulation "'is highly detailed'"

26   and even if the private entity's activities "'are highly supervised and monitored.'" *Riggs v. Airbus*

27   *Helicopters, Inc.*, 939 F.3d 981, 985 (9th Cir. 2019) (quoting *Watson*, 551 U.S. at 153). When all the

28   defendant alleges is that it complies with federal "government regulations and recommendations,"

1   the defendant "has failed to establish that it was 'acting under' a federal official, and it has not iden-

2   tified a duty of the federal government that it performed." *Saldana v. Glenhaven Healthcare LLC*, 27

3   F.4th 679, 685 (9th Cir. 2022). That is true, the Ninth Circuit has held, even when the party is acting

4   pursuant to "formally delegated legal authority" from a federal agency. *Riggs*, 939 F.3d at 985. In

5   *Riggs*, for example, a helicopter manufacturer argued that it was "acting under" the Federal Aviation

6   Administration because the agency delegated to the manufacturer the authority to certify that heli-

7   copter designs complied with federal requirements. *Id.* The Ninth Circuit held that the manufacturer

8   was not acting under the FAA, because the manufacturer was only following "a detailed, FAA-ap-

9   proved procedures manual." *Id.* at 988–89 (internal quotation marks and emphasis omitted). That is

10   the most that Polymarket could say about federal regulation here.

11        Polymarket argues that it is "acting under" the CFTC because it operates a DCM regulated

12   by the CFTC and the CFTC allows it to self-certify its event contracts. Notice ¶ 6. Specifically, Poly-

13   market asserts that it "acts as a self-regulatory organization exercising delegated authority from the

14   CFTC" because it is able to self-certify its contracts as complying with the CEA and then list them

15   for trading on its DCM. *Id.* That is nowhere near enough for federal officer removal.

16        The Ninth Circuit has specifically held that the "delegation of authority 'to self-certify com-

17   pliance with the relevant regulations'" is insufficient to show that someone is acting under the direc-

18   tion of a federal officer. *Riggs*, 939 F.3d at 988 (quoting *Fidelitad*, 904 F.3d at 1100). Although courts

19   have explained that some self-regulatory organizations can "exercis[e] quasi-governmental powers,"

20   *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998),

21   *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374

22   (2016), *no court* has held that a self-regulatory organization comes within the federal officer removal

23   statute on that basis alone. Indeed, under Polymarket's theory, *every* DCM across the country would

24   be able to remove any case alleging its conduct violates state law to federal court—a dramatic expan-

25   sion of federal jurisdiction that would be directly contrary to the Supreme Court's guidance in *Wat-

26   son*.

27        The key case on which Polymarket relies, *Sparta Surgical*, was not a case where a party

28   asserted federal officer removal. Instead, it is a case about governmental immunity, and the facts are

<div align="center">Page <strong>12</strong> of <strong>19</strong></div>

1    completely distinguishable from the situation here. There, the National Association of Securities

2    Dealers (NASD), which operates the NASDAQ stock exchange and has the power to regulate trading

3    on that exchange, delisted the plaintiff company's stock from the NASDAQ SmallCap market on the

4    grounds that the listing violated the market's rules. *Sparta Surgical*, 159 F.3d at 1211. The plaintiff

5    brought state and federal claims against NASD, and NASD claimed government immunity on the

6    ground that it was "exercising quasi-governmental powers." *Id.* at 1213. The Ninth Circuit explained

7    that NASD was entitled to governmental immunity on the plaintiff's non-federal claims because

8    NASD was "acting in an adjudicatory, prosecutorial, arbitrative or regulatory capacity" with respect

9    to the plaintiff's stock. *Id.* at 1214–15. The key point is that NASD was regulating *third parties* on

10   behalf of the government. As the Court explained, NASD would not have been entitled to immunity

11   if the case involved only NASD's "private business." *Id.*

12        This case involves only Polymarket's private business, not any regulatory function with re-

13   spect to third parties. The contracts at issue on Polymarket's markets *are its own contracts*; the only

14   relevant conduct is Polymarket's own conduct. Polymarket is not claiming that it regulates anyone

15   else's conduct. Polymarket's removal notice confirms this. The notice cites various "functions" with

16   which Polymarket asserts it has been "specifically charged" under the CEA as a DCM, Notice ¶¶ 32–

17   37—but the cited provisions of the CEA simply impose various requirements on Polymarket that

18   govern the operation of its own DCM. To the extent Polymarket follows those provisions, that would

19   show "mere compliance with federal directives," which the Ninth Circuit has held is insufficient to

20   show that a company is acting under a federal officer. *Riggs*, 939 F.3d at 989. As the Ninth Circuit

21   emphasized, "compliance with the law 'does not bring a private actor within the scope of the federal

22   officer removal statute.'" *Id.* at 988 (quoting *Fidelitad*, 904 F.3d at 1100).

23        Polymarket suggests (Notice ¶ 30) that it acts as the CFTC's "agent" or otherwise "assist[s]

24   the [CFTC] in fulfilling 'basic governmental tasks' that 'the Government itself would have had to

25   perform' if it had not contracted with a private firm." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th

26   733, 756 (9th Cir. 2022) (quoting *Watson*, 551 U.S. at 153–54); *see Watson*, 551 U.S. at 153 (noting

27   that a contractor "helping the Government to produce an item that it needs" may be able to make use

28   of the federal officer removal statute). Again, this basis for acting-under jurisdiction does not apply

Page **13** of **19**

1    when an entity merely ensures its own compliance with federal law. For example, the Ninth Circuit

2    has concluded that a private insurer pursuing subrogation benefits on behalf of the Office of Personnel

3    Management acts under a federal officer in bringing claims against a third party, which is different

4    from it "simpl[y] compl[ying] with the law" in its own conduct. *Goncalves ex rel. Goncalves v. Rady*

5    *Children's Hosp. San Diego*, 865 F.3d 1237, 1246–47 (9th Cir. 2017). Here, Polymarket does not

6    identify any comparable assistance it provides to the government in regulating third parties; all of its

7    assertions are about how it lists its own contracts for trading on its own market.[1]

8         Polymarket also suggests that it acts under the CFTC's "close direction." Notice ¶ 29 (quot-

9    ing *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 914 (9th Cir. 2024)). But it identifies no examples

10   of such close direction—indeed, it does not say that the CFTC (or any other federal agency) played

11   any role in its decision to list sports and other wagers on its market. Polymarket instead notes (Notice

12   ¶ 37) that the CFTC has the authority to stay, amend, or prohibit Polymarket's self-certified listings,

13   which Polymarket argues shows that the CFTC closely supervises its activities. But the fact that the

14   CFTC can review Polymarket's self-certifications reflects only that, in determining whether to list

15   contracts on its market, Polymarket is "duty-bound to follow prescriptive rules set forth by" the CFTC

16   and the CEA, "thus falling within the 'simple compliance with the law' circumstance that does not

17   meet the 'acting under' standard." *Riggs*, 939 F.3d at 989. That is, this shows only that the CFTC

18   regulates Polymarket, not that Polymarket is itself exercising any regulatory authority.

19   Polymarket also suggests that it faces a "risk of state-court 'prejudice'" if its case is not permitted to

20   be removed. Notice ¶ 43. But it provides no basis to think that its activities are "so closely related to

21   the government's implementation of its federal duties that [it] faces 'a significant risk of state-court

22   prejudice.'" *Cnty. of San Mateo*, 32 F.4th at 757 (quoting *Watson*, 551 U.S. at 152). The federal

23   officer removal statute is intended to protect the federal government from interference with its oper-

24   ations through state-court proceedings. *See id.* at 755–56. The state-law claims asserted against

25

26         [1]   Polymarket cites (Notice ¶ 30) a district court decision stating that self-regulatory organi-
      zations can perform "a variety of regulatory functions that would, in other circumstances, be per-
27   formed by a government agency." *In re Chi. Bd. Options Exch. Volatility Index Manipulation An-*
      *titrust Litig.*, 390 F. Supp. 3d 916, 929 (N.D. Ill. 2019). But that decision did not involve the federal
28   officer removal statute, and Polymarket does not explain how the conduct in this case involves the
      sort of governmental tasks that the government would have to perform if Polymarket did not.

1   Polymarket here do not interfere with the activities of any federal officers. Rather, the claims relate

2   to Polymarket's private conduct—offering sports wagers within the State of Nevada without comply-

3   ing with Nevada's gaming laws.

4        At bottom, Polymarket is a private entity that has chosen to offer sports and other event

5   contracts on its DCM in order to make a profit. The fact that the CEA permits DCMs to self-regulate

6   in certain circumstances does not turn Polymarket itself into a federal officer or mean that it is acting

7   under the CFTC's supervision or direction, or that it is performing a governmental function on behalf

8   of the CFTC. Instead, Polymarket is merely ensuring its own compliance with federal law. That is

9   what every regulated entity must do. If that were enough to invoke the federal-officer removal statute,

10   then every regulated entity would be able to do so in every case. This Court should reject Poly-

11   market's expansive theory of federal officer removal jurisdiction.

12      **B.**    **The Board's State-Law Claims Do Not Support Federal-Question Jurisdiction**

13        Polymarket's second theory is that this case belongs in federal court because it purportedly

14   "arises under" federal law. *See* Notice ¶¶ 45–52. That also is mistaken. The Board filed this action in

15   Nevada state court, seeking to enforce state gaming law and asserting only state-law causes of action.

16   Compl. ¶¶ 60–80. There is no federal claim on the face of the well-pleaded complaint. That is the end

17   of the jurisdictional inquiry. If Polymarket believes federal law supplies a defense to those claims, it

18   is free to raise that defense in state court. It may not transform a state-law enforcement action into a

19   federal case through removal.

20        Under 28 U.S.C. § 1331, federal courts have jurisdiction to decide cases "arising under"

21   federal law. 28 U.S.C. § 1331; *see Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025).

22   "Arising under" jurisdiction is carefully circumscribed: A case "arises under federal law only if either

23   (1) federal law creates the cause of action, or (2) a "substantial question of federal law is a necessary

24   element of a plaintiff's well-pleaded complaint." *Newtok Vill. v. Patrick*, 21 F.4th 608, 616 (9th Cir.

25   2021) (citation omitted). Polymarket relies only on the second category. It argues that this is one of

26   the "rare" class of cases in which a complaint asserting only state-law claims nonetheless "necessarily

27   raise[s]" a "substantial" and "actually disputed" federal issue—that is, where it is not legally possible

28   for the plaintiff to prevail without addressing federal law. *Royal Canin*, 604 U.S. at 26; *see Gunn v.*

1    *Minton*, 568 U.S. 251, 258 (2013) (referring to the second category as a "special and small category"

2    of cases).

3        Polymarket is wrong, and its position (if accepted) would dramatically expand federal-ques-

4    tion jurisdiction. Polymarket's main argument is that a court cannot decide whether Polymarket is

5    violating Nevada law without also deciding whether state law is preempted by the federal CEA. No-

6    tice ¶¶ 10, 47–52. But that preemption issue was not raised by the Board in the complaint; instead, it

7    is a preemption defense. Whether Polymarket's unlicensed operations violate Nevada law depends

8    on what contracts it is offering, whether its sports bets qualify as "wagers" and whether it is operating

9    a "sports pool" or "percentage game" under Nevada law, and whether it is licensed, pays Nevada

10    taxes, and otherwise complies with Nevada gaming law. *See* Compl. ¶¶ 25–59. Polymarket admitted

11    that the federal preemption argument is a defense to enforcement—not an element of the State's

12    causes of action—when it raised the issue in opposing the TRO. *See* ECF No. 2-4, at 28 ("Federal

13    law," including the CFTC's "exclusive jurisdiction," "preempts the application of state gambling

14    laws to federally regulated contract markets."). Polymarket's competitors that are in litigation against

15    state regulators likewise have recognized that their CEA arguments are preemption defenses, not

16    elements of a state complaint for violation of the gaming laws. *See, e.g.*, *Crypto.com*, 2025 WL

17    2916151, at *1 ("Crypto contends that . . . Nevada law is preempted due to the CFTC's exclusive

18    jurisdiction over transactions on DCMs."); *Martin*, 793 F. Supp. 3d at 678 ("Kalshi argues that Con-

19    gress manifested a field-preemptive intent by granting the CFTC 'exclusive jurisdiction' over . . .

20    'swaps' traded on a [designated contract market].").

21        Polymarket studiously avoids using the word "preemption" now, but that is its argument. It

22    is well established that a preemption defense is not a basis for removal: Cases "may not be removed

23    to federal court on the basis of . . . the defense of pre-emption." *Caterpillar*, 482 U.S. at 393; *see*

24    *Negrete v. City of Oakland*, 46 F.4th 811, 817 (9th Cir. 2022) (same). Thus, the mere assertion of a

25    federal preemption defense does not provide a basis for "arising under" jurisdiction.

26        Polymarket relies (Notice ¶ 48) on one particular Nevada statute that the Board alleges Poly-

27    market violates, NRS § 465.086, but its reliance is misplaced. Section 465.086 requires entities of-

28    fering gaming in Nevada to obtain a Nevada gaming license "[e]xcept as otherwise provided by law,"

1    and to obtain all licenses "as required by statute." NRS § 465.086(1). Polymarket contends that the

2    CEA is a "law" that "provides" that it is not "required" to obtain a Nevada license. Notice ¶ 49. But

3    Section 465.086 does not directly refer to any federal law, let alone the CEA. And the CEA does not

4    say anything about compliance with Nevada gaming law—let alone provide that a DCM is exempt

5    from all state licensing. *See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314

6    (2005). What Polymarket means—again—is that it believes federal law preempts Nevada's licensing

7    regime as applied to it. But that is not a basis for federal-question jurisdiction. Further, even if the

8    CEA provided an exception to the state-law licensing requirement, the statutory phrasing "except as

9    otherwise provided" indicates that this would be an affirmative defense to be raised and proved by

10    Polymarket—not an element of the Board's claim. *See Cunningham v. Cornell Univ.*, 604 U.S. 693,

11    701 (2025). It is black-letter law that an affirmative defense cannot form the basis of federal-question

12    jurisdiction, "even if both parties concede that the federal defense is the only question truly at issue."

13    *Caterpillar*, 482 U.S. at 393.

14          Polymarket's reliance (Notice ¶¶ 48–49) on NRS § 465.086(1)'s requirement of "federal"

15    licenses in addition to "state, county and municipal gaming licenses" equally is unavailing. Those

16    state law requirements are cumulative; possessing one license does not excuse the absence of another.

17    In other words, if Polymarket lacks a Nevada gaming license (which it does not dispute), then it

18    violates Section 465.086 even if it has a federal license. Thus, this portion of Section 465.086 does

19    not "necessarily raise" a federal issue. *Royal Canin*, 604 U.S. at 26. And in any event, "mere refer-

20    ences to federal law in [a statute] do not convert the claim into a federal cause of action." *Nevada v.*

21    *Bank of Am. Corp.*, 672 F.3d 661, 675 (9th Cir. 2012).[2]

22          Polymarket's expansive position would mean that anytime a defendant raises a federal de-

23    fense, there is "arising under" jurisdiction. It should be rejected for that reason. And if there were any

24    doubt, principles of federalism foreclose Polymarket's removal attempt. Exercising federal-question

25    jurisdiction here would upset the "balance of federal and state judicial responsibilities." *Bank of Am.*,

26

27    _____

      [2]    Polymarket also argues that the CFTC's "discretion" under the Special Rule to prohibit the
      listing of event contracts involving gaming somehow triggers federal-question jurisdiction. Notice

28    ¶ 51; *see* 7 U.S.C. § 7a-2(c)(5)(C). But the Special Rule has nothing to do with this case; the Board
      is not asking the CFTC to de-list Polymarket's gaming-related contracts, it is seeking to have Poly-
      market comply with state gaming law.

1   672 F.3d at 675. The Board brought this action "in state court to enforce its own state laws," alleging

2   only "state law causes of action, brought to protect Nevada residents." *Id.* at 676. Under these cir-

3   cumstances, "the claim of sovereign protection from removal arises in its most powerful form." *Id.*

4   (citation omitted). The Court should be "reluctant to snatch" a case that "a State has brought from the

5   courts of that State, unless some clear rule demands it." *Franchise Tax Bd. of State of Cal. v. Constr.*

6   *Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983). No such rule does. Nevada courts

7   should adjudicate this matter, even if doing so requires them to contend with issues of federal law.

8   *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 150 (1988). After all, the Supreme Court has long

9   recognized that "state courts . . . are presumed competent to resolve federal issues." *Id.*

10          Polymarket's reliance (Notice ¶ 50) on *Georgia Gambling Recovery LLC v. Kalshi Inc.*, 2026

11   WL 279375 (M.D. Ga. Feb. 3, 2026), is misplaced. In that case, to succeed on its state-law cause of

12   action, the plaintiff had to prove that the challenged contracts were illegal under federal law. *See id.*

13   at *2–3. Here, by contrast, the Board does not have to prove anything about Polymarket's compliance

14   with federal law in order to prove that Polymarket violates Nevada gaming law. *Georgia Gambling*

15   also involved a lawsuit seeking recovery of gambling losses, not a sovereign enforcement action

16   brought by a State, *see id.* at *1, so there were no similar federalism concerns in that case, *see Bank*

17   *of Am.*, 672 F.3d at 676.

18          For all of these reasons, the Court should reject Polymarket's expansive theory of "arising

19   under" jurisdiction.

20          **C.       An Award of Attorneys' Fees is Appropriate**

21          The Court should award the Board its attorneys' fees and costs incurred for this motion to

22   remand. Under 28 U.S.C. § 1447(c), an order remanding a case "may require payment of just costs

23   and any actual expenses, including attorney fees, incurred as a result of the removal." Although at-

24   torneys' fees are not automatic, attorneys' fees are appropriate where the removal was not objectively

25   reasonable. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Assessing costs and fees for

26   unreasonable removals deters defendants from abusing the removal process to unjustly delay litiga-

27   tion and impose unwarranted costs on plaintiffs. *Id.* at 140.

28   / / /

Page **18** of **19**

1          Polymarket's removal was not reasonable because Polymarket plainly does not fall under the

2    federal officer removal statute, 28 U.S.C. § 1442, and this case does not arise under federal law, *see*

3    28 U.S.C. § 1331. No objective basis exists to support Polymarket's contention that it qualifies as a

4    federal officer based on its status as a DCM. The few cases Polymarket cites do not support its con-

5    tention, and it entirely fails to engage with the Ninth Circuit's holdings that mere compliance with

6    federal law is insufficient. Indeed, common sense rejects the suggestion that every DCM in the coun-

7    try can suddenly become a person acting under a federal officer and entitled to remove an action to

8    federal court whenever such an entity is sued under state law. Polymarket's effort to couch a preemp-

9    tion defense as a basis for federal question jurisdiction fares no better. It entirely fails to grapple with

10    the long line of case law rejecting that argument—Polymarket does not even cite those cases, let alone

11    attempt to distinguish them. The Board accordingly requests that this Court award fees and costs

12    under 28 U.S.C. § 1447(c).

13    **V.    CONCLUSION**

14          The Court should remand this matter to the First Judicial District Court of Nevada, Carson

15    City prior to the expiration of the TRO on February 26, 2026, and should award attorney's fees to the

16    Board.

17          DATED this 9th day of February, 2026.

18                                   AARON D. FORD
19                                   Attorney General

                               By: /s/ *Jessica E. Whelan*
20                                     Jessice E. Whelan (Bar No. 14781)
                                   Chief Deputy Solicitor General – Litigation
21                                     John S. Michela (Bar No. 8189
                                   Senior Deputy Attorney General
22                                     Sabrena K. Clinton (6499)
                                   Senior Deputy Attorney General
23                                     State of Nevada
                                 Office of the Attorney General
24                                     1 State of Nevada Way, Suite 100
                                 Las Vegas, NV 89119
25                                     jwhelan@ag.nv.gov
                                 jmichela@ag.nv.gov
26                                     sclinton@ag.nv.gov

27                                   *Attorneys for Plaintiff State of Nevada ex rel.*
                               *Nevada Gaming Control Board*
28

**Exhibit 1 to State Plaintiff's
Motion to Remand
Dist. Ct. Doc. 7-1 (filed February 9, 2026)**

# Exhibit 1

| | |
|---|---|
| **From:** | Spencer, Jacob T. <JSpencer@gibsondunn.com> |
| **Sent:** | Sunday, February 1, 2026 9:13 PM |
| **To:** | Jessica E. Whelan; Snyder, Orin; Dupree Jr., Thomas H.; Benjamin, Matt; Dotson Robert |
| **Cc:** | Sabrena K. Clinton; John S. Michela; Abigail L. Pace; Darlene B. Caruso; Jeny M. Beesley |
| **Subject:** | RE: NGCB v. Polymarket - follow up on briefing and service |

> **WARNING** - This email originated from outside the State of Nevada. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Jessica—

Thank you for the call this evening.  To memorialize our agreement, we have agreed that our opposition brief is due on Thursday, February 5 by noon PT, and your reply brief is due on Tuesday, February 10 by noon PT.  We are happy to discuss the stipulation question further tomorrow at your convenience, as discussed.

Best,
Jacob

**Jacob T. Spencer**
Partner

T: +1 202.887.3792 | M: +1 202.527.1525
JSpencer@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W., Washington, D.C. 20036-4504

---

**From:** Spencer, Jacob T.
**Sent:** Saturday, January 31, 2026 9:46 PM
**To:** Whelan Jessica E. <JWhelan@ag.nv.gov>; Snyder, Orin <OSnyder@gibsondunn.com>; Dupree Jr., Thomas H. <TDupree@gibsondunn.com>; Benjamin, Matt <MBenjamin@gibsondunn.com>; Dotson Robert <rdotson@dhvnv.com>
**Cc:** Clinton Sabrena K. <SClinton@ag.nv.gov>; Michela John S. <JMichela@ag.nv.gov>; Pace Abigail L. <APace@ag.nv.gov>; Caruso Darlene B. <DCaruso@ag.nv.gov>; Beesley Jeny M. <JBeesley@ag.nv.gov>
**Subject:** RE: NGCB v. Polymarket - follow up on briefing and service

Jessica—

Thank you for resending your email.  We are authorized to waive service on behalf of our two U.S.-based clients (Blockratize and QCX) and will send you the waiver forms.  We are not authorized to waive service on behalf of Adventure One, which is a Panamanian corporation.

 In terms of the briefing schedule, would you be amenable to extending our time to file an opposition brief until Friday, February 6?  Let us know if you would like to discuss.

1

2App252

Our clients have complied with, and will comply with, the TRO.

Best,

Jacob

**Jacob T. Spencer**
Partner

T: +1 202.887.3792 | M: +1 202.527.1525
JSpencer@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W., Washington, D.C. 20036-4504

---

**From:** Jessica E. Whelan <JWhelan@ag.nv.gov>
**Sent:** Friday, January 30, 2026 5:38 PM
**To:** Spencer, Jacob T. <JSpencer@gibsondunn.com>; Snyder, Orin <OSnyder@gibsondunn.com>; Dupree Jr., Thomas H. <TDupree@gibsondunn.com>; Benjamin, Matt <MBenjamin@gibsondunn.com>; 'Robert Dotson' <rdotson@dhvnv.com>
**Cc:** Sabrena K. Clinton <SClinton@ag.nv.gov>; John S. Michela <JMichela@ag.nv.gov>; Abigail L. Pace <APace@ag.nv.gov>; Darlene B. Caruso <DCaruso@ag.nv.gov>; Jeny M. Beesley <JBeesley@ag.nv.gov>
**Subject:** RE: NGCB v. Polymarket - follow up on briefing and service

Counsel,

I am following back up on my email from yesterday regarding timing of briefing and acceptance of service. I'd also like to discuss what efforts Polymarket has taken/is taking to comply with the Court's TRO.

I am available this evening and over the weekend to discuss. If I don't have an answer on acceptance of service by Monday, we will have summonses issued and serve in the ordinary course, reserving our right to seek the costs of service pursuant to NRCP 4.1(b).

Thank you,

2

Jessica

**Jessica E. Whelan**

Chief Deputy Solicitor General - Litigation

Office of the Attorney General

1 State of Nevada Way

Suite 100

Las Vegas, Nevada 89119

jwhelan@ag.nv.gov

D: 702-486-4346



*Notice: This e-mail message and any attachments thereto may contain confidential, privileged, or non-public information.  Use, dissemination, distribution, or reproduction of this information by unintended recipients is strictly prohibited.  If you have received this message in error, please notify the sender immediately and destroy all copies.*

---

**From:** Jessica E. Whelan
**Sent:** Thursday, January 29, 2026 10:02 AM
**To:** Spencer, Jacob T. <jspencer@gibsondunn.com>; osnyder@gibsondunn.com; tdupree@gibsondunn.com; Benjamin, Matt <mbenjamin@gibsondunn.com>; 'Robert Dotson' <rdotson@dhvnv.com>
**Cc:** Sabrena K. Clinton <SClinton@ag.nv.gov>; John S. Michela <JMichela@ag.nv.gov>; Abigail L. Pace <APace@ag.nv.gov>; Darlene B. Caruso <DCaruso@ag.nv.gov>; Jeny M. Beesley <JBeesley@ag.nv.gov>
**Subject:** NGCB v. Polymarket - follow up on briefing and service

Counsel,

3

In light of the Court's order, I wanted to reach out and revisit two issues: (1) a briefing schedule on the Motion for Preliminary Injunction; and (2) whether you are willing to accept/waive service for your US-based clients in light of NRCP 4.2. I addressed the second issue in the attached email I sent last week, but I realize that the email was sent on the day that Outlook was down for everyone, so I'm not sure if you actually received it.

Please let me know if you'd like to discuss.

Thank you,

Jessica

**Jessica E. Whelan**

Chief Deputy Solicitor General - Litigation

Office of the Attorney General

1 State of Nevada Way

Suite 100

Las Vegas, Nevada 89119

jwhelan@ag.nv.gov

D: 702-486-4346

<image001.png>

*Notice: This e-mail message and any attachments thereto may contain confidential, privileged, or non-public information.  Use, dissemination, distribution, or reproduction of this information by unintended recipients is strictly prohibited.  If you have received this message in error, please notify the sender immediately and destroy all copies.*

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**Notice of Supplemental Authority Regarding CFTC's Motion to File Amicus Curiae Brief**
**Dist. Ct. Doc. 3 (filed February 5, 2026)**

ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
JUSTIN C. VANCE
Nevada State Bar No. 11306
DOTSON, HAYWARD & VANCE, PC
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
Tel:   (775) 501-9400
Email:  rdotson@dhvnv.com
        dhayward@dhvnv.com
        jvance@dhvnv.com

GIBSON, DUNN & CRUTCHER LLP
THOMAS H. DUPREE JR.
*(Pro Hac Vice to be submitted)*
JACOB T. SPENCER
*(Pro Hac Vice to be submitted)*
 1700 M Street, N.W.
Washington, DC  20036
Tel:   (202) 955-8500
Email  TDupree@gibsondunn.com
       JSpencer@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER
*(Pro Hac Vice to be submitted)*
MATT BENJAMIN
*(Pro Hac Vice to be submitted)*
 200 Park Avenue
New York, NY 10166
Tel:   (212) 351-4000
Email:  OSnyder@gibsondunn.com
        MBenjamin@gibsondunn.com

Attorneys for Defendants BLOCKRATIZE
INC. d/b/a POLYMARKET; QCX LLC d/b/a
POLYMARKET US; ADVENTURE ONE
QSS, INC. d/b/a POLYMARKET

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>Plaintiff,<br><br>v.<br><br>BLOCKRATIZE INC. d/b/a Polymarket; QCX LLC d/b/a Polymarket US; ADVENTURE ONE QSS INC. d/b/a Polymarket,<br><br>Defendants. | CASE NO. 3:26-cv-00089<br><br>[Nev. Dist. Ct. No. 26OC000121B]<br><br>NOTICE OF SUPPLEMENTAL AUTHORITY |

1

NOTICE OF REMOVAL TO FEDERAL COURT

### NOTICE OF SUPPLEMENTAL AUTHORITY

Polymarket US respectfully submits this Notice of Supplemental Authority to notify the Court of today's filing by the Commodity Futures Trading Commission ("CFTC") in *N. Am. Derivatives Exchange, Inc. v. State of Nevada*, No. 25-7187 (9th Cir. Feb. 5, 2026), ECF 30.1, attached as Exhibit A. The CFTC's filing is a significant development confirming that the federal questions necessarily presented by this case should be resolved in this Court.

1.  **Federal interest confirmed.** Polymarket US removed this case to this Court. Shortly before the removal, the CFTC publicly confirmed the federal government's strong interest in the issues presented here. Specifically, the CFTC sought leave to participate in a pending Ninth Circuit appeal in support of another designated contract market to protect and defend its "exclusive jurisdiction" over federally regulated derivatives trading. The CFTC made clear that it "has a substantial interest in presenting its view of the proper interpretation of the scope of its exclusive jurisdiction and the correct application" of the Commodity Exchange Act's ("CEA") "statutory definition of a swap." Ex. A, at 1–2. It therefore sought "to assist the Court in resolving these important questions by filing an amicus curiae brief addressing the CEA's preemption of state laws attempting to regulate trading on CFTC-registered contract markets, the legal question at the core of this dispute." *Id.* at 2. According to the CFTC, these are "question[s] of exceptional importance and on which the CFTC has substantial expertise to offer the Court." *Id.* at 1.

2.  **Core legal question is identical.** The Ninth Circuit appeal presents the same controlling legal question as this case: whether states may regulate or license trading on CFTC-registered designated contract markets notwithstanding Congress' grant of exclusive jurisdiction to the CFTC. *See* Ex. A, at 1. The CFTC explained that "resolution of th[at] appeal requires a detailed examination of the CEA, the federal statute that provides the framework for the regulation of commodity futures, options, and swaps markets in the United States" and "whether

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

NOTICE OF REMOVAL TO FEDERAL COURT

financial instruments satisfying the CEA's definition of a 'swap' may also be regulated, or prohibited, under state law." *Id.*  The CFTC unequivocally affirmed that Congress vested exclusive federal authority over designated contract markets and their participants in a single federal regulator to ensure nationwide uniformity and prevent fragmented, state-by-state regulation.  State laws purporting to regulate or prohibit trading on CFTC-registered markets, according to the CFTC, impermissibly "displace" the federal regulatory framework and conflict with the CEA's express preemption provisions.  *Id.*  Confirming that the core legal question is identical, the CFTC pointed to *this case* as an example of improper state intrusion on federal authority:  "[T]here are numerous enforcement actions and court decisions regarding whether event contracts like those offered by Crypto.com fall within the CFTC's exclusive jurisdiction, and the number of challenges are increasing." *Id.* at 2.  In particular, the CFTC noted, "[t]he State of Nevada and its Gaming Control Board recently filed a civil enforcement action against the CFTC-registered contract market Polymarket, *Nevada et al. v. Blockratize, Inc., et al.*, No. 26 OC 0012 1B (Nev. 1st Jud. Dist. 2026)." *Id.* at 3.

       3.    **Implications for federal jurisdiction.**  The timing and substance of the CFTC's filing underscore the federal question here.  The agency entrusted with exclusive oversight of derivatives markets declared its intent to participate in federal appellate litigation to address whether state enforcement actions targeting CFTC-registered markets are preempted.  This confirms that the federal question presented in this case is not ancillary or speculative, but one of exceptional importance.  Resolution of this action necessarily requires interpretation of the CEA's jurisdictional provisions, its express preemption clause, and Congress' allocation of regulatory authority to the CFTC.  The CFTC's motion thus confirms that federal jurisdiction is not merely proper, but essential to preserve federal supremacy and ensure uniform application of the CEA.

NOTICE OF REMOVAL TO FEDERAL COURT

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA  89511

1
2   And to the extent any prior judicial decision was based on the assumption that the CFTC did not
3   have a clear position on its authority, its actions and pronouncements have made clear that is not
4   the case. *See KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *4 (D. Nev. Nov. 24, 2025).
5
6   DATED this 5th day of February 2026.
7                                           DOTSON, HAYWARD & VANCE, PC
8
9                                           */s/ Robert A. Dotson*
10                                          ROBERT A. DOTSON (NSB No. 5285)
                                            DANIEL T. HAYWARD (NSB No. 5986)
                                            JUSTIN C. VANCE (NSB No. 11306)
11                                          5355 Reno Corporate Drive, Ste 100
                                            Reno, Nevada 89511
12                                          (775) 501-9400
13                                          Orin Snyder*
                                            Matt Benjamin*
14                                          GIBSON, DUNN & CRUTCHER LLP
                                            200 Park Avenue
15                                          New York, NY  10166
                                            212.351.4000
16                                          OSnyder@gibsondunn.com
                                            MBenjamin@gibsondunn.com
17
                                            Thomas H. Dupree Jr.*
18                                          Jacob T. Spencer*
                                            GIBSON, DUNN & CRUTCHER LLP
19                                          1700 M Street, N.W.
                                            Washington, D.C.  20036
20                                          202.955.8500
                                            TDupree@gibsondunn.com
21                                          JSpencer@gibsondunn.com
22                                          *Attorneys for Defendants BLOCKRATIZE INC.
                                            d/b/a POLYMARKET; QCX LLC d/b/a
23                                          POLYMARKET US; ADVENTURE ONE QSS INC.
                                            d/b/a POLYMARKET*
24
25                                          **Pro hac vice* forthcoming
26
27
28

                                           4
NOTICE OF REMOVAL TO FEDERAL COURT

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record. I also caused a true and correct copy of the foregoing document to be served upon the following parties by email:

Jessica E. Whelan
John S. Michela
Sabrena K. Clinton
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

Respectfully submitted,


By: _/s/ Robert A. Dotson_

5

NOTICE OF REMOVAL TO FEDERAL COURT

**Exhibit A to Notice of Supplemental Authority – CFTC's Unopposed Motion for Leave to File Amicus Curiae Brief,** *N. Am. Derivatives Exchange, Inc. v. State of Nevada*, **No. 25-7187 (9th Cir. Feb. 5, 2026) Dist. Ct. Doc. 3-1 (filed February 5, 2026)**

# EXHIBIT A

No. 25-7187

## In The United States Court of Appeals
## for the Ninth Circuit

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D / B / A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*

v.

THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:25-cv-00978-APG-BNW

**UNOPPOSED MOTION OF COMMODITY FUTURES TRADING
COMMISSION, A FEDERAL GOVERNMENT AGENCY, FOR LEAVE TO
FILE AN OUT-OF-TIME AMICUS CURIAE BRIEF AND TO MODIFY
BRIEFING SCHEDULE**

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5129

*Counsel for Amicus Curiae*
*Commodity Futures Trading Commission*

Pursuant to Federal Rule of Appellate Procedure 29(a), proposed amicus curiae, the Commodity Futures Trading Commission ("CFTC" or "Commission"), respectfully moves for leave to file an amicus brief out of time in support of North American Derivatives Exchange, Inc. d/b/a Crypto.com and to modify the briefing schedule.  The CFTC is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-26.

This appeal presents important questions about the scope and applicability of the CEA.  Specifically, whether states can regulate or license trading on CFTC-registered Designated Contract Markets despite the CEA's grant of "exclusive jurisdiction" to the CFTC to oversee the operators of, and participants on, these markets.  This is a question of exceptional importance and on which the CFTC has substantial expertise to offer the Court.

The resolution of this appeal requires a detailed examination of the CEA, the federal statute that provides the framework for the regulation of commodity futures, options, and swaps markets in the United States.  Among other issues, the Court must determine whether financial instruments satisfying the CEA's definition of a "swap" may also be regulated, or prohibited, under state law, and whether those laws displace the CEA's express preemption provisions.  The CFTC has a substantial interest in presenting its view of the proper interpretation of the scope of its exclusive jurisdiction and the correct application of the CEA's statutory

1

definition of a swap.  The CFTC seeks to offer its views to assist the Court in resolving these important questions by filing an amicus curiae brief addressing the CEA's preemption of state laws attempting to regulate trading on CFTC-registered contract markets, the legal question at the core of this dispute.

As a federal government agency, the CFTC ordinarily may participate as amicus curiae without consent of the parties or leave of court.  Fed. R. App. P. 29(a)(2).  The CFTC respectfully seeks leave in this instance because of the timing of its proposed filing.

Appellant's opening brief was filed on January 12, 2026, and any amicus brief in support of Appellant was due January 20, 2026.  Fed. R. App. P. 29(a)(6).  However, "[a] court may grant leave for later filing."  *Id*.  Recent leadership changes at the CFTC account for the agency's delay in filing an amicus brief.  Chairman Selig was confirmed by the U.S. Senate on December 18, 2025, and sworn in on December 22, 2025.  Further, the Commission's General Counsel was sworn in on January 28, 2026.  These leadership transitions, both in place of former acting officials, necessarily altered the CFTC's programmatic priorities and institutional posture.

In addition, there are numerous enforcement actions and court decisions regarding whether event contracts like those offered by Crypto.com fall within the CFTC's exclusive jurisdiction, and the number of challenges are increasing.  A bill

2

has been introduced in Hawaii's House of Representatives that would ban prediction markets in the state. H.B. No. 2198, 32nd Leg., Reg. Sess. (Haw. 2026). The State of Nevada and its Gaming Control Board recently filed a civil enforcement action against the CFTC-registered contract market Polymarket, *Nevada et al. v. Blockratize, Inc., et al.*, No. 26 OC 0012 1B (Nev. 1st Jud. Dist. 2026), and the Tennessee Sports Wagering Council issued cease and desist letters against KalshiEX, LLC and other contract markets registered with the CFTC, *see, e.g.,* Letter to T. Mansour from M.B. Thomas Re: *Demand to Cease and Desist Offering Sports Event Contracts in Tennessee* (Jan. 9, 2026).

Under these circumstances, the CFTC's new leadership has concluded that participation as an *amicus curiae* in the Ninth Circuit is warranted and has since acted diligently to begin preparing the CFTC's brief.

In order to prevent disruption and allow all parties the full benefit of the CFTC's brief, the CFTC moves to modify the briefing schedule in this appeal to allow the CFTC to file its amicus brief on or before February 17, 2026. The CFTC proposes that Appellees would file their Responses on March 3, 2026, and any Reply would be filed on March 24, 2026. This schedule will allow Appellees time to consider the CFTC's brief as well as the Appellant's previously filed brief, without disturbing the parties' request for an April argument.

The Commission has notified all parties of its intent to file this motion and forthcoming amicus brief. Appellant consents. Defendant-Appellees take the following position: "State Defendants take no position on the CFTC's motion for leave to file an amicus brief out of time. But if the Court grants the motion for leave, State Defendants respectfully request that the Court enter the briefing schedule proposed by the CFTC, so that State Defendants and the Nevada Resorts Association have until March 3, 2026, to file their response briefs. State Defendants further request that the Court schedule the case for argument at the earliest practicable opportunity on the April 2026 calendar. Intervenor-Appellee the Nevada Resorts Association shares the State Defendants' position and makes the same request.

Accordingly, the CFTC respectfully requests that this Court grant its motion for leave to file an amicus curiae brief out of time on or before February 17, 2026, and to modify the briefing schedule to accommodate this filing.

Dated: February 5, 2026

Respectfully Submitted,

Anne Stukes
_____
D.C. Bar 469446

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127

4

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2026, I electronically filed this Motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ Anne Stukes

**CERTIFICATE OF COMPLIANCE TYPE-VOLUME LIMITATIONS**

I hereby certify that the foregoing document complies with the type limitations set in Fed. R. App. P. 27(d)(E) and 32(a)(5) and (6) because it is in Times New Roman 14-point type.  I further certify that this motion complies with the volume limitations of Fed. R. App. P. 27(d)(2) because it contains 856 words, as counted by the word processing software Microsoft Word.

/s/ Anne Stukes