No. 26-1343

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

State of Nevada *ex rel.* Nevada Gaming Control Board,

*Plaintiff-Appellee,*

*v.*

Blockratize Inc. d/b/a Polymarket; QCX LLC d/b/a Polymarket US;
Adventure One QSS Inc. d/b/a Polymarket,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Nevada
(Hon. Miranda Du)
No. 3:26-cv-00089

## DEFENDANTS-APPELLANTS BLOCKRATIZE INC. D/B/A POLYMARKET; QCX LLC D/B/A POLYMARKET US; ADVENTURE ONE QSS INC. D/B/A POLYMARKET APPENDIX: VOLUME 3 OF 3

Mark A. Hutchison
Joseph C. Reynolds
HUTCHISON & STEFFEN, PLLC
100 West Liberty Street, Suite 765
Reno, Nevada 89501
Telephone: 775.853.8746
mhutchison@hutchlegal.com

Adam P. Laxalt
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, D.C. 20036
Telephone: 202.220.9600
alaxalt@cooperkirk.com

Thomas H. Dupree Jr.
Jacob T. Spencer
Adam I. Steene
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com

Orin Snyder
Matthew Benjamin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com

*Attorneys for Defendants-Appellants*

**Notice of Removal**
**Dist. Ct. Doc. 1 (filed February 5, 2026)**

1

2  ROBERT A. DOTSON                          GIBSON, DUNN & CRUTCHER LLP
   Nevada State Bar No. 5285                 ORIN SNYDER
3  DANIEL T. HAYWARD                         *(Pro Hac Vice to be submitted)*
   Nevada State Bar No. 5986                 MATT BENJAMIN
4  JUSTIN C. VANCE                           *(Pro Hac Vice to be submitted)*
   Nevada State Bar No. 11306                 200 Park Avenue
5  DOTSON, HAYWARD & VANCE, PC              New York, NY 10166
   5355 Reno Corporate Drive, Ste 100        Tel:     (212) 351-4000
6  Reno, Nevada 89511                        Email: OSnyder@gibsondunn.com
7  Tel:     (775) 501-9400                            MBenjamin@gibsondunn.com
   Email: rdotson@dhvnv.com
8          dhayward@dhvnv.com
           jvance@dhvnv.com
9
   GIBSON, DUNN & CRUTCHER LLP
10 THOMAS H. DUPREE JR.
   *(Pro Hac Vice to be submitted)*
11 JACOB T. SPENCER
   *(Pro Hac Vice to be submitted)*
12  1700 M Street, N.W.
   Washington, DC  20036
13 Tel:     (202) 955-8500
14 Email  TDupree@gibsondunn.com
          JSpencer@gibsondunn.com
15
16 Attorneys for Defendants BLOCKRATIZE
   INC. d/b/a POLYMARKET; QCX LLC d/b/a
17 POLYMARKET US; ADVENTURE ONE
   QSS, INC. d/b/a POLYMARKET
18
19                 UNITED STATES DISTRICT COURT
20                      DISTRICT OF NEVADA
21
22 STATE OF NEVADA ex rel. NEVADA          CASE NO. _____
   GAMING CONTROL BOARD,
23                                          [Nev. Dist. Ct. No. 26OC000121B]
                 Plaintiff,
24                                          NOTICE OF REMOVAL TO FEDERAL
        v.                                  COURT
25 BLOCKRATIZE INC. d/b/a Polymarket;
   QCX LLC d/b/a Polymarket US;
26 ADVENTURE ONE QSS INC. d/b/a
   Polymarket,
27
                 Defendants.
28

                                     1

NOTICE OF REMOVAL TO FEDERAL COURT

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1331, 1441(a), 1442(a) and 1446, Defendants Blockratize Inc. d/b/a Polymarket ("Blockratize"); QCX LLC d/b/a Polymarket US ("Polymarket US"); and Adventure One QSS Inc. ("Adventure One"), by and through their attorneys, hereby remove the above-captioned action from the First Judicial District Court of Nevada for Carson City, to the United States District Court for the District of Nevada.

This Notice of Removal is not intended and should not be construed as constituting the general appearance or appearance on the merits of Defendants in this matter. By filing this Notice of Removal, Defendants do not waive any defenses they have to this action whether in state or federal court, including, but not limited to, improper service of process and/or lack of personal jurisdiction. Defendants reserve the right to amend or supplement this Notice of Removal.

In support of removal, Defendants state as follows:

**BACKGROUND**

1.    Prediction markets, exchanges that trade a kind of derivative financial instrument known as event contracts, are a core component of modern, federally regulated financial markets. Hundreds of thousands of U.S. consumers—and millions worldwide—rely on these markets to obtain real-time, accurate information about consequential events in politics, finance, technology, news, and sports. Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the Commodity Futures Trading Commission ("CFTC").

2.    In the United States, Polymarket US operates a federally licensed designated contract market that offers event contracts. Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates. For event contracts, the "payoff is based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane." CFTC,

NOTICE OF REMOVAL TO FEDERAL COURT

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

*Futures Glossary: A Guide to the Language of the Futures Industry.*[1]  Polymarket US offers event contracts subject to and in full compliance with the CFTC's regulatory oversight and federal law.

3.     On January 29, 2026, CFTC Chairman Michael S. Selig publicly reaffirmed that the CFTC "has the expertise and responsibility to defend *its exclusive jurisdiction over commodity derivatives*"—including over event contracts traded on national contract markets.  "[P]rediction markets, or event contracts," are "not new," he explained, but "have operated within the CFTC's regulatory perimeter for more than two decades."  The Chairman emphasized that "the CFTC supports lawful innovation in these markets," which play an "important role . . . in the broader financial system."  Exercising the CFTC's exclusive federal authority, the Chairman directed CFTC Staff "to move forward with drafting an events contracts rulemaking" to "establish[] clear standards" and "provide certainty to market participants."  Warning that litigation like this suit—brought by state regulators seeking to displace federal authority—creates "uncertainty" that "has not served our markets well" and undermines "the public interest," the Chairman also "directed CFTC staff to reassess the Commission's participation in matters currently pending before the" courts.[2]

4.     Just hours before the Chairman's statement, however, the Nevada state court entered an *ex parte* temporary restraining order prohibiting Defendants from offering *all* federally regulated event contracts in Nevada unless they first obtained a state gaming license.  That order directly conflicts with federal law and intrudes upon the CFTC's exclusive and comprehensive authority to regulate exchange-traded derivatives markets nationwide.

5.     State efforts to shut down operations of federally regulated derivatives exchanges are unlawful.  Those exchanges are subject to exclusive federal oversight, not state regulation.  Allowing state regulators to shut down derivates trading by rushing to state courts would fracture

---

[1] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[2] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1 (emphasis added).

3

NOTICE OF REMOVAL TO FEDERAL COURT

the uniform national framework Congress designed, subject to the sole federal regulator Congress appointed. This Court has jurisdiction to halt Plaintiff's unlawful intrusion and to prevent a single State from disrupting federally regulated markets that Congress placed exclusively under federal supervision.

6.    This Court has jurisdiction under 28 U.S.C. § 1442 because Plaintiff's suit directly targets Polymarket US's "act[ions] under" the CFTC. In operating a designated contract market, Polymarket US acts as a self-regulatory organization exercising delegated authority from the CFTC, under the comprehensive oversight of the CFTC, assisting the CFTC by performing functions the federal agency itself would otherwise carry out. And those functions—certifying event contracts for listing, offering market access, resolving disputes, and promulgating and enforcing rules to promote fair and equitable trading and to protect the market and market participants—are exactly what Plaintiff's suit challenges. Polymarket US is therefore entitled to have its federal preemption defense resolved in federal court.

7.    This Court also has jurisdiction under 28 U.S.C. § 1331. Plaintiff's purported state law claims necessarily turn on disputed questions about the meaning and scope of the Commodity Exchange Act ("CEA"). For example, to succeed on its claims, Plaintiff would have to prove that the CEA does not permit Polymarket US to offer event contracts without first obtaining a state license. And Plaintiff's own theory confirms that what Plaintiff calls "wagers" are what the CEA calls "swaps." Again, this Court is the proper forum to resolve those questions of federal law.

**I.    Federal Regulatory Authority**

8.    Defendant Polymarket US operates a federally regulated derivatives exchange on which users nationwide trade event contracts—derivative financial instruments that constitute "swaps" under the CEA. *See* 7 U.S.C. § 1a(47)(A)(ii); Compl. ¶ 2 (Polymarket US is a "financial services company" that "operates a derivatives exchange and prediction market . . . where it offers products referred to as event contracts for sale").

NOTICE OF REMOVAL TO FEDERAL COURT

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

9.    On July 9, 2025, the CFTC formally approved Polymarket US as a designated contract market under the CEA—a designation reflecting an extensive federal finding that Polymarket US satisfies stringent requirements that govern derivatives trading on federal exchanges, including with respect to market integrity, access, transparency, financial safeguards, surveillance, and customer protection. *See* 7 U.S.C. §§ 7(a), 7(d), 8(a).

10.    When it comes to exchange-traded event contracts, Congress could not have been clearer: the CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market.  7 U.S.C. § 2(a)(1)(A).  That exclusivity leaves no room to target federally regulated derivatives markets with state licensing regimes, enforcement actions, or injunctive relief.

11.    Polymarket US operates in full compliance with the CFTC's comprehensive regulatory regime, including the CEA's 23 core principles and all CFTC rules governing market participant access, contract design, surveillance, enforcement, dispute resolution, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.

**II.    Nevada's Suit Directly Conflicts With Federal Law.**

12.    Despite this exclusive federal regime, the Nevada Gaming Control Board filed suit under state gaming statutes on January 16, 2026, asserting that federally regulated event contracts constitute unlawful "wagering" unless approved by Nevada regulators and accompanied by state licensure, taxation, and compliance with Nevada gaming procedures.  Relying on this state-law theory, Plaintiff sought an *ex parte* temporary restraining order to immediately block Polymarket US from offering all federally regulated event contracts on its federally regulated exchange.

13.    The Complaint purports to state a claim against Defendants under Nevada Revised Statutes §§ 463.160, 463.343, 463.346, 463.350, 465.086, and 465.092—*i.e.*, Nevada's gaming statutes—for Polymarket US's offering of *federally regulated* events contracts subject to the CFTC's exclusive jurisdiction.  Compl. ¶¶ 36–80.

14.    Plaintiff's theory is that contracts for "sports event and other events" constitute "wagering" activity under Nevada law.  Compl. ¶¶ 19–20.  In Plaintiff's view, offering those

5
NOTICE OF REMOVAL TO FEDERAL COURT

event contacts is unlawful, among other reasons, because Defendants do not have a state license. *Id.* ¶ 25.

15.    Plaintiff also asserts that, "[o]n information and belief," Polymarket US "does not employ adequate safeguards to ensure that wagers are not being placed on an event from owners, coaches, players, or officials participating in the event, and does not communicate about potential evidence of match fixing or point shaving with Nevada gaming regulatory authorities." Compl. ¶ 35.

16.    Additionally, Plaintiff alleges that Defendants do "not pay taxes on gaming revenue" to "the State of Nevada" and allow "persons under the age of 21 years to place wagers on its market." Compl. ¶ 33.

17.    In addition to the Complaint, Plaintiff filed a motion for an *ex parte* temporary restraining order and preliminary injunction.  That motion asserts that Polymarket US "does not participate in the State's process," overseen by Plaintiff, "for disputes between a Nevada licensee and its patron," and that a "[p]erson entering a wager through an event contract available on" Polymarket US "has no recourse should there be a dispute over the wager." TRO Mot. 12. For that reason, Plaintiff maintains that Polymarket US "does not provide[] adequate protection to purchasers of event contracts." *Id.*  And although Plaintiff has been litigating similar issues against other designated contract markets without an injunction for almost a year, it urged the state court to enter an *ex parte* temporary restraining order "immediately," without even affording Defendants the opportunity to meaningfully respond. *Id.* at 7.

18.    Defendants will demonstrate that Plaintiff's Complaint fails as a matter of law. Congress expressly granted the CFTC—not the States—"exclusive jurisdiction" over exchange-traded event contracts.  7 U.S.C. § 2(a)(1)(A).  It authorized the CFTC—not the States—to determine whether event contracts involve "gaming" and whether they may be listed or must be prohibited in the public interest. 7 U.S.C. § 7a-2(c)(5)(C). It stripped States of the power to bring most any claim against CFTC-regulated exchanges. *See* 7 U.S.C. § 13a-2. And it did so to ensure that regulation of "market participants" remains "under the oversight of the *Commission*," 7

NOTICE OF REMOVAL TO FEDERAL COURT

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA  89511

U.S.C. § 5(b) (emphasis added)—and no "other regulatory agencies," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982). Even the state-law definition Nevada invokes to characterize event contracts as "wagers" confirms that they are swaps subject to the CFTC's exclusive jurisdiction. *Compare* Nev. Rev. Stat. § 463.01962 ("'Wager' means a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain."), *with* 7 U.S.C. § 1a(47)(A)(ii) (defining "swap" to include any contract providing for payment "that is dependent on the occurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence").

19.    As the CFTC Chairman made clear just last week in his public statement, "the Commission," not Plaintiff, has "exclusive jurisdiction over commodity derivatives."

20.    Nevada's attempt to override and usurp the CFTC's exclusive federal authority through state-law injunctions is not regulation—it is unlawful displacement.

**III.    Nevada's Suit Also Targets International Trading That Prohibits U.S. Users.**

21.    Throughout the Complaint, Plaintiff conflates the federally regulated Polymarket US exchange—which is a federally regulated designated contract market—with Polymarket.com, a blockchain-based decentralized-finance trading protocol (the "International Protocol"). *See, e.g.*, Compl. ¶¶ 2, 20–23, 32–33.

22.    Defendant Adventure One, a Panamanian corporation, provides trading-related services for the International Protocol. Defendant Blockratize, a Delaware corporation, developed the software for the International Protocol.

23.    Neither Adventure One nor Blockratize maintains employees, property, or operations in Nevada. And individuals located in the United States are prohibited from trading on the International Protocol.

**FIRST GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL**

24.    The federal officer removal statute guarantees Polymarket US the right to have its federal preemption defense heard by a federal court. As a self-regulatory organization, Polymarket US exercises delegated authority under the supervision of the CFTC to carry out

7

NOTICE OF REMOVAL TO FEDERAL COURT

functions the CFTC itself would otherwise perform. And Plaintiff's suit directly targets the way Polymarket US exercises that delegated authority.

25. The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). The Ninth Circuit, likewise, has repeatedly affirmed that "removal rights under section 1442 are much broader than those under" the general removal statute. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006). Federal officer removal "is an exception to the well-pleaded complaint rule," allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006). And in assessing federal officer removal, courts credit the *defendant's* "theory of the case for purposes" of the "jurisdictional inquiry." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999).

26. Polymarket US satisfies the three-part test for federal officer removal because "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251. And because Polymarket US is "entitled to remove under § 1442, . . . the entire case is remov[able] to the federal court." *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

27. *First*, it is well-established that "corporations" like Polymarket US "are 'person[s]' under § 1442(a)(1)." *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (collecting cases); *see also* 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").

28. *Second*, Plaintiff's suit directly targets actions Polymarket US took under the supervision of and exercising authority delegated from the CFTC—including with respect to

8

NOTICE OF REMOVAL TO FEDERAL COURT

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

market participant access, contract listing, safeguards, dispute resolution, and market integrity—establishing the necessary "causal nexus." *Goncalves*, 865 F.3d at 1244.

29.    Polymarket US operates its designated contract market subject to the CFTC's "close direction" and "an unusually close [relationship] involving detailed regulation, monitoring, [and] supervision." *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 914 (9th Cir. 2024).  To operate as a designated contract market, Polymarket US must comply with the CEA's 23 core principles and all CFTC rules governing access, contract design, surveillance, enforcement, dispute resolution, and customer protection.  *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.  The CFTC has "sweeping authority" to enforce the CEA and its regulations.  *CFTC v. Schor*, 478 U.S. 833, 842 (1986).  The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges.  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).  The CFTC may also suspend or revoke the designation of a contract market, *id.* §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for, among other things, injunctive relief, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

30.    In operating a designated contract market, Polymarket US functions as a "[s]elf-regulatory organization."  17 C.F.R. § 1.3.  As a self-regulatory organization, Polymarket US "assist[s]" the CFTC, helping it to carry out "governmental tasks" that the CFTC would otherwise have to perform.  *Goncalves*, 865 F.3d at 1245 (cleaned up).  That includes by "perform[ing] 'a variety of regulatory functions that would, in other circumstances, be performed by a government agency.'"  *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 929 (N.D. Ill. 2019).  In short, the relationship between Polymarket US and the CFTC goes well beyond that of a highly regulated entity subject to comprehensive supervision.

31.    Courts, including the Ninth Circuit, have consistently held that self-regulatory organizations "exercis[e] quasi-governmental powers" and "authority delegated by Congress" or federal agencies.  *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1214 (9th Cir. 1998) (self-regulatory organization under Securities Exchange Act of 1934), *abrogated*

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

NOTICE OF REMOVAL TO FEDERAL COURT

*on other grounds*, 578 U.S. 374 (2016); *see also*, *e.g.*, *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (holding that self-regulatory organization was immune for actions exercising authority "delegated by the SEC"); *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) (similar).

32.    In its role as a self-regulatory organization, Polymarket US is specifically charged with a broad array of functions.  For example, a designated contract market is required to "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market."  7 U.S.C. § 7(d)(2).

33.    A designated contract market also has the "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures."  7 U.S.C. § 7(d)(4).

34.    A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant."  7 U.S.C. § 7(d)(12).  To that end, it must also must "maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information" "to assist in the prevention of customer and market abuses."  *Id.* § 7(d)(10).

35.    And a designated contract market must "establish and enforce rules regarding, and provide facilities for alternative dispute resolution as appropriate for, market participants and any market intermediaries."  7 U.S.C. § 7(d)(14).

36.    To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the contract complies with federal law and the Commission's requirements.  7 U.S.C. § 7a-2(c)(1).  The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review.  *Id.* § 7a-2(c)(2)–(3).

10

NOTICE OF REMOVAL TO FEDERAL COURT

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

37.    Similarly, to list new event contracts, the entity must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the Commission's requirements.  7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c).  The CFTC retains authority to investigate, stay, or amend the contract after it has been listed.  17 C.F.R. § 40.2(c).  If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C).

38.    In all of these respects, a designated contract market exercises authority delegated by the federal government.  Because Polymarket US's actions "involve an effort to assist, or to help carry out, the duties or tasks of the federal superior," it "'acts under'" the authority of the CFTC.  *Watson*, 551 U.S. at 152 (emphasis omitted).

39.    The conduct Nevada challenges—market participant access, contract listing, safeguards, dispute resolution, and market integrity—falls squarely within the actions Polymarket US takes under the authority, supervision, and jurisdiction of the CFTC.

    a.    Plaintiff seeks to impose liability on Polymarket US based on event contracts that are allegedly illegal under state law.  *See* Compl. ¶¶ 60–80.  But Polymarket US offers those event contracts pursuant to its status as a federally designated contract market subject to comprehensive CFTC oversight.

    b.    Plaintiff says that Polymarket US improperly allows certain market participants to "create an account and trade on its platform."  Compl. § 33.  Yet federal law directs Polymarket US to "establish, monitor, and enforce compliance" with "access requirements," 7 U.S.C. § 7(d)(2), and provide "impartial access to its markets and services," 17 C.F.R. § 38.151 (b).

    c.    While Plaintiff claims that Polymarket US "does not employ adequate safeguards" to ensure lawful transactions, Compl. ¶ 35, Polymarket US's obligation to "have and enforce rules that are designed to promote fair and equitable trading and to

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

NOTICE OF REMOVAL TO FEDERAL COURT

protect the market and market participants from abusive practices" is established by federal law, 17 C.F.R. § 38.651.

    d.  Similarly, Plaintiff complains about the adequacy of Polymarket US's dispute-resolution procedures, *see* TRO Mot. 11–12, another function Polymarket US exercises under the express directive and supervision of the federal government, *see* 7 U.S.C. § 7(d)(14); 17 C.F.R. § 38.750.

40.    These allegations easily clear the "low" "hurdle erected by the causal-connection requirement." *Goncalves*, 865 F.3d at 1244 (alterations omitted). The causal nexus is not attenuated; it is direct.

41.    *Third*, Plaintiff's claims are preempted by federal law, which constitutes "a colorable federal defense" for purposes of federal officer removal. *Goncalves*, 865 F.3d at 1249.

42.    Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction" over exchange-traded derivatives to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A). Federal law authorizes the CFTC, not state regulators, to determine whether event contracts involve "gaming" and may be listed on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C). And Congress ensured that the CFTC—and no "other regulatory agencies"—would establish a uniform, comprehensive regulatory framework to avoid fracturing national derivatives markets. *Merrill Lynch*, 456 U.S. at 386.

43.    "One of the primary purposes of the removal statute . . . was to have [federal officers'] defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). "State-court proceedings may reflect 'local prejudice' against unpopular federal laws and federal officials." *Watson*, 551 U.S. at 150. And private parties likewise may face "a significant risk of state-court 'prejudice.'" *Id.* at 152.

44.    This Court can and should recognize its jurisdiction under § 1442(a)(1) to ensure that Polymarket US's preemption defense is fairly and fully litigated.

NOTICE OF REMOVAL TO FEDERAL COURT

DOTSON, HAYWARD & VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

**SECOND GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION**

45.     This case also belongs in federal court because it necessarily turns on disputed and substantial questions of federal law.  *See* 28 U.S.C. § 1331.

46.     Plaintiff's claims require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Dante Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

47.     Plaintiff's claims necessarily require proof that the event contracts at issue are illegal gambling—and those claims cannot be adjudicated without deciding disputed and substantial questions of federal law.  Plaintiff concedes that Polymarket US "operates a derivatives exchange" offering "event contracts."  Compl. ¶ 2.  The core question is whether Nevada may nonetheless impose its own licensing and enforcement regime on federally licensed derivatives exchanges.  And that question cannot be answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under the CEA.

48.     Take, for example, Plaintiff's claim that Polymarket US has violated Nevada Revised Statutes § 465.086.  *See* Compl. ¶¶ 46, 52, 75, 79.  That section states, "*Except as otherwise provided by law*, it is unlawful for a person to receive . . . any percentage or share of the money or property played, for accepting any bet or wager . . . without having first procured, and thereafter maintaining in effect, *all federal*, state, county and municipal gaming *licenses as required by statute*."  Nev. Rev. Stat. § 465.086(1) (emphases added).  Plaintiff's claim under this section raises three issues: (1) whether the "law" "otherwise provides" that Polymarket US need not "procure[]" and "maintain[]" a Nevada license; (2) whether Polymarket US holds the necessary "federal . . . licenses"; and (3) whether any other "licenses" are "required by statute." *Id.*

49.     Each issue necessarily requires Plaintiff to contend with federal law:  (1) By granting the CFTC "exclusive jurisdiction" over Polymarket US's exchange-traded contracts, 7

13

Dotson, Hayward
& Vance, PC
5355 Reno Corporate Dr.
Suite #100
Reno, Nevada 89151

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

U.S.C. § 2(a)(1)(A), the "law" "provide[s]" that Polymarket US need only comply with the CEA and CFTC regulations, not the Nevada licensing regime, Nev. Rev. Stat. § 465.086(1); (2) as a CFTC-designated contract market, Polymarket US has "procured" and "maintain[ed]" all the "federal . . . licenses" it needs to offer event contracts, *id.*; and (3) given the CEA's comprehensive scheme and the CFTC's exclusive jurisdiction over Polymarket US's designated contract market, Polymarket US likewise holds all the "licenses" that are "required by statute," *id.*

50.    Because Plaintiff's claim will fail unless it can prove otherwise, the claim "necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction." Order at 8, *Ga. Gambling Recovery LLC v. Kalshi Inc.*, No. 4:25-cv-310 (M.D. Ga. Feb. 2, 2026), Dkt. No. 46 (denying motion to remand suit against designated contract market for violations of state gaming law).

51.    Plaintiff's own theory that event contracts constitute "wagers" under Nevada law confirms that they are in fact "swaps" subject to the CFTC's exclusive jurisdiction.  The two statutory definitions necessarily overlap:  A "wager" under Nevada law is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." Nev. Rev. Stat. § 463.01962.  And a "swap" under federal law includes contracts for which payment "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).  Likewise, the CEA's "Special Rule" grants the *CFTC* discretion to decide whether "[e]vent contracts" involve "gaming"—and, if so, whether to prohibit their listing as contrary to the "public interest."  *Id.* § 7a-2(c)(5)(C).  Similarly, the CEA grants the CFTC exclusive jurisdiction to assess whether Polymarket US complied with its regulatory requirements—and, if so, whether to stay listing of any of its event contracts.  *Id.* § 7a-2(c)(1).

52.    Allowing a state court to adjudicate the legality of—and enjoin the trading of—federally regulated swaps would fracture national derivatives markets and undermine the uniformity Congress deemed essential by granting the CFTC exclusive jurisdiction over these

14

NOTICE OF REMOVAL TO FEDERAL COURT

markets.  The CFTC Chairman's clear guidance just last week confirms the supremacy of the federal government in regulating exchange-traded swaps.  Upholding federal jurisdiction here does not disrupt the federal-state balance; it enforces it.

### ALL REMOVAL REQUIREMENTS ARE MET

53.    Based on the foregoing facts and allegations, this Court has original jurisdiction over this action because Plaintiff's claims are for or relating to actions that Polymarket US took under color of federal office.

54.    Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Complaint necessarily raises substantial, disputed federal questions that belong in a federal court.

55.    Venue is proper in this Court because this judicial district and division embraces the First Judicial District Court of Nevada, Carson City, in which this case was filed.  28 U.S.C. §§ 1391, 1441(a), 1446(a).

56.    Removal is timely because Defendants Blockratize and Polymarket US have agreed to accept service as of January 21, 2026, and the remaining Defendant has not yet been served, and therefore removal is being filed within 30 days of service of Plaintiff's Complaint.  28 U.S.C. § 1446(b)(1) and (2)(B).

57.    All Defendants join this Notice of Removal.  28 U.S.C. § 1446(b)(2)(A).

58.    Copies of all required process, pleadings, and orders are attached hereto as Exhibits B–D.  28 U.S.C. § 1446(a).

59.    Defendants will provide Plaintiff with written notice of this filing, and they will promptly file a true and correct copy of this Notice of Removal with the Clerk of the District Court for Carson City.  The Notice of Filing of Notice of Removal to be filed with the District Court for Carson City is attached as Exhibit A.  28 U.S.C. § 1446(d).

60.    By filing this Notice of Removal, Defendants do not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses.  Defendants reserve all of their

Dotson, Hayward & Vance, PC
5355 Reno Corporate Dr.
Suite #100
Reno, Nevada  89511

15

NOTICE OF REMOVAL TO FEDERAL COURT

1  defenses, and this Notice of Removal is filed subject to full reservation of any rights and all
2
   objections, arguments, and defenses to Plaintiff's Complaint.
3
                                   **CONCLUSION**
4
           Defendants hereby remove this action and respectfully request that the Court retain
5
   jurisdiction for all further proceedings in this matter.
6
7  DATED this 5th day of February 2026.

8                                   DOTSON, HAYWARD & VANCE, PC

9
                                    */s/ Robert A. Dotson*
10                                  ROBERT A. DOTSON (NSB No. 5285)
                                    DANIEL T. HAYWARD (NSB No. 5986)
11                                  JUSTIN C. VANCE (NSB No. 11306)
                                    5355 Reno Corporate Drive, Ste 100
12                                  Reno, Nevada 89511
                                    (775) 501-9400
13
                                    Orin Snyder*
14                                  Matt Benjamin*
                                    GIBSON, DUNN & CRUTCHER LLP
15                                  200 Park Avenue
                                    New York, NY  10166
16                                  212.351.4000
                                    OSnyder@gibsondunn.com
17                                  MBenjamin@gibsondunn.com

18                                  Thomas H. Dupree Jr.*
                                    Jacob T. Spencer*
19                                  GIBSON, DUNN & CRUTCHER LLP
                                    1700 M Street, N.W.
20                                  Washington, D.C.  20036
                                    202.955.8500
21                                  TDupree@gibsondunn.com
                                    JSpencer@gibsondunn.com
22
                                    *Attorneys for Defendants BLOCKRATIZE INC.*
23                                  *d/b/a POLYMARKET; QCX LLC d/b/a*
                                    *POLYMARKET US; ADVENTURE ONE QSS INC.*
24                                  *d/b/a POLYMARKET*

25                                  **Pro hac vice* forthcoming

26

27

28

                                    16
NOTICE OF REMOVAL TO FEDERAL COURT

1

2

**CERTIFICATE OF SERVICE**

3      I hereby certify that on February 5, 2026, I electronically filed the foregoing document

4  with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel

5  of record.  I also caused a true and correct copy of the foregoing document to be served upon the

6  following parties by First Class Mail and by email:

7

8      Jessica E. Whelan
       John S. Michela

9      Sabrena K. Clinton
       State of Nevada

10     Office of the Attorney General
       1 State of Nevada Way, Suite 100

11     Las Vegas, NV 89119
       jwhelan@ag.nv.gov

12     jmichela@ag.nv.gov

13     sclinton@ag.nv.gov

14                                      Respectfully submitted,

15

16                            By:

17

18

19

20

21

22

23

24

25

26

27

28

17

NOTICE OF REMOVAL TO FEDERAL COURT

Dotson, Hayward
& Vance, PC
5355 Reno Corporate Dr.
Suite #100
Reno, Nevada 89511

**Exhibit A to Notice of Removal –
Notice of Filing of Notice of Removal
Dist. Ct. Doc. 1-2 (filed February 5, 2026)**

# EXHIBIT A
## Notice of Filing of
## Notice of Removal

ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
JUSTIN C. VANCE
Nevada State Bar No. 11306
DOTSON, HAYWARD & VANCE, PC
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
Tel:    (775) 501-9400
Email:  rdotson@dhvnv.com
        dhayward@dhvnv.com
        jvance@dhvnv.com

GIBSON, DUNN & CRUTCHER LLP
THOMAS H. DUPREE JR.
*(Pro Hac Vice to be submitted)*
JACOB T. SPENCER
*(Pro Hac Vice to be submitted)*
 1700 M Street, N.W.
Washington, DC  20036
Tel:    (202) 955-8500
Email   TDupree@gibsondunn.com
        JSpencer@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER
*(Pro Hac Vice to be submitted)*
MATT BENJAMIN
*(Pro Hac Vice to be submitted)*
 200 Park Avenue
New York, NY 10166
Tel:    (212) 351-4000
Email: OSnyder@gibsondunn.com
        MBenjamin@gibsondunn.com

*Attorneys for Defendants*
*Blockratize Inc. dba Polymarket;*
*QCX LLC dba Polymarket US; and*
*Adventure One QSS Inc. dba Polymarket*

**IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**
**IN AND FOR CARSON CITY**

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD, | Case No.: 26-OC-00012-1B |
| Plaintiff, | Dept. No.: 1 |
| v. | |
| BLOCKRATIZE INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS INC. d/b/a POLYMARKET, | |
| Defendants. | |

**NOTICE OF FILING NOTICE OF REMOVAL OF CIVIL ACTION TO**

**THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

1

1        Please take notice that on February 5, 2026, Defendants BLOCKRATIZE, INC. d/b/a

2    POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a

3    POLYMARKET (collectively "Defendants") filed in the United States District Court for the District

4    of Nevada a Notice of Removal in accordance with 28 U.S.C. §§ 1331, 1441(a), 1442(a), and 1446.

5        A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1.

6        The First Judicial District Court of the State of Nevada in and for Carson City is hereby

7    requested to proceed no further with this matter unless the case is remanded.

8    **Affirmation Pursuant to NRS 239B.030**

9        The undersigned does hereby affirm that the preceding document does not contain the social

10   security number of any person.

11

12   DATED:  February 5, 2026          DOTSON, HAYWARD & VANCE, PC

13

14                             */s/ Robert A. Dotson*

15                             ROBERT A. DOTSON
                               Nevada State Bar No. 5285

16                             DANIEL T. HAYWARD
                               Nevada State Bar No. 5986

17                             JUSTIN C. VANCE
                               Nevada State Bar No. 11306

18                             5355 Reno Corporate Drive, Ste 100
                               Reno, Nevada 89511

19                             (775) 501-9400

20
21                             Orin Snyder*
                               Matt Benjamin*

22                             GIBSON, DUNN & CRUTCHER LLP
                               200 Park Avenue

23                             New York, NY  10166
                               (212) 351-4000

24                             OSnyder@gibsondunn.com
                               MBenjamin@gibsondunn.com

25
26                             Thomas H. Dupree Jr.*
                               Jacob T. Spencer*

27                             GIBSON, DUNN & CRUTCHER LLP
                               1700 M Street, N.W.

28                             Washington, D.C.  20036
                               (202) 955-8500

2

1

TDupree@gibsondunn.com

2

*Attorneys for Defendants*
*Blockratize, Inc. d/b/a Polymarket and*

3

*QCX, LLC d/b/a Polymarket US*

4

*Pro hac vice* forthcoming

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

## CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I hereby certify that I am an employee of DOTSON, HAYWARD & VANCE, PC and that on this date I caused to be served a true and correct copy of the foregoing by:

☒　(BY MAIL) on all parties in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At Dotson, Hayward & Vance, PC , mail placed in that designated area is given the correct amount of postage and is deposited that same date in the ordinary course of business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

☐　By electronic service by filing the foregoing with the Clerk of Court using the E-Flex system, which will electronically mail the filing to the following individuals.

☐　(BY PERSONAL DELIVERY) by causing a true copy thereof to be hand delivered this date to the address(es) at the address(es) set forth below.

☐　(BY FACSIMILE) on the parties in said action by causing a true copy thereof to be telecopied to the number indicated after the address(es) noted below.

☒　Email.

addressed as follows:

Jessica E. Whelan
Sabrena K. Clinton
John S. Michela
Nevada Office of the Attorney General
1 State of Nevada Way Ste 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
JMichela@ag.nv.gov
*Attorneys for Plaintiff*

DATED this 5 day of February 2026.

_____
L. MORGAN BOGUMIL

4

**Exhibit B to Notice of Removal –
State Court Complaint
Dist. Ct. Doc. 1-3 (filed February 5, 2026)**

# EXHIBIT B

## Complaint

DISTRICT COURT CIVIL COVER SHEET
**Carson City** County, Nevada

Case No. _____
*(Assigned by Clerk's Office)*

REC'D & FILED
2026 JAN 16 PM 4:59
WILL_____SEN
BY_____
DEPUTY

**I. Party Information** *(provide both home and mailing addresses if different)*

| | |
|---|---|
| Plaintiff(s) (name/address/phone): | Defendant(s) (name/address/phone): |
| State of Nevada ex. rel. | Blockratize, Inc., et al. |
| Nevada Gaming Control Board | |
| E-mail address: jwhelan@ag.nv.gov | E-mail address: |
| Attorney (name/address/phone): | Attorney (name/address/phone): |
| Law Firm/Bar # **14781** | Law Firm/Bar # |
| E-mail address: | E-mail address: |

**II. Nature of Controversy** *(Please Select the Primary Complaint or the One Most Applicable Case Type Below)*

**Civil Case Filing Types**

| Real Property | Torts | |
|---|---|---|
| **Landlord/Tenant** | **Negligence** | **Other Torts** |
| ☐ Unlawful Detainer | ☐ Auto | ☐ Product Liability |
| ☐ Other Landlord/Tenant | ☐ Premises Liability | ☐ Intentional Misconduct |
| **Title to Property** | ☐ Other Negligence | ☐ Employment Tort |
| ☐ Judicial Foreclosure | **Malpractice** | ☐ Insurance Tort |
| ☐ Foreclosure Mediation Assistance | ☐ Medical/Dental | ☐ Other Tort |
| ☐ Other Title to Property (e.g., Quiet Title) | ☐ Legal | |
| **Other Real Property** | ☐ Accounting | |
| ☐ Condemnation/Eminent Domain | ☐ Other Malpractice | |
| ☐ Other Real Property | | |

| Probate | Construction Defect & Contract | Judicial Review/Appeal |
|---|---|---|
| **Probate** *(select case type and estate value)* | **Construction Defect** | **Judicial Review** |
| ☐ Summary Administration | ☐ Chapter 40 | ☐ Petition to Seal Records |
| ☐ General Administration | ☐ Other Construction Defect | ☐ Mental Competency (in Lower Court Proceedings) |
| ☐ Special Administration | **Contract Case** | **Nevada State Agency Appeal** |
| ☐ Set Aside ( ) Surviving Spouse | ☐ Uniform Commercial Code | ☐ Department of Motor Vehicle |
| ☐ Trust/Conservatorship | ☐ Building and Construction | ☐ Worker's Compensation |
| ☐ Other Probate | ☐ Insurance Carrier | ☐ Other Nevada State Agency |
| **Estate Value** | ☐ Commercial Instrument | **Appeal Other** |
| ☐ $300,000 or Greater | ☐ Collection of Accounts | ☐ Appeal from Justice/Municipal Court |
| ☐ $200,000-$299,999 | ☐ Employment Contract | ☐ Other Judicial Review/Appeal |
| ☐ $100,001-$199,999 | ☐ Other Contract | |
| ☐ $25,001-$100,000 | | |
| ☐ $20,001-$25,000 | | |
| ☐ $2,501-20,000 | | |
| ☐ $2,500 or less | | |

| Civil Writ | | Other Civil Filing |
|---|---|---|
| **Civil Writ** | | **Other Civil Filing** |
| ☐ Writ of Habeas Corpus | ☐ Writ of Prohibition | ☐ Compromise of Minor's Claim |
| ☐ Writ of Mandamus | ☐ Other Civil Writ | ☐ Foreign Judgment |
| ☐ Writ of Quo Warrant | | ☒ Other Civil Matters |

*Business Court filings should be filed using the Business Court civil coversheet.*

1/16/26
Date

Signature of initiating party or representative   #14543

*See other side for family/juvenile-related case filings.*



1  AARON D. FORD
    Attorney General
2  Jessica E. Whelan (Bar No. 14781)
    Chief Deputy Solicitor General – Litigation
3  John S. Michela (Bar No. 8189)
    Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
    Senior Deputy Attorney General
5  State of Nevada
    Office of the Attorney General
6  1 State of Nevada Way, Suite 100
    Las Vegas, NV 89119
7  (702) 486-3420 (phone)
    (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
    jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10 *Attorneys for Plaintiff*

11              **FIRST JUDICIAL DISTRICT COURT**

12                 **CARSON CITY, NEVADA**

13 STATE OF NEVADA ex rel. NEVADA
     GAMING CONTROL BOARD,
14                                          Case No.: 26OC 00012 1B
15        Plaintiffs,
                                            Dept. No.: I
16 vs.

17 BLOCKRATIZE, INC. d/b/a
     POLYMARKET; QCX LLC d/b/a
18 POLYMARKET US; ADVENTURE ONE
     QSS, INC. d/b/a POLYMARKET,
19

20        Defendants.

21                                          **COMPLAINT FOR PERMANENT
                                            INJUNCTION AND DECLARATORY
22                                          RELIEF**

23                                          **Hearing Requested**

24

25

26

27

28

                        Page **1** of **13**

COMES NOW, Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD, by and through its attorneys, files this Complaint for BLOCKRATIZE, INC., d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC., d/b/a POLYMARKET's violations of State of Nevada gaming laws and hereby asserts and alleges as follows:

**PARTIES**

1.    At all times relevant hereto, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD ("BOARD") was and is a political subdivision of the State of Nevada established pursuant to NRS 463.030.  The BOARD is charged with the responsibility of strictly regulating gaming in the State of Nevada because gaming is vitally important to the State, its economy, and the general welfare of its inhabitants.

2.    At all times relevant hereto, BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively "POLYMARKET") was and is a financial services company with its principal places of business in New York and Florida.  POLYMARKET operates a derivatives exchange and prediction market ("market") where it offers products referred to as event contracts for sale.  These products are offered for sale on POLYMARKET's mobile app and are made available to persons located in Nevada.

**GENERAL ALLEGATIONS**

**A.    Nevada has a strong interest in regulating gaming in Nevada.**

3.    The State of Nevada has a long history of gambling regulation and is the leader in gambling regulation in the United States.

4.    In 1931, the Nevada Legislature legalized gambling in the State.

5.    The Nevada Gaming Control Act of 1949 shifted gaming licensing from local government to state government.

6.    With the passage of the Nevada Gaming Control Act, Nevada became the first State in the Nation to legalize sports betting.

Page **2** of **13**

1       7.    "It is established beyond question that gaming is a matter of privilege

2 conferred by the State rather than a matter of right." *State v. Rosenthal*, 93 Nev. 36, 40,

3 559 P.2d 830, 833 (1977).

4       8.    Nevada's public policy, as expressed by the Legislature, is that "[t]he gaming

5 industry is vitally important to the economy of the State and the general welfare of the

6 inhabitants" and that "[a]ll establishments where gaming is conducted . . . must therefore

7 be licensed, controlled and assisted to protect the public health, safety, morals, good order

8 and general welfare of the inhabitants of the State, to foster the stability and success of

9 gaming and to preserve the competitive economy and policies of free competition of the

10 State of Nevada." NRS 463.0129(1)(a)-(d).

11       9.    The Legislature has conclusively determined that "[p]ublic confidence and

12 trust can only be maintained by strict regulation of all persons, locations, practices,

13 associations and activities related to the operation of licensed gaming establishments,"

14 NRS 463.0129(1)(c), and that any activity that reflects "discredit upon the State of Nevada

15 or the gaming industry" may be deemed an unsuitable method of operation by the BOARD

16 and the Nevada Gaming Commission ("COMMISSION"), Nev. Gaming Comm'n Reg.

17 5.011(1).

18       10.    Currently, the State of Nevada has a two-tiered regulatory structure to

19 regulate gaming within the State involving the BOARD and COMMISSION.

20       11.    Nevada law requires that all gaming activity be strictly regulated and

21 licensed, as the gaming industry is "vitally important to the economy of the State and the

22 general welfare of the inhabitants." NRS 463.0129(1)(a).

23       12.    Pursuant to Nevada law, the continued growth and success of gaming in the

24 State of Nevada is "dependent upon public confidence and trust that licensed gaming" is

25 "conducted honestly and competitively." NRS 463.0129(1)(b).

26       13.    Pursuant to Nevada law, "public confidence and trust can only be maintained

27 by strict regulation of all persons, locations, practices, associates, and activities related" to

28 the operation of gaming in Nevada. NRS 463.0129(1)(c) (emphasis added).

Page **3** of **13**

14.    Pursuant to Nevada law, all entities making gaming available in Nevada must "be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." NRS 463.0129(1)(d).

15.    Lack of enforcement of Nevada gaming laws against entities that make gaming accessible to persons within the State will severely impact Nevada's ability to strictly regulate gaming in Nevada and foster Nevada's gaming industry, which is vitally important to its economy and its citizens.

**B.**    **POLYMARKET's market is a gambling game and/or sports pool and accepts wagers in or from Nevada.**

16.    "Gaming" in Nevada is synonymous with "gambling" and includes any regulated game. NRS 463.0153.

17.    A "game" subject to regulation in Nevada includes "any game played with . . . equipment or any mechanical or electronic device or machine for money . . . or any representative of value" that is accessible in Nevada. NRS 463.0152.

18.    POLYMARKET's products meet the requirements of NRS 463.0152 because a person accesses POLYMARKET's market through POLYMARKET's mobile app and the use of the Internet and enters wagers through POLYMARKET's market with the payment of money. Moreover, POLYMARKET uses electronic devices such as computers and servers to make its wagers available on its mobile app and the Internet. Although POLYMARKET's website states that POLYMARKET is "not available to . . . persons located in the United States," users are able to access POLYMARKET by signing up for an account through its mobile app.

19.    A game subject to regulation in Nevada includes a "sports pool." NRS 463.160. A "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193. A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962.

20. POLYMARKET's products meet the requirement of NRS 463.160 and NRS 463.0193 because POLYMARKET's market allows users to wager on the outcomes of sporting events and other events for which the outcome is uncertain. These sporting events and other events include, but are not limited to, college basketball games, college and professional football games, and elections. POLYMARKET also has offered wagers related to news events, such as wagers on when arrests would be made in connection with the shootings of Charlie Kirk and at Brown University. *See* POLYMARKET, *New Arrests in Charlie Kirk Shooting by September 30?*, perma.cc/6EQX-JRFP; POLYMARKET, *Brown University Shooter Arrested By . . . ?*, perma.cc/U7PA-6PBK.

21. POLYMARKET's event contracts are wagers: A user spends a sum of a money to buy an event contract on an outcome of an event, and receives a payout if the outcome occurs and not if the outcome does not occur. For example, as of January 16, 2026, a user could buy an event contract for $0.36 that would pay out $1 if the Chicago Bears won their January 18, 2026, NFL playoff game against the Los Angeles Rams—essentially, approximately 3/1 odds. POLYMARKET, *Rams v. Bears*, https://perma.cc/6YNG-F4PN.

22. A "game" subject to regulation in Nevada includes a "percentage game." NRS 463.1052. A "percentage game" exists where the "house" does not directly participate in a wager and its only stake is a commission derived from wagers. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984).

23. POLYMARKET's products meet this requirement because POLYMARKET takes a commission, or percentage, on the wagers placed through its market. POLYMARKET takes a percentage of money wagered through its market in the form of commissions styled as "trading fees." POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-RADG.

24. In taking a percentage of the wagers placed through its market, POLYMARKET accepts wagers on sporting events and other events.

**C.    POLYMARKET's offerings that are available in Nevada cause harm to Nevada.**

25.    Despite making wagers, sports betting, and other gaming activity ("gaming") accessible in the State of Nevada, POLYMARKET is not licensed in Nevada and does not comply with Nevada gaming law.

26.    Nevada law requires every entity that makes gaming activities, including wagers, accessible in Nevada to be subject to a rigorous licensing process and an in-depth investigation of all entities and natural persons who directly or indirectly have an ownership interest in the entity offering the wagers.

27.    POLYMARKET has not undergone Nevada's rigorous licensing process for its wagering activities.

28.    Entities conducting gaming activities in the State of Nevada must pay taxes on gross gaming revenue derived from gaming activities accessible in the State.

29.    POLYMARKET does not pay taxes on gross gaming revenue derived from gaming activities, including wagers, accessible in the State of Nevada.

30.    Entities accepting wagers from persons in the State of Nevada must have a physical location in Nevada.

31.    POLYMARKET does not have a physical location in Nevada for its wagering activity.

32.    Entities accepting wagers in the State of Nevada on sporting events may not allow persons under 21 years of age to place wagers.

33.    POLYMARKET allows persons under the age of 21 years of age to place wagers on its market.  Specifically, it allows anyone over the age of 18 to create an account and trade on its platform.  POLYMARKET, *Polymarket.com Terms of Use*, perma.cc/L3Y2-U4YS.

34.    Entities accepting wagers in the State of Nevada on sporting events must employ safeguards to ensure that wagers are not being placed on an event by owners,

Page **6** of 13

1    coaches, players, or officials participating in the event, and must communicate with Nevada

2    gaming regulatory authorities about potential evidence of match fixing or point shaving.

3        35.    On information and belief, POLYMARKET does not employ adequate

4    safeguards to ensure that wagers are not being placed on an event from owners, coaches,

5    players, or officials participating in the event, and does not communicate about potential

6    evidence of match fixing or point shaving with Nevada gaming regulatory authorities.

7        **D.    POLYMARKET's market violates NRS 463.160.**

8        36.    Pursuant to NRS 463.160, it is unlawful for a person to expose a game or a

9    sports pool for play in Nevada without the required gaming licenses.

10        37.    POLYMARKET's market exposes a percentage game for play in Nevada.

11        38.    POLYMARKET's market exposes a sports pool for play in Nevada.

12        39.    POLYMARKET does not possess a Nevada gaming license.

13        40.    POLYMARKET does not possess a Nevada sports pool approval.

14        41.    POLYMARKET, in making its market available to persons located in Nevada,

15    has violated, and continues to violate, NRS 463.160.

16        **E.    POLYMARKET's market violates NRS 463.350.**

17        42.    Pursuant to NRS 463.350, a person under the age of 21 may not play, be

18    allowed to play, place wagers at, or collect winnings from any game or sports pool.

19        43.    POLYMARKET's market does not restrict persons under the age of 21 from

20    participating.

21        44.    POLYMARKET's market constitutes a percentage game and/or sports pool.

22        45.    POLYMARKET, in making its market available to persons located in Nevada

23    who are under the age of 21, has violated, and continues to violate, NRS 463.350.

24        **F.    POLYMARKET's market violates NRS 465.086.**

25        46.    Pursuant to NRS 465.086(1), it is unlawful for any person to directly or

26    indirectly receive any compensation or any percentage or share of the money played

27    for accepting or facilitating any wager upon the result of any sporting event without a

28    gaming license.

Page **7** of **13**

1    47.   POLYMARKET is not licensed to accept wagers.

2    48.   POLYMARKET's market accepts wagers.

3    49.   In addition to accepting wagers on the results of sporting events and other

4  events, POLYMARKET's market facilitates wagers on sporting events and other events

5  between individual participants in its market.

6    50.   As set out above, these wagers are on sporting events and other events,

7  including elections.

8    51.   POLYMARKET takes a percentage of money wagered through its market in

9  the form of commissions.

10   52.   POLYMARKET, in making event-based contracts concerning the outcomes,

11 or partial outcomes, of sporting or other events available on its market in Nevada, is a

12 person directly or indirectly receiving compensation or a percentage or share of the money

13 played for accepting or facilitating wagers on the results of sporting events and other events

14 without a gaming license.  As a result, it has violated, and continues to violate, NRS

15 465.086.

16   **G.   POLYMARKET's market violates NRS 465.092.**

17   53.   Pursuant to NRS 465.092, it is unlawful for a person to knowingly accept a

18 wager from a person inside of Nevada through a medium of communication unless the

19 person accepting the wager is licensed pursuant to Nevada law and otherwise complies

20 with applicable Nevada laws and regulations concerning wagering.

21   54.   POLYMARKET's market accepts wagers on sporting events and other events.

22   55.   POLYMARKET's market accepts wagers from persons inside of Nevada.

23   56.   The Internet is a medium of communication.  NRS 465.091.

24   57.   POLYMARKET's market uses the Internet for wagering activities.

25   58.   POLYMARKET is not and has never been licensed to accept wagers in

26 Nevada.

27   59.   POLYMARKET, in making event-based contracts concerning the outcomes,

28 or partial outcomes, of sporting or other events available on its market in Nevada without

Page **8** of **13**

1   a license to accept such wagers, is a person knowingly accepting wagers from persons inside

2   of Nevada through a medium of communication and has violated, and continues to violate,

3   NRS 465.092.

### FIRST CLAIM FOR RELIEF

**(Declaratory and Injunctive Relief - NRS 463.343 and 463.346)**

6      60.   The BOARD repeats, realleges, and incorporates each and every paragraph

7   contained in the General Allegations above as though fully set forth herein.

8      61.   Pursuant to NRS 463.343, the BOARD may bring an action for declaratory

9   judgment in this Court to obtain "a judicial determination of any question of construction

10  or validity arising under" NRS chapter 463.  NRS 463.343(1).

11      62.   Pursuant to NRS 463.346, the BOARD may institute a civil action in this

12  Court "to restrain a violation" of NRS chapters 463 and 465.  NRS 463.346(1).

13      63.   The Court "shall give priority over other civil actions to an action brought

14  pursuant to" NRS 463.346.  NRS 463.345.

15      64.   A justiciable controversy exists as to the application of NRS 463.160 and

16  463.350 to the activities of POLYMARKET as they relate to the State of Nevada.

17      65.   The BOARD's and POLYMARKET's interests are adverse.

18      66.   The BOARD has a strong legal interest in this controversy as it directly

19  impacts the BOARD's ability to carry out its legislative charge to strictly regulate gaming

20  because it is vitally important to Nevada, its economy, and the general welfare of its

21  inhabitants.

22      67.   The issue involved in this controversy is ripe for judicial determination.

23      68.   The Court is required to construe all statutes at issue in this claim for relief

24  in a manner consistent with the declared public policy of Nevada.  NRS 463.343(3).

25      69.   The BOARD is entitled to a declaration from this Court that NRS 463.160

26  prohibits POLYMARKET from making event-based contracts concerning the outcomes, or

27  ...

28

Page **9** of 13

1  partial outcomes, of sporting or other events available on its market in Nevada without
2  obtaining the required gaming licenses.

3      70.    The BOARD is entitled to a declaration from this Court that NRS 463.350
4  prohibits POLYMARKET from making event-based contracts concerning the outcomes, or
5  partial outcomes, of sporting or other events available on its market to persons under the
6  age of 21 in Nevada.

7      71.    The BOARD is entitled to an injunction enjoining POLYMARKET from
8  making event-based contracts concerning the outcomes, or partial outcomes, of sporting or
9  other events available on its market in Nevada unless and until POLYMARKET obtains
10  the appropriate gaming licenses.

11      72.    The BOARD is entitled to an injunction enjoining POLYMARKET from
12  making event-based contracts concerning the outcomes, or partial outcomes, of sporting or
13  other events available on its market to persons under the age of 21 in Nevada.

14                          **SECOND CLAIM FOR RELIEF**
15                  **(Declaratory and Injunctive Relief - NRS 30.030)**

16      73.    The BOARD repeats, realleges, and incorporates each and every paragraph
17  contained in the General Allegations above as though fully set forth herein.

18      74.    Pursuant to NRS 30.030, this Court has the "power to declare rights, status
19  and other legal relations whether or not further relief is or could be claimed." NRS 30.030.
20  The declaration "may be either affirmative or negative in form and effect" and "shall have
21  the force and effect of a final judgment or decree." *Id.*

22      75.    A justiciable controversy exists as to the application of NRS 465.086 and
23  465.092 to the activities of POLYMARKET as they relate to Nevada.

24      76.    The BOARD's and POLYMARKET's interests are adverse.

25      77.    The BOARD has a strong legal interest in this controversy as it directly
26  impacts the BOARD's ability to carry out its legislative charge to strictly regulate
27  ...

28

Page **10** of 13

1  gaming because it is vitally important to Nevada, its economy, and the general welfare of

2  its inhabitants.

3      78.    The issue involved in this controversy is ripe for judicial determination.

4      79.    The BOARD is entitled to a declaration from this Court that NRS 465.086 and

5  465.092 prohibit POLYMARKET from making event-based contracts concerning the

6  outcomes, or partial outcomes, of sporting or other events available on its market in Nevada

7  without obtaining the required gaming licenses.

8      80.    The BOARD is entitled to an injunction enjoining POLYMARKET from

9  making event-based contracts concerning the outcomes, or partial outcomes, of sporting or

10 other events available on its market in Nevada unless and until POLYMARKET obtains

11 the appropriate gaming licenses.

12                        **PRAYER FOR RELIEF**

13      WHEREFORE, the BOARD prays for judgment against POLYMARKET as follows:

14      1.    For a declaration that NRS 463.160, 465.086, and 465.092 prohibit

15 POLYMARKET from making event-based contracts concerning the outcomes, or partial

16 outcomes, of sporting or other events available on its market in Nevada without obtaining

17 the required gaming licenses;

18      2.    For a declaration that NRS 463.350 prohibits POLYMARKET from making

19 event-based contracts concerning the outcomes, or partial outcomes, of sporting or other

20 events available on its market to persons under the age of 21 in Nevada;

21      3.    For an injunction enjoining POLYMARKET from making event-based

22 contracts concerning the outcomes, or partial outcomes, of sporting or other events

23 available on its market in Nevada unless and until POLYMARKET obtains the appropriate

24 gaming licenses;

25      4.    For an injunction enjoining POLYMARKET from making event-based

26 contracts concerning the outcomes, or partial outcomes, of sporting or other events

27 available on its market to persons under the age of 21 in Nevada;

28 ...

                        Page **11** of **13**

5.     For reasonable attorneys' fees and costs of suit incurred herein; and

6.     For such other and further relief as the Court deems just and proper.

### AFFIRMATION

The undersigned does hereby affirm that the proceeding document does not contain the social security number of any person.

DATED this 16th day of January 2026.

AARON D. FORD
Attorney General

By: _____  #11543

for

Jessica E. Whelan (Bar No. 14781)
Chief Deputy Solicitor General – Litigation
John S. Michela (Bar No. 8189)
Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Plaintiff*

Page **12** of **13**

1

## CERTIFICATE OF SERVICE

2      I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3   and that on January 16, 2026, I deposited for mailing in the United States Mail, first-class

4   postage prepaid, at Carson City, Nevada, a true and correct copy of the COMPLAINT for

5   permanent injunction and declaratory relief to the following:

6          BLOCKRATIZE, INC. d/b/a POLYMARKET
           c/o CORPORATION SERVICE COMPANY
7          251 LITTLE FALLS DRIVE
           WILMINGTON, DE 19808
8
           QCX LLC d/b/a POLYMARKET US
9          c/o CORPORATION SERVICE COMPANY
           251 LITTLE FALLS DRIVE
10         WILMINGTON, DE 19808

11         ADVENTURE ONE QSS, INC. d/b/a POLYMARKET
           1280 LEXINGTON AVE
12         NEW YORK, NY 10028

13

14                                        _____

15                                        Mercedita Garcia
                                          AG Legal Secretary
16

17

18

19

20

21

22

23

24

25

26

27

28

                              Page **13** of **13**

**Exhibit C to Notice of Removal –
Other State Court Pleadings
Dist. Ct. Doc. 1-4 (filed February 5, 2026)**

# EXHIBIT C

## Other State Court Pleadings

1   AARON D. FORD
      Attorney General
2   Jessica E. Whelan (Bar No. 14781)
      Chief Deputy Solicitor General – Litigation
3   Sabrena K. Clinton (Bar No. 6499)
      Senior Deputy Attorney General
4   John S. Michela (Bar No. 8189)
      Senior Deputy Attorney General
5   State of Nevada
      Office of the Attorney General
6   1 State of Nevada Way, Suite 100
      Las Vegas, NV 89119
7   (702) 486-3420 (phone)
      (702) 486-3773 (fax)
8   jwhelan@ag.nv.gov
      sclinton@ag.nv.gov
9   jmichela@ag.nv.gov

10  *Attorneys for Plaintiff*

REC'D & FILED

2026 JAN 16  PM 5: 00

WILLIAM SCOTT HOEN
CLERK

BY_____
DEPUTY

11              **FIRST JUDICIAL DISTRICT COURT**

12                  **CARSON CITY, NEVADA**

13  STATE OF NEVADA ex rel. NEVADA      Case No.  26 0C 00013 1B
    GAMING CONTROL BOARD,
14                                       Dept. No.  7
           Plaintiff,
15
    vs.
16                                       **Plaintiff's Application for Temporary
    BLOCKRATIZE, INC. d/b/a              Restraining Order and Motion for
17  POLYMARKET; QCX LLC d/b/a            Preliminary Injunction**
    POLYMARKET US; ADVENTURE ONE
18  QSS, INC. d/b/a POLYMARKET           **Hearing Requested**

19         Defendants.

20

21       Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD

22  ("BOARD"), by and through its attorneys, hereby files this Application for Immediate

23  Temporary Restraining Order and Motion for Preliminary Injunction against

24  BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and

25  ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET"). The

26  BOARD seeks to restrain and enjoin POLYMARKET and any of its agents, employees,

27  officers, or affiliates from operating a derivatives exchange and prediction market

28  ("market") that offers event-based contracts relating to sporting and other events to people

                        Page 1 of 13

1    within Nevada without obtaining all required Nevada gaming licenses, and from allowing

2    its market to accept wagers from persons under the age of 21 in Nevada.  This Application

3    and Motion are made pursuant to NRCP 65 and are based upon the following Memorandum

4    of Points and Authorities, all papers on file herein, and any oral argument this

5    Court permits.

**MEMORANDUM OF POINTS AND AUTHORITIES**

6

7    **I.    FACTS**

8       **A.    The State Comprehensively Regulates Gaming in Nevada.**

9       Nevada has a long history of gaming regulation.  Except for a brief period during

10   prohibition, Nevada has allowed some form of legalized gaming for over 150 years.  *See*

11   Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling—A*

12   *Jurisdictional Overview*, 23 Gaming L. Rev. 645, 648 & n.18 (2019).

13      Nevada's gaming industry is "vitally important to the economy of the State

14   and the general welfare of the inhabitants."  NRS 463.0129(1)(a).  All entities that

15   conduct gaming in Nevada must "be licensed, controlled and assisted to protect the

16   public health, safety, morals, good order and general welfare of the inhabitants of the

17   State."  NRS 463.0129(1)(d).

18      The Nevada Legislature has found that the continued growth and success of gaming

19   "is dependent on public confidence and trust that licensed gaming" is "conducted honestly

20   and competitively."  NRS 463.0129(1)(b).  And the Legislature has made clear that "public

21   confidence and trust can only be maintained by *strict* regulation of all persons, locations,

22   practices, associates, and activities related" to the operation of gaming in Nevada.

23   NRS  463.0129(1)(c)  (emphasis  added).  The  BOARD  is  statutorily  charged  with

24   administering and enforcing Nevada gaming law.  NRS 463.140(1).

25      "Gaming" in Nevada is synonymous with "gambling" and includes any regulated

26   game. NRS 463.0153. A "game" subject to regulation in Nevada includes "any game played

27   with . . . equipment or any mechanical or electronic device or machine for money . . . or any

28   representative of value" that is accessible in Nevada.  NRS 463.0152.  The games subject

Page **2** of **13**

1    to regulation in Nevada include "percentage game[s]." NRS 463.0152. A "percentage game"

2    exists where the "house" does not directly participate in a wager and its only stake is a

3    commission derived from the wager. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984).

4    Gaming includes operating a "sports pool," which is "the business of accepting wagers on

5    sporting events or other events by any system or method of wagering," NRS 463.0193;

6    a "wager" is "a sum of money or representative of value that is risked on an occurrence for

7    which the outcome is uncertain," NRS 463.01962.

8        Nevada law comprehensively regulates entities that conduct gaming activities in the

9    State. Every entity that makes gaming activities accessible in Nevada is subject to a

10    rigorous licensing process. NRS 463.160(1). Entities conducting gaming activities in the

11    State of Nevada must pay taxes on gross gaming revenue derived from gaming activities

12    accessible in the State. NRS 463.373. Licensed entities accepting wagers from persons

13    in the State of Nevada must have a physical location in Nevada. Nev. Gam'g Comm.

14    Reg. 22.060(2). Licensed entities may not accept wagers from those under 21 years of age.

15    NRS 463.350. Further, licensed entities accepting wagers on sporting events must employ

16    safeguards to ensure that wagers are not being placed on an event by owners, coaches,

17    players, or officials participating in the event, and must communicate with Nevada gaming

18    regulatory authorities about potential evidence of match fixing or point shaving. *See* Nev.

19    Gam'g Comm. Reg. 22.1205(2). Failing to enforce these laws would severely weaken the

20    State's ability to strictly regulate gaming and would jeopardize the growth and integrity of

21    Nevada's gaming industry, which is vitally important to its economy and the welfare of

22    its citizens.

23        **B.**    **POLYMARKET's Market is a Gambling Game and/or Sports Pool and**
              **Accepts Wagers from Persons in Nevada.**
24

25        POLYMARKET operates a market that offers event-based contracts relating to

26    sporting and other events. Compl. ¶ 20. These events include, but are not limited to,

27    college basketball games, college and professional football games, and elections. *Id.*

28

Page <b>3</b> of 13

1    POLYMARKET's event contracts are wagers under NRS 463.01962:

2    POLYMARKET's market allows persons located in Nevada to risk money on sporting

3    events and elections, and the outcomes of sporting events and elections are, by their very

4    nature, uncertain. *See, e.g.*, POLYMARKET, *Rams vs Bears*, perma.cc/6YNG-F4PN

5    (allowing a user to spend $0.36 on an event contract that pays out $1.00 if the Bears win

6    their January 18, 2026, playoff game against the Rams). POLYMARKET consequently

7    operates a "sports pool" under Nevada law. NRS 463.0193.

8         Further, POLYMARKET's market takes a commission, or percentage, on the wagers

9    placed through its market. *See* POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-

10   RADG. POLYMARKET accordingly offers a "percentage game"—a type of "gambling

11   game"—under Nevada law. NRS 463.0152.

12        A person can access POLYMARKET's market through its mobile app. Compl. ¶ 18.

13   POLYMARKET uses computers and servers to make its event-based contracts available on

14   its mobile app. *Id.* A person enters into an event-based contract on POLYMARKET's

15   market with the payment of money. *Id.*

16   **C.    POLYMARKET's Activities in Nevada Cause Harm to Nevada.**

17        Although POLYMARKET conducts gaming activity in Nevada, including by

18   operating a sports pool, POLYMARKET does not comply with Nevada gaming law. Among

19   other things, POLYMARKET has not undergone Nevada's rigorous licensing process to

20   obtain a gaming license for its wagering activities. Compl. ¶ 27. It accordingly does not

21   possess a Nevada license to conduct gaming activities, including operating a sports pool.

22   *Id.* ¶ 37. Further, POLYMARKET does not pay taxes on gross gaming revenue generated

23   from wagers placed by persons in Nevada. *Id.* ¶ 29. And POLYMARKET does not have a

24   physical location in Nevada. *Id.* ¶ 31.

25        POLYMARKET also does not comply with the various regulations on gaming that

26   Nevada has imposed to protect Nevada and its citizens. POLYMARKET does not require

27   its patrons to be at least 21 years of age to place a wager in its markets, Compl. ¶ 33;

28   instead, it allows anyone over the age of 18 to create an account and trade on its platform,

1    *see* POLYMARKET, *Terms of Service* (Aug. 26, 2025), perma.cc/L3Y2-U4YS. To Plaintiff's

2    knowledge, POLYMARKET does not employ adequate safeguards to ensure that wagers

3    are not being placed on an event by owners, coaches, players, or officials participating in

4    the event, and does not communicate about potential evidence of match fixing or point

5    shaving to Nevada regulatory authorities. Compl. ¶ 35.

6    **II.    PROCEDURAL HISTORY**

7       On January 16, 2025, the BOARD filed this action to obtain a declaration from this

8    Court that POLYMARKET is violating Nevada law and an injunction ordering

9    POLYMARKET to cease its violations of Nevada law. *See* Compl. 11. In this Application

10    for Temporary Restraining Order and Motion for Preliminary Injunction, the BOARD seeks

11    a temporary restraining order and preliminary injunction prohibiting POLYMARKET and

12    any of its agents, employees, officers, or affiliates from operating a market that offers event-

13    based contracts relating to sporting and other events to people within Nevada without

14    obtaining the required Nevada gaming licenses, and prohibiting POLYMARKET from

15    allowing its market to accept wagers from persons under the age of 21 in Nevada.

16    **III.   LEGAL STANDARD**

17       A court should grant preliminary injunctive relief when it "appear[s] by the

18    complaint that the plaintiff is entitled to the relief demanded, and such relief or any part

19    thereof consists in restraining the commission or continuance of the act complained of,"

20    NRS 33.010(1), and when "the commission or continuance of some act, during the litigation,

21    would produce great or irreparable injury to the plaintiff," NRS 33.010(2). The plaintiff

22    must demonstrate two elements: (1) there is a reasonable likelihood that the plaintiff will

23    prevail in the underlying case and (2) absent a preliminary injunction, the plaintiff will

24    suffer irreparable harm for which compensatory damages are not sufficient. *Elk Point*

25    *Country Club Homeowners' Ass'n, Inc. v. K.J. Brown, LLC,* 138 Nev. 640, 642, 515 P.3d 837,

26    839 (2022); *Posner v. U.S. Bank Nat'l Ass'n,* 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152

27    (Nev. 2024). The court may also consider the balance of hardships and the public interest.

28

Page **5** of 13

1  *See Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100
2  P.3d 179, 187 (2004).

3      Nevada Rule of Civil Procedure 65(b) authorizes a court to issue an ex parte
4  temporary restraining order.    Courts often apply similar standards for temporary
5  restraining orders and preliminary injunctions, as both are forms of injunctive relief aimed
6  at preventing harm before a final resolution of the case.  *See, e.g., LIT Ventures, LLC v.*
7  *Carranza,* 457 F. Supp. 3d 906, 908 (D. Nev. 2020).  The key question is whether the
8  Plaintiff has shown that it will suffer "immediate and irreparable injury." NRCP 65(b); *see*
9  *State ex rel. Friedman v. Eighth Jud. Dist. Ct. In & For Clark Cnty.*, 81 Nev. 131, 134, 399
10  P.2d 632, 633 (1965).

11      The requirements for both a preliminary injunction and for a temporary restraining
12  order are met here.  In particular, the BOARD is suffering serious, ongoing, irreparable
13  harm every day that POLYMARKET operates its market in violation of Nevada law, and
14  so the Court should immediately issue a temporary restraining order.

15  **IV.    ARGUMENT**

16      POLYMARKET has been willfully circumventing Nevada law requiring all gaming
17  activity in the State to be strictly regulated and licensed.  POLYMARKET operates a
18  "sports pool" and/or "gambling game" under Nevada law.  Yet POLYMARKET does not
19  possess a Nevada license to operate a sports pool or conduct other gaming activity in
20  Nevada.  POLYMARKET also does not follow many of the restrictions on licensed gaming
21  in the State.  In particular, POLYMARKET allows persons under 21 years of age to wager
22  on its market.  Accordingly, the BOARD is entitled to a temporary restraining order and
23  preliminary injunction prohibiting POLYMARKET from operating an unlicensed sports
24  pool in Nevada and prohibiting POLYMARKET from accepting wagers from persons under
25  the age of 21.

26      **A.    Plaintiff is likely to succeed on the merits of its claims.**

27      The BOARD is likely to succeed in showing that POLYMARKET violates, at a
28  minimum, NRS 463.160, 463.350, 465.086, and 465.092.

1    POLYMARKET violates NRS 463.160.  Pursuant to NRS 463.160, it is unlawful for

2   a person to expose a game or a sports pool for play in Nevada without the required gaming

3   licenses.  POLYMARKET's market exposes a percentage game and/or sports pool for play

4   in Nevada.  Compl. ¶¶ 18–24.  POLYMARKET does not possess a Nevada gaming license

5   either to offer a percentage game or to operate a sports pool in Nevada.  *Id.* ¶ 39.

6   Accordingly, POLYMARKET, in making its market available to persons located in Nevada,

7   has violated and continues to violate NRS 463.160.

8    POLYMARKET violates NRS 463.350.  Pursuant to NRS 463.350, a person under

9   the age of 21 may not play, be allowed to play, place wagers at, or collect winnings from

10   any game or sports pool.  POLYMARKET's market constitutes a percentage game and/or

11   sports pool.  Compl. ¶¶ 18–24.  Yet POLYMARKET's market does not restrict persons

12   under the age of 21 from participating.  *Id.* ¶ 43.  Accordingly, POLYMARKET, in making

13   its market available to persons located in Nevada who are under the age of 21, has violated

14   and continues to violate NRS 463.350.

15    POLYMARKET violates NRS 465.086.  Pursuant to NRS 465.086(1), it is unlawful

16   for any person to directly or indirectly receive any compensation or any percentage or share

17   of the money played for accepting or facilitating any wager upon the result of any sporting

18   event without a gaming license.   POLYMARKET is not licensed to accept wagers in

19   Nevada.  Compl. ¶ 47.  POLYMARKET's market accepts wagers in Nevada.  *Id.* ¶ 48.  In

20   addition  to  accepting  wagers  on  the  results  of  sporting  events  and  other  events,

21   POLYMARKET's market facilitates wagers on sporting events and other events between

22   individual participants in its market.   *Id.* ¶ 49.  POLYMARKET takes a percentage of

23   money wagered through its market in the form of commissions styled as "trading fees."

24   POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-RADG.   Accordingly,

25   POLYMARKET, in operating its market, has violated and continues to violate NRS

26   465.086.

27    POLYMARKET violates NRS 465.092.  Pursuant to NRS 465.092, it is unlawful for

28   a person to knowingly accept a wager from a person inside of Nevada through a medium of

Page **7** of 13

1  communication unless the person accepting the wager is licensed pursuant to Nevada law

2  and otherwise complies with applicable Nevada laws and regulations concerning wagering.

3  POLYMARKET's market accepts wagers on sporting events and other events. Compl. ¶ 54.

4  POLYMARKET's market accepts wagers from persons inside of Nevada. *Id.* ¶ 55. The

5  Internet is a medium of communication. NRS 465.091. POLYMARKET's market uses

6  the Internet for wagering activities. Compl. ¶ 57. Accordingly, in operating its

7  market, POLYMARKET is a person knowingly accepting wagers from persons inside of

8  Nevada through a medium of communication, and has violated and continues to violate

9  NRS 465.092.

10        For at least these reasons, POLYMARKET is violating Nevada gaming law. Yet

11  POLYMARKET has made clear that it will not voluntarily obtain a gaming license or

12  otherwise comply with Nevada gaming law. The BOARD therefore is likely to succeed on

13  the merits of its claims and obtain a permanent injunction from this Court enjoining

14  POLYMARKET from operating its market without complying with Nevada gaming law.

15        **B.    Plaintiff is suffering and will continue to suffer immediate and**
16        **irreparable harm absent relief.**

17        Plaintiff suffers serious and irreparable harm every day that POLYMARKET

18  operates its market in violation of Nevada law. The Nevada Legislature has enacted a

19  "comprehensive regulatory structure, coupled with strict licensing standards" to ensure the

20  integrity of gaming in the State. NRS 463.745. Plaintiff is statutorily charged with

21  enforcing Nevada gaming law and overseeing Nevada's gaming industry, to protect the

22  reputation of the State of Nevada, to protect the reputation of gaming in Nevada, and to

23  protect the public health, safety, morals, good order, and general welfare of the inhabitants

24  of Nevada. NRS 463.140(1).

25        POLYMARKET's failure to comply with Nevada gaming law impairs the BOARD

26  from carrying out its statutory functions. For example, in order to ensure that wagering is

27  fair, Nevada gaming regulations prohibit accepting wagers on sporting events from owners,

28  coaches, players, officials, or other participants in the event and require licensees to take

1  reasonable steps to avoid circumvention of this regulation.  Nev. Gam'g Comm. Reg.
2  22.1205(2).  Licensed sports books also must:  (1) obtain certain identification information
3  from patrons who place wagers of a certain size; (2) prevent multiple wagers designed to
4  circumvent the identification requirements for wagers of a certain size; and (3) prevent
5  wagers structured to circumvent the identification requirements.  Nev. Gam'g Comm. Reg.
6  22.061, 22.062, and 22.063.  Further, licensed sports books must communicate with the
7  BOARD about potential evidence of match fixing or point shaving.  *See* Nev. Gam'g Comm.
8  Reg. 22.121.    To Plaintiff's knowledge, POLYMARKET does not adhere to these
9  requirements, which harms the BOARD by preventing it from ensuring the integrity of
10  gaming in the State.

11       POLYMARKET's failure to comply with Nevada gaming law gives it a massive and
12  unfair competitive advantage over its competitors, which greatly disrupts the gaming
13  industry.  That advantage is both pecuniary, in that POLYMARKET does not need to spend
14  the money its competitors need to spend on licensing fees, taxes, and compliance (including
15  maintaining a physical location in Nevada), as well as strategic, in that POLYMARKET's
16  products are not subject to the same requirements as its competitors.  Plaintiff, which is
17  charged with ensuring that gaming in Nevada is fair, suffers irreparable harm when
18  POLYMARKET is able to distort the playing field and disrupt the industry in this manner.
19  *See Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509
20  (9th Cir. 1993).

21       The harm only increases the longer POLYMARKET is allowed to operate unfettered.
22  POLYMARKET's ability to profit from unlicensed gaming will incentivize others to enter
23  into prediction markets instead of becoming (or remaining) licensed by the State.  Indeed,
24  that already has started to happen: DraftKings and FanDuel have decided to forgo
25  licensing in Nevada so that they can enter the prediction-markets business in other States.
26  *See KalshiEX LLC v. Hendrick*, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025), *appeal*
27  *pending*, No 25-7516 (9th Cir. filed Nov. 25, 2025).  Other sportsbooks could follow suit,
28  "unleashing even more unregulated gambling."  *Id.*

1    Thus, the harms caused by POLYMARKET are on-going, serious, and irreparable.

2    The BOARD seeks to stop the myriad of harms caused by POLYMARKET.

3    **C.    The balance of hardships and the public interest weigh heavily**
4    **in favor of granting a temporary restraining order and**
     **preliminary injunction.**

5    Compared to the ongoing, severe, irreparable harm that POLYMARKET's market

6    causes to the BOARD and to the State, any harms that POLYMARKET claims to suffer

7    from an injunction are insignificant.  Indeed, the BOARD seeks only for POLYMARKET to

8    follow Nevada gaming law, and following the law is not a harm.  *See Goldman v. Newage*

9    *Lake Las Vegas, LLC,* 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019).

10    POLYMARKET may contend that federal law preempts Nevada gaming law, and

11    that it is harmed by being required to follow preempted law.  But a federal district court

12    evaluating this argument brought by POLYMARKET's competitor concluded that the

13    competitor is not likely to prevail on the argument.  *KalshiEX*, 2025 WL 3286282, at *6–

14    12.  In any event, as the federal court explained, any claimed harms from being required

15    to stop operating are "largely monetary"—"essentially that [the company] will not be able

16    to profit from [its] trades"—and pale in comparison to the harms to the BOARD.  *Id* at *12.

17    Notably, the federal agency POLYMARKET may claim to regulate it expressly told

18    POLYMARKET to "account[] for" "State regulatory actions and pending and potential

19    litigation, including enforcement actions," and that it should have "contingency plans,"

20    including "liquidation or close-out policies and procedures" in the event it cannot operate

21    in a State.  U.S. Commodity Futures Trading Comm'n, CFTC Letter No. 25-36, at 2 (Sept.

22    30, 2025), perma.cc/B26G-SBH5.  The balance of harms thus weighs in the BOARD's favor.

23    *KalshiEX*, 2025 WL 3286282, at *13.

24    The public interest similarly weighs in favor of enjoining POLYMARKET from

25    violating Nevada gaming law.  The Legislature has determined that "[p]ublic confidence

26    and trust can only be maintained by strict regulation of all persons, locations, practices,

27    associations and activities related to the operation of licensed gaming establishments."

28    NRS 463.0129(1)(c).  "All establishments where gaming is conducted . . . must therefore be

Page **10** of 13

1   licensed, controlled and assisted to protect the public health, safety, morals, good order and

2   general welfare of the inhabitants of the State." NRS 463.0129(1)(d). The Legislature thus

3   has determined that the public interest requires *all* gaming operators to be licensed and to

4   follow Nevada gaming law. Any gaming business, including POLYMARKET, that does not

5   comply with Nevada gaming law poses a threat to this vital industry.

6       In particular, POLYMARKET does not adhere to the consumer-protection

7   requirements in Nevada law. To start, POLYMARKET's operations harm some of Nevada's

8   most vulnerable residents. Nevada law prohibits persons under 21 from placing sports

9   wagers, NRS 463.350(1)(a), but POLYMARKET does not require its participants to be 21

10  years of age. Nevada law also protects those suffering from problem gaming by requiring,

11  among other measures, that gaming licensees letting patrons set deposit limits,

12  "conspicuously display" information about responsible-gaming resources, train employees

13  to identify signs of problem gaming, and refrain from marketing to customers who

14  have excluded themselves. Nev. Gam'g Comm. Reg. 5.225(18)(a)-(b). To Plaintiff's

15  knowledge, POLYMARKET does not adhere to these requirements to the extent required

16  by Nevada law.

17      POLYMARKET's operations further harm the gaming public because

18  POLYMARKET does not participate in the State's process to resolve patron disputes. *See*

19  NRS 463.362 *et seq.* Patrons of licensed gaming establishments may utilize a process with

20  the BOARD to resolve disputes related to wagering activities. But this structure is in place

21  only for disputes between a Nevada licensee and its patron. NRS 463.362. A person

22  entering a wager through an event contract available on POLYMARKET's market is not a

23  patron of a Nevada licensee and, thus, pursuant to the applicable statutes, has no recourse

24  should there be a dispute over the wager. POLYMARKET's market thus harms the public

25  interest because it does not provides adequate protection to purchasers of event contracts.

26      POLYMARKET also harms the State's economy and the public fisc. Licensed

27  gaming is "vitally important to the economy of the State and the general welfare of

28  the inhabitants." NRS 463.0129(1)(a). All licensed gaming operators must pay taxes, *see*

1  NRS 463.370—revenues that finance "indispensable" State functions, from schools to

2  highways. *Sacco v. State*, 105 Nev. 844, 847 (1989). POLYMARKET's unlicensed gaming

3  operations threatens that revenue, by evading taxes and diverting business from licensed

4  sports books that pay taxes, and thus "represents a serious threat to the state's economic

5  base." *Id.* Allowing POLYMARKET to offer unlawful gaming activities risks "devastating

6  the Nevada economy and related tax revenues." *KalshiEX*, 2025 WL 3286282, at *14. The

7  public interest thus weighs decisively in favor of enjoining POLYMARKET.

8                           **CONCLUSION**

9      The Court should grant this application for temporary restraining order and

10  preliminary injunction, and enter an order prohibiting POLYMARKET and any of its

11  agents, employees, officers, or affiliates from operating a market that offers event-based

12  contracts relating to sporting and other events to people in Nevada without obtaining all

13  required Nevada gaming licenses, and prohibiting POLYMARKET from allowing its

14  market to accept wagers from persons under the age of 21 in Nevada.

15      Dated: January 16, 2026.

16                        AARON D. FORD
17                        **Attorney General**

18        By:  #11543
19               **Jessica E. Whelan** (Bar No. 14781)
                 Chief Deputy Solicitor General - Litigation
20               Sabrena K. Clinton (Bar No. 6499)
                 Senior Deputy Attorney General
21               John S. Michela (Bar No. 8189)
                 Senior Deputy Attorney General
22               State of Nevada
                 Office of the Attorney General
23               jwhelan@ag.nv.gov
                 sclinton@ag.nv.gov
24               jmichela@ag.nv.gov

25               *Attorneys for Plaintiff*

26

27

28

1

### CERTIFICATE OF SERVICE

2        I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3  and that on January 16, 2026, I deposited for mailing in the United States Mail, first-class

4  postage prepaid, at Carson City, Nevada, a true and correct copy of the foregoing to

5  the following:

6        BLOCKRATIZE, INC. d/b/a POLYMARKET
         c/o CORPORATION SERVICE COMPANY
7        251 LITTLE FALLS DRIVE
         WILMINGTON, DE 19808
8
         QCX LLC d/b/a POLYMARKET US
9        c/o CORPORATION SERVICE COMPANY
         251 LITTLE FALLS DRIVE
10       WILMINGTON, DE 19808

11       ADVENTURE ONE QSS, INC. d/b/a POLYMARKET
         1280 LEXINGTON AVE
12       NEW YORK, NY 10028

13

14                                        Mercedita Garcia
                                          AG Legal Secretary
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page **13** of 13

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General – Litigation
3  Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
4  John S. Michela (Bar No. 8189)
     Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   sclinton@ag.nv.gov
9  jmichela@ag.nv.gov

10  *Attorneys for Plaintiff*

11              **FIRST JUDICIAL DISTRICT COURT OF NEVADA**

12                            **CARSON CITY**

13  STATE OF NEVADA ex rel. NEVADA          Case No. 26 0C 00012 1B
    GAMING CONTROL BOARD,
14
                        Plaintiff,
15          vs.

16  BLOCKRATIZE, INC. d/b/a
    POLYMARKET; QCX LLC d/b/a
17  POLYMARKET US; ADVENTURE ONE
    QSS, INC. d/b/a POLYMARKET                **HEARING REQUESTED**
18
19                      Defendants.

20  **ERRATA TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING**
    **ORDER AND MOTION FOR PRELIMINARY INJUNCTION**
21

22      Plaintiff, STATE OF NEVADA, *ex rel.* NEVADA GAMING CONTROL BOARD, by

23  and through its attorneys, hereby files this Errata to Plaintiffs' Complaint against

24  BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US;

25  ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.

26      This Errata comprises two updates to the previously filed Motion for Temporary

27  Restraining Order: a Declaration from Chief Deputy Attorney General Jessica E. Whelan,

28  and a proposed Temporary Restraining Order. Due to the expedited nature of these

                            Page 1 of 8

1   proceedings, these attachments were inadvertently excluded from the filing of the initial

2   motion. These attachments do not expand the scope of relief Plaintiffs seek in any way.

3   Plaintiffs hereby request that the Court consider the attached documents in its

4   consideration of the Complaint and Motion.

5      Dated: January 21, 2026.

AARON D. FORD
Attorney General

By:
   Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General - Litigation
   Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
   John S. Michela (Bar No. 8189)
     Senior Deputy Attorney General
   State of Nevada
   Office of the Attorney General
   jwhelan@ag.nv.gov
   sclinton@ag.nv.gov
   jmichela@ag.nv.gov

   *Attorneys for Plaintiff*

Page 2 of 8

# DECLARATION OF JESSICA E. WHELAN

I, Jessica E. Whelan, declare as follows:

I am the Chief Deputy Solicitor General—Litigation in the Nevada Attorney General's Office, and I make this declaration in support of Plaintiff's application for an *ex parte* temporary restraining order under NRS 463.346 and NRCP 65(b).

On October 15, 2025, the Nevada Gaming Control Board ("BOARD") issued public guidance explaining that "it considers offering sports event contracts, or certain other events contracts, as constituting wagering activity under NRS 463.0193 and 463.01962," regardless of whether "the contract is listed on an exchange regulated by the Commodity Futures Trading Commission (CFTC) or elsewhere."  Nev. Gaming Control Bd., *Notice to Licensees No. 2025-77: Sports Event Contracts Are Wagers* 1 (Oct. 15, 2025), perma.cc/ 7XEH-BZLV.  The BOARD further explained that "[e]xamples of event contracts that the Board specifically considers to be wagering subject to its jurisdiction include event contracts based on the outcome or partial outcome of any sporting or athletic event, or other selected events such as the World Series of Poker, the Oscars, Esports, and political elections." *Id.*

The BOARD also explained that "[o]fferings for Sports and Other Events Contracts may be conducted in Nevada only if the offering entity possesses a nonrestricted gaming license with sports pool approval in Nevada and meets the other requirements for sports wagering including, without limitation, wagering accounts and sports book systems." *Id.*

Accordingly, as of October 15, 2025, the Board had provided public notice to all entities that allow for the purchase or sale of event contracts based on the outcome of sporting and certain other events in Nevada without possessing a gaming license with sports pool approval that such conduct violates Nevada law.

Defendants BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET") operate a market that offers event-based contracts relating to sporting and other events.  Compl. ¶ 20.  These events include, but are not limited to, college

Page 3 of 8

1   basketball games, college and professional football games, and elections. *Id.* Although
2   POLYMARKET's website states that POLYMARKET is "not available to . . . persons
3   located in the United States," users in Nevada are able to access POLYMARKET by signing
4   up for an account through its mobile app. *Id.* ¶ 18.

5       POLYMARKET's activities meet the definition of a "game" subject to regulation in
6   Nevada—specifically, it operates a "sports pool" under Nevada law. *See* Compl. ¶¶ 18-23.
7   But despite conducting gaming accessible in the State of Nevada, POLYMARKET is not
8   licensed in Nevada and does not comply with Nevada gaming law. *Id.* ¶ 25. It has not
9   undergone Nevada's rigorous licensing process for its gaming activities, nor has does it
10  comply with the restrictions and requirements of Nevada law for operators of sports pools.
11  *See id.* ¶¶ 26, 35.

12      Because POLYMARKET is an unlicensed entity, the BOARD does not have contact
13  information to provide POLYMARKET notice of this application.

14      An *ex parte* temporary restraining order is appropriate because POLYMARKET's
15  activities in Nevada are causing immediate and irreparable injury to Plaintiff and the State
16  of Nevada, and will continue to do so before POLYMARKET can be heard in opposition to
17  Plaintiff's application.

18      The BOARD enforces Nevada gaming law and oversees the State's gaming industry
19  to protect the integrity and reputation of gaming in Nevada and to safeguard the public.
20  POLYMARKET's failure to comply with Nevada gaming law harms the public.   For
21  example, Nevada law prohibit persons under the age 21 from engaging in gaming, yet
22  POLYMARKET allows those as young as 18 to wager on its platform.  Nevada law also
23  prohibits wagers by owners, coaches, players, officials, or other participants in sporting
24  events and require licensees to take reasonable steps to prevent circumvention of that rule.
25  To the undersigned counsel's knowledge, POLYMARKET does not comply with these
26  requirements.

27      POLYMARKET's failure to comply with Nevada gaming law also gives it a massive
28  and unfair competitive advantage over its competitors, which upends the gaming industry.

1  That advantage is both pecuniary, in that POLYMARKET does not need to spend the

2  money its competitors need to spend on licensing fees, taxes, and compliance (including

3  maintaining a physical location in Nevada), as well as strategic, in that POLYMARKET's

4  products are not subject to the same requirements as its competitors.  The BOARD suffers

5  irreparable harm when POLYMARKET is able to distort the playing field and disrupt the

6  industry in this manner.

7       The harm only increases the longer POLYMARKET is allowed to operate unfettered.

8  POLYMARKET's ability to profit from unlicensed gaming will incentivize others to enter

9  into prediction markets rather than becoming (or remaining) licensed by the State.

10      Plaintiff and the State of Nevada are currently suffering the serious, ongoing, and

11  irreparable harms outlined above every day that POLYMARKET operates its market in

12  violation of Nevada law.  These harms justify issuance of the temporary restraining order

13  on an *ex parte* basis without notice to POLYMARKET or an opportunity for it to respond.

14      Dated this 20th day of January, 2026.

16      By: /s/

17      JESSICA E. WHELAN

Page **5** of 8

## TEMPORARY RESTRAINING ORDER

Upon review of the Application for Temporary Restraining Order and the accompanying declaration of Jessica E. Whelan, this Court determines that Plaintiff has satisfied the requirements of NRCP 65(b)(1).

Plaintiff has shown that it is likely to succeed on the merits. Plaintiff also has shown irreparable harm resulting from Defendants' efforts to circumvent Nevada law requiring all gaming activity in the State to be strictly regulated and licensed. Specifically, Plaintiff has shown that it will suffer serious and irreparable harm every day that Defendants operate their market in violation of Nevada law, because Defendants' conduct impairs Plaintiff's ability to carry out its statutory functions. Further, Defendants' failure to comply with Nevada gaming law gives them a massive and unfair competitive advantage over their competitors, thereby disrupting the gaming industry Plaintiff is charged with overseeing and regulating.

The public interest will also be harmed absent a temporary restraining order, as Defendants do not adhere to the consumer-protection requirements set forth in Nevada's comprehensive gaming regime, and Defendants' shirking of their regulatory obligations will harm the State's economy and the public fisc.

In contrast, Defendants will not suffer significant and irreparable harm from a temporary restraining order. Finally, the serious, ongoing, and irreparable harms Plaintiff is incurring and will continue to incur as a result of continued delay in waiting for Defendants to respond to the application supports issuance of an *ex parte* temporary restraining order without giving Defendants notice or an opportunity to respond.

/ / /
/ / /
/ / /

Page **6** of 8

1    Based on the foregoing, and good cause appearing, IT IS HEREBY ORDERED that

2    Defendants and any of their principals, employees, or agents are hereby enjoined from

3    operating a market that offers event-based contracts relating to sporting and other events

4    to people in Nevada without obtaining all required Nevada gaming licenses and enjoined

5    from allowing their market to accept wagers from persons under the age of 21 in Nevada.

6    This order is effective for 14 days unless further ordered by the Court.

7    Signed this ___ day of _____, 2026, at __:___ am/pm

8

9

10    _____
       DISTRICT COURT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page **7** of **8**

3App333

1

2      **CERTIFICATE OF SERVICE**

     I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3 and that on January 21, 2026, I deposited for mailing in the United States Mail, first-class

4 postage prepaid, at Carson City, Nevada, a true and correct copy of the foregoing

5 to the following:

6 Jacob T. Spencer, Esq.
Gibson. Dunn & Crutcher, LLP

7 1700 M. Street, N.W.
Washington, D.C. 20036-4504

8

*Attorneys for Blockratize, Inc. d/b/a*
9 *Polymarket; QCX LLC d/b/a Polymarket*
*US; Adventure One QSS, Inc. d/b/a*
10 *Polymarket*

11

                  _____
12             An employee of the Office of the
Nevada Attorney General

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                        Page 8 of 8

1 | ROBERT A. DOTSON
2 | Nevada State Bar No. 5285
  | DANIEL T. HAYWARD
3 | Nevada State Bar No. 5986
  | JUSTIN C. VANCE
4 | Nevada State Bar No. 11306
  | DOTSON, HAYWARD & VANCE, PC
5 | 5355 Reno Corporate Drive, Ste 100
  | Reno, Nevada 89511
6 | Tel:   (775) 501-9400
7 | Email:  rdotson@dhvnv.com
  |        dhayward@dhvnv.com
8 |        jvance@dhvnv.com

9 | ORIN SNYDER (*Pro Hac Vice Forthcoming*)
10 | GIBSON, DUNN & CRUTCHER LLP
   | 200 Park Avenue
11 | New York, NY 10166
   | Tel:   (212) 351-4000
12 | Email: OSnyder@gibsondunn.com

13 | *Attorneys for Defendants BLOCKRATIZE, INC.*
14 | *d/b/a POLYMARKET; QCX LLC d/b/a*
   | *POLYMARKET US*

15 |

16 | **IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**
   | **IN AND FOR CARSON CITY**

17 | STATE OF NEVADA ex rel. NEVADA       Case No.: 26-OC-00012-1B
18 | GAMING CONTROL BOARD,
   |                                      Dept. No.: 1
19 |          Plaintiff,

20 |      v.

21 | BLOCKRATIZE, INC. d/b/a
22 | POLYMARKET; QCX, LLC d/b/a
   | POLYMARKET US; ADVENTURE ONE
23 | QSS, INC. d/b/a POLYMARKET,

24 |          Defendants.

25 | **DEFENDANTS' PRELIMINARY RESPONSE AND REQUEST FOR OPPORTUNITY TO**
26 | **FILE FULL OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY**
27 | **RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION AND TO**
   | **ATTEND HEARING AND BE HEARD THEREON**
28 |

DOTSON, HAYWARD
& VANCE, PC
1355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

1

1    Defendants, BLOCKRATIZE, INC., d/b/a POLYMARKET and QCX LLC, d/b/a

2   POLYMARKET US ("Defendants"), by and through their counsel, GIBSON DUNN and DOTSON,

3   HAYWARD & VANCE, PC, hereby provide the following preliminary response[1]:

4                                     **INTRODUCTION**

5           This case presents a textbook example of the improper use of *ex parte* emergency relief to gain

6   leverage, rather than to address any genuine emergency. On the eve of a holiday weekend, the Nevada

7   Gaming Control Board (the "Board") sought to shut down a federally regulated national prediction

8   market—without notice, without the certification required by Nevada law, and without the evidentiary

9   materials necessary to justify extraordinary relief.

10          Defendant QCX LLC operates Polymarket US, a nationwide prediction market regulated by the

11  Commodity Futures Trading Commission ("CFTC"). Prediction markets allow participants to trade

12  contracts tied to the outcome of future events—such as elections, economic indicators, technological

13  developments, and sports—producing real-time price signals that reflect collective expectations about

14  matters of public importance. Hundreds of thousands of consumers in the United States, and millions

15  worldwide, rely on these markets for timely, accurate information. Federal law places such national

16  contract markets under the "exclusive jurisdiction" of the CFTC, 7 U.S.C. § 2(a)(1)(A), precisely

17  because they cannot function if subjected to a patchwork of inconsistent state regulation.

18          Despite this comprehensive federal framework, the Board sought to halt Polymarket US's

19  lawful operations in Nevada through an *ex parte* temporary restraining order, depriving Defendants of

20  any meaningful opportunity to be heard. Worse still, it now appears clear that after Defendants' counsel

21  had already contacted the Board, after the parties were actively discussing an orderly briefing schedule,

22  and after a meet-and-confer had been scheduled, the Board, through counsel, filed a sworn declaration

23  asserting that it lacked contact information for Defendants—without disclosing to the Court that those

24  statements were no longer true and yet it included an address for Gibson, Dunn & Crutcher LLP in the

25  service page.

26

27

---

28  [1] Adventure One QSS, Inc. is not a U.S. corporation and does no business in Nevada. To the extend necessary this
    should be considered a special appearance.

DOTSON, HAYWARD
& VANCE, PC
355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

2

1    The Board then withheld notice of its *ex parte* filing from Defendants while simultaneously
2 using the threat of immediate injunctive relief as leverage to demand that Defendants cease lawful
3 operations in Nevada. No purported emergency could justify this conduct. Fundamental due process
4 requires that Defendants be afforded a meaningful opportunity to respond before the Court considers
5 extraordinary relief of this magnitude. The Court should deny the Board's request for an *ex parte*
6 temporary restraining order, permit Defendants to file an opposition on February 13, 2026, and set a
7 hearing no fewer than fourteen days thereafter. Once heard, the Court will also see that the Board's
8 request fails on the merits.

9                             **REQUEST FOR RELIEF**

10    Defendants respectfully request the opportunity to file an opposition to Plaintiff's Application
11 for a Temporary Restraining Order and Motion for Preliminary Injunction on February 13, 2026, and
12 that the Court schedule a hearing on Plaintiff's application no less than fourteen days thereafter.
13 Defendants do not waive—and expressly reserve—all defenses available to them, including, without
14 limitation, improper service of process and lack of personal jurisdiction.

15    The Board's attempt to obtain an *ex parte* temporary restraining order shutting down
16 Polymarket US's operations in Nevada is procedurally improper, substantively meritless, and violates
17 fundamental principles of due process. This Court should grant Defendants a meaningful opportunity
18 to be heard before the Court considers extraordinary, immediate injunctive relief.

19    A.      **The Board Failed to Comply with Basic Procedural Requirements for *Ex Parte***
20            **Relief.**

21    The Board made no effort to comply with the procedural rules governing *ex parte* relief. On
22 the eve of a holiday weekend, it filed this lawsuit and sought emergency relief without written
23 certification of any efforts to give notice or an explanation of why notice should not be required, as
24 Nevada procedural rules expressly require. *See* N.R.C.P. 65(b) (*ex parte* temporary restraining orders
25 require that "the movant's attorney certifies in writing any efforts made to give notice and the reasons
26 why it should not be required").

27    That omission appears to have been no accident. The Board made no effort whatsoever to
28 provide notice. It did not contact Defendants, did not send courtesy copies of its filings, and did not

DOTSON, HAYWARD
& VANCE, PC
1355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

3

3App337

1  provide any information about the nature of its claims or the relief it intended to seek.  In fact,

2  Defendants' counsel obtained a copy of the Complaint and Application only by retrieving it from the

3  clerk's office after the filing was processed on Tuesday, January 20.  And even then, the Application

4  included no declaration, affidavit, or proposed order, leaving Defendants unable to determine whether

5  the Board intended to seek *ex parte* relief or instead proceed by noticed motion.

6          Late Tuesday night, counsel for the Board emailed a copy of the Complaint—along with

7  requests to waive service—to Defendant QCX's Chief Compliance Officer.  That email apparently did

8  not attach, reference, or even mention the Application, let alone disclose that the Board was seeking an

9  *ex parte* temporary restraining order.

10     **B.     The Board Concealed Its *Ex Parte* Strategy While Engaging in Parallel**

11          **Communications.**

12          On Wednesday morning, before 7:00 a.m. Pacific Time, Defendants' counsel emailed counsel

13  for the Board requesting a meet-and-confer "about proposing an orderly briefing schedule and agreed-

14  upon hearing date" for the Board's Application.  Shortly thereafter, the Board's counsel agreed and

15  proposed a meet-and-confer for 9:00 a.m. the following day (Thursday)—again without any mention

16  that the Board was pursuing *ex parte* relief.

17          Yet more than five hours later, the Board filed a purported Errata to its Application, attaching

18  for the first time a Declaration from Chief Deputy Attorney General Jessica E. Whalen and a proposed

19  Temporary Restraining Order—documents the Board claimed were "inadvertently excluded from the

20  filing of the initial motion" and that purportedly did "not expand the scope of relief" sought.  The

21  Declaration asserted that "the BOARD does not have contact information to provide POLYMARKET

22  notice of this application."  That assertion was inaccurate at the time it was submitted.[2]  By then, the

23  Board had already communicated directly with Defendants' counsel and had scheduled a meet-and-

24  confer to discuss briefing and hearing logistics.

25          Critically, the Board failed to disclose to the Court that:

26          •     Defendants' counsel had contacted the Board;

---

27  [2]  *See* Nevada Rule of Professional Conduct 3.3 generally and 3.3(d) particularly ("In an *ex parte*
28  proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable
    the tribunal to make an informed decision, whether or not the facts are adverse.").

4

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

1       •   The parties were actively discussing an orderly briefing and hearing schedule; or

2       •   A meet-and-confer had already been scheduled.

3       Nor did the Board promptly notify Defendants or their counsel that it had filed the Errata

4   seeking *ex parte* relief. Defendants learned of the filing only during the meet-and-confer, when Board

5   counsel revealed—after the fact—that the documents had already been submitted.[3]

6       During that same meeting, Board counsel stated that the Board would withdraw its *ex parte*

7   request and agree to a briefing schedule only if Defendants ceased operations in Nevada. If Defendants

8   instead chose to oppose the TRO, Board counsel asserted that they lacked authority to agree to any

9   briefing schedule at all.

10      **C.**     **The Board's *Ex Parte* Request Is Tainted by Material Omissions and Tactical**

11             **Abuse.**

12      No purported emergency could justify this conduct. Even if the Board initially lacked contact

13  information when the Complaint was filed, that was no longer true when the Declaration was submitted.

14  By that time, the Board knew the identities of Defendants' counsel, had communicated with them, and

15  had scheduled a meet-and-confer to discuss an orderly process.

16      The Board has offered no explanation for withholding notice of its *ex parte* filing from opposing

17  counsel or for presenting the Court with a materially incomplete account of the parties'

18  communications. These facts demonstrate that the Board's *ex parte* filing was not the product of

19  necessity, but of tactical choice—one that deprived the Court of a complete factual record and deprived

20  Defendants of the process the law requires.

21      *Ex parte* relief is reserved for the rarest circumstances and demands the utmost candor. The

22  Board's conduct falls well short of that standard.

23      **D.**     **The Board's Request Also Fails on the Merits.**

24      Once afforded a fair opportunity to respond, Defendants will also establish that the Board's

25  request for injunctive relief fails on the merits.

26

27  [3] *See* Nevada Rule of Professional Conduct 3.5A ("When a lawyer knows or reasonably should know

    the identity of a lawyer representing an opposing party, he or she should not take advantage of the

28  lawyer by causing any default or dismissal to be entered without first inquiring about the opposing

    lawyer's intention to proceed.").

5

1       Defendant QCX LLC, which operates Polymarket US, is a designated contract market subject
2   to the "exclusive jurisdiction" of the CFTC.  7 U.S.C. § 2(a)(1)(A).  Federal law preempts the
3   application of state gambling laws to federally regulated contract markets, which cannot function under
4   a patchwork of conflicting state regimes.

5       As described in the footnote above, Defendant Adventure One QSS, Inc. does not operate in
6   Nevada at all.  It is a foreign corporation operating an international exchange not offered in the United
7   States, and it is not subject to personal jurisdiction in Nevada.  Defendant Blockratize, Inc. is not subject
8   to person jurisdiction either.

9       The Board's improper and meritless Application would inflict immediate and irreparable harm
10  on Defendants, their employees, their business partners, and their users.   .

11                                    **CONCLUSION**

12      For all of these reasons, the Court should deny the Board's request for an *ex parte* temporary
13  restraining order, permit Defendants to file an opposition on February 13, 2026, and schedule a hearing
14  on Plaintiff's application no fewer than fourteen days thereafter.

15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

6

3App340

**Affirmation Pursuant to NRS 239B.030**

    The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

    DATED this 22 day of January 2026.

DOTSON, HAYWARD & VANCE PC

ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
(775) 501-9400

GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER
*(Pro Hac Vice to be submitted)*
MATT BENJAMIN
*(Pro Hac Vice to be submitted)*
200 Park Avenue
New York, NY 10166
(212) 351-4000

GIBSON, DUNN & CRUTCHER LLP
THOMAS H. DUPREE JR.
*(Pro Hac Vice to be submitted)*
JACOB T. SPENCER
*(Pro Hac Vice to be submitted)*
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500

*Attorneys for Defendants BLOCKRATIZE, INC.*
*d/b/a POLYMARKET; QCX LLC d/b/a*
*POLYMARKET US*

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

7

### CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I hereby certify that I am an employee of DOTSON, HAYWARD & VANCE, PC and that on this date I caused to be served a true and correct copy of the foregoing by:

☒ (BY MAIL) on all parties in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At Dotson, Hayward & Vance, PC , mail placed in that designated area is given the correct amount of postage and is deposited that same date in the ordinary course of business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

☐ By electronic service by filing the foregoing with the Clerk of Court using the E-Flex system, which will electronically mail the filing to the following individuals.

☐ (BY PERSONAL DELIVERY) by causing a true copy thereof to be hand delivered this date to the address(es) at the address(es) set forth below.

☐ (BY FACSIMILE) on the parties in said action by causing a true copy thereof to be telecopied to the number indicated after the address(es) noted below.

☒ Email.

addressed as follows:

Jessica E. Whelan
Sabrena K. Clinton
John S. Michela
Abigail L. Pace
Nevada Office of the Attorney General
1 State of Nevada Way Ste 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
JMichela@ag.nv.gov
*Attorneys for Plaintiff*

DATED this 22 day of January 2026.

L. MORGAN BOGUMIL

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

8

REC'D & FILED

2026 JAN 23  PM 4: 20

WILLIAM SCOTT HOEN
CLERK
BY_____ DEPUTY

IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR CARSON CITY

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET,<br><br>　　　　　Defendants. | Case No.:  26 OC 00012 1B<br><br>Dept. No.: 1 |

**ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER
WITHOUT PREJUDICE AND SETTING HEARING ON
MOTION FOR PRELIMINARY INJUNCTION**

THIS MATTER is before the Court on a *Complaint for Permanent Injunction and Declaratory Relief* ("*Complaint*") and *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Application*") both of which were filed by the NEVADA GAMING CONTROL BOARD ("BOARD") on January 16, 2026.  Certificates of service accompanying both the *Complaint* and the *Application* reflect that they were sent by mail to three addresses purporting to be associated with the Defendants.

This Court reviewed the *Complaint* and *Application* and familiarized itself with the legal authority cited therein.  Initially, it was not clear whether the BOARD requested issuance of a

1 temporary restraining order without notice pursuant to NRCP 65(b)(1) as the *Application*

2 included an express request for hearing.  In any event, the initial *Application* failed to satisfy the

3 procedural requirements for issuance of a temporary restraining order without notice because

4 the *Complaint* is not verified and the *Application* was not supported by affidavit.  NRCP

5 65(b)(1) ("The court may issue a temporary restraining order without written or oral notice to

6 the adverse party or its attorney only if … specific facts in an affidavit or a verified complaint

7 clearly show that immediate and irreparable injury, loss, or damage will result to the movant

8 before the adverse party can be heard in opposition.…")  In addition, there was no written

9 certification by the BOARD's attorney concerning efforts to give notice to the Defendant

10 named in the *Complaint* and *Application*.  NRCP 65(b)(1)(B) ("The court may issue a

11 temporary retraining order without written or oral notice to the adverse party or its attorney only

12 if … the movant's attorney certifies in writing any efforts made to give notice.…")

13        Thereafter, additional filings have been made with the Court.  First, on January 21,

14 2026, the Board filed an *Errata to Plaintiff's Application for Temporary Restraining Order and*

15 *Motion for Preliminary Injunction* ("*Errata*").  The *Errata* consists of a *Declaration of Jessica*

16 *E. Whelan* ("*Declaration*") and a proposed *Temporary Restraining Order*.  On January 22,

17 2026, the *Defendants' Preliminary Response and Request for Opportunity to File Full*

18 *Opposition to Plaintiff's Application for Temporary Restraining Order and Motion for*

19 *Preliminary Injunction and to Attend Hearing and Be Heard Thereon* ("*Response*").  This Court

20 reviewed the *Errata* and *Response* and familiarized itself with the legal authority cited therein.

21        Based on the filings made to date, the Court rules as follows:

22        The BOARD's request for issuance of a temporary restraining order without notice is

23 deficient.  As indicated above, Nevada authorizes issuance of a temporary restraining order

24 without notice only if certain specific facts are clearly shown in an "affidavit or verified

25 complaint."  As also indicated above, the *Complaint* is not verified, and there is no "affidavit,"

26 as such, offered to establish the required factual basis.  Rather, the *Declaration* is provided in

27 lieu of an "affidavit."  Generally, an unsworn declaration is a legally sufficient substitute for an

28 affidavit under Nevada law, and the affidavit requirement of NRCP 65 is no exception.  NRS

1  53.045. However, a declaration must be "signed by the declarant under penalty of perjury," and

2  the *Declaration* before the Court is not. *Id.*

3        Further, the Declaration claims urges issuance of the temporary restraining order without

4  notice because POLYMARKET is an "unlicensed entity" and the Board lacks information by

5  which to provide it notice of the *Application*. Extending the BOARD the benefit of the doubt,

6  this statement was presumably true when the *Declaration* was signed on January 20 and when it

7  was filed on January 21. But it is no longer accurate. Therefore, formal notice of all filings and

8  proceedings going forward will be required.

9        For these reasons, the *Application* will be denied in its current form, although the denial

10  will be without prejudice to allow the BOARD to re-submit its request for a temporary

11  restraining order in a form that cures these deficiencies. As the *Application* is denied on

12  procedural grounds, this Court expresses no opinion concerning its merits at this time.

13        As to the *Application*'s corresponding request for a preliminary injunction, this Court

14  will set the matter for hearing as requested.

15        Therefore, good cause appearing,

16        **IT IS HEREBY ORDERED** that *Plaintiff's Application for Temporary Restraining*

17  *Order and Motion for Preliminary Injunction* is **DENIED WITHOUT PREJUDICE** insofar as

18  it requests issuance of a temporary restraining order.

19        **IT IS HEREBY FURTHER ORDERED** that a hearing on *Plaintiff's Application for*

20  *Temporary Restraining Order and Motion for Preliminary Injunction* will be held in the First

21  Judicial District Court, located at 885 East Musser Street, Carson City, Nevada, Department I,

22  on **February 19, 2026, at 1:30 p.m.**

23        Dated this 23rd day of January, 2026.

25  JASON D. WOODBURY
      DISTRICT JUDGE

**CERTIFICATE OF MAILING**

The undersigned, an employee of the First Judicial District Court, hereby certifies that on the _W_ day of January, 2026, I served the foregoing Order by placing a copy in the United States Mail, postage prepaid, addressed as follows:

Aaron D. Ford, Attorney General
Jessica E. Whelan, Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton, Senior Deputy Attorney General
John S. Michela, Senior Deputy Attorney General
State of Nevada
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

Jacob T. Spencer, Esq.
Gibson, Dunn & Crutcher, LLP
1700 M. Street, N.W.
Washington, D.C. 20036-4504

Orin Snyder, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Robert A. Dotson, Esq.
Daniel T. Hayward, Esq.
Justin C. Vance, Esq.
Dotson, Hayward & Vance, PC
5355 Reno Corporate Drive, Suite 100
Reno, NV 89511

Julie Harkleroad
Judicial Assistant, Dept. 1

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag,nv.gov
9  sclinton@ag.nv.gov

10  *Attorneys for Plaintiff*

11          **IN THE FIRST JUDICIAL DISTRICT COURT OF**

12        **THE STATE OF NEVADA IN AND FOR CARSON CITY**

13  STATE OF NEVADA ex rel. NEVADA          Case No. 26 0C 00012 1B
    GAMING CONTROL BOARD,
14
             Plaintiff(s),
15
    vs.
16
    BLOCKRATIZE, INC. d/b/a
17  POLYMARKET; QCX LLC d/b/a
    POLYMARKET US; ADVENTURE ONE
18  QSS, INC d/b/a POLYMARKET,,
19
             Defendants.
20

21      **PLAINTIFF'S RENEWED EX PARTE APPLICATION FOR TEMPORARY
                          RESTRAINING ORDER**
22

23          Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD

24  ("BOARD"), by and through its attorneys, hereby files this Renewed Ex Parte Application

25  for Immediate Temporary Restraining Order against BLOCKRATIZE, INC. d/b/a

26  POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC.

27  d/b/a POLYMARKET (collectively, "POLYMARKET"). The BOARD seeks to immediately

28  restrain and enjoin POLYMARKET and any of its agents, employees, officers, or affiliates

Page 1 of **15**

1   from operating a derivatives exchange and prediction market ("market") that offers event-

2   based contracts relating to sporting and other events to people within Nevada without

3   obtaining all required Nevada gaming licenses, and from allowing its market to accept

4   wagers from persons under the age of 21 in Nevada. This Renewed Application is made

5   pursuant to NRCP 65 and is based upon the following Memorandum of Points and

6   Authorities, the Declaration of Jessica E. Whelan, attached hereto as **Exhibit 1**, all papers

7   on file herein, and any oral argument this Court permits.

**MEMORANDUM OF POINTS AND AUTHORITIES**

9   **I.**     **FACTS**

10       **A.**     **The State Comprehensively Regulates Gaming in Nevada.**

11       Nevada has a long history of gaming regulation. Except for a brief period during

12   prohibition, Nevada has allowed some form of legalized gaming for over 150 years. *See*

13   Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling—A*

14   *Jurisdictional Overview*, 23 Gaming L. Rev. 645, 648 & n.18 (2019).

15       Nevada's gaming industry is "vitally important to the economy of the State and the

16   general welfare of the inhabitants." NRS 463.0129(1)(a). All entities that conduct gaming

17   in Nevada must "be licensed, controlled and assisted to protect the public health, safety,

18   morals, good order and general welfare of the inhabitants of the State." NRS 463.0129(1)(d).

19       The Nevada Legislature has found that the continued growth and success of gaming

20   "is dependent on public confidence and trust that licensed gaming" is "conducted honestly

21   and competitively." NRS 463.0129(1)(b). And the Legislature has made clear that "public

22   confidence and trust can only be maintained by *strict* regulation of all persons, locations,

23   practices, associates, and activities related" to the operation of gaming in Nevada. NRS

24   463.0129(1)(c) (emphasis added). The BOARD is statutorily charged with administering

25   and enforcing Nevada gaming law. NRS 463.140(1).

26       "Gaming" in Nevada is synonymous with "gambling" and includes any regulated

27   game. NRS 463.0153. A "game" subject to regulation in Nevada includes "any game played

28   with . . . equipment or any mechanical or electronic device or machine for money . . . or any

Page 2 of 15

1   representative of value" that is accessible in Nevada. NRS 463.0152. The games subject to

2   regulation in Nevada include "percentage game[s]." NRS 463.0152. A "percentage game"

3   exists where the "house" does not directly participate in a wager and its only stake is a

4   commission derived from the wager. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984).

5   Gaming includes operating a "sports pool," which is "the business of accepting wagers on

6   sporting events or other events by any system or method of wagering," NRS 463.0193; a

7   "wager" is "a sum of money or representative of value that is risked on an occurrence for

8   which the outcome is uncertain," NRS 463.01962.

9       Nevada law comprehensively regulates entities that conduct gaming activities in the

10  State. Every entity that makes gaming activities accessible in Nevada is subject to a

11  rigorous licensing process. NRS 463.160(1). Entities conducting gaming activities in the

12  State of Nevada must pay taxes on gross gaming revenue derived from gaming activities

13  accessible in the State. NRS 463.373. Licensed entities accepting wagers from persons in

14  the State of Nevada must have a physical location in Nevada. Nev. Gam'g Comm. Reg.

15  22.060(2). Licensed entities may not accept wagers from those under 21 years of age. NRS

16  463.350. Further, licensed entities accepting wagers on sporting events must employ

17  safeguards to ensure that wagers are not being placed on an event by owners, coaches,

18  players, or officials participating in the event, and must communicate with Nevada gaming

19  regulatory authorities about potential evidence of match fixing or point shaving. *See* Nev.

20  Gam'g Comm. Reg. 22.1205(2). Failing to enforce these laws would severely weaken the

21  State's ability to strictly regulate gaming and would jeopardize the growth and integrity of

22  Nevada's gaming industry, which is vitally important to its economy and the welfare of its

23  citizens.

24      **B.    POLYMARKET's Market is a Gambling Game and/or Sports Pool and
            Accepts Wagers from Persons in Nevada.**
25

26      POLYMARKET operates a market that offers event-based contracts relating to

27  sporting and other events. Compl. ¶ 20. These events include, but are not limited to, college

28  basketball games, college and professional football games, and elections. *Id.*

Page 3 of 15

1    POLYMARKET's event contracts are wagers under NRS 463.01962:
2    POLYMARKET's market allows persons located in Nevada to risk money on sporting
3    events and elections, and the outcomes of sporting events and elections are, by their very
4    nature, uncertain. *See, e.g.,* POLYMARKET, *Rams vs Bears*, perma.cc/6YNG-F4PN
5    (allowing a user to spend $0.36 on an event contract that pays out $1.00 if the Bears win
6    their January 18, 2026, playoff game against the Rams). POLYMARKET consequently
7    operates a "sports pool" under Nevada law. NRS 463.0193.

8    Further, POLYMARKET's market takes a commission, or percentage, on the wagers
9    placed through its market. *See* POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-
10   RADG. POLYMARKET accordingly offers a "percentage game"—a type of "gambling
11   game"—under Nevada law. NRS 463.0152.

12   A person can access POLYMARKET's market through its mobile app. Compl. ¶ 18.
13   POLYMARKET uses computers and servers to make its event-based contracts available on
14   its mobile app. *Id.* A person enters into an event-based contract on POLYMARKET's
15   market with the payment of money. *Id.*

16   **C.    POLYMARKET's Activities in Nevada Cause Harm to Nevada.**

17   Although POLYMARKET conducts gaming activity in Nevada, including by
18   operating a sports pool, POLYMARKET does not comply with Nevada gaming law. Among
19   other things, POLYMARKET has not undergone Nevada's rigorous licensing process to
20   obtain a gaming license for its wagering activities. Compl. ¶ 27. It accordingly does not
21   possess a Nevada license to conduct gaming activities, including operating a sports pool.
22   *Id.* ¶ 37. Further, POLYMARKET does not pay taxes on gross gaming revenue generated
23   from wagers placed by persons in Nevada. *Id.* ¶ 29. And POLYMARKET does not have a
24   physical location in Nevada. *Id.* ¶ 31.

25   POLYMARKET also does not comply with the various regulations on gaming that
26   Nevada has imposed to protect Nevada and its citizens. POLYMARKET does not require
27   its patrons to be at least 21 years of age to place a wager in its markets, Compl. ¶ 33;
28   instead, it allows anyone over the age of 18 to create an account and trade on its platform,

1   *see* POLYMARKET, *Terms of Service* (Aug. 26, 2025), perma.cc/L3Y2-U4YS. To Plaintiff's

2   knowledge, POLYMARKET does not employ adequate safeguards to ensure that wagers

3   are not being placed on an event by owners, coaches, players, or officials participating in

4   the event, and does not communicate about potential evidence of match fixing or point

5   shaving to Nevada regulatory authorities. Compl. ¶ 35.

6   **II.    PROCEDURAL HISTORY**

7        On January 16, 2026, the BOARD filed a Complaint for Permanent Injunction and

8   Declaratory Relief to obtain a declaration from this Court that POLYMARKET is violating

9   Nevada law and an injunction ordering POLYMARKET to cease its violations of Nevada

10  law. *See* Compl. 11. That same day, the BOARD filed an Application for Temporary

11  Restraining Order and Motion for Preliminary Injunction ("PI Motion"). *See* 1/16/26 PI Mot.

12  On January 21, 2026, the BOARD filed an Errata to its PI Motion, informing the Court

13  that it had inadvertently omitted a declaration in support of its Application for Temporary

14  Restraining Order, and including that declaration, as well as a proposed Temporary

15  Restraining Order. *See* 1/21/26 Errata.

16       On January 22, 2026, POLYMARKET filed a Preliminary Response and Request for

17  Opportunity to File Full Opposition to Plaintiff's Application for Temporary Restraining

18  Order and Motion for Preliminary Injunction and to Attend Hearing and Be Heard Thereon

19  ("Preliminary Opposition"). *See* 1/22/26 Preliminary Opp.

20       On January 23, 2026, this Court issued an order denying without prejudice the

21  BOARD's Application for Temporary Restraining Order and setting a hearing on the PI

22  Motion for February 19, 2026. *See* 1/23/26 Order. The Court's order denying the Application

23  for Temporary Restraining Order did so "on procedural grounds" and allowed the BOARD

24  to resubmit its request. *See* 1/23/26 Order at 3.

25       In this Renewed Application for Ex Parte Temporary Restraining Order, the BOARD

26  seeks an ex parte temporary restraining order prohibiting POLYMARKET and any of its

27  agents, employees, officers, or affiliates from operating a market that offers event-based

28  contracts relating to sporting and other events to people within Nevada without obtaining

1    the required Nevada gaming licenses, and prohibiting POLYMARKET from allowing its

2    market to accept wagers from persons under the age of 21 in Nevada. Notwithstanding the

3    ex parte nature of the relief sought, because the BOARD is now aware of and in contact

4    with counsel for POLYMARKET, the BOARD provided email notice to POLYMARKET's

5    counsel on January 26, 2026, in advance of this filing. *See* Ex. 1, ¶ 7. The BOARD

6    nonetheless seeks immediate, ex parte relief, as POLYMARKET's unlicensed and

7    unregulated operation in the State of Nevada is causing significant harm to the State, its

8    citizens, and its gaming industry, every day that it is permitted to continue operating. *Id.*

9    **III.   LEGAL STANDARD**

10           Nevada Rule of Civil Procedure 65(b) authorizes a court to issue an ex parte

11   temporary restraining order. Courts often apply similar standards for temporary

12   restraining orders and preliminary injunctions, as both are forms of injunctive relief aimed

13   at preventing harm before a final resolution of the case. *See, e.g., LIT Ventures, LLC v.*

14   *Carranza,* 457 F. Supp. 3d 906, 908 (D. Nev. 2020). A court should grant such relief when

15   it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded, and such

16   relief or any part thereof consists in restraining the commission or continuance of the act

17   complained of," NRS 33.010(1), and when "the commission or continuance of some act,

18   during the litigation, would produce great or irreparable injury to the plaintiff," NRS

19   33.010(2). The plaintiff must demonstrate two elements: (1) there is a reasonable likelihood

20   that the plaintiff will prevail in the underlying case and (2) absent a relief, the plaintiff will

21   suffer irreparable harm for which compensatory damages are not sufficient. *Elk Point*

22   *Country Club Homeowners' Ass'n, Inc. v. K.J. Brown, LLC,* 138 Nev. 640, 642, 515 P.3d 837,

23   839 (2022); *Posner v. U.S. Bank Nat'l Ass'n,* 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152

24   (Nev. 2024). The court may also consider the balance of hardships and the public interest.

25   *See Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't,* 120 Nev. 712, 721, 100

26   P.3d 179, 187 (2004).

27   / / /

28   / / /

1    The key question in issuing a temporary restraining order is whether the Plaintiff
2  has shown that it will suffer "immediate and irreparable injury." NRCP 65(b); *see State ex*
3  *rel. Friedman v. Eighth Jud. Dist. Ct. In & For Clark Cnty.*, 81 Nev. 131, 134, 399 P.2d 632,
4  633 (1965).

5    The requirements a temporary restraining order are met here. In particular, the
6  BOARD is suffering serious, ongoing, irreparable harm every day that POLYMARKET
7  operates its market in violation of Nevada law, and so the Court should immediately issue
8  an ex parte temporary restraining order.

9  **IV.    ARGUMENT**

10    POLYMARKET has been willfully circumventing Nevada law requiring all gaming
11  activity in the State to be strictly regulated and licensed. POLYMARKET operates a "sports
12  pool" and/or "gambling game" under Nevada law. Yet POLYMARKET does not possess a
13  Nevada license to operate a sports pool or conduct other gaming activity in Nevada.
14  POLYMARKET also does not follow many of the restrictions on licensed gaming in the
15  State. In particular, POLYMARKET allows persons under 21 years of age to wager on its
16  market. Accordingly, the BOARD is entitled to a temporary restraining order prohibiting
17  POLYMARKET from operating an unlicensed sports pool in Nevada and prohibiting
18  POLYMARKET from accepting wagers from persons under the age of 21.

19    **A.    Plaintiff is likely to succeed on the merits of its claims.**

20    The BOARD is likely to succeed in showing that POLYMARKET violates, at a
21  minimum, NRS 463.160, 463.350, 465.086, and 465.092.

22    POLYMARKET violates NRS 463.160. Pursuant to NRS 463.160, it is unlawful for
23  a person to expose a game or a sports pool for play in Nevada without the required gaming
24  licenses. POLYMARKET's market exposes a percentage game and/or sports pool for play
25  in Nevada. Compl. ¶¶ 18–24. POLYMARKET does not possess a Nevada gaming license
26  either to offer a percentage game or to operate a sports pool in Nevada. *Id.* ¶ 39.
27  Accordingly, POLYMARKET, in making its market available to persons located in Nevada,
28  has violated and continues to violate NRS 463.160.

1    POLYMARKET violates NRS 463.350. Pursuant to NRS 463.350, a person under the

2    age of 21 may not play, be allowed to play, place wagers at, or collect winnings from any

3    game or sports pool. POLYMARKET's market constitutes a percentage game and/or sports

4    pool. Compl. ¶¶ 18–24. Yet POLYMARKET's market does not restrict persons under the

5    age of 21 from participating. *Id.* ¶ 43. Accordingly, POLYMARKET, in making its market

6    available to persons located in Nevada who are under the age of 21, has violated and

7    continues to violate NRS 463.350.

8    POLYMARKET violates NRS 465.086. Pursuant to NRS 465.086(1), it is unlawful

9    for any person to directly or indirectly receive any compensation or any percentage or share

10    of the money played for accepting or facilitating any wager upon the result of any sporting

11    event without a gaming license. POLYMARKET is not licensed to accept wagers in Nevada.

12    Compl. ¶ 47. POLYMARKET's market accepts wagers in Nevada. *Id.* ¶ 48. In addition to

13    accepting wagers on the results of sporting events and other events, POLYMARKET's

14    market facilitates wagers on sporting events and other events between individual

15    participants in its market. *Id.* ¶ 49. POLYMARKET takes a percentage of money wagered

16    through its market in the form of commissions styled as "trading fees." POLYMARKET,

17    *Fees & Operating Hours*, perma.cc/FWA6-RADG. Accordingly, POLYMARKET, in

18    operating its market, has violated and continues to violate NRS 465.086.

19    POLYMARKET violates NRS 465.092. Pursuant to NRS 465.092, it is unlawful for

20    a person to knowingly accept a wager from a person inside of Nevada through a medium of

21    communication unless the person accepting the wager is licensed pursuant to Nevada law

22    and otherwise complies with applicable Nevada laws and regulations concerning wagering.

23    POLYMARKET's market accepts wagers on sporting events and other events. Compl. ¶ 54.

24    POLYMARKET's market accepts wagers from persons inside of Nevada. *Id.* ¶ 55. The

25    Internet is a medium of communication. NRS 465.091. POLYMARKET's market uses the

26    Internet for wagering activities. Compl. ¶ 57. Accordingly, in operating its market,

27    POLYMARKET is a person knowingly accepting wagers from persons inside of Nevada

28

1  through a medium of communication and has violated and continues to violate NRS

2  465.092.

3      For at least these reasons, POLYMARKET is violating Nevada gaming law. Yet

4  POLYMARKET has made clear that it will not voluntarily obtain a gaming license or

5  otherwise comply with Nevada gaming law. The BOARD therefore is likely to succeed on

6  the merits of its claims and obtain a permanent injunction from this Court enjoining

7  POLYMARKET from operating its market without complying with Nevada gaming law.

8      **B.    Plaintiff is suffering and will continue to suffer immediate and irreparable harm absent relief.**

9

10     Plaintiff suffers serious and irreparable harm every day that POLYMARKET

11  operates its market in violation of Nevada law. The Nevada Legislature has enacted a

12  "comprehensive regulatory structure, coupled with strict licensing standards" to ensure the

13  integrity of gaming in the State. NRS 463.745. Plaintiff is statutorily charged with

14  enforcing Nevada gaming law and overseeing Nevada's gaming industry, to protect the

15  reputation of the State of Nevada, to protect the reputation of gaming in Nevada, and to

16  protect the public health, safety, morals, good order, and general welfare of the inhabitants

17  of Nevada. NRS 463.140(1).

18     POLYMARKET's failure to comply with Nevada gaming law impairs the BOARD

19  from carrying out its statutory functions. For example, to ensure that wagering is fair,

20  Nevada gaming regulations prohibit accepting wagers on sporting events from owners,

21  coaches, players, officials, or other participants in the event and require licensees to take

22  reasonable steps to avoid circumvention of this regulation. Nev. Gam'g Comm. Reg.

23  22.1205(2). Licensed sports books also must: (1) obtain certain identification information

24  from patrons who place wagers of a certain size; (2) prevent multiple wagers designed to

25  circumvent the identification requirements for wagers of a certain size; and (3) prevent

26  wagers structured to circumvent the identification requirements. Nev. Gam'g Comm. Reg.

27  22.061, 22.062, and 22.063. Further, licensed sports books must communicate with the

28  BOARD about potential evidence of match fixing or point shaving. *See* Nev. Gam'g Comm.

1    Reg. 22.121. To Plaintiff's knowledge, POLYMARKET does not adhere to these

2    requirements, which harms the BOARD by preventing it from ensuring the integrity of

3    gaming in the State.

4         POLYMARKET's failure to comply with Nevada gaming law gives it a massive and

5    unfair competitive advantage over its competitors, which greatly disrupts the gaming

6    industry. That advantage is both pecuniary, in that POLYMARKET does not need to spend

7    the money its competitors need to spend on licensing fees, taxes, and compliance (including

8    maintaining a physical location in Nevada), as well as strategic, in that POLYMARKET's

9    products are not subject to the same requirements as its competitors. Plaintiff, which is

10   charged with ensuring that gaming in Nevada is fair, suffers irreparable harm when

11   POLYMARKET is able to distort the playing field and disrupt the industry in this manner.

12   *See Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509

13   (9th Cir. 1993).

14        The harm only increases the longer POLYMARKET is allowed to operate unfettered.

15   POLYMARKET's ability to profit from unlicensed gaming will incentivize others to enter

16   into prediction markets instead of becoming (or remaining) licensed by the State. Indeed,

17   that already has started to happen: DraftKings and FanDuel have decided to forgo

18   licensing in Nevada so that they can enter the prediction-markets business in other States.

19   *See KalshiEX LLC v. Hendrick*, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025), *appeal

20   pending*, No 25-7516 (9th Cir. filed Nov. 25, 2025). Other sportsbooks could follow suit,

21   "unleashing even more unregulated gambling." *Id.*

22        Thus, the harms caused by POLYMARKET are ongoing, serious, and irreparable.

23   The BOARD seeks to stop the harms caused by POLYMARKET.

24        **C.    The balance of hardships and the public interest weigh heavily in
            favor of granting an ex parte temporary restraining order.**

25

26        Compared to the ongoing, severe, irreparable harm that POLYMARKET's market

27   causes to the BOARD and to the State, any harms that POLYMARKET claims to suffer

28   from an injunction are insignificant. Indeed, the BOARD seeks only for POLYMARKET to

Page **10** of 15

1  follow Nevada gaming law, and following the law is not a harm. *See Goldman v. Newage*

2  *Lake Las Vegas, LLC,* 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019).

3      POLYMARKET may contend that federal law preempts Nevada gaming law, and

4  that it is harmed by being required to follow preempted law. But a federal district court

5  evaluating this argument brought by POLYMARKET's competitor concluded that the

6  competitor is not likely to prevail on the argument. *KalshiEX,* 2025 WL 3286282, at *6–12.

7      The public interest similarly weighs in favor of enjoining POLYMARKET from

8  violating Nevada gaming law. The Legislature has determined that "[p]ublic confidence

9  and trust can only be maintained by strict regulation of all persons, locations, practices,

10  associations and activities related to the operation of licensed gaming establishments."

11  NRS 463.0129(1)(c). "All establishments where gaming is conducted . . . must therefore be

12  licensed, controlled and assisted to protect the public health, safety, morals, good order and

13  general welfare of the inhabitants of the State." NRS 463.0129(1)(d). The Legislature thus

14  has determined that the public interest requires *all* gaming operators to be licensed and to

15  follow Nevada gaming law. Any gaming business, including POLYMARKET, that does not

16  comply with Nevada gaming law poses a threat to this vital industry.

17      In particular, POLYMARKET does not adhere to the consumer-protection

18  requirements in Nevada law. To start, POLYMARKET's operations harm some of Nevada's

19  most vulnerable residents. Nevada law prohibits persons under 21 from placing sports

20  wagers, NRS 463.350(1)(a), but POLYMARKET does not require its participants to be 21

21  years of age. Nevada law also protects those suffering from problem gaming by requiring,

22  among other measures, that gaming licensees letting patrons set deposit limits,

23  "conspicuously display" information about responsible-gaming resources, train employees

24  to identify signs of problem gaming, and refrain from marketing to customers who have

25  excluded themselves. Nev. Gam'g Comm. Reg. 5.225(18)(a)-(b). To Plaintiff's knowledge,

26  POLYMARKET does not adhere to these requirements to the extent required by Nevada

27  law.

28  / / /

Page **11** of 15

1    POLYMARKET's operations further harm the gaming public because

2  POLYMARKET does not participate in the State's process to resolve patron disputes. *See*

3  NRS 463.362 *et seq.* Patrons of licensed gaming establishments may utilize a process with

4  the BOARD to resolve disputes related to wagering activities. But this structure is in place

5  only for disputes between a Nevada licensee and its patron. NRS 463.362. A person

6  entering a wager through an event contract available on POLYMARKET's market is not a

7  patron of a Nevada licensee and, thus, pursuant to the applicable statutes, has no recourse

8  should there be a dispute over the wager. POLYMARKET's market thus harms the public

9  interest because it does not provides adequate protection to purchasers of event contracts.

10    POLYMARKET also harms the State's economy and the public fisc. Licensed gaming

11  is "vitally important to the economy of the State and the general welfare of the inhabitants."

12  NRS 463.0129(1)(a). All licensed gaming operators must pay taxes, *see* NRS 463.370—

13  revenues that finance "indispensable" State functions, from schools to highways. *Sacco v.*

14  *State*, 105 Nev. 844, 847 (1989). POLYMARKET's unlicensed gaming operations threatens

15  that revenue, by evading taxes and diverting business from licensed sports books that pay

16  taxes, and thus "represents a serious threat to the state's economic base." *Id.* Allowing

17  POLYMARKET to offer unlawful gaming activities risks "devastating the Nevada economy

18  and related tax revenues." *KalshiEX*, 2025 WL 3286282, at *14. The public interest thus

19  weighs decisively in favor of enjoining POLYMARKET.

20    **D.    The Court should extend the temporary restraining order until**
21  **February 19, 2026, the date of its hearing on the PI Motion.**

22    NRCP 65(b)(2) states that a temporary restraining order expires no later than

23  fourteen days after its issuance. Should the Court issue the temporary restraining order

24  today, the temporary restraining order would expire, on its own terms, on February 9, 2026.

25  However, the Court has set a hearing on the PI Motion for February 19, 2026, *see* 1/23/26

26  Order, and therefore good cause exists to extend the effectiveness of the temporary

27  restraining order until that date. To allow the temporary restraining order to expire before

28  the hearing on the PI Motion would be to allow the substantial harms to the BOARD, the

Page **12** of **15**

1    State, its citizens, and its gaming industry to resume unchecked. Therefore, the BOARD

2    respectfully requests that the temporary restraining order be extended up to and including

3    February 19, 2026.

4        **E.    No security is required.**

5        NRCP 65(b)(c) generally requires that a party in whose favor a temporary

6    restraining order is issued post security "in an amount that the court considers proper to

7    pay the costs and damages sustained by any party found to have been wrongfully enjoined

8    or restrained." However, that same provision requires unequivocally that "[t]he State, its

9    officers, and its agencies are not required to give security." Therefore, the ex parte

10   temporary restraining order can and should be issued and effective without the posting of

11   security.

12                              **CONCLUSION**

13       The Court should grant this renewed application for ex parte temporary restraining

14   order and immediately enter an order prohibiting POLYMARKET and any of its agents,

15   employees, officers, or affiliates from operating a market that offers event-based contracts

16   relating to sporting and other events to people in Nevada without obtaining all required

17   Nevada gaming licenses, and prohibiting POLYMARKET from allowing its market to

18   accept wagers from persons under the age of 21 in Nevada.

19

20

21

22

23

24

25

26   / / /

27   / / /

28   / / /

1

2

## AFFIRMATION
### (Pursuant to NRS 239B.030)

3        The undersigned does hereby affirm that the foregoing document does not contain

4    the social security number of any person.

5        Dated: January 26, 2026.

6                                    AARON D. FORD
                                     Attorney General
7

8                          By: _____ #11543

9                              Jessica E. Whelan (Bar No. 14781)
                                 Chief Deputy Solicitor General – Litigation
10                             John S. Michela (Bar No. 8189)
                                 Senior Deputy Attorney General
11                             Sabrena K. Clinton (6499)
                                 Senior Deputy Attorney General
12                             State of Nevada
                               Office of the Attorney General
13                             1 State of Nevada Way, Suite 100
                               Las Vegas, NV 89119
14                             jwhelan@ag.nv.gov
                               jmichela@ag.nv.gov
15                             sclinton@ag.nv.gov

16                             *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

Page **14** of **15**

# EXHIBIT 1

1  AARON D. FORD
   Attorney General
2  Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10 *Attorneys for Plaintiff*

11        **IN THE FIRST JUDICIAL DISTRICT COURT OF**
          **THE STATE OF NEVADA IN AND FOR CARSON CITY**
12
   STATE OF NEVADA ex rel. NEVADA          Case No. 26 0C 00012 1B
13 GAMING CONTROL BOARD,

14         Plaintiff(s),

15 vs.

16 BLOCKRATIZE, INC. d/b/a
   POLYMARKET; QCX LLC d/b/a
17 POLYMARKET US; ADVENTURE ONE
   QSS, INC d/b/a POLYMARKET,,
18
           Defendants.
19

20        **DECLARATION OF JESSICA E. WHELAN IN SUPPORT OF PLAINTIFF'S**
          **RENEWED APPLICATION FOR EX PARTE TEMPORARY RESTRAINING**
21                                    **ORDER**

22     I, Jessica E. Whelan, declare as follows:

23     1.     I am the Chief Deputy Solicitor General—Litigation in the Nevada Attorney

24 General's Office, and I make this declaration in support of Plaintiff's renewed application

25 for an *ex parte* temporary restraining order under NRS 463.346 and NRCP 65(b). All facts

26 stated herein are based on my personal knowledge

27     2.     On October 15, 2025, the Nevada Gaming Control Board ("BOARD") issued

28 public guidance explaining that "it considers offering sports event contracts, or certain

                                    Page 1 of 4

1   other events contracts, as constituting wagering activity under NRS 463.0193 and

2   463.01962," regardless of whether "the contract is listed on an exchange regulated by the

3   Commodity Futures Trading Commission (CFTC) or elsewhere." Nev. Gaming Control Bd.,

4   *Notice to Licensees No. 2025-77: Sports Event Contracts Are Wagers* 1 (Oct. 15, 2025),

5   perma.cc/7XEH-BZLV. The BOARD further explained that "[e]xamples of event contracts

6   that the Board specifically considers to be wagering subject to its jurisdiction include event

7   contracts based on the outcome or partial outcome of any sporting or athletic event, or other

8   selected events such as the World Series of Poker, the Oscars, Esports, and political

9   elections." *Id.*

10       3.      The BOARD also explained that "[o]fferings for Sports and Other Events

11   Contracts may be conducted in Nevada only if the offering entity possesses a nonrestricted

12   gaming license with sports pool approval in Nevada and meets the other requirements for

13   sports wagering including, without limitation, wagering accounts and sports book

14   systems." *Id.*

15       4.      Accordingly, as of October 15, 2025, the Board had provided public notice to

16   all entities that allow for the purchase or sale of event contracts based on the outcome of

17   sporting and certain other events in Nevada without possessing a gaming license with

18   sports pool approval that such conduct violates Nevada law.

19       5.      Defendants BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a

20   POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively,

21   "POLYMARKET") operate a market that offers event-based contracts relating to sporting

22   and other events. Compl. ¶ 20. These events include, but are not limited to, college

23   basketball games, college and professional football games, and elections. *Id.* Although

24   POLYMARKET's website states that POLYMARKET is "not available to . . . persons

25   located in the United States," users in Nevada are able to access POLYMARKET by signing

26   up for an account through its mobile app. *Id.* ¶ 18.

27       6.      POLYMARKET's activities meet the definition of a "game" subject to

28   regulation in Nevada—specifically, it operates a "sports pool" under Nevada law.

1    *See* Compl. ¶¶ 18-23. But despite conducting gaming accessible in the State of Nevada,

2    POLYMARKET is not licensed in Nevada and does not comply with Nevada gaming law.

3    *Id.* ¶ 25. It has not undergone Nevada's rigorous licensing process for its gaming activities,

4    nor has does it comply with the restrictions and requirements of Nevada law for operators

5    of sports pools. *See id.* ¶¶ 26, 35.

6        7.    On January 26, 2026, undersigned counsel provided notice to counsel for

7    POLYMARKET via email that the BOARD intended to file its Renewed Application for Ex

8    Parte Temporary Restraining Order on the same date. *See* **Exhibit 1-1** (1/26/26 email from

9    J. Whelan to opposing counsel). Despite notice being given to counsel for POLYMARKET,

10   the BOARD requests issuance of a temporary restraining order on an *ex parte* basis because

11   POLYMARKET's activities in Nevada are causing immediate and irreparable injury to

12   Plaintiff and the State of Nevada and will continue to do so before POLYMARKET can be

13   heard in opposition to Plaintiff's renewed application.

14       8.    The BOARD enforces Nevada gaming law and oversees the State's gaming

15   industry to protect the integrity and reputation of gaming in Nevada and to safeguard the

16   public. POLYMARKET's failure to comply with Nevada gaming law harms the public. For

17   example, Nevada law prohibit persons under the age 21 from engaging in gaming, yet

18   POLYMARKET allows those as young as 18 to wager on its platform. Nevada law also

19   prohibits wagers by owners, coaches, players, officials, or other participants in sporting

20   events and require licensees to take reasonable steps to prevent circumvention of that rule.

21   To the undersigned counsel's knowledge, POLYMARKET does not comply with these

22   requirements.

23       9.    POLYMARKET's failure to comply with Nevada gaming law also gives it a

24   massive and unfair competitive advantage over its competitors, which upends the gaming

25   industry. That advantage is both pecuniary, in that POLYMARKET does not need to

26   spend the money its competitors need to spend on licensing fees, taxes, and compliance

27   (including maintaining a physical location in Nevada), as well as strategic, in that

28   POLYMARKET's products are not subject to the same requirements as its competitors.

1  The BOARD suffers irreparable harm when POLYMARKET is able to distort the playing

2  field and disrupt the industry in this manner.

3       10.    The harm only increases the longer POLYMARKET is allowed to operate

4  unfettered. POLYMARKET's ability to profit from unlicensed gaming will incentivize

5  others to enter into prediction markets rather than becoming (or remaining) licensed by

6  the State.

7       11.    Plaintiff and the State of Nevada are currently suffering the serious, ongoing,

8  and irreparable harms outlined above every day that POLYMARKET operates its market

9  in violation of Nevada law. These harms justify issuance of the temporary restraining order

10  on an *ex parte* basis without notice to POLYMARKET or an opportunity for it to respond.

11       I declare under penalty of perjury that the foregoing is true and correct.

12       Dated this 26th day of January, 2026.

13

14       By: _____

15           JESSICA E. WHELAN

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 4 of 4

# EXHIBIT 1-1

| | |
|---|---|
| **From:** | Jessica E. Whelan |
| **To:** | Spencer, Jacob T.; OSnyder@gibsondunn.com; Benjamin, Matt; TDupree@gibsondunn.com; "Robert Dotson"; morgan.dhvnv |
| **Cc:** | Sabrena K. Clinton; John S. Michela; Jeny M. Beesley |
| **Subject:** | State of Nevada v. Polymarket - Notice of Filing of Renewed Application for Ex Parte Temporary Restraining Order |
| **Date:** | Monday, January 26, 2026 1:21:12 PM |
| **Attachments:** | image001.png |

Counsel,

Pursuant to NRCP 65(b)(1), I am hereby providing you notice that the State intends to file a Renewed Application for Ex Parte Temporary Restraining Order in the 1st Judicial District Court today. We are providing you notice but will ask the Court to sign the TRO on an ex parte basis given the substantial and irreparable harm that the State is facing due to Polymarket's unlicensed and unregulated operation in the State. I will provide a courtesy copy by email of our filing, as we agreed last week.

If you have reconsidered our proposal to cease operating in the State while the Motion for Preliminary Injunction is pending, please let me know and we can discuss.

Thank you,
Jessica

Jessica E. Whelan
Chief Deputy Solicitor General - Litigation
Office of the Attorney General
1 State of Nevada Way
Suite 100
Las Vegas, Nevada 89119
jwhelan@ag.nv.gov
D: 702-486-4346



*Notice: This e-mail message and any attachments thereto may contain confidential, privileged, or non-public information. Use, dissemination, distribution, or reproduction of this information by unintended recipients is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy all copies.*

1

**CERTIFICATE OF SERVICE**

2      I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3    and that on January 26, 2026, I deposited for mailing in the United States Mail, first-class

4    postage prepaid, at Carson City, a true and correct copy of the foregoing document,

5    addressed to the following:

6    Jacob T. Spencer, Esq.     Blockratize, Inc. d/b/a Polymarket
  Gibson, Dunn & Crutcher LLP   C/O Corporation Service Company
7     1700 M Street, N.W.      251 Little Falls Drive
  Wahington, D.C. 20036-4504   Wilmington, DE 19808
8     JSpencer@gibsondunn.com

9    *Attorneys for Defendants*

10   QCX LLC d/b/a Polymarket US   Adventure One QSS, Inc. d/b/a
  C/O Corporation Service Company  Polymarket
11    251 Little Falls Drive     1280 Lexington Ave
  Wilmington, DE 19808     New York, NY 10028

12

13

14            AG Legal Secretary, an employee of
         the Office of the Nevada Attorney General

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  ROBERT A. DOTSON
   Nevada State Bar No. 5285
2  DANIEL T. HAYWARD
   Nevada State Bar No. 5986
3  JUSTIN C. VANCE
   Nevada State Bar No. 11306
4  DOTSON, HAYWARD & VANCE, PC
   5355 Reno Corporate Drive, Ste 100
5  Reno, Nevada 89511
   Tel:    (775) 501-9400
6  Email: rdotson@dhvnv.com
           dhayward@dhvnv.com
7          jvance@dhvnv.com
8
9  Orin Snyder (*pro hac vice forthcoming*)
   GIBSON, DUNN & CRUTCHER LLP
10 200 Park Avenue
   New York, NY 10166
11 212.351.4000
   OSnyder@gibsondunn.com
12

13 *Attorneys for Defendants BLOCKRATIZE, INC.*
   *d/b/a POLYMARKET; QCX LLC d/b/a*
14 *POLYMARKET US*

15 *Additional counsel listed on signature page*
16

17        **IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

18                    **IN AND FOR CARSON CITY**

19 STATE OF NEVADA ex rel. NEVADA
   GAMING CONTROL BOARD,
20
21            Plaintiff,
22 v.                                          Case No. 26-OC-00012-1B
                                               Department No. I
23 BLOCKRATIZE, INC., d/b/a POLYMARKET;
   QCX, LLC, d/b/a POLYMARKET US; and
24 ADVENTURE ONE QSS, INC., d/b/a
   POLYMARKET,
25
26            Defendants.
27 **DEFENDANTS' PRELIMINARY RESPONSE AND RENEWED REQUEST FOR**
   **OPPORTUNITY TO FILE FULL OPPOSITION TO PLAINTIFF'S RENEWED**
28 **APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER**

                                    1

1    Defendants BLOCKRATIZE, INC., d/b/a POLYMARKET, and QCX, LLC, d/b/a

2    POLYMARKET US ("Defendants"), by and through their counsel, hereby provide the following

3    preliminary response:[1]

### REQUEST FOR RELIEF

5    The Court should deny the Nevada Gaming Control Board's renewed request for an *ex parte*

6    temporary restraining order. The Board has not met the demanding standard required for such

7    extraordinary relief. The Court should instead permit Defendants to file a full opposition to the Board's

8    application for injunctive relief, in accordance with a normal briefing schedule, on or before February

9    2, 2026. The Court should then hear arguments on any request for a temporary restraining order or

10   preliminary injunction.

11   This is the Board's second attempt to obtain extraordinary *ex parte* relief without affording

12   Defendants a meaningful opportunity to be heard. The Court has already rejected the Board's first effort

13   as "deficient." Order Denying TRO at 2. The Board's renewed application fares no better. Although

14   the Board repackages its allegations in a newly sworn declaration, it still fails to present the "specific

15   facts" that "clearly show" an immediate and irreparable injury necessary to justify *ex parte* relief under

16   N.R.C.P. 65(b)(1)(A). Worse, the Board either has not filed or (in violation of this Court's Friday order)

17   has not served Defendants with a proposed order for the renewed motion. So, as with the Board's first

18   filing, Defendants have no way of knowing precisely what the Board is asking the Court to order

19   Defendants to do – or how it differs from the original request.

20   Equally troubling, the Board's submission omits material facts known to it that undermine any

21   claim of emergency, including:

22   1. Jurisdictional Misstatements. Defendant Adventure One QSS is a Panamanian corporation

23   that does no business in Nevada. The Board nevertheless seeks emergency relief against that foreign

24   entity.

25

26

---

27   [1] Adventure One QSS, Inc, is not a U.S. corporation and does no business in Nevada. To the extent
necessary, this should be considered a special appearance. Defendants do not waive—and expressly
28   reserve—all defenses available to them, including, without limitation, improper service of process and
lack of personal jurisdiction.

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

2

2. Absence of Urgency. Just last year, a federal district court in Nevada enjoined the Board from enforcing its gaming laws against another federally designated contract market for six months. *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *2 (D. Nev. Apr. 9, 2025). The Board did not appeal that injunction. Its inaction in that case undermines any claim of imminent harm now.

3. Exclusive Federal Jurisdiction. Polymarket US operates a federally designated contract market subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission. 7 U.S.C. § 2(a)(1)(A). Congress established a comprehensive federal regulatory regime governing such markets to ensure fair and financially secure trading facilities, protect market participants, and promote responsible innovation and fair competition. *See id.* § 5. The Board's application asks this Court to disrupt that federally regulated system through emergency relief, without briefing, evidence, or adversarial testing.

Granting an *ex parte* temporary restraining order under these circumstances would be neither fair nor prudent. It would disrupt national trading on a federally regulated exchange. It would impose irreparable harm on Defendants and third parties. It would enjoin a foreign corporation lacking meaningful contacts with Nevada. And it would reward an attempt to bypass both exclusive federal regulatory authority and fundamental principles of due process.

There is a more sensible and orderly course. Defendants are prepared to file a comprehensive opposition, addressing the applicable facts and law as well as the numerous other deficiencies in the Board's applications for injunctive relief. Defendants anticipate making that filing by February 2, 2026—or by any shortened deadline the Court deems appropriate. To satisfy the demands of due process, the Court should permit that briefing and consider the complete record at a hearing, where the parties can address any questions the Court might have.

## CONCLUSION

The Court should deny the Board's renewed request for an *ex parte* temporary restraining order, permit Defendants to file their opposition on February 2, 2026, and consider all requests for injunctive relief on a full and adversarial record at a hearing. If the Court denies the request for *ex parte* relief, Defendants will work with counsel for the Board to propose a mutually agreeable hearing date, since Defendants' lead counsel is not available on February 19. If the Court does grant *ex parte* relief, the

3

1  Court should set an immediate hearing.  *See* N.R.C.P. 65(b)(3).  Lead counsel for Defendants would

2  be available for that hearing any day from February 4 through February 18 except February 12.

**Affirmation Pursuant to NRS 239B.030**

4    The undersigned does hereby affirm that the preceding document does not contain the social

5  security number of any person.

6    DATED this 27 day of January 2026.

7    DOTSON, HAYWARD & VANCE PC

10  ROBERT A. DOTSON
    Nevada State Bar No. 5285
11  DANIEL T. HAYWARD
    Nevada State Bar No. 5986
12  JUSTIN C. VANCE
    Nevada State Bar No. 11306
13  5355 Reno Corporate Drive, Ste 100
    Reno, Nevada 89511
14  (775) 501-9400

15
16  GIBSON, DUNN & CRUTCHER LLP
    ORIN SNYDER *(Pro Hac Vice to be submitted)*
    MATT BENJAMIN *(Pro Hac Vice to be submitted)*
17   200 Park Avenue
    New York, NY 10166
18  (212) 351-4000
19  OSnyder@gibsondunn.com
    MBenjamin@gibsondunn.com
20
21  GIBSON, DUNN & CRUTCHER LLP
    THOMAS H. DUPREE JR.
22  *(Pro Hac Vice to be submitted)*
    JACOB T. SPENCER *(Pro Hac Vice to be submitted)*
23   1700 M Street, N.W.
    Washington, DC  20036-4504
24  (202) 955-8500
    TDupree@gibsondunn.com
25  JSpencer@gibsondunn.com
26
    *Attorneys for Defendants BLOCKRATIZE, INC.*
27  *d/b/a POLYMARKET; QCX LLC d/b/a*
    *POLYMARKET US*
28

4

**CERTIFICATE OF SERVICE**

1

2      Pursuant to NRCP 5(b), I hereby certify that I am an employee of DOTSON, HAYWARD &

3    VANCE, PC and that on this date I caused to be served a true and correct copy of the foregoing by:

4      ☒    (BY MAIL) on all parties in said action, by placing a true copy thereof enclosed in a
            sealed envelope in a designated area for outgoing mail, addressed as set forth below.
5            At Dotson, Hayward & Vance, PC , mail placed in that designated area is given the
            correct amount of postage and is deposited that same date in the ordinary course of
6            business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

7

8      ☐    By electronic service by filing the foregoing with the Clerk of Court using the E-Flex
            system, which will electronically mail the filing to the following individuals.

9      ☐    (BY PERSONAL DELIVERY) by causing a true copy thereof to be hand delivered
10           this date to the address(es) at the address(es) set forth below.

11     ☐    (BY FACSIMILE) on the parties in said action by causing a true copy thereof to be
            telecopied to the number indicated after the address(es) noted below.
12

13     ☒    Email.

14   addressed as follows:

15     Jessica E. Whelan
       Sabrena K. Clinton
16     John S. Michela
       Nevada Office of the Attorney General
17     1 State of Nevada Way Ste 100
       Las Vegas, NV 89119
18     jwhelan@ag.nv.gov
19     sclinton@ag.nv.gov
       JMichela@ag.nv.gov
20     *Attorneys for Plaintiff*

21     DATED this ⟨⟨ day of January 2026.

22

23

24                                              L. MORGAN BOGUMIL

25

26

27

28

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

5

REC'D & FILED

2026 JAN 29 AM 9: 09

WILLIAM SCOTT HOEN
CLERK

BY _____
DEPUTY

IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR CARSON CITY

STATE OF NEVADA ex rel. NEVADA
GAMING CONTROL BOARD,

        Plaintiff,

    vs.

BLOCKRATIZE, INC. d/b/a
POLYMARKET; QCX LLC d/b/a
POLYMARKET US; ADVENTURE ONE
QSS, INC. d/b/a POLYMARKET,

        Defendants.

Case No.:  26 OC 00012 1B

Dept. No.: 1

## ORDER GRANTING PLAINTIFF'S RENEWED *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

THIS MATTER is before the Court on a *Complaint for Permanent Injunction and Declaratory Relief* ("*Complaint*") filed January 16, 2026 by the NEVADA GAMING CONTROL BOARD ("BOARD") and *Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Renewed Application*") filed by the BOARD on January 26, 2026. With the *Renewed Application*, the BOARD included the *Declaration of Jessica E. Whelan in Support of Plaintiff's Renewed Application for Ex Parte Temporary Restraining Order* ("*Declaration*"). Previously, in response to *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Original Application*") filed January 16, 2026 and *Errata to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Errata*") filed January 21, 2026, the

1  *Defendants' Preliminary Response and Request for Opportunity to File Full Opposition to*

2  *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction*

3  *and to Attend Hearing and Be Heard Thereon* was filed January 22, 2026 ("*Original*

4  *Opposition*").  And in response to the *Renewed Application*, *Defendants' Preliminary Response*

5  *and Renewed Request for Opportunity to File Full Opposition to Plaintiff's Renewed*

6  *Application for Ex Parte Temporary Restraining Order* was filed January 27, 2026 ("Renewed

7  Opposition").  The *Original Opposition* and *Renewed Opposition* are collectively referred to as

8  the "*Opposition*" hereinafter.  The *Original Application* and *Errata* were previously denied on

9  procedural grounds without prejudice to the BOARD to resubmit the *Application*, and the

10  BOARD's request for a preliminary injunction was scheduled for a hearing on February 19,

11  2026.  The Court has reviewed the *Complaint*, *Renewed Application*, and *Opposition* and

12  familiarized itself with the legal authorities cited therein.

13  **A. LEGAL STANDARD**

14  As pertinent to the *Renewed Application*, NRCP 65 provides:

15  **(b) Temporary Restraining Order.**

16  
17  (1) **Issuing Without Notice.**  The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

18  (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

19  
20  
21  (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

22  
23  ....

24  \\\\

25  \\\\

26  \\\\

27  \\\\

28  \\\\

**(d)  Contents and Scope of Every Injunction and Restraining Order.**

> (1) **Contents.**  Every order granting an injunction and every
> restraining order must:
>> (A) state the reasons why it issued;
>> (B) state its terms specifically; and
>> (C) describe in reasonable detail—and not by referring to
>> the complaint or other document—the act or acts restrained
>> or required.

> (2) **Persons Bound.**  The order binds only the following who
> receive actual notice of it by personal service or otherwise:
>> (A) the parties;
>> (B) the parties' officers, agents, servants, employees, and
>> attorneys; and
>> (C) other persons who are in active concert or participation
>> with anyone described in Rule 65(d)(2)(A) or (B).

Nevada law further explains that the injunctive relief of a temporary restraining order is authorized when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded"; the relief involves "restraining the commission or continuance of the act complained of"; and when continuance of the act "would produce great or irreparable injury to the plaintiff." NRS 33.010; *Posner v. U.S. Bank N.A.*, 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152 (Nev. 2024) (holding injunctive relief is "'proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent [such relief], it will suffer irreparable harm for which compensatory damages would not suffice.'" (*quoting Excellence Cmty. Mgmt., LLC v. Gilmore*, 131 Nev. 347, 351, 351 P.3d 720, 722 (Nev. 2015))).

In addition, the balance of hardships and public interest may be considered in determining whether injunctive relief is warranted and, if so, the scope and nature of that relief. *University & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

\\\\

\\\\

\\\\

\\\\

\\\\

**B. ANALYSIS**

    **1. Based on the information that has been presented at this early stage in the proceedings, the BOARD appears to be reasonably likely to prevail on the merits of the underlying case.**

Here, the *Complaint*, *Application*, and *Declaration* satisfy the requirements of NRCP 65(b)(1) for issuance of the requested temporary restraining order without notice. As a threshold matter, the BOARD has a "reasonable likelihood of success on the merits." First, the *Complaint* establishes that gaming in Nevada is expansively and strictly regulated. The BOARD, in conjunction with the Nevada Gaming Commission, has virtually comprehensive statutory authority over gaming in Nevada. *See generally* Nev. Rev. Stat. ch. 463. The strict regulation of gaming promotes the public interest in several respects, including the prevention of underage gambling, preservation of the integrity of the events which are the subject of gaming wagers, and exclusion of unsuitable individuals from gaming activities. NRS 463.166, .350, *Nev. Gam'g Comm. Reg.* 22.1205(2). Gaming in Nevada may only be conducted by an entity licensed under the authority of the Nevada Gaming Control Act. NRS 463.160

Second, "gaming" as used in Nevada law includes a "percentage game," and a "wager" in a "sports pool." NRS 493.0152, .0193, .01962. "Percentage games are … games where patrons wager against each other and the house takes a percentage of each wager as a 'rake-off.'" *Hughes Properties v. State*, 100 Nev. 295, 297, 680 P.2d 970, 971 (1984). A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962. And a "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193.

Third, the record at this early stage in the proceedings indicates BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET") are not licensed under the Nevada Gaming Control Act.

\\\\

1     Fourth, the record at this early stage in the proceedings indicates POLYMARKET offers

2 "event-based contracts" that relate to sporting and other events, including college basketball

3 games, college and professional football games and elections.  Under Nevada law, this conduct

4 constitutes the operation of a "sports pool" as it involves the acceptance of "wagers" concerning

5 "sporting events or other events" "for which the outcome is uncertain."  Further, the record

6 indicates POLYMARKET takes a commission on contracts purchased through its system,

7 meaning it is operating a "percentage game" as defined in Nevada law.

8     And, finally, the Court has considered POLYMARKET's contention that it "operates a

9 federally designated contract market subject to the 'exclusive jurisdiction' of the Commodity

10 Futures Trading Commission."  As such, POLYMARKET asserts federal law, specifically 7

11 U.S.C. §2(a)(1)(A), preempts the BOARD's effort to subject its "event-based contracts" to

12 Nevada law.  The question of federal preemption in this regard is nuanced and rapidly evolving.

13 At the moment, the balance of convincing legal authority weighs against federal preemption in

14 this context.  *See KalshiEx, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist.

15 LEXIS 234246 at *11-38 (D. Nev. Nov. 24, 2025) [hereinafter referred to as "*KalshiEx*"]; *see*

16 *also North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.*, No. 2:25-cv-00978-

17 APG-BNW, 2025 U.S. Dist. LEXIS 466366 (D. Nev. Oct. 14, 2025) (holding contracts based

18 on outcome of sporting events are not "swaps" under the Commodity Exchange Act and are not

19 subject to exclusive jurisdiction of CFTC), *KalshiEx, LLC v. Martin*, No. 25-cv-1283-ABA, 793

20 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815 (D. Maryland Aug. 1, 2025) (holding state law

21 not preempted by Commodity Exchange Act as applied to sports-related event contracts).  *But*

22 *see KalshiEx, LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893

23 (D.N.J. April 28, 2025) (holding state law preempted by Commodity Exchange Act as applied

24 to sports-related event contracts).  The reasoning in *KalshiEx* is persuasive.  Therefore, this

25 Court concludes that based on the current state of the law, the Commodities Exchange Act,

26 more specifically 7 U.S.C. §2(a)(1)(A), fairly interpreted, does not vest exclusive jurisdiction

27 over POLYMARKET's contracts with the Commodity Futures Trading Commission.  As such,

28 \\\\

1  Nevada law is not preempted and the BOARD has authority to prosecute the enforcement action

2  presented by the *Complaint* and *Renewed Application*.

3        **2. The BOARD's injuries are irreparable and non-compensable.**

4        If POLYMARKET's acts are wrongful, the resulting harm in evasion of Nevada's

5  "comprehensive regulatory structure" and "strict licensing standards" is immediate, irreparable

6  and not sufficiently remediable by compensatory damages.  The BOARD has a statutory duty to

7  protect the public and advance Nevada's interest in administering a reputable gaming industry

8  with integrity.  In furtherance of that duty, the BOARD is obliged to consistently and equitably

9  monitor and enforce regulatory and statutory compliance among all industry participants and

10  protect the health, safety, morals, good order, and general welfare of gaming consumers.  An

11  unlicensed participant beyond the BOARD's control, such as POLYMARKET, obstructs the

12  BOARD's ability to fulfill its statutory functions.  For example, the BOARD lacks authority to

13  ensure that wagers are not being accepted by POLYMARKET from owners, coaches, players or

14  officials who are in a position to influence the outcome of a sporting event.  The BOARD also

15  has no means to ensure that underage individuals are not allowed to purchase

16  POLYMARKET's contracts and no ability to enforce any sanction against POLYMARKET

17  even it determined this to be the case.  Additionally, the BOARD has no way to know, much

18  less prevent, if unsuitable individuals are involved with POLYMARKET's activities in Nevada.

19  By their nature, the nature of these injuries cannot be mitigated, much less restored, by

20  compensatory damages after the injury is incurred.

21        These potential consequences must be characterized as irreparable under Nevada law.

22  As such, they support issuance of a temporary restraining order.

23        **3. The *Declaration* establishes immediate and irreparable injury will result if**

24             **POLYMARKET is allowed a full opportunity to respond before the**

25             **temporary restraining order is issued.**

26        As the *Declaration* and the record establish, POLYMARKET has been provided notice

27  of the BOARD's filings as well as the actual filings themselves.  Further, POLYMARKET has

28  been given some opportunity to respond and, in fact, responded, albeit to a limited extent.

POLYMARKET requests that this Court defer issuance of any injunctive relief until it is able to

1    "file a comprehensive opposition" which it anticipates filing "February 2, 2026 or by any

2    shortened deadline the Court deems appropriate." POLYMARKET's request is clearly in good

3    faith and not for the purposes of delay, as it unilaterally proposes a significantly expedited

4    schedule.   Issuance of the temporary restraining order in advance of POLYMARKET's

5    comprehensive response may necessitate conversion of the response to a motion to dissolve

6    under NRCP 65(b)(4), but there is nothing to otherwise prevent POLYMARKET from being

7    fully and fairly heard on the issues in dispute and on an expedited basis.  However, the nature of

8    the BOARD's injuries which are alleged and, at least preliminarily, substantiated are imminent.

9    They are also the types of injuries that exacerbate with each day that POLYMARKET operates

10   in Nevada outside the authority of the BOARD.   A day means more consumers.   More

11   consumers mean more transactions.   More transactions means more potential harm to the

12   BOARD.  As such, every day matters in this case in a literal sense.  For these reasons, this

13   Court deems immediate action to be necessary and issues the temporary restraining order in

14   advance of POLYMARKET providing the comprehensive response it contemplates.

15         **4.   The balance of hardships and public interest weigh in favor of issuing the**

16              **temporary restraining order.**

17         Largely for the reasons that have already been explained above, the balance of hardships

18   and public interest in maintaining meaningful control over Nevada's gaming industry for the

19   purpose of ensuring its integrity strongly supports issuance of the temporary restraining order.

20   Beyond the factors previously addressed, if it is later determined that the temporary restraining

21   order was issued wrongfully, POLYMARKET would have been denied a brief period in the

22   market which damaged them in an amount that should be relatively straightforward to quantify

23   and, if legally redressable, compensate.  There is no reciprocal remedy for the BOARD if the

24   temporary restraining order is wrongfully denied.

25         **5.   No security is required.**

26         A party who is the beneficiary of a temporary restraining order is typically required to

27   post security for damages resulting from wrongful issuance of the temporary restraining order.

28   \\\\

1  NRCP 65(c). However, the BOARD, as an agency of the State of Nevada, is exempted from
2  that typical requirement. *Id.* Therefore, no security will be required.

3         **6.    The duration of the temporary restraining order is limited to 14 days.**

4         NRCP 65(b)(2) limits the duration of a temporary restraining order without notice to a
5  maximum of 14 days unless it is extended for good cause or the adverse party consents to a
6  longer period. The *Renewed Application* urges this Court to extend the temporary restraining
7  order until February 19, 2026 when the hearing on the preliminary injunction was set. This is
8  insufficient to establish good cause for an extended duration. First, the February 19, 2026
9  hearing was set at a time when no temporary restraining order had been issued. As such, no
10  effort was made to expedite the hearing further and schedule it within a 14-day period. Second,
11  the *Renewed Opposition* indicates POLYMARKET's counsel is not available on February 19,
12  2026, so the hearing must be re-scheduled anyway. For these reasons, there is insufficient cause
13  to extend the order beyond the normal 14-day time period at this time. Therefore, the
14  BOARD's request to do so is denied, but denied without prejudice to request an extension in a
15  subsequent filing if it believes circumstances develop to support good cause for a renewed
16  request.

17         **C.  ORDER**

18         Therefore, good cause appearing,

19         **IT IS HEREBY ORDERED** that *Plaintiff's Renewed Ex Parte Application for*
20  *Temporary Restraining Order and Motion for Preliminary Injunction* filed on January 26, 2026
21  is **GRANTED** insofar as it requests issuance of a temporary restraining order.

22         **IT IS HEREBY FURTHER ORDERED** that a hearing on *Plaintiff's Renewed Ex*
23  *Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction*
24  filed January 26, 2026 will be held in the First Judicial District Court, located at 885 East
25  Musser Street, Carson City, Nevada, Department I, on **February 11, 2026, at 9:00 a.m.**

26         **IT IS HEREBY FURTHER ORDERED** that the hearing on the *Plaintiff's Application*
27  *for Temporary Restraining Order and Motion for Preliminary Injunction* filed January 16, 2026
28  set by the January 23, 2026 *Order Denying Application for Temporary Restraining Order*

1 | *Without Prejudice and Setting Hearing on Motion for Preliminary Injunction* on **February 19,**
2 | **2026 at 1:30 p.m.** is **VACATED**.

3 |     Dated this 29ᵗʰ day of January, 2026.

Jason D. Woodbury
DISTRICT JUDGE

1

**CERTIFICATE OF MAILING**

2          The undersigned, an employee of the First Judicial District Court, hereby certifies that on

3    the ___ day of January, 2026, I served the foregoing Order by placing a copy in the United States

4    Mail, postage prepaid, addressed as follows:

5
     Aaron D. Ford, Attorney General
6    Jessica E. Whelan, Chief Deputy Solicitor General – Litigation
     Sabrena K. Clinton, Senior Deputy Attorney General
7    John S. Michela, Senior Deputy Attorney General
     State of Nevada
8    Office of the Nevada Attorney General
9    1 State of Nevada Way, Suite 100
     Las Vegas, NV 89119
10
11   Jacob T. Spencer, Esq.
     Gibson, Dunn & Crutcher, LLP
12   1700 M. Street, N.W.
     Washington, D.C. 20036-4504
13
14   Orin Snyder, Esq.
     Gibson, Dunn & Crutcher LLP
15   200 Park Avenue
     New York, NY 10166
16
17   Robert A. Dotson, Esq.
     Daniel T. Hayward, Esq.
18   Justin C. Vance, Esq.
     Dotson, Hayward & Vance, PC
19   5355 Reno Corporate Drive, Suite 100
20   Reno, NV 89511

21

22

23                                        _____
                                          Julie Harkleroad
24                                        Judicial Assistant, Dept. 1

25

26

27

28

REC'D & FILED

2026 JAN 29  AM 9: 09

WILLIAM SCOTT HOEN
CLERK
BY

IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR CARSON CITY

STATE OF NEVADA ex rel. NEVADA
GAMING CONTROL BOARD,

        Plaintiff,

    vs.

BLOCKRATIZE, INC. d/b/a
POLYMARKET; QCX LLC d/b/a
POLYMARKET US; ADVENTURE ONE
QSS, INC. d/b/a POLYMARKET,

        Defendants.

Case No.:  26 OC 00012 1B

Dept. No.:  I

## TEMPORARY RESTRAINING ORDER

For the reasons set forth in the *Order Granting Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order* issued this 29th day of January, 2026, which is expressly incorporated herein by this reference, this Court **HEREBY ORDERS** as follows:

BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET") and any of POLYMARKET's principals, employees, or agents are **HEREBY ENJOINED** from operating or offering a market in Nevada that involves "events-based contracts" without a valid license issued in accordance with Chapter 463 of Nevada Revised Statutes and regulations adopted in accordance therewith.  For purposes of this *Temporary Restraining Order*, the term "events-based contracts" includes any "percentage game," "sports pool" or "wager" as those terms are defined in *Hughes Properties v. State*, 100 Nev. 295, 297, 680 P.2d 970, 971 (1984),

NRS 463.0193, and NRS 463.01962, respectively, and in the *Order Granting Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order* dated January 29, 2026.

This *Temporary Restraining Order* is effective on January 29, 2026 as of the time reflected on the file-stamp on the first page of this *Temporary Restraining Order* and expires at the same time on February 12, 2026 unless dissolved, modified or extended sooner by order of this Court.

Dated this 29ᵗʰ day of January, 2026.

Jason D. Woodbury
DISTRICT JUDGE

**CERTIFICATE OF MAILING**

The undersigned, an employee of the First Judicial District Court, hereby certifies that on the _ day of January, 2026, I served the foregoing Order by placing a copy in the United States Mail, postage prepaid, addressed as follows:

Aaron D. Ford, Attorney General
Jessica E. Whelan, Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton, Senior Deputy Attorney General
John S. Michela, Senior Deputy Attorney General
State of Nevada
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

Jacob T. Spencer, Esq.
Gibson, Dunn & Crutcher, LLP
1700 M. Street, N.W.
Washington, D.C. 20036-4504

Orin Snyder, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Robert A. Dotson, Esq.
Daniel T. Hayward, Esq.
Justin C. Vance, Esq.
Dotson, Hayward & Vance, PC
5355 Reno Corporate Drive, Suite 100
Reno, NV  89511

Julie Harkleroad
Judicial Assistant, Dept. 1

**Exhibit D to Notice of Removal –
Waiver of Service
Dist. Ct. Doc. 1-5 (filed February 5, 2026)**

# EXHIBIT D

## Waiver of Service

ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
JUSTIN C. VANCE
Nevada State Bar No. 11306
DOTSON, HAYWARD & VANCE, PC
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
Tel:   (775) 501-9400
Email: rdotson@dhvnv.com
       dhayward@dhvnv.com
       jvance@dhvnv.com

GIBSON, DUNN & CRUTCHER LLP
THOMAS H. DUPREE JR.
*(Pro Hac Vice to be submitted)*
JACOB T. SPENCER
*(Pro Hac Vice to be submitted)*
 1700 M Street, N.W.
Washington, DC  20036-4504
Tel:   (202) 955-8500
Email  TDupree@gibsondunn.com
       JSpencer@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER
*(Pro Hac Vice to be submitted)*
MATT BENJAMIN
*(Pro Hac Vice to be submitted)*
 200 Park Avenue
New York, NY 10166
Tel:   (212) 351-4000
Email: OSnyder@gibsondunn.com
       MBenjamin@gibsondunn.com

*Attorneys for Defendants*
*Blockratize Inc. dba Polymarket and*
*QCX LLC dba Polymarket US*

**IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
IN AND FOR CARSON CITY**

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>Plaintiff,<br><br>v.<br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX, LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET,<br><br>Defendants. | Case No.:  26-OC-00012-1B<br><br>Dept. No.: 1 |

**WAIVER OF SERVICE OF SUMMONS
RULE 4.1 OF THE NEVADA RULES OF CIVIL PROCEDURE**

1

1     ROBERT A. DOTSON, counsel for Defendants BLOCKRATIZE INC. dba POLYMARKET

2 ("Blockratize") and QCX LLC dba POLYMARKET US ("Polymarket US") has received the

3 Plaintiff's request to waive service of a summons in this lawsuit along with a copy of the complaint

4 and copies of waiver forms.

5     Blockratize and Polymarket US agree to save Plaintiff the expense of serving them with a

6 summons and complaint in this lawsuit. This waiver of service, however, is not intended to be and

7 should not be construed as constituting the general appearance or appearance on the merits of

8 Defendants in this matter. By executing and filing this waiver of service, Blockratize and Polymarket

9 US do not waive any defenses or objections they have to this action (including but not limited to lack

10 of personal jurisdiction), except for objections to the lack of summons or service.

11     For the avoidance of doubt, this waiver does not apply to Defendant Adventure One QSS Inc.

12 ("Adventure One"). I am not authorized to waive service or any other defense or objection on behalf

13 of Adventure One. Nor should this waiver be construed as a general appearance or appearance on the

14 merits of Adventure One in this matter.

15     I also understand that Blockratize and Polymarket US must file and serve an answer or a

16 motion under Rule 12 of the Nevada Rules of Civil Procedure within 60 days from January 21, 2026,

17 the date when the request was sent (or 90 days if it was sent outside the United States). If I fail to do

18 so, a default judgment will be entered against me or the entities I represent.

19     DATED this 4 day of February 2026.

20                        DOTSON, HAYWARD & VANCE PC

21

22

23                        ROBERT A. DOTSON (NSB No. 5285)

                        DANIEL T. HAYWARD (NSB No. 5986)

24                        JUSTIN C. VANCE (NSB No. 11306)

                        5355 Reno Corporate Drive, Ste 100

25                        Reno, Nevada 89511

                        (775) 501-9400

26

27                        *Attorneys for Defendants*

                       *Blockratize Inc. dba Polymarket and*

28                        *QCX LLC dba Polymarket US*

2

**State Defendants' Opposition to Temporary Restraining Order and Countermotion**
*KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev. Apr. 4, 2025), Doc. No. 34

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General – Litigation
3  Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
4  Devin A. Oliver (Bar No. 16773C)
     Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   sclinton@ag.nv.gov
9  doliver@ag.nv.gov

10 *Attorneys for Kirk D. Hendrick, in his Official*
   *Capacity as Chairman of the Nevada Gaming*
11 *Board; George Assad, in his official capacity as*
   *A Member of the Nevada Gaming Control Board;*
12 *Chandeli K. Sendal, in her official capacity as a*
   *Member of the Nevada Gaming Control Board;*
13 *Nevada Gaming Control Board; Jennifer Togliatti,*
   *In her official capacity as Chair of the Nevada Gaming*
14 *Commission; Rosa Solis-Rainey, in her official capacity*
   *As a Member of the Nevada Commission; Brian Krolicki,*
15 *In his official capacity as a Member of the Nevada Gaming*
   *Commission; George Markantonis, in his official capacity*
16 *As a Member of the Nevada Gaming Commission; Abbi*
   *Silver, in her office capacity as a Member of the Nevada*
17 *Gaming Commission; Nevada Gaming Commission;*
   *Aaron D. Ford, in his official Capacity as Attorney*
18 *General of Nevada*

19              **UNITED STATES DISTRICT COURT**

20                     **DISTRICT OF NEVADA**

21 | KALSHIEX, LLC,                          | Case No. 2:25-cv-00575-GMN-BNW |
   |-----------------------------------------|--------------------------------|
22 |          Plaintiff,                     | **DEFENDANTS' OPPOSITION TO**  |
   |                                         | **PLAINTIFF'S MOTION AND**     |
23 | vs.                                     | **MEMORANDUM OF POINTS AND**   |
   |                                         | **AUTHORITIES IN SUPPORT OF AN**|
24 | KIRK D. HENDRICK, in his official       | **IMMEDIATE TEMPORARY**        |
   | capacity as Chairman of the Nevada      | **RESTRAINING ORDER AND**      |
25 | Gaming Control Board; GEORGE ASSAD,     | **PRELIMINARY INJUNCTION AND** |
   | in his official capacity as a Member of the | **DEFENDANTS' COUNTERMOTION** |
26 | Nevada Gaming Control Board;            | **FOR AN IMMEDIATE TEMPORARY** |
   | CHANDENI K. SENDALL, in her official    | **RESTRAINING ORDER AND**      |
27 | capacity as a Member of the Nevada      | **PRELIMINARY INJUNCTION**     |
   | Gaming Control Board; NEVADA            |                                |
28 | GAMING CONTROL BOARD; JENNIFER          |                                |

Page **1** of **24**

1 TOGLIATTI, in her official capacity as
Chair of the Nevada Gaming Commission;
2 ROSA SOLIS-RAINEY, in her official
capacity as a Member of the Nevada
3 Gaming Commission; BRIAN KROLICKI,
in his official capacity as a Member of the
4 Nevada Gaming Commission; GEORGE
MARKANTONIS, in his official capacity as
5 a Member of the Nevada Gaming
Commission; ABBI SILVER, in her official
6 capacity as a Member of the Nevada
Gaming Commission; NEVADA GAMING
7 COMMISSION; AARON D. FORD, in his
official capacity as Attorney General of
8 Nevada,

9   Defendant(s).

10

11   Defendants Kirk D. Hendrick, in his Official Capacity as Chairman of the Nevada

12 Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada

13 Gaming Control Board; Chandeli K. Sendal, in her official capacity as a Member of the

14 Nevada Gaming Control Board; Nevada Gaming Control Board;[1] Jennifer Togliatti, in her

15 official capacity as Chair of the Nevada Gaming Commission; Rosa Solis-Rainey, in her

16 official capacity as a Member of the Nevada Gaming Commission; Brian Krolicki, in his

17 official capacity as a Member of the Nevada Gaming Commission; George Markantonis, in

18 his official capacity as a Member of the Nevada Gaming Commission; Abbi Silver, in her

19 official capacity as a Member of the Nevada Gaming Commission; Nevada Gaming

20 Commission[2]; Aaron D. Ford, in his official capacity as Attorney General of Nevada

21 (collectively "State Defendants'), by and through counsel, make this special appearance[3] to

22 oppose Plaintiff KalshiEX LLC's motion and memorandum of points and authorities in

23 support of an immediate temporary restraining order and preliminary injunction (ECF No.

24 18) and to file a countermotion for an immediate temporary restraining order and

25

26  [1] The Nevada Gaming Control Board was incorrectly named pursuant to NRS
41.031(2).
27  [2] The Nevada Gaming Commission was incorrectly named pursuant to NRS
41.031(2).
28  [3] None of the State Defendants have been properly served with a summons and
complaint.

Page **2** of **24**

1  preliminary injunction to enjoin Kalshi from offering event-based contracts related to

2  gaming, sports pools, and race books in Nevada unless and until approved as licensed

3  gaming by the Nevada Gaming Commission and to enjoin Kalshi from offering event-based

4  contracts on election outcomes in Nevada.

5        This opposition and countermotion are based on the following memorandum of

6  points and authorities, the pleadings and papers on file herein, and any oral argument

7  before the Court.

### MEMORANDUM OF POINTS AND AUTHORITY

### INTRODUCTION

10       The Court should deny Plaintiff KalshiEX LLC's (Kalshi) request for the equitable

11  relief of a temporary restraining order and a preliminary injunction. Kalshi failed to

12  demonstrate that Congress, by the enactment of the Commodity Exchange Act, intended

13  to preempt Nevada gaming laws under the Supremacy Clause. Nor do the actions of State

14  Defendants' in attempting to prohibit unlawful conduct by enforcing gaming laws

15  constitute irreparable harm. The balance of the equities and the public interest in

16  maintaining the integrity of the Nevada gaming industry warrant the denial of Kalshi's

17  motion.

### STATUTORY BACKGROUND

19  **I.    Commodity Exchange Act[4]**

20       The Commodity Exchange Act was enacted in 1936 and overseen by the Commodity

21  Exchange Commission, a division within the U.S. Department of Agriculture.[5]

22  / / /

23

24  _____

    [4] Pursuant to FRE 201, State Defendants request that the Court take judicial notice
    concerning the enactment and evolution of the Commodity Exchange Act (CEA).

25  [5] The Commodity Exchange Act replaced the Grain Futures Act which applied to
    agriculture and natural resources. All references to "grain" were replaced with the term
26  "commodities" and the Grain Futures Commission became the Commodity Exchange
    Commission. CFTC, History of the CFTC: US Futures Trading and Regulation Before the
27  Creation of the CFTC,
    https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html#:~:text=June%2015%
28  2C%201936%20%E2%80%93%20The%20Commodity,potatoes%2C%20as%20well%20as%
    20grains (last visited April 2, 2025).

1    Over the next four decades, the CEA was amended to: (1) add additional products

2    (e.g., wool tops, fats, oils, peanuts etc.) to the list of regulated commodities; (2) enable the

3    Secretary of Agriculture to submit to Congress and make public the names, addresses, and

4    market positions of traders;  and (3) allow the Commodity Exchange Commission to set the

5    level of registration and renewal fees for futures commission merchants and other

6    registrants.[6]

7    During this period, two major scandals concerning the manipulation of costs on

8    futures contracts and the use of phony receipts for non-existent commodities highlighted

9    the need for increased regulation of the commodity futures market.[7] As a result of incidents

10    like these, new financial requirements for futures commission merchants; enhanced

11    reporting requirements; and increased criminal penalties for manipulation were enacted.[8]

12    **II.    1974 amendments to the Commodity Exchange Act[9]**

13    The 1974 Amendments overhauled the CEA and resulted in the establishment of the

14    Commodity Futures Trading Commission (CFTC). The CFTC was tasked with taking

15    enforcement actions against individuals and firms registered with the Commission, those

16    who were engaged in commodity futures and option trading on designated domestic

17    exchanges, and those who improperly issued market futures and options contracts.[10]

18    **PROCEDURAL BACKGROUND**

19    On March 4, 2025, the Nevada Gaming Control Board (NGCB) issued Kalshi a letter

20    to Cease and Desist offering event-based contracts related to gaming, including sports

21    pools, in Nevada unless or until approved as licensed gaming by the Nevada Gaming

22    Commission and to Cease and Desist offering event-based contracts on election outcomes

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Pursuant to FRE 201, State Defendants request that the Court take judicial notice concerning the amendment of the Commodity Exchange Act.

[10] CFTC,    Law    Regulation:    Enforcement    Actions, https://www.cftc.gov/LawRegulation/EnforcementActions/index.htm#:~:text=The%20CFTC%20takes%20enforcement%20actions,market%20futures%20and%20options%20contracts.&text=March%2012%20Order%20Debiex%2C%20et,Order%3A%20Debiex%2C%20et%20al (last visited 4/2/25).

1  in Nevada. ECF No. 1-2 at 2. Kalshi was given ten days to provide confirmation of the

2  cessation of all prohibited activity. *Id.* at 3. At the request of Kalshi's counsel, Kalshi was

3  also given additional time to comply (ECF No. 18 at 12). However, following discussions on

4  March 28, 2025 between Kalshi's counsel and the NGCB Chairman and his counsel, Kalshi

5  filed a complaint for permanent injunctive and declaratory relief alleging that pursuant to

6  the Supremacy Clause the Commodity Exchange Act preempts Nevada gaming laws. ECF

7  No. 1. Contemporaneous with its complaint, Kalshi filed a motion and memorandum of

8  points and authorities in support of an immediate temporary restraining order and

9  preliminary injunction. ECF No. 18.

10     On April 1, 2025, the Court issued an order setting a response date for April 4, 2025

11  at 12:00 noon and a hearing on April 8, 2025 at 10:30 am.

12                              **RELEVANT FACTS**

13     Kalshi alleges that it is a federally designated and approved derivative exchange.

14  ECF No. 1 §5. It offers consumers the opportunity to invest in contracts such as  on wheat,

15  cotton, rice, corn, and oats as well as interest rates, financial instruments, economic

16  indices, and risk metrics that may be contingent on the outcome of events. Additionally, in

17  the past few months, Kalshi began offering event based contracts that are contingent on

18  the outcome of political elections and sports. *Id.* Kalshi contends that the event based

19  contracts are only subject to oversight by the Commodity Futures Trading Commission

20  (CFTC). *Id.*

21     Through Nevada's two-tiered regulatory structure, the NGCB and Nevada Gaming

22  Commission (NGC) promulgate rules and regulations for the licensing and operation of

23  gaming in Nevada and establish rules and regulations for tax reports of gaming licensees.

24  *Id.,* §17. The NGCB enforces state laws and regulations governing gaming through its

25  divisions, *Id.,* §17, while the NGC acts on the recommendations of the NGCB on issues of

26  licensing and work permit appeals and has final authority on all gaming licensing matters.

27  *Id.* §23.

28  / / /

Page **5** of **24**

1    Kalshi alleges that by virtue of giving CFTC "exclusive jurisdiction" over federally
2  regulated exchanges, the Commodity Exchange Act (CEA) preempts Nevada gaming laws
3  precluding enforcement of laws that prohibit unlawful gaming in the State of Nevada. *Id.*
4  at 6.

5                                  **LEGAL STANDARD**

6    A preliminary injunction is "an extraordinary remedy that may only be awarded
7  upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def.*
8  *Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must show that: (1) he is likely to succeed
9  on the merits; (2) likely to suffer irreparable harm; (3) the balance of the equities tips in
10  his favor; and (4) the injunction is in the public interest. *Id.* at 21. "[T]he legal standards
11  applicable to TROs and preliminary injunctions are 'substantially identical.'" *Washington*
12  *v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (per curiam) (quoting *Stuhlbarg Int'l*
13  *Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

14    Where the party opposing injunctive relief is a government entity, the potential
15  hardship and the public interest considerations are merged. *See Nken v. Holder*, 556 U.S.
16  418, 435 (2009). Courts should pay particular attention to the public consequences when
17  considering a request for injunctive relief. *Winter*, 555 U.S. at 24. They must also consider
18  the effect on each party and balance the competing claims of harm. *Id.*

19                                     **ARGUMENT**

20  **I.    Kalshi failed to demonstrate a likelihood of success**

21    Kalishi has not alleged facts demonstrating a likelihood of success on the merits.
22  While the Supremacy Clause provides that the laws and treaties made pursuant to the
23  authority of the United States constitute the supreme law of the land (*See* U.S. Const. art.
24  VI), it is not the "source of any federal rights." *See Golden State Transit Corp. v. Los*
25  *Angeles*, 493 U.S. 103, 107, (1989)(quoting *Chapman v. Houston Welfare Rights*
26  *Organization*, 441 U.S. 600, 613, (1979)). The Supremacy Clause simply raises the question
27  of whether a law is a valid exercise of federal power. Only where there is a direct conflict
28  with state laws does the clause establish the supremacy of laws made pursuant to the

Constitution. *See Gibbons v. Ogden*, 9 Wheat. 1, 210, 6 L. Ed. 23 (1824). "But it will not follow from this doctrine that acts of the larger society which are *not pursuant* to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies, will become the supreme law of the land." *See Alden v. Maine*, 527 U.S. 706, 731, 119 S. Ct. 2240, 2255, 144 L. Ed. 2d 636 (1999)(quoting The Federalist No. 33, at 204 (A. Hamilton)).

By enacting the CEA, Congress did not manifest a clear intent to exclusively occupy the entire field of gaming laws. Nor did the NGCB's enforcement of its gaming laws create an impenetrable obstacle to securing the full purposes and objectives of Congress in enacting the CEA. For  these reasons and those discussed below, Kalshi has not demonstrated that Nevada gaming laws are preempted by the CEA.

### A.    The Commodity Exchange Act does not preempt Nevada gaming laws

#### 1.    The text of the Commodity Exchange Act does not evidence a clear and manifest Congressional intent to preempt Nevada gaming laws

The CEA provides that the CFTC has exclusive jurisdiction over accounts, agreements, and transactions involving commodity futures contracts traded on a designated contract market. 7 U.S.C. 2(a)(1)(A). Kalshi posits that the "exclusive jurisdiction" language preempts the enforcement of Nevada gaming laws. ECF No. 18 at 5, 13. This view ignores the purposes for which the CEA was enacted and is contradicted by Kalshi's own assertions.

When statutory interpretation is at issue, courts begin their analysis by construing the text of the statute. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 74, 143 S. Ct. 665, 671, 214 L. Ed. 2d 434 (2023). Where the language is ambiguous, courts are charged with resolving the ambiguity and finding "the interpretation that is 'more consistent with the broader context' and 'primary purpose' of the statute." *See Connell v. Lima Corp.,* 988 F.3d 1089, 1097 (9th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345-46, 117 S. Ct. 843, 136 L.Ed.2d 808 (1997). But even when a provision is unambiguous, a court resorts to legislative history "where the legislative history clearly indicates that Congress meant

1    something other than what it said." *See Amalgamated Transit Union Loc. 1309, AFL-CIO*

2    *v. Laidlaw Transit Servs., Inc.,* 448 F.3d 1092, 1094 (9th Cir. 2006) (internal citations

3    omitted). As will be discussed in greater detail in section 2 below, the legislative history of

4    CEA does not support Kalshi's theories of preemption.

5        Congress' intention is further evidenced by the "Findings" and "Purpose" of the CEA

6    which were to ensure fair and financially secure trading facilities and protect market

7    participants from fraudulent or other abusive sales practices. *See* 7 U.S.C. 5(a)(b). And

8    since courts must interpret statutes as a whole, every effort should be made not to construe

9    a provision in a manner that renders the other provisions meaningless, inconsistent, or

10   superfluous. *See Rodriguez v. Sony Computer Ent. Am., LLC*, 801 F.3d 1045, 1051 (9th Cir.

11   2015). Put simply, these subsections when read in conjunction with the "exclusive

12   jurisdiction" provision fail to elucidate a clear and manifest Congressional intent to usurp

13   the states' police power to impose gaming laws for public health, safety and welfare.

14       Further, in attempting to differentiate congressional control (election betting)

15   contracts from "gaming" contracts that are subject to exclusion under the CEA's Special

16   Rule (7 U.S.C. 7a-2(c)(5)(C)(i)), Kalshi argued to the D.C. District Court that "[t]he only

17   relevant legislative history . . . confirms that contracts on 'sporting events such as the Super

18   Bowl, the Kentucky Derby, and Masters Golf Tournament' were precisely what Congress

19   had in mind as 'gaming' contracts." *KalshiEX, LLC v. Commodity Futures Trading*

20   *Commission,*[11] Memorandum of Law in Support of Plaintiff's Motion for Summary

21   Judgment, 2024 WL 397419, 12-13 (D.D.C. Jan. 25, 2024).  Kalshi argued this point again

22   before the Court of Appeals[12] (*See* ECF No. 18 at 2) stating "an event contract . . . involves

23   'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby,

24   Super Bowl, or Masters golf tournament . . ."  Appellee Brief, 2024 WL 4802698, *17 (D.C.

25   Cir. Nov. 15, 2024).

26   / / /

27   _____

28       [11] No. CV 23-3257 (JMC), 2024 WL 4164694  (D.D.C. Sept. 12, 2024).
         [12] 119 F.4th 58 (D.C. Cir. 2024).

Page **8** of **24**

1    Whether or not the Court construes the CEA as ambiguous, the legislative history

2   sheds further light on Congress' purpose for enacting it.

3            **2.    The Commodity Exchange Act's legislative history shows no intent to preempt Nevada's gaming laws**

4

5    Despite the Act's clear text, Kalshi scours the legislative record for any statement

6   that might, at first blush, show Congress intended for the CEA's preemption of Nevada's

7   *gaming* laws. *See* ECF No. 18 at 13-16. But there is no such extra-textual evidence. To the

8   extent Kalshi relies on legislative history, the Court should disregard it completely.

9    To start, the Court need not consider remarks by individual legislators—namely, the

10  statements of Senators Clark, Curtis, and Talmadge—that Kalshi plucks out of context.

11  *See Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) ("[E]ven those of who believe that

12  clear legislative history can 'illuminate ambiguous text' won't allow 'ambiguous legislative

13  history to muddy clear statutory language.'" (quoting *Milner v. Dep't of Navy*, 562 U.S. 562,

14  572 (2011)).  After all, "[w]hat Congress ultimately agrees on is the text that it enacts, not

15  the preferences expressed by certain legislators" in congressional debates or reports.

16  *N.L.R.B. v. SW Gen., Inc.,* 580 U.S. 288, 306 (2017) (declining to consider extra-textual

17  evidence (*i.e.*, legislative history) after concluding that disputed statutory text was "clear");

18  *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately

19  the provisions of our laws rather than the principal concerns of our legislators by which we

20  are governed.").

21    For example, Kalshi cites remarks by Senator Dick Clark, one of the Act's sponsors,

22  to assert that "Congress sought to prevent the 'chaos' that would result from subjecting

23  futures trading to a patchwork of conflicting state laws."[13] Senator Clark's statement is not

24  relevant to, much less controlling, on the issue of federal preemption of state *gaming* laws.

25  Ultimately, "floor statements by individual legislators rank among the least illuminating

26  forms of legislative history." *SW Gen., Inc.,* 580 U.S. at 307 (citation omitted); *See also*

27

28

---

[13] ECF No. 18 at 2; *See also Id.* at 4, 14.

1   *Weinberger v. Rossi*, 456 U.S. 25, 35 & n.15 (1982) ("The contemporaneous remarks of a

2   sponsor of legislation are certainly not controlling in analyzing legislative history.").

3       In any event, Kalshi has plucked Senator Clark's statement about the regulatory

4   "chaos" of "different State laws" out of context. In its proper context, this statement

5   grappled with a narrower preemption debate: whether the Act should "deprive the Federal

6   courts of their jurisdiction under the *antitrust* laws and [] deprive Federal and State courts

7   of jurisdiction to enforce *contract and commercial law* rights."[14]  Senator Clark framed this

8   statement as a leading question for Mr. Willett Clark, a securities law professor, who was

9   testifying about the need for the Act to preempt state *securities* regulations: "The

10  Constitution's majestic vision of this country as one country in matters of commerce, . . . is

11  being clouded at the present time by . . . State attempts to regulate commodities markets

12  under the guise of *securities* regulation."[15] And even then, one could read the Act's

13  legislative history to cut both for and against preemption of state laws concerning

14  securities, contracts, and corporate law.[16]

15      Defendants are seeking to enforce Nevada's gaming laws under Title 41 of the NRS.

16  Kalshi does not point to any legislative history, including the congressional reports and law

17  review articles cited in the Motion, supporting its position that legislators sought to

18  preempt state gaming and election laws through the CEA.[17] At best, the legislative record

19  shows brief instances where legislators conceptually distinguished futures markets from

20  gaming, in that one's risk analysis differs fundamentally between the contexts of poker

21  (impulsive, self-created risk) and speculation in commodity markets (empirically grounded

22

23  ───────────────

24      [14] *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 663 (May 21, 1974) (statement of Deputy Asst. Atty. Gen. Clearwaters) (emphases added).

25      [15] *Id.* at 681 (statement of Mr. Willett Clark) (emphasis added), 685 (statement of Sen. Clark); *See also Id.* at 680 ("I am urging that to the extent that Federal and State securities statutes impinge on the same area as does the Commodity Exchange Act, the Commodity Exchange Act and its enforcement organ should be exclusive.").

26

27      [16] *See Id.* at 664 (statement of Chairman/Sen. Talmadge) ("I doubt that this committee, and I doubt the House had in mind depriving either Federal courts or jurisdictions in antitrust matters, or any other matter, and certainly not State courts.").

28      [17] *See* ECF No. 18 at 13-15.

1  in economic trends).[18] Without plain-text references to states' police power over gaming or

2  any legislative history to the contrary, Kalshi cannot conjure out of thin air additional areas

3  of federal preemption. *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1054 (9th Cir.

4  2018) ("Further, the doctrine of *expressio unius est exclusio alterius* as applied to statutory

5  interpretation creates a presumption that when a statute designates certain persons,

6  things, or manners of operation, all omissions should be understood as exclusions."

7  (citations and quotation marks omitted)).

8      Based on the preceding considerations, neither the language nor legislative history

9  of the CEA demonstrate a congressional intent to preempt Nevada gaming law or election

10  laws.

11          **3.    Congress did not intend for the Commodity Exchange Act to
              occupy the field of gaming regulation**
12

13      "In all preemption cases, and particularly in those in which Congress has legislated

14  ... in a field which the States have traditionally occupied, ... [courts] start with the

15  assumption that the historic police powers of the States were not to be superseded by the

16  Federal Act unless that was the clear and manifest purpose of Congress." *See Wyeth v.*

17  *Levine,* 555 U.S. 555, 129 S. Ct. 1187, 1194–95, 173 L.Ed.2d 51 (2009) (internal quotation

18  marks and citations omitted) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S. Ct.

19  2240, 135 L.Ed.2d 700 (1996)). A state's "'intangible rights of allocation, exclusion, and

20  control'—its prerogatives over who should get a benefit and who should not . . . 'amount to

21  no more and no less than' the State's 'sovereign power to regulate.'" *See Kelly v. United*

22  *States*, 590 U.S. 391, 400–01, 140 S. Ct. 1565, 1572, 206 L. Ed. 2d 882 (2020)(internal

23  citations omitted); *also See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737

24  (9th Cir. 2003) (noting that "the regulation of gambling lies at the heart of the state's police

25  power" (cleaned up)); *Ottenheimer v. Real Est. Div. of Nevada Dep't of Com.,* 91 Nev. 338,

26  _____

27      [18] *See, e.g., Id.* at 326 (statement of Carlos Bradley) ("Speculation thus differs
    fundamentally from gambling in this important particular: . . ."), 373 (statement of Sen.
    Humphrey) (stating that the Act's "establishment of a futures contract market must . . .
28  not permit the legalization of sort of a 'crap game,' a gambling game").

1   341–42, 535 P.2d 1284, 1285 (1975)("[T]he State through its police powers may regulate

2   business activities for the protection of the public.")(internal citations omitted).

3        For the reasons previously discussed, neither the legislative history nor the text of

4   the statute demonstrate a clear and manifest purpose of Congress to preempt the field of

5   gaming regulation with the passage of the CEA. *See* ECF No. 18, 13-15. Nevada's gaming

6   laws do not constrain Kalshi participation in the commodities futures market. Nor does it

7   interfere with CEA's ability to oversee commodities participants; to "prevent price

8   manipulation or any other disruptions to market integrity; to ensure the financial integrity

9   of all transactions subject to this chapter and the avoidance of systemic risk; to protect all

10  market participants from fraudulent or other abusive sales practices and misuses of

11  customer assets; and to promote responsible innovation and fair competition

12  among boards of trade, other markets and market participants." 7 U.S.C. 5(b); *also See*

13  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013) (even with an express preemption

14  clause, the FAAA did not preempt state law claims because they were not sufficiently

15  connected).

16       Further, Kalshi failed to demonstrate how CFTC's comprehensive regulatory scheme

17  concerning derivative markets is somehow negated by NGCB's enforcement of gaming

18  laws.  ECF No. 18 at 16.  A more accurate depiction includes the two schemes working in

19  tandem pursuant to the concept of dual federalism to create public confidence and trust in

20  both spheres.  Certainly, eighty-nine years of the CEA not infringing on states' rights to

21  regulate, even completely ban, gaming activity proves that Congress did not intend for the

22  Act to do so. For these reasons, Kalshi's field preemption claim fails.

23            **4.    Conflict preemption is inapplicable because enforcement of
                       Nevada gaming laws does not create an obstacle to the purpose**
24            **and objective of the Commodity Exchange Act**

25       Obstacle preemption is a subset of implied preemption.  In assessing whether

26  obstacle preemption has occurred, courts "employ [their] 'judgment, to be informed by

27  examining the federal statute as a whole and identifying its purpose and intended effects.'"

28  *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019) (internal citations

1  omitted)(internal citations omitted). An "[i]mplied preemption analysis does not justify a

2  'freewheeling judicial inquiry into whether a state statute is in tension with federal

3  objectives' . . ." *Id.* (internal citations omitted). Rather "a high threshold must be met if a

4  state law is to be preempted for conflicting with the purposes of a federal act." *Id.* (internal

5  citations omitted). In other words, obstacle preemption will only attach if the state laws

6  impose an obstructive, not insignificant  burden on federal activities. *United States v.*

7  *California*, 921 F.3d 865, 880 (9th Cir. 2019).

8      Kalshi identifies four reasons that purportedly undermine the purpose of the CEA

9  but none of those reasons justify the application of conflict preemption. ECF No. 18, 18-21.

10      First, Kalshi asserts that Congress enacted the CEA to bring futures markets under

11  a uniform regulatory scheme. ECF No. 18 at 18.  It also asserts that a contract market

12  could not operate efficiently if varying or contradictory legal standards governed its duties

13  to investors. *Id.* The State of Nevada is not an investor. It is a sovereign entity. And while

14  Congress has the power to regulate individuals, it does not have the power to regulate

15  states. *See Murphy v. NCAA*, —— U.S. ——, 138 S. Ct. 1461, 1476, 200 L.Ed.2d 854 (2018).

16  This is consistent with the Tenth Amendment which reserves to the States "[t]he powers

17  not delegated to the United States by the Constitution, nor prohibited by it to the States..."

18  U.S. Const. amend. X.  Put another way, Congress cannot commandeer the states by issuing

19  orders to compel facilitation or adoption of preferred federal regulatory programs. *See New*

20  *York v. United States,* 505 U.S. 144, 161-62 (1992). The NGCB was created by the Nevada

21  legislature in 1955, and Congress created the CFTC in 1974. The NGCB is not aware of

22  any instance when the CFTC, or its predecessor, ever claimed that Nevada's gaming laws

23  were preventing compliance with the CEA. Consequently, Kalshi cannot be permitted to

24  create this scenario and then allege that Nevada's gaming laws preclude Kalshi's

25  compliance with CEA's regulatory scheme. Indeed, CFTC still requires applications to

26  determine who is qualified to operate as a designated exchange. It still imposes

27  recordkeeping requirements, reporting obligations, and penalties for non-compliance.

28

1    Simply put, enforcement of Nevada gaming laws on Kalshi does not disrupt the actions of

2    the CFTC.

3          Second, Kalshi contends that when states adopt a method of enforcement that differs

4    from the enforcement method adopted by Congress to achieve its goals, preemption is

5    required to avoid conflicts with the federal scheme. ECF No. 18, 18-19. Kalshi's premise is

6    flawed. It equates the imposition of state penalties to the displacement of federal penalties.

7    They are not mutually exclusive. Enforcement of Nevada gaming law does not preclude

8    CFTC from continuing to regulate commodity futures. Similarly, Nevada gaming laws do

9    not preclude Kalshi from complying with the CFTC, except when Kalshi attempts to

10   disguise state-regulated gaming activity as commodities. Eighty-nine years of the CEA,

11   seventy years of the NGCB, and fifty-one years of the CFTC provide ample historical prove

12   of those facts.

13         Third, Kalshi concludes that since its political events contracts and sports related

14   contracts are authorized, it would create a preemptive conflict if Nevada prohibited them.

15   ECF No. 18 at 20.  Kalshi continues to conflate commodity futures regulations with gaming

16   regulations. CFTC has no authority to authorize Kalshi to  engage in unlicensed gaming

17   activity in the State of Nevada.  Nor does the fact that Kalshi's event contracts are overseen

18   by CFTC pursuant to a commodity futures regulatory scheme negate NGCB's authority

19   pursuant to the state's police power to regulate entities conducting business within its

20   jurisdiction.

21         Finally, Kalshi asserts that CFTC's Core Principles require it to provide its members

22   with impartial access to its markets and services. ECF No. 18 at 20 citing 17 C.F.R.

23   §§38.150, 38.151(b). But absent a gaming license issued by the NGC, Kalshi does not have

24   a market for event-based contracts related to gaming, sports pools, and race books, in

25   Nevada. Furthermore, Nevada law does not allow a market for event-based contracts on

26   election outcomes.

27         For the preceding reasons, enforcement of Nevada gaming laws do not impose an

28   obstacle to the purpose or objectives of CEA.

Page **14** of **24**

**B.    Public policy mandates that Nevada continue strictly regulating the gaming industry**

There are many reasons why Nevada strictly regulates gaming and why it is important that activities related to gaming must be licensed.

If an entity, such as Kalshi, directly makes use of Nevada gaming, i.e., sports pools, in its business model without possessing a gaming license a big hole is created in Nevada's regulatory structure. Nevada's legislature has carefully crafted the law in this state to ensure that every aspect of gaming related activity is regulated and conducted with integrity and consumer protections.

For instance, Nevada has a structure in place to resolve patron disputes. NRS 463.362 *et seq*. Patrons of licensed gaming establishments may utilize a process with the Board to resolve disputes related to wagering activities. However, this structure is in place only for disputes between a Nevada licensee and its patron. NRS 463.362. The purchaser in a Kalshi transaction is not a patron of a Nevada licensed sports book and, thus, pursuant to the applicable statutes, has no recourse should there be a dispute. Protections are inherent in Nevada's all-encompassing Gaming Control Act and advance the public policy of protecting consumers. Any business model, including Kalshi's, that does not allow for protection of the consumer is clearly outside the statutory scheme intended for gaming in this State and is a threat to the public policy so vital to its operation.

In that same regard, both Nevada and the Fedal Government require casinos to have strong Anti-Money Laundering (AML) and Know Your Customer (KYC) protections. The requirements support the public policy of, inter alia, maintaining the integrity of gaming. Certainly, Congress would not have intentionally created a loophole for entities like Kalshi to skirt such essential legal protections.

For example, Nevada requires its licensed sports books to (1) obtain certain identification information from patrons who place wagers of a certain size, (2) prevent multiple wagers designed to circumvent the identification requirements for wagers of a certain size, and (3) prevent wagers structured to circumvent the identification

1   requirements. Nev. Gam'g Comm. Regs. 22.061, 22.062, and 22.063. Moreover, Nevada

2   requires its licensed books to report suspicious activity. Nev. Gam'g Comm. Reg. 22.121.

3   Licensed books are required to adhere to internal control procedures. Nev. Gam'g Comm.

4   Regs. 6.090 and 6.100. A licensed book is prohibited from accepting wagers on an event

5   from an official, owner, coach, or staff of a participant or team or participant in that event.

6   Nev. Gam'g Comm. Reg. 22.1205. Currently, Kalshi: (1) does not require its patrons to be

7   21 years of age or older to place a wager in its markets (but see NRS 463.350); (2) does not

8   prohibit wagers placed on an event from owners, coaches, players, or officials participating

9   in the event (Nev. Gam'g Comm'n Reg. 22.1205); (3) does not pay taxes on gross gaming

10  revenue derived from wagers made from Nevada; (4) has not undergone Nevada's rigorous

11  licensing process for its wagering activities; (5) does not have a physical location in Nevada,

12  unlike all other entities accepting wagers from Nevada; and (6) does not communicate

13  about potential evidence of match fixing or point shaving to Nevada regulatory authorities.

14  As an unlicensed entity, these important and necessary protections would not apply to

15  Kalshi and the operation of Kalshi's business model is an effort to circumvent all of the

16  protections that licensed gaming provides. Included in those protections is the NGCB

17  requirement that licensed gaming entities and individuals must adhere to all federal, state

18  and local laws.

19      In the Federal arena, casinos are defined as financial institutions under the Bank

20  Secrecy Act (BSA) and regulated by the Financial Crimes Enforcement Network (FinCEN).

21  *See* 31 U.S.C. §5311, *et seq.* Among many other requirements, casinos must make reports

22  of suspicious activity (SARs). *See* 31 C.F.R. §1021.320. As an unlicensed entity, Kalshi is

23  not subject to these AML and KYC requirements. Congress certainly did not intend for the

24  CEA to create a loophole for entities like Kalshi to engage in gaming activity without proper

25  KYC protocols and monitoring of customers' source of funds.

26      In short, the Board is charged by statute to strictly regulate gaming in Nevada to

27  protect the reputation of the State of Nevada, to protect the reputation of gaming in

28  Nevada, and to protect the public health, safety, morals, good order, and general welfare of

1  the inhabitants of Nevada. Kalshi's activities constitute wagering and, thus, gaming. These

2  activities require licensure and regulatory oversight. Because Kalshi's activities carry a

3  large risk to the strict regulation of gaming in Nevada and the welfare of Nevada's

4  inhabitants, its request for extraordinary relief should be denied.

5        **C.    Kalshi is judicially estopped from challenging the application of
          Nevada gaming law to some of its events based contracts**

6

7        Kalshi is judicially estopped from arguing that gaming does not specifically

8  encompass event based contracts on sports. "The doctrine of judicial estoppel is an equitable

9  doctrine a court may invoke to protect the integrity of the judicial process." *United Nat.*

10  *Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778–79 (9th Cir. 2009) (internal citation

11  omitted). It "not only bars inconsistent positions taken in the same litigation, but 'bar[s]

12  litigants from making incompatible statements in two different cases." *Id.* (internal

13  citations omitted).

14        When trying to argue that elections are not "gaming", Kalshi is on record to the D.C.

15  Court of Appeals stating that:

16              An event contract thus involves "gaming" if it is contingent on a
                game or a game-related event. App.107. The classic example is
17              a contract on the outcome of a sporting event; as the legislative
                history directly confirms, Congress did not want sports betting
18              to be conducted on derivatives markets. Elections, by contrast,
                are not games or related to games. They are not staged for
19              entertainment, diversion, or sport. The Congressional Control
                Contracts are thus not subject to public-interest review under
20              the "gaming" exception.

21  Appellee Brief, 2024 WL 4802698, *17 (D.C. Cir. Nov. 15, 2024).

22        Based on these statements and those referenced in section I(A)(1) above, judicial

23  estoppel should apply to Kalshi's claims.,

24  **II.    Kalshi cannot clearly show it suffered irreparable harm**

25        In seeking a TRO and preliminary injunction, Kalshi must make a "clear showing"

26  that, absent injunctive relief, it suffers irreparable harm that is both likely and imminent.

27  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) ("[P]laintiffs seeking preliminary

28  relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction.");

1    *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc) ("The Supreme

2    Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm,

3    the federal courts should not enjoin a state to conduct its business in a particular way.").

4    And because Kalshi "seeks to enjoin a government agency, '[its] case must contend with the

5    well-established rule that the Government has traditionally been granted the widest

6    latitude in the dispatch of its own internal affairs.'" *Midgett v. Tri-County Metro. Transp.*

7    *Dist. of Or.*, 254 F.3d 846, 850 (9th Cir. 2001) (quoting *Rizzo v. Goode*, 423 U.S. 362, 378-

8    79 (1976)). "This 'well-established rule' bars federal courts from interfering with non-

9    federal government operations in the absence of facts showing an immediate threat of

10   substantial injury." *Id.* (quoting *Hodgers-Durgin*, 199 F.3d at 1042-43).

11       Here, Kalshi chose to violate Nevada gaming laws.  And after receiving the Board's

12   cease-and-desist letter and even securing an extended response deadline, Kalshi did not

13   timely comply with the NGCB's letter. Instead, Kalshi chose to continue its actions, and

14   decided to ask this Court to issue a TRO and preliminary injunction—extraordinary

15   equitable remedies—to facilitate Kalshi's illegal conduct. This foul play, alone, torpedoes

16   Kalshi's ability to establish irreparable harm and enjoin the Board's "dispatch of its own

17   internal affairs." *Midgett*, 254 F.3d at 850. Further still, preliminary injunctive relief is

18   unwarranted here because Kalshi largely seeks relief for non-irreparable *monetary* and

19   *reputational* harms; harms which Kalshi itself has created.

20       **A.**    **The Board's lawful enforcement of Nevada gaming laws, designed to**
       **prevent illegal acts like Kalshi's does not create irreparable harm**
21

22       Through its Motion, Kalshi effectively asks this Court to halt Nevada's lawful

23   enforcement efforts in order to bless Kalshi's illegal activities as an unlicensed sports pool.

24   *See Midgett*, 254 F.3d at 850. Kalshi asks the Court to preliminarily enjoin the Board from

25   enforcing NRS 463.0193, 463.01962, 463.160, 463.245, 463.360, 465.086, 465.092, and

26   293.830, and Nevada Gaming Regulation 22.1205(3), or any other Nevada law that

27   attempts to effectively regulate Plaintiff's futures market (ECF No. 1 at 17)—duly enacted

28   gaming statutes and regs—in response to Kalshi's own statutory violations. Kalshi cannot

1   use this Court's inherent equitable powers to rubberstamp its own violations—an illegal

2   status quo that Nevada's gaming laws were designed to prevent. *See John Doe Co. v. CFPB*,

3   235 F. Supp. 3d 194, 203-04 (D.D.C. 2017) (finding lack of irreparable harm in part because,

4   even in "cases involving enforcement actions pursued in an unconstitutional manner or by

5   an unconstitutional," "having to submit oneself to an enforcement proceeding typically does

6   not constitute irreparable harm" (citing *Jarkesy v. SEC*, 803 F.3d 9, 26 (D.C. Cir. 2015));

7   *cf. Original Invs., LLC v State*, 542 F. Supp. 3d 1230, 1233-35 (W.D. Okla. 2021) (denying

8   equitable relief because "[i]t is well-settled . . . that 'a court won't use its equitable power

9   to facilitate illegal conduct.'"); *U.S. v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th Cir.

10  1979) (suggesting preliminary injunctions are inappropriate to maintain an illegal status

11  quo that a challenged "statute was designed to disrupt"). Conversely, any chance that Kalshi,

12  Kalshi, as a result of NGCB action, will have to submit to federal (CFTC) enforcement

13  actions—regulatory powers Kalshi does not challenge –do not constitute irreparable harm.

14  *See* ECF No. 18 at 24; *John Doe Co.*, 235 F. Supp. 3d at 203-04; *Jarkesy*, 803 F.3d at 26, 28.

15      Even if Kalshi were not seeking injunctive relief to bless its own illegal acts, the

16  Nevada gaming laws at issue are not preempted, and the Board's valid enforcement actions

17  are not "unconstitutional." *See supra*, § _#_; ECF No. 18 at 21-22. The two cases that

18  Kalshi cites are inapposite. First, in *Valle del Sol v. Whiting*, 732 F.3d 1006, 1012, 1022,

19  1029 (9th Cir. 2013), those plaintiffs seeking preliminary relief challenged a state law that

20  *both* violated an independent constitutional provision *and* was preempted by federal law.

21  *See* ECF No. 18 at 21; *Valle del Sol Inc.*, 732 F.3d at 1012, 1022, 1029 (affirming

22  preliminary injunction after concluding that Arizona criminal statute was both void for

23  vagueness under the Due Process Clause and preempted by federal criminal laws).

24      And second, the facts of this case materially differ from the more "imminent"

25  enforcement threat at issue in *Morales*. In *Morales*, the plaintiff airline companies sought

26  a preliminary injunction against states' enforcement actions, but did so only after the state

27  attorneys general had sent them letters "serving 'as formal notice[s] of intent to sue'" based

28  on preempted state fare-advertising laws that imposed additional liability for multiple

1   violations. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380-81 (1992). Yet here,

2   the Board merely issued a cease-and-desist letter informing Kalshi of its unlawful actions,

3   and then agreed to grant Kalshi additional time to respond to the letter. *See* ECF No. 18 at

4   12. The Board did not formally notify Kalshi of its intent to immediately sue or criminally

5   prosecute. *See Morales*, 504 U.S. at 380. Beyond the cease-and-desist letter, the Board has

6   done nothing to escalate its enforcement actions anywhere near the inflection point in

7   *Morales*, which led the Court to observe that the states' enforcement actions were

8   "imminent." *Morales*, 504 U.S. at 381.

9       **B.**    **Neither economic nor reputational losses establish irreparable harm**

10      Kalshi goes on to lament the purported loss of a commercial partnership with

11  Robinhood, "forego[ne] business" generally, and "tens of millions of dollars annually" spent

12  to "implement geolocation capabilities" to comply with Nevada law. ECF Nos. 18 at 22-24;

13  18-1 at 6, 13. Yet "such monetary injury is not normally considered irreparable." *L.A. Mem'l*

14  *Coliseum Comm'n v. Nat'l Football* League, 634 F.2d 1197, 1202 (9th Cir. 1980). Further,

15  Kalshi provides no *factual* showing of *irreparable* monetary harms beyond the

16  unsubstantiated statements of Mr. Xavier Sottile, Kalshi's Head of Markets. If anything,

17  more questions than answers emerge from Mr. Sottile's statements. For example, would

18  the purported "tens of millions of dollars annually" spent on geolocation implementation

19  (for "10,000 Nevada users") torpedo Kalshi's entire existence, or is it a mere drop in Kalshi's

20  revenue bucket? *See Doran v. Salem Inn, Inc.*, 472 U.S. 922, 932 (1975) (affirming

21  preliminary injunction because "absent preliminary injunction [plaintiffs, who each

22  operated a local topless dancing bar,] would suffer a substantial loss of business and

23  perhaps even bankruptcy" by overbroad ordinance banning topless dancing). Similarly,

24  what is the degree of monetary harm caused by the alleged loss of a partnership with

25  Robinhood? Kalshi has not at all clarified the degree of alleged monetary harm. But even

26  assuming "extensive" monetary harms would result from future Board enforcement action,

27  ECF No. 18 at 23, Kalshi cannot avoid its burden to clearly demonstrate "a significant

28

Page **20** of 24

1    threat of irreparable injury, irrespective of the magnitude of the injury," *Simula, Inc. v.*

2    *Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999) (citation omitted).[19]

3         Nor can Kalshi clearly show, through proffered evidence, that any loss of customer

4    "goodwill" "constitutes a distinct form of irreparable harm." ECF No. 18 at 24. Kalshi's

5    allegations of lost customer goodwill are not grounded in any evidence and thus speculative.

6    One of the very cases Kalshi cites on this issue—*Herb Reed Enters., LLC v. Fla. Ent. Mgmt.,*

7    *Inc.*, 736 F.3d 1239 (9th Cir. 2013)—reveals just that. It may be that "[e]vidence of loss of

8    control over business reputation and damage to goodwill could constitute irreparable

9    harm." 736 F.3d at 1250 (citation omitted). But a keyword in *Herb Reed* is "*evidence*." In

10   this case, like in *Herb Reed*, "missing from this record is any such evidence." *Id.* Offering

11   only conclusory statements about reputational harm, ECF Nos. 18-1 at 13; 18 at 23-24,

12   Kalshi simply cites as support two other cases with very different facts and claims

13   (trademark and copyright infringement) to show that it has suffered irreparable reputation

14   harm. *See generally Herb Reed*; *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th

15   Cir. 2017). By far, this is not a "clear showing" of likely irreparable harm. *Winter,* 555 U.S.

16   at 22; *Midgett*, 254 F.3d at 850. "As with [Kalshi's] speculation on future harm, citation to

17   a different case with a different record does not meet the standard of showing 'likely'

18   irreparable harm." *Herb Reed*, 736 F.3d at 1250 (reversing preliminary injunction and

19   remanding because plaintiff had failed to show likely irreparable harm); *but See Disney*,

20   869 F.3d at 854, 866 (finding irreparable harm given plaintiff's "substantial,"

21   "uncontroverted evidence" that plaintiff had improperly streamed defendant's copyrighted

22   works).

23   / / /

24   / / /

25   / / /

26   

27        [19] Kalshi also cannot establish irreparable harm on behalf of its users, whose
contracts, Kalshi alleges, would need to be either modified or unilaterally terminated. *See*

28   ECF No. 18 at 23. Kalshi makes no argument that it has, as a prudential matter, third-
party standing to sue on its customers' behalf.

Page **21** of 24

**III.    Balancing of the equities and the public interest warrant denial of Kalshi's motion**

As already discussed, it is vital that all gaming activity which takes place in Nevada or activity which is related to a licensed gaming establishment is strictly regulated and licensed. "It is established beyond question that gaming is a matter of privilege conferred by the State rather than a matter of right." *State v. Rosenthal*, 93 Nev. 36, 40, 559 P.2d 830, 833 (1977). "Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments…" NRS 463.0129(1)(c). "All establishments where gaming is conducted… must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State…" NRS 463.0129(1)(d). An activity which reflects "discredit upon the State of Nevada or the gaming industry…" may be deemed an unsuitable method of operation by the NGCB and Nevada Gaming Commission. Because Kalshi is not licensed and its business model facilitates illegal gaming activities, the Court should deny Kalshi's motion.

**IV.    State Defendants' countermotion for preliminary injunction should be granted[20]**

For all of the reasons argued in response to Kalshi's motion, State Defendants have met the standards for injunctive relief.

First, State Defendants have shown a likelihood of success on the merits. The text of the statute, its purpose, and the legislative history support State Defendants' contention that the CEA does not preempt Nevada gaming laws under the Supremacy Clause. Kalshi grounds its position on an untenable, ahistorical understanding of the regulation of the commodity futures market and fails to show a clear Congressional intent that the CEA preempt Nevada gaming law. *See supra* Argument Part I. Kalshi's activity constitutes gaming under Nevada law. At a minimum, the "event-based contracts" at issue here are

---

[20] State Defendants reserve all rights to assert additional arguments against Kalshi including other state and federal claims.

Page **22** of 24

1   percentage games and/or sports pools that are subject to regulation under Nevada gaming

2   law. *See* NRS 463.160; NRS. 463.0152; NRS 465.092. Moreover, those contracts also

3   constitute wagers under NRS 463.01962. A wager is a sum of money risked on an

4   occurrence—like the results of a sporting event or an election—for which the outcome is

5   uncertain. NRS 463.01962; *See also* NRS 293.830; NRS 465.092. And it is undisputed that

6   Kalshi does not possess a Nevada gaming license. State Defendants therefore are likely to

7   prevail on the question whether Kalshi's conduct—offering event-based contracts

8   pertaining to games, sports, pools, race books, and election outcomes in Nevada—is subject

9   to Nevada's legal framework regulating gaming activity in Nevada.

10      Second, State Defendants have also shown irreparable harm. Nevada heavily

11   regulates gaming industry in Nevada to preserve public trust and confidence and to protect

12   the State's reputation. *See supra* Argument I(B).  Absent the controls that the gaming laws

13   impart, accountability and recourse for harms dissipate. For instance, Kalshi is apparently

14   taking contracts on the outcome of elections and sporting events from persons in Nevada

15   who are 18 through 20 years of age. Nevada law strictly prohibits gaming activity by

16   persons under the age of 21. Consequently, allowing Kalshi to continue blatantly violating

17   Nevada's public safety law while licensed regulated establishments in Nevada are

18   forbidden from gaming activity from those 18 through 20 years of age is a clear example of

19   immediate and irreparable harm to Nevada's licensed gaming industry and the protection

20   of Nevada's citizens and visitors.

21      Allowing Kalshi to continue violating Nevada gaming law, thereby depriving Nevada

22   of its authority to regulate gaming activity within its own borders, irreparably harms the

23   sovereign interests of Nevada. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts,

24   C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes

25   enacted by representatives of its people, it suffers a form of irreparable injury.").

26      Finally, balancing the equities in conjunction with the public interest in maintaining

27   accountability in the gaming industry, the State Defendants' countermotion for

28   preliminary injunction should be granted. As the State Defendants have argued above,

Page **23** of 24

1   Kalshi fails to show that it will suffer irreparable harm if it is required to abide by Nevada

2   gaming law. *See supra* Argument II. And allowing Kalshi to continue engaging in

3   unlicensed gaming activity is against the public interest.

4       For those reasons, this Court should enter an immediate temporary restraining

5   order and preliminary injunction to enjoin Kalshi from offering event-based contracts

6   related to gaming, sports pools, and race books in Nevada unless and until approved as

7   licensed gaming by the Nevada Gaming Commission and to enjoin Kalshi from offering

8   event-based contracts on election outcomes in Nevada.

9                        **CONCLUSION**

10      For the preceding reasons, State Defendants request that Kalshi's motion be denied

11   and their countermotion for injunctive relief be granted

12      DATED this 4th day of April, 2025.

13                     AARON D. FORD
                          Attorney General

14

15                  By: */s/ Sabrena K. Clinton*
                     Jessica E. Whelan (Bar No. 14781)

16                    Chief Deputy Solicitor General  Litigation
                   Sabrena K. Clinton (Bar No. 6499)

17                    Senior Deputy Attorney General
                   Devin A. Oliver (Bar No. 16773C)

18                    Deputy Solicitor General
                   State of Nevada

19                    Office of the Attorney General
                   1 State of Nevada Way, Suite 100

20                    Las Vegas, NV 89119
                   (702) 486-3420 (phone)

21                    (702) 486-3773 (fax)
                   jwhelan@ag.nv.gov

22                    sclinton@ag.nv.gov
                   doliver@ag.nv.gov

23                    *Attorneys for Kirk D. Hendrick, George*

24                    *Assad, Chandeni K. Sendall, Nevada*
                   *Gaming Control Board, Jennifer Togliatti,*

25                    *Rosa Solis-Rainey, Brian Krolicki, George*
                   *Markantonis, Abbi Silver, Nevada Gaming*

26                    *Control Board and Aaron D. Ford.*

27

28

**Notice of Appeal**
**Dist. Ct. Doc. 45 (filed March 3, 2026)**

1   Mark A. Hutchison (Nev. Bar No. 4639)       Orin Snyder
Joseph C. Reynolds (Nev. Bar No. 8630)     (*pro hac vice*)
2   HUTCHISON & STEFFEN, PLLC         Matthew Benjamin
3   100 West Liberty Street, Suite 765       (*pro hac vice*)
Reno, Nevada 89501             GIBSON, DUNN & CRUTCHER LLP
4   mhutchison@hutchlegal.com         200 Park Avenue
jreynolds@hutchlegal.com           New York, New York 10166
5   (775) 853-8746               OSnyder@gibsondunn.com
6   (*designated local counsel*)        MBenjamin@gibsondunn.com
                                   (212) 351-4000
7

8   Adam P. Laxalt (Nev. Bar No. 12426)      Thomas H. Dupree Jr.
COOPER & KIRK, PLLC            (*pro hac vice*)
9   1523 New Hampshire Avenue NW     Jacob T. Spencer
Washington, D.C. 20036          (*pro hac vice*)
10  alaxalt@cooperkirk.com           Adam I. Steene
(202) 220-9600                (*pro hac vice*)
11
                                     GIBSON, DUNN & CRUTCHER LLP
12                                 1700 M Street NW
                                   Washington, D.C. 20036
13                                 TDupree@gibsondunn.com
14                                 JSpencer@gibsondunn.com
                                   ASteene@gibsondunn.com
15                                 (202) 955-8500

16  Counsel for Defendants BLOCKRATIZE INC.
d/b/a Polymarket; QCX LLC d/b/a Polymarket US;
17  and ADVENTURE ONE QSS INC. d/b/a Polymarket

18             UNITED STATES DISTRICT COURT

19              DISTRICT OF NEVADA

20

21  STATE OF NEVADA ex rel. NEVADA    |  Case No.: 3:26-cv-00089-MMD-CLB
    GAMING CONTROL BOARD,

22              Plaintiffs,    |  [Nev. Dist. Ct. No. 26OC000121B]

23  v.                     |  NOTICE OF APPEAL

24  BLOCKRATIZE INC. d/b/a Polymarket; QCX
    LLC d/b/a Polymarket US; ADVENTURE
25  ONE QSS INC. d/b/a Polymarket,

26              Defendants.

27

28

1

**NOTICE OF APPEAL**

2      Notice is hereby given that Defendants Blockratize Inc. d/b/a Polymarket; QCX LLC

3

d/b/a Polymarket US; and Adventure One QSS Inc. d/b/a Polymarket appeal to the United

4

5

States Court of Appeals for the Ninth Circuit from this Court's order remanding this case to

6

state court, entered on March 2, 2026 (Dkt. 41); and all rulings, orders, findings, and

7

conclusions leading up to, merged in, or included within the above listed judgment and order.

8      No prior appeal has been noticed in this case.

9      DATED: March 3, 2026.

10

HUTCHISON & STEFFEN, PLLC

11

*/s/ Joseph C. Reynolds*

12

_____

13

Mark A. Hutchison (Nev. Bar No. 4639)
Joseph C. Reynolds (Nev. Bar No. 8630)

14

100 West Liberty Street, Suite 765
Reno, Nevada 89501

15

mhutchison@hutchlegal.com

16

jreynolds@hutchlegal.com
(775) 853-8746

17

18

Adam P. Laxalt (Nev. Bar No. 12426)
COOPER & KIRK, PLLC

19

1523 New Hampshire Avenue NW
Washington, D.C. 20036

20

alaxalt@cooperkirk.com
(202) 220-9600

21

22

Orin Snyder (*pro hac vice*)
Matt Benjamin (*pro hac vice*)

23

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue

24

New York, New York 10166

25

OSnyder@gibsondunn.com
MBenjamin@gibsondunn.com

26

(212) 351-4000

27

28

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Thomas H. Dupree Jr. (*pro hac vice*)
Jacob T. Spencer (*pro hac vice*)
Adam I. Steene (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, D.C. 20036
TDupree@gibsondunn.com
JSpencer@gibsondunn.com
ASteene@gibsondunn.com
(202) 955-8500

*Counsel for Defendants BLOCKRATIZE INC.*
*d/b/a Polymarket; QCX LLC d/b/a Polymarket*
*US; and ADVENTURE ONE QSS INC. d/b/a*
*Polymarket.*

3

**REPRESENTATION STATEMENT**

Ninth Circuit Rule 3-2(b)

**Counsel for Defendants-Appellants Blockratize Inc. d/b/a Polymarket; QCX LLC d/b/a Polymarket US; and Adventure One QSS Inc. d/b/a Polymarket.**

Mark A. Hutchison
Joseph C. Reynolds
HUTCHISON & STEFFEN, PLLC
100 West Liberty Street, Suite 765
Reno, Nevada 89501
mhutchison@hutchlegal.com
jreynolds@hutchlegal.com
(775) 853-8746

Adam P. Laxalt
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, D.C. 20036
alaxalt@cooperkirk.com
(202) 220-9600

Orin Snyder
Matt Benjamin (*application for admission to Ninth Circuit forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
OSnyder@gibsondunn.com
MBenjamin@gibsondunn.com
(212) 351-4000

Thomas H. Dupree Jr.
Jacob T. Spencer
Adam I. Steene (*application for admission to Ninth Circuit forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, D.C. 20036
TDupree@gibsondunn.com
JSpencer@gibsondunn.com
ASteene@gibsondunn.com
(202) 955-8500

4

**Counsel for Plaintiff-Appellee State of Nevada ex rel. Nevada Gaming Control Board**

Jessica Whelan
Sabrena Clinton
OFFICE OF THE ATTORNEY GENERAL
1 State of Nevada Way, Suite 100
Las Vegas, Nevada 89119
Jwhelan@ag.ny.gov
Sclinton@ag.nv.gov
(702) 486-3420

John S. Michaela
OFFICE OF THE ATTORNEY GENERAL, GAMING DIVISION
5420 Kietzke Lane, Suite 202
Reno, Nevada 89511
Jmichela@ag.nv.gov
(775) 850-4153

5

1

2

CERTIFICATE OF SERVICE

3

4

5

I hereby certify that on the date below, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system which will send notification of such

filing to the following:

6

7

8

9

10

11

Jessica Whelan
Sabrena Clinton
OFFICE OF THE ATTORNEY GENERAL
1 State of Nevada Way, Suite 100
Las Vegas, Nevada 89119
Jwhelan@ag.ny.gov
Sclinton@ag.nv.gov
(702) 486-3420

John S. Michaela
OFFICE OF THE ATTORNEY
GENERAL, GAMING DIVISION
5420 Kietzke Lane, Suite 202
Reno, Nevada 89511
Jmichela@ag.nv.gov
(775) 850-4153

*Attorney for Plaintiff*

12

*Attorneys for Plaintiff*

13

DATED: March 3, 2026.

14

15

By: */s/ Madelyn Carnate-Peralta*
An Employee of Hutchison & Steffen, PLLC

16

17

18

19

20

21

22

23

24

25

26

27

28

6

**District of Nevada Docket Sheet**

CLOSED,APPEAL

# United States District Court
## District of Nevada (Reno)
## CIVIL DOCKET FOR CASE #: 3:26-cv-00089-MMD-CLB

State of Nevada ex rel Nevada Gaming Control Board vs Blockratize, et al
Assigned to: Judge Miranda M. Du
Referred to: Magistrate Judge Carla Baldwin
 Case: 2:26-cv-00406-MMD-MDC
Case in other court: Ninth Circuit, 26-01343
                       First Judicial District Court, Carson City, Nevada, 26-OC-00012-1B
Cause: 28:1441 Petition for Removal

Date Filed: 02/05/2026
Date Terminated: 03/12/2026
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

### Plaintiff

**State of Nevada ex rel. Nevada Gaming Control Board**

represented by **Jessica Whelan**
Nevada Attorney General's Office
Office of the Attorney General
1 State of Nevada Way, Suite 100
Ste 100
Las Vegas, NV 89119
702-486-4346
Email: jwhelan@ag.nv.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John S. Michela**
Nevada Office of the Attorney General
Gaming Division
5420 Kietzke Lane
Suite 202
Reno, NV 89511
775-850-4153
Fax: 775-850-1150
Email: jmichela@ag.nv.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sabrena Clinton**
Nevada Attorney General's Office
1 State of Nevada Way
Suite 100
Las Vegas, NV 89119
702-486-3420
Fax: 702-486-3773
Email: sclinton@ag.nv.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Blockratize, Inc**
*doing business as*
Polymarket

represented by **Adam I. Steene**
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, DC 20036
202-777-9326
Email: asteene@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe C Reynolds**
Hutchison & Steffen, PLLC
5371 Kietzke Lane
Reno, NV 89511
775-853-8746
Fax: 775-201-9611
Email: jreynolds@hutchlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark A. Hutchison**
Hutchison & Steffen, LLC
10080 W Alta Dr
Suite 200
Las Vegas, NV 89145
702-385-2500
Fax: 702-385-2086
Email: mhutchison@hutchlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Orin Snyder**
Gibson, Dunn & Crutcher LLP
200 Oarj Avenue
New York, NY 10166
212 351 4000
Email: osnyder@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam P. Laxalt**
Cooper & Kirk, PLLC
1523 New Hampshire Ave. NW
Washington, DC 20036
202-220-9600
Email: alaxalt@cooperkirk.com

*ATTORNEY TO BE NOTICED*

**Daniel T. Hayward**
Dotson, Hayward & Vance, PC
5355 Reno Corporate Dr
Ste 100
Reno, NV 89511
775-501-9400
Email: dhayward@dhvnv.com
*TERMINATED: 02/27/2026*

**Jacob T Spencer**
Gibson, Dunn & Crutcher LLP
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington
Washington, DC 20036
617-921-2105
Email: jspencer@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin C Vance**
Dotson, Hayward & Vance, PC
5355 Reno Corporate Dr.
Ste 100
Reno, NV 89511
775-501-9400
Email: jvance@dhvnv.com
*TERMINATED: 02/27/2026*

**M Benjamin**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212 351 4000
Email: mbenjamin@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert A Dotson**
Dotson, Hayward & Vance, PC
5355 Reno Corporate Dr.
Suite 100
Reno, NV 89511
775-501-9400
Email: rdotson@dhvnv.com
*TERMINATED: 02/27/2026*

**Thomas Henderson Dupree , Jr**
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036-4504
202-955-8547

Email: tdupree@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**QCX, LLC**                          represented by   **Adam I. Steene**
*doing business as*                                    (See above for address)
Polymarket US                                          *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jacob T Spencer**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Joe C Reynolds**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **M Benjamin**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Orin Snyder**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Thomas Henderson Dupree , Jr**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Daniel T. Hayward**
                                                       (See above for address)
                                                       *TERMINATED: 02/27/2026*

                                                       **Justin C Vance**
                                                       (See above for address)
                                                       *TERMINATED: 02/27/2026*

                                                       **Robert A Dotson**
                                                       (See above for address)
                                                       *TERMINATED: 02/27/2026*

**Defendant**

**Adventure One QSS Inc**
*doing business as*
Polymarket

represented by **Adam I. Steene**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jacob T Spencer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe C Reynolds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M Benjamin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Orin Snyder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Henderson Dupree , Jr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam P. Laxalt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel T. Hayward**
(See above for address)
*TERMINATED: 02/27/2026*

**Justin C Vance**
(See above for address)
*TERMINATED: 02/27/2026*

**Robert A Dotson**
(See above for address)
*TERMINATED: 02/27/2026*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 02/05/2026 | 1 | PETITION FOR REMOVAL from First Judicial District Court, Case Number 26-OC-00012-1B, (Filing fee $ 405 receipt number ANVDC-8351453) by ADVENTURE ONE QSS, INC., QCX, LLC, BLOCKRATIZE, INC.. Proof of service is due by 4/16/2026. Certificate of Interested Parties is due by 2/15/2026. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Dotson, Robert)<br><br>NOTICE of Certificate of Interested Parties requirement: Under Local Rule 7.1-1, a party must immediately file its disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court. (Entered: 02/05/2026) |
|---|---|---|
| 02/05/2026 | 2 | ERRATA to 1 Petition for Removal,, by Defendants Blockratize, Inc, QCX, LLC, adventure One QSS, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Dotson, Robert) (Entered: 02/05/2026) |
| 02/05/2026 | 3 | NOTICE of Supplement Authority by Blockratize, Inc, QCX, LLC, adventure One QSS, Inc. (Attachments: # 1 Exhibit)(Dotson, Robert) (Entered: 02/05/2026) |
| 02/05/2026 | | Case randomly assigned to Judge Miranda M. Du and Magistrate Judge Carla Baldwin. (GA) (Entered: 02/06/2026) |
| 02/06/2026 | 4 | NOTICE TO COUNSEL PURSUANT TO LOCAL RULE IA 11-2. Counsel Orin Snyder, Matt Benjamin, Thomas Dupree and Jacob Spencer to comply with completion and filing of the Verified Petition and Designation of Local Counsel. The form is available on the Court's website - www.nvd.uscourts.gov. Counsel is required to register for the court's electronic filing system at PACER www.pacer.gov to register Attorney. Verified Petition is due by 2/20/2026. (no image attached) (WJ) (Entered: 02/06/2026) |
| 02/06/2026 | 5 | CERTIFICATE of Interested Parties by Adventure One QSS Inc, Blockratize, Inc, QCX, LLC that identifies all parties that have an interest in the outcome of this case. Corporate Parent Intercontinental Exchange, Inc. for Blockratize, Inc added. (Dotson, Robert) (Entered: 02/06/2026) |
| 02/09/2026 | 6 | STANDING ORDER. This case has been assigned to the Honorable Miranda M. Du. Judge Du's Civil Standing Order is posted on the U.S. District Court, District of Nevada public website and may be accessed directly via this hyperlink: www.nvd.uscourts.gov. (Copies have been distributed pursuant to the NEF - KW) (Entered: 02/09/2026) |
| 02/09/2026 | 7 | MOTION to Remand to State Court by Plaintiff State of Nevada ex rel. Nevada Gaming Control Board. Responses are due by 2/23/2026. (Attachments: # 1 Exhibit 1)(Whelan, Jessica) (Entered: 02/09/2026) |
| 02/10/2026 | 8 | LIMITED NOTICE of Appearance by attorney Jessica Whelan on behalf of Plaintiff State of Nevada ex rel. Nevada Gaming Control Board. (Whelan, Jessica) (Entered: 02/10/2026) |
| 02/10/2026 | 9 | CERTIFICATE of Interested Parties by State of Nevada ex rel. Nevada Gaming Control Board. There are no known interested parties other than those participating in the case (Whelan, Jessica) (Entered: 02/10/2026) |
| 02/10/2026 | 10 | Joint STIPULATION re 1 Petition for Removal,, by Plaintiff State of Nevada ex rel. Nevada Gaming Control Board.. (Whelan, Jessica) (other) (dispositive) (Entered: 02/10/2026) |
| 02/13/2026 | 11 | NOTICE of Appearance by attorney Joe C Reynolds on behalf of Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. Notice of Appearance and Association with Local Counsel (Reynolds, Joe) (Entered: 02/13/2026) |
| 02/13/2026 | 12 | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by Matthew Benjamin and DESIGNATION of Local Counsel Joseph Reynolds (Filing fee $ 250 receipt |

| | | |
|---|---|---|
| | | number ANVDC-8366747) by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC.. (Reynolds, Joe) (Entered: 02/13/2026) |
| 02/13/2026 | [13](#) | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by Thomas H. Dupree, Jr. and DESIGNATION of Local Counsel Joseph Reynolds (Filing fee $ 250 receipt number ANVDC-8366752) by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC.. (Reynolds, Joe) (Entered: 02/13/2026) |
| 02/13/2026 | [14](#) | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by Jacob T. Spencer and DESIGNATION of Local Counsel Joseph Reynolds (Filing fee $ 250 receipt number ANVDC-8366753) by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC.. (Reynolds, Joe) (Entered: 02/13/2026) |
| 02/13/2026 | [15](#) | RESPONSE to [7](#) Motion to Remand to State Court by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. Replies are due by 2/20/2026. (Reynolds, Joe) (Entered: 02/13/2026) |
| 02/17/2026 | [16](#) | ORDER Granting [12](#) Verified Petition for Permission to Practice Pro Hac Vice attorney as to Matthew Benjamin for Adventure One QSS Inc, Blockratize, Inc, QCX, LLC and approving Designation of Local Counsel as to Joseph Reynolds. Signed by Judge Miranda M. Du on 2/17/2026. Any Attorney not yet registered with the Court's e-filng system shall register on the PACER website [www.pacer.gov](http://www.pacer.gov) (Copies have been distributed pursuant to the NEF - GA) (Entered: 02/17/2026) |
| 02/17/2026 | [17](#) | ORDER Granting [13](#) Verified Petition for Permission to Practice Pro Hac Vice Attorney Thomas H. Dupree, Jr., for Adventure One QSS Inc, Blockratize, Inc, QCX, LLC., and approving Designation of Local Counsel as to Joseph Reynolds. Signed by Judge Miranda M. Du on 2/17/2026. Any Attorney not yet registered with the Court's e-filng system shall register on the PACER website [www.pacer.gov](http://www.pacer.gov) (Copies have been distributed pursuant to the NEF - GA) (Entered: 02/17/2026) |
| 02/17/2026 | [18](#) | ORDER Granting [14](#) Verified Petition for Permission to Practice Pro Hac Vice Attorney as to Jacob T. Spencer for Adventure One QSS Inc, Blockratize, Inc, QCX, LLC., and approving Designation of Local Counsel as to Joseph Reynolds. Signed by Judge Miranda M. Du on 2/17/2026. Any Attorney not yet registered with the Court's e-filng system shall register on the PACER website [www.pacer.gov](http://www.pacer.gov) (Copies have been distributed pursuant to the NEF - GA) (Entered: 02/17/2026) |
| 02/17/2026 | [19](#) | MOTION for Leave to File Document re [15](#) Response by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. Responses are due by 3/3/2026. (Attachments: # [1](#) Exhibit A)(Reynolds, Joe) (dispositive) (Entered: 02/17/2026) |
| 02/18/2026 | [20](#) | REPLY to Response to [7](#) Motion to Remand to State Court by Plaintiff State of Nevada ex rel. Nevada Gaming Control Board. (Whelan, Jessica) (Entered: 02/18/2026) |
| 02/19/2026 | [21](#) | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by Orin Snyder and DESIGNATION of Local Counsel Joseph Reynolds (Filing fee $ 250 receipt number ANVDC-8373867) by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC.. (Reynolds, Joe) (Entered: 02/19/2026) |
| 02/19/2026 | [22](#) | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by Adam I. Steene and DESIGNATION of Local Counsel Joseph Reynolds (Filing fee $ 250 receipt number ANVDC-8373903) by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC.. (Reynolds, Joe) (Entered: 02/19/2026) |

| 02/19/2026 | 23 | ORDER granting Stipulation Modifying Briefing Schedule on Plaintiff's Motion to Remand (ECF No. 10 ). Signed by Judge Miranda M. Du on 2/19/2026.<br><br>(Copies have been distributed pursuant to the NEF - KW) (Entered: 02/19/2026) |
|---|---|---|
| 02/19/2026 | 24 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Miranda M. Du on 2/19/2026. By Deputy Clerk: Karen Walker.<br><br>A virtual hearing on Plaintiff's Motion to Remand (ECF No. 7 ) is set for Tuesday, February 24, 2026, at 9:00 A.M. in LV Courtroom 4B before Judge Miranda M. Du.<br><br>The hearing will be conducted by Zoom Video Conference. The parties are directed to contact the courtroom administrator, Karen Walker, at (775) 686-5918 or Karen_Walker@nvd.uscourts.gov, by **Friday, February 20, 2026**, to provide the e-mail address of all counsel who will be attending the hearing.<br><br>The following Zoom Video Conference Instructions shall be adhered to as follows:<br><br>Instructions and zoom invite to the scheduled hearing will be sent via e-mail at least ONE (1) day prior to the hearing to the participants e-mail provided to the Court.<br><br>1. Log on to the Zoom five (5) minutes prior to the hearing time.<br>2. Mute your sound prior to entering the hearing.<br>3. Do not talk over one another.<br>4. State your name prior to speaking for the record.<br>5. Do not have others in the video screen or moving in the background.<br>6. No recording of the hearing.<br>7. No forwarding of any video conference invitations.<br>8. Unauthorized users on the video conference will be removed.<br><br>*Reminder: Please take notice that any person, entity, or organizationincluding but not limited to counsel, counsel's agents or staff, the parties, law enforcement agents/officers, and members of the publicwho participates in or listens to this proceeding may not record it in any manner. Any violation of this provision will be subject to sanctions by this Court.*<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - KW) (Entered: 02/19/2026) |
| 02/19/2026 | 25 | ORDER Granting 21 Verified Petition for Permission to Practice Pro Hac Vice of Attorney Orin Snyder for BlockratizeInc. and all Defendants, and approving Designation of Local Counsel Joseph C. Reynolds. Signed by Judge Miranda M. Du on 2/19/2026.<br>Any Attorney not yet registered with the Court's e-filng system shall register on the PACER website www.pacer.gov<br>(Copies have been distributed pursuant to the NEF - DRM) (Entered: 02/19/2026) |
| 02/19/2026 | 26 | ORDER Granting 22 Verified Petition for Permission to Practice Pro Hac Vice of Attorney Adam I. Steene for Blockratize Inc. and all Defendants, and approving Designation of Local Counsel Joseph C. Reynolds. Signed by Judge Miranda M. Du on 2/19/2026.<br>Any Attorney not yet registered with the Court's e-filng system shall register on the PACER website www.pacer.gov<br>(Copies have been distributed pursuant to the NEF - DRM) (Entered: 02/19/2026) |
| 02/19/2026 | 27 | Non-Party Request for Remote Access by Maurice Bransfield re 24 Minute Order Setting Hearing on Motion. Responses are due by 3/5/2026. (RJDG) (Entered: 02/19/2026) |

| 02/19/2026 | 28 | Non-Party Request for Remote Access by Daniel Wallach re 24 Minute Order Setting Hearing on Motion. Responses are due by 3/5/2026. (RJDG) (Entered: 02/20/2026) |
|---|---|---|
| 02/20/2026 | 29 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Miranda M. Du on 2/20/2026. By Deputy Clerk: Karen Walker. <br><br> The Court set a hearing on Plaintiff State of Nevada on relation of the Nevada Gaming Control Board's motion to remand filed in two related cases, Case No. 3:26-cv-00089-MMD-CLB and Case No. 2:26-cv-406-MMD-MDC, for February 24, 2026 at 9:00 am. Plaintiff's motion to remand in each case raises some overlapping arguments for remand. Accordingly, Plaintiff's motion to remand in each case will be heard collectively. Plaintiff will have a combined 20 minutes to present argument for both cases. Defendant in each case will have up to 15 minutes to present their argument. The Court encourages defense counsel to confer to avoid duplication of the issues presented. <br><br> **(no image attached)** (Copies have been distributed pursuant to the NEF - KW) (Entered: 02/20/2026) |
| 02/20/2026 | 30 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Miranda M. Du on 2/20/2026. <br><br> Good cause appearing, Defendant's motion for leave to file supplemental authority (ECF No. 19 ) is granted. <br><br> **(no image attached)** (Copies have been distributed pursuant to the NEF - KW) (Entered: 02/20/2026) |
| 02/20/2026 | 31 | Non-Party Request for Remote Access by Jacob Atlas re 24 Minute Order Setting Hearing on Motion. Responses are due by 3/6/2026. (RJDG) (Entered: 02/20/2026) |
| 02/23/2026 | 32 | Non-Party Request for Remote Access by Daniel O'Boyle re 24 Minute Order Setting Hearing on Motion. Responses are due by 3/9/2026. (RJDG) (Entered: 02/23/2026) |
| 02/23/2026 | 33 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Miranda M. Du on 2/23/2026. <br><br> Before this Court are non-party requests for remote access to a civil proceeding set for February 24, 2026 at 9:00 A.M. (ECF Nos. 27 , 28 , 31 and 32 ). Under First Amended General Order 2025-1, "non-parties may request remote audio access in a civil proceeding on a case-by-case basis by submitting a Non-Party Access Request form to the Clerk's Office". Here, this Court finds no reason to deny the non-party's request and grants the requests (ECF Nos. 27 , 28 , 31 and 32 ). <br><br> *Reminder: Please take notice that any person, entity, or organization including but not limited to counsel, counsel's agents or staff, the parties, law enforcement agents/officers, and members of the public who participates in or listens to this proceeding may not record it in any manner. Any violation of this provision will be subject to sanctions by this Court.* <br><br> **(no image attached)** (Copies have been distributed pursuant to the NEF - KW) (Entered: 02/23/2026) |
| 02/23/2026 | 34 | Non-Party Request for Remote Access by Jacob Gordon re 24 Minute Order Setting Hearing on Motion. Responses are due by 3/9/2026. (RJDG) (Entered: 02/23/2026) |
| 02/23/2026 | 35 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Miranda M. Du on 2/23/2026. <br><br> Before this Court is a non-party request for remote access to a civil proceeding set for February 24, 2026, at 9:00 A.M. (ECF No. 34 ). Under First Amended General Order 2025-1, "non-parties may request remote audio access in a civil proceeding on a case-by- |

| | | |
|---|---|---|
| | | case basis by submitting a Non-Party Access Request form to the Clerk's Office". Here, this Court finds no reason to deny the non-party's request and grants the request (ECF No. 34 ). *Reminder: Please take notice that any person, entity, or organization including but not limited to counsel, counsel's agents or staff, the parties, law enforcement agents/officers, and members of the public who participates in or listens to this proceeding may not record it in any manner. Any violation of this provision will be subject to sanctions by this Court.* **(no image attached)** (Copies have been distributed pursuant to the NEF - KW) (Entered: 02/23/2026) |
| 02/24/2026 | 36 | MINUTES OF PROCEEDINGS - Virtual Motion Hearing held on 2/24/2026 before Judge Miranda M. Du. Crtrm Administrator: *Karen Walker*; Pla Counsel: *Jessica Whelan*; Def Counsel: *Virtual - Thomas Dupree, M. Benjamin, Orin Snyder, Joe Reynolds, Adam Laxalt and Mark Hutchinson*; Court Reporter: *Kathy French*; Time of Hearing: *9:00 a.m.*; Recording start and end times: *9:16 a.m. - 10:4 a.m.*; Courtroom: *4B*. The Court addresses counsel regarding the purpose of today's hearing. The Court notes that both cases (2:26-cv-406-MMD-MDC and 3:26-cv-89-MMD-CLB) are being heard together due to the similarity of both motions to remand (ECF Nos. 10 and 7 ). The Court hears arguments from Ms. Whelan, Mr. Dupree (3:26-cv-89) and Mr. LaRoche (2:26-cv-406). After hearing from counsel, the Court takes the matter under submission and advises a written order will be issued. **(no image attached)** (Copies have been distributed pursuant to the NEF - KW) (Entered: 02/25/2026) |
| 02/25/2026 | 37 | Second STIPULATION *and Order to Extend Ex Parte Temporary Restraining Order Pending Resolution of Plaintiff's Motion to Remand (Second Request)* by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC.. (Reynolds, Joe) (other) (injunctive) (Entered: 02/25/2026) |
| 02/26/2026 | 38 | ORDER Granting 37 Second Stipulation *to Extend Ex Parte Temporary Restraining Order Pending Resolution of Plaintiff's Motion to Remand* . Signed by Judge Miranda M. Du on 2/26/2026. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 02/26/2026) |
| 02/27/2026 | 39 | NOTICE *of Withdrawal of Counsel* by Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. (Dotson, Robert) (Entered: 02/27/2026) |
| 02/27/2026 | 40 | ORDER Granting Withdrawal of Counsel : Robert A. Dotson, Daniel T. Hayward, Justin C. Vance, and Dotson, Hayward & Vance, PC, hereby withdraw as counsel for Defendants Blockratize Inc. dba Polymarket, QCX LLC dba Polymarket US, and Adventure One QSS Inc. dba Polymarket Signed by Magistrate Judge Carla Baldwin on 2/27/2026. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 02/27/2026) |
| 03/02/2026 | 41 | ORDER - It is therefore ordered that the Board's motion to remand to state court ECF No. 7 is granted. This action is remanded to the First Judicial District Court in Carson City, Nevada. It is further ordered that the Board's request for attorneys' fees is denied. The Clerk of Court is directed to close this case. (CC: Certified copy of order and docket sheet mailed to state court GA) Signed by Judge Miranda M. Du on 3/2/2026. (Copies have been distributed pursuant to the NEF - GA) (Entered: 03/02/2026) |

| | | |
|---|---|---|
| 03/02/2026 | 42 | Emergency MOTION to Stay Case by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. Responses are due by 3/16/2026. (Attachments: # 1 Declaration Declaration of Jacob T. Spencer)(Reynolds, Joe) Modified on 3/5/2026 to terminate motion (KW). (Entered: 03/02/2026) |
| 03/02/2026 | 43 | NOTICE *Plaintiff's Notice Regarding Emergency Motion for Administrative Stay (ECF No. 42)* by State of Nevada ex rel. Nevada Gaming Control Board re 42 Motion to Stay Case or Discovery. (Whelan, Jessica) (Entered: 03/02/2026) |
| 03/03/2026 | 44 | First STIPULATION *and Order Modifying Briefing Schedule on Defendants' Motion to Stay Pending Appeal (First Request)* re 42 Motion to Stay Case or Discovery by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC.. (Reynolds, Joe) (other) (referral) (Entered: 03/03/2026) |
| 03/03/2026 | 45 | NOTICE OF APPEAL by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. Filing fee $ 605, receipt number ANVDC-8393697. E-mail notice (NEF) sent to the US Court of Appeals, Ninth Circuit. <br><br>Designation of Transcripts and Transcript Order forms and instructions for appeal can be found on the Court's website at www.nvd.uscourts.gov. <br><br>(Reynolds, Joe) (Entered: 03/03/2026) |
| 03/03/2026 | 46 | MOTION to Stay Case by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. Responses are due by 3/17/2026. (Reynolds, Joe) (Entered: 03/03/2026) |
| 03/04/2026 | 47 | ORDER Granting 44 Stipulation : Response to 46 Motion to Stay Case or Discovery due by 3/6/2026; Reply due by 3/9/2026. Signed by Judge Miranda M. Du on 3/4/2026. (Copies have been distributed pursuant to the NEF - DRM) Modified on 3/4/2026 for grammar only (DRM). (Entered: 03/04/2026) |
| 03/04/2026 | 48 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Miranda M. Du on 3/4/2026. The Court has granted the parties stipulation to an administrative stay of the Courts order remanding this case pending further order of this Court and no earlier than April 6, 2026. (ECF No. 47 .) Because the remand order has been forwarded to the state court, the Court recalls the remand order and directs the Clerk of Court to notify the state court that this Court has resumed jurisdiction over the action for the time being. Defendants previously filed emergency motion for administrative stay (ECF No. 42 ) is denied as moot.**(no image attached)** (Copies have been distributed pursuant to the NEF - LJ) Modified on 3/4/2026 to link (KW). (Entered: 03/04/2026) |
| 03/05/2026 | 49 | TRANSCRIPT of Proceedings, 36 Motion Hearing,,,, held on 2-24-26, before Judge Miranda M. Du. Court Reporter/Transcriber: Kathy French, Kathy_French@nvd.uscourts.gov. Any Redaction Request is due by 3/26/2026. Release of the Transcript Restriction is set for 6/3/2026. Before release date, the transcript may be viewed at the court public terminal or purchased through the court reporter. After release date, it may be obtained through the court reporter or PACER. <br><br>**THIS TRANSCRIPT MUST NOT BE ATTACHED AS AN EXHIBIT OR MADE PART OF AN APPENDIX. See Local Rule IA 10-3.(b).** <br>(KF) (Entered: 03/05/2026) |
| 03/06/2026 | 50 | RESPONSE to 46 Motion to Stay Case or Discovery by Plaintiff State of Nevada ex rel. Nevada Gaming Control Board. Replies are due by 3/13/2026. (Whelan, Jessica) (Entered: 03/06/2026) |
| 03/06/2026 | 51 | USCA, Ninth Circuit, Docketing Notice and Time Schedule Order as to 45 Notice of Appeal. **USCA Case Number 26-1343.** (Copies have been distributed pursuant to the NEF |

| | | |
|---|---|---|
| | | - DLS) (Entered: 03/06/2026) |
| 03/09/2026 | [52](#) | REPLY to [46](#) Motion to Stay Case or Discovery by Defendants Adventure One QSS Inc, Blockratize, Inc, QCX, LLC. (Reynolds, Joe) (Entered: 03/09/2026) |
| 03/12/2026 | [53](#) | ORDER - It is therefore ordered that Polymarket's motion for stay pending appeal (ECF No. [46](#) ) is denied.<br>It is further ordered that this case is remanded to the First Judicial Court of Nevada, Carson City. However, the Clerk of Court is directed not to mail this order to the First Judicial Court of Nevada, Carson City until April 6, 2026 in light of the Court's order granting the parties' stipulation. (ECF No. [47](#) at 4.)<br>The Clerk of Court is directed to close this case.<br>Signed by Judge Miranda M. Du on 3/12/2026. (Copies have been distributed pursuant to the NEF - Certified Copies of Order and Docket will be mailed 1st JDC on 4/6/26 - DLS) (Entered: 03/12/2026) |