No. 26-1343

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

State of Nevada *ex rel.* Nevada Gaming Control Board,

*Plaintiff-Appellee*,

*v.*

Blockratize Inc. d/b/a Polymarket; QCX LLC d/b/a
Polymarket US; Adventure One QSS Inc. d/b/a Polymarket,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Nevada
(Hon. Miranda Du)
No. 3:26-cv-00089

## OPENING BRIEF OF APPELLANTS

Mark A. Hutchison
Joseph C. Reynolds
HUTCHISON & STEFFEN, PLLC
100 West Liberty Street, Suite 765
Reno, Nevada 89501
Telephone: 775.853.8746
mhutchison@hutchlegal.com
jreynolds@hutchlegal.com

Adam P. Laxalt
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, D.C. 20036
Telephone: 202.220.9600
alaxalt@cooperkirk.com

Thomas H. Dupree Jr.
Jacob T. Spencer
Adam I. Steene
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

Orin Snyder
Matthew Benjamin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................1

STATEMENT OF JURISDICTION .........................................................6

STATEMENT OF THE ISSUES...............................................................7

STATEMENT OF THE CASE ..................................................................7

    A.    CFTC-regulated contract markets exercise delegated federal authority under federal law. ...................................7

    B.    Polymarket US operates a CFTC-designated contract market specializing in event contracts. .............13

    C.    Plaintiff sues Polymarket US and obtains an *ex parte* order preventing Polymarket US from exercising its delegated authority in Nevada. .................16

    D.    Defendants remove to federal court. ...............................18

SUMMARY OF THE ARGUMENT .......................................................20

STANDARD OF REVIEW......................................................................24

ARGUMENT ..........................................................................................24

I.    Polymarket US Properly Removed Under The Federal Officer Removal Statute.........................................................................24

    A.    Polymarket US acts under a federal officer.....................28

    B.    The other requirements for federal officer removal are satisfied...................................................................40

        1.    Plaintiff's efforts to shut down Polymarket US's platform relate to Polymarket US's regulation of that platform....................................40

        2.    Polymarket US's preemption argument—adopted by courts around the country—is far more than colorable. ..............................................46

II.    Federal Question Jurisdiction Applies. ..........................................48

    A.    Plaintiff's case necessarily raises a question of federal law. .......................................................................49

    B.    The remaining *Grable* elements are satisfied...................52

CONCLUSION ...................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barry v. Cboe Glob. Mkts., Inc.,*
42 F.4th 619 (7th Cir. 2022) ..................................................... 10, 32

*Bell v. Thornburg,*
743 F.3d 84 (5th Cir. 2014) ............................................................. 30

*BP P.L.C. v. Mayor & City Council of Baltimore,*
593 U.S. 230 (2021) ...................................................................... 7, 30

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.,*
797 F.3d 720 (9th Cir. 2015) ............................................................ 37

*Ceballos v. NP Palace, LLC,*
514 P.3d 1074 (Nev. 2022) ......................................................... 23, 50

*CFTC v. Savage,*
611 F.2d 270 (9th Cir. 1979) ..................................................... 11, 33

*CFTC v. Schor,*
478 U.S. 833 (1986) ........................................................................ 12

*Chevron USA Inc. v. Plaquemines Parish,*
146 S. Ct. 1052 (2026) ...................... 4, 25, 26, 27, 40, 41, 43, 44, 45, 46

*City of Oakland v. BP PLC,*
969 F.3d 895 (9th Cir. 2020) ........................................................... 53

*In re Commonwealth's Motion to Appoint Counsel Against or
Directed to Def. Ass'n of Phila.,*
790 F.3d 457 (3d Cir. 2015) ............................................................ 30

*DeFiore v. SOC LLC,*
85 F.4th 546 (9th Cir. 2023) ..................... 24, 25, 26, 28, 31, 38, 46, 47

*DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.,*
409 F.3d 93 (2d Cir. 2005) ........................................................... 8, 9

*Durham v. Lockheed Martin Corp.,*
445 F.3d 1247 (9th Cir. 2006) ........................................... 3, 25, 26, 41

*E. Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ........................................................... 24

*Edwards v. Emperor's Garden Rest.*,
130 P.3d 1280 (Nev. 2006) ..............................................................50

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019) ................................................. 2, 9, 54

*Evergreen Square of Cudahy v. Wisconsin Hous. & Econ.
Dev. Auth.*,
776 F.3d 463 (7th Cir. 2015) ...................................................... 53, 54

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) ........................................................................39

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ................................................................... 50, 51

*Fidelitad, Inc. v. Insitu, Inc.*,
904 F.3d 1095 (9th Cir. 2018) ......................................................31

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ........................................................47

*Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*,
865 F.3d 1237 (9th Cir. 2017)
..................................................21, 27, 28, 30, 31, 33, 37, 38, 40, 41, 43

*Grable & Sons Metal Products, Inc. v. Darue Engineering &
Manufacturing*,
545 U.S. 308 (2005)...................................................... 5, 7, 23, 48, 54

*Gunn v. Minton*,
568 U.S. 251 (2013)............................................................. 48, 52, 53

*Harmon v. Tanner Motor Tours of Nev., Ltd.*,
377 P.2d 622 (Nev. 1963) ........................................................ 49, 51

*Hornish v. King Cnty.*,
899 F.3d 680 (9th Cir. 2018)........................................................49

*Houston v. Moore*,
18 U.S. (5 Wheat.) 1 (1820)..........................................................51

*Isaacson v. Dow Chemical Co.*,
517 F.3d 129 (2d Cir. 2008) .........................................................30

*Jacks v. Meridian Res. Co.*,
701 F.3d 1224 (8th Cir. 2012)......................................................30

*Jefferson Cnty. v. Acker*,
527 U.S. 423 (1999)...............................................................25, 48

*KalshiEX LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. May 5, 2026) ..........................................47

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026).....................................48

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014)...........................................................25

*Maryland v. Soper*,
270 U.S. 9 (1926)...........................................................................25, 40

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)...........................................................................54

*Ray v. Tabriz*,
110 F.4th 949 (7th Cir. 2024) ...........................................................30

*Riggs v. Airbus Helicopters, Inc.*,
939 F.3d 981 (9th Cir. 2019).................................................21, 34, 35

*Ruppel v. CBS Corp.*,
701 F.3d 1176 (7th Cir. 2012).......................................................5, 26

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
548 F.3d 110 (D.C. Cir. 2008)..............................................................9

*Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
159 F.3d 1209 (9th Cir. 1998).........................3, 8, 9, 10, 20, 21, 32, 43

*Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*,
322 F.3d 1039 (9th Cir. 2003)............................................................12

*Wash. Dep't of Health v. GEO Grp., Inc.*,
2025 WL 2986482 (9th Cir. Oct. 23, 2025)........................................30

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007)............. 4, 18, 20, 25, 26, 28, 29, 30, 31, 32, 34, 37

*Willingham v. Morgan*,
395 U.S. 402 (1969)......................................................................46, 48

**STATUTES**

7 U.S.C. § 2 ................................................................ 1, 12, 22, 47

7 U.S.C. § 5 ................................................................ 1, 9, 20, 33, 54

7 U.S.C. § 7 ................................................................11, 13, 21, 32, 36, 43, 44

7 U.S.C. § 7a-2 ........................................................... 11, 33

7 U.S.C. § 8 ................................................................13

28 U.S.C. § 1291 ........................................................6

28 U.S.C. § 1331 ........................................................ 2, 6, 18, 48

28 U.S.C. § 1442 ...................... 2, 3, 6, 7, 18, 20, 22, 24, 27, 28, 34, 41, 46

28 U.S.C. § 1447 ........................................................6

Nevada Revised Statutes § 463.160.....................................................52

Nevada Revised Statutes § 465.086.....................2, 5, 7, 19, 23, 49, 50, 52

**RULES**

Fed. R. App. P. 4..........................................................6

**REGULATIONS**

17 C.F.R. § 1.3 ...........................................................10

17 C.F.R. § 38.151 ......................................................11

17 C.F.R. § 40.2 .........................................................12

*Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806 (June 12, 2026)............................................. 10, 12, 13, 14

**OTHER AUTHORITIES**

CFTC Designated Contract Market Rules No. 59101 (Dec. 30, 2025), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationRules/59101 ......................................................15

Polymarket US Rulebook (Dec. 30, 2025)................................................15

## INTRODUCTION

Congress enacted the Commodity Exchange Act ("CEA") to ensure a "system of effective self-regulation" of national derivatives markets "under the oversight of the" Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 5(b). Under that system, the CFTC shares "front-line regulator[y]" responsibilities with designated contract markets, which exercise delegated governmental authority as "self-regulatory" organizations. CFTC Prediction Markets Advisory at 1, CFTCLTR No. 26-08 (Mar. 12, 2026). In that role, contract markets assist the CFTC by regulating market access, terms and conditions of contracts, and market integrity—tasks the CFTC itself would otherwise perform.

For more than 50 years, the CEA has assigned the CFTC "exclusive jurisdiction" over derivatives traded on designated contract markets, but some States are no longer content with this arrangement. 7 U.S.C. § 2(a)(1)(A). Taking the position that they remain free to regulate exchange-traded derivatives as illegal gambling, those States have threatened to shut down these federally regulated markets. As is fitting for a dispute over a federal statute enacted to ensure "uniform" "market regulation," most of the resulting lawsuits—and there are dozens—have

- 1 -

found their way to federal court. *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019).

The State of Nevada, a party in several of these suits, grew impatient. Rather than wait for this Court's forthcoming resolution of the preemption question, the State launched a campaign to shut down contract markets in state court. Here, the State's gaming regulator sued Defendant-Appellant Polymarket US for offering Nevadans access to Polymarket US's event contracts and contract market without a state gaming license and without adopting Nevada's preferred rules for market integrity. Plaintiff obtained an *ex parte* temporary restraining order effectively shutting down Polymarket US's Nevada operations.

Polymarket US removed to federal court. Because the lawsuit targets actions Polymarket US took while exercising delegated federal authority, Polymarket US invoked the federal officer removal statute, 28 U.S.C. § 1442(a)(1). And because Nevada law states that an entity need not obtain a Nevada gaming license if federal "law" "otherwise provide[s]," Nev. Rev. Stat. § 465.086(1), Polymarket US also invoked the district court's federal question jurisdiction, 28 U.S.C. § 1331.

- 2 -

The district court held that it lacked jurisdiction and remanded the case. That was error.

*First*, the district court had jurisdiction under the federal officer removal statute. That statute was enacted to prevent state courts from "paralyz[ing] the operations of the government." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1254 (9th Cir. 2006). And it guarantees a federal forum to private entities that "act[] under" a government agency. 28 U.S.C. § 1442(a)(1).

Polymarket US "act[s] under" the CFTC by operating a designated contract market specializing in event contracts. As a "self-regulatory organization," Polymarket US serves as both a "market facilitator" and a market regulator, exercising "authority delegated by Congress" to promulgate and enforce rules governing access to and trading on its market. *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1214 (9th Cir. 1998) (internal quotation marks omitted).

Because Polymarket US "performs a variety of" delegated "regulatory functions that would, in other circumstances, be performed by" the CFTC, *Sparta Surgical*, 159 F.3d at 1214 (internal quotation marks omitted), it is involved in precisely the kind of "effort to assist" a

"federal superior" that courts treat as establishing an acting-under relationship, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007) (emphasis omitted). And because Nevada's lawsuit directly challenges the way in which Polymarket US exercises its delegated governmental authority, it easily clears the low "relating to" bar. *See Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1061 (2026) (requiring only "a connection that is not 'tenuous, remote, or peripheral'").

The district court nevertheless rejected federal officer removal, concluding that Polymarket US does not act under the CFTC. The court reasoned that Polymarket US is "duty-bound to follow [the] CFTC's requirements" because "the CFTC has the ability to override Polymarket US's [delegated] decisions." ER-011–12 (internal quotation marks omitted). But the Supreme Court and this Court consistently treat "subjection, guidance, or control" by a federal agency as a *hallmark* of an acting-under relationship. *Watson*, 551 U.S. at 151. And because the Constitution *requires* an agency to be able to override decision-making delegated to private entities, the district court's reasoning would bar federal officer removal by *any* private entity. The statute, however, "has

- 4 -

historically authorized removal by private parties without qualification." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012).

*Second*, the district court had federal question jurisdiction. The premise of Plaintiff's suit is that Polymarket US lacks a Nevada gaming license. But Nevada law requires a gaming license only if the "law" does not "otherwise provide." Nev. Rev. Stat. § 465.086(1). The U.S. and Nevada Supreme Courts have held that the term "law" usually encompasses both state *and federal* law. As a result, Plaintiff cannot succeed on its claims without grappling with the authorization supplied by federal law—a classic embedded federal question under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).

Again, the district court disagreed, concluding without explanation that the term "law" in Nevada Revised Statutes § 465.086(1) does *not* encompass federal law. In reaching that conclusion, the district court impermissibly disregarded the Nevada Supreme Court's authoritative interpretation of Nevada law.

The Court should reverse.

- 5 -

## STATEMENT OF JURISDICTION

The district court has jurisdiction under 28 U.S.C. § 1442(a)(1) and 28 U.S.C. § 1331.  Plaintiff sued in Nevada state court on January 16, 2026.  ER-241.  On February 5, 2026, Defendants timely removed the action to the United States District Court for the District of Nevada.  ER-255.  The notice of removal invoked section 1442 because Polymarket US "act[s] under" the CFTC by exercising delegated regulatory responsibilities and because Plaintiff's lawsuit is "for or relating to" Polymarket US's exercise of those responsibilities.  28 U.S.C. § 1442(a)(1); *see* ER-258 ¶ 6.  The notice of removal invoked section 1331 because Plaintiff's state law claim presents an embedded federal question.  ER-258 ¶ 7.

This Court has jurisdiction under 28 U.S.C. § 1291.  The district court entered a remand order on March 2, 2026.  ER-007.  Defendants timely filed a notice of appeal on March 3, 2026.  ER-273; *see* Fed. R. App. P. 4(a)(1)(A).

The ordinary bar on appellate review of remand orders does not apply to "an order remanding a case to the State court from which it was removed pursuant to section 1442."  28 U.S.C. § 1447(d).  Where, as here,

- 6 -

a remand order is appealable, section "1447(d) authorizes a court of appeals to review each and every" "ground[] for removal." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 237 (2021).

## STATEMENT OF THE ISSUES

1.     Where Polymarket US "acts under" the CFTC by exercising delegated rulemaking and enforcement responsibilities on the agency's behalf, Plaintiff's lawsuit relates to those actions, and Polymarket US asserts a colorable federal preemption defense, did the district court err in declining to exercise jurisdiction under the federal officer removal statute?  28 U.S.C. § 1442(a)(1).

2.     Plaintiff sued under Nevada Revised Statutes § 465.086, which requires a gaming license "[e]xcept as otherwise provided by law." Did the district court err in concluding that "law" refers only to state (not federal) law, and thus that there was no embedded federal question under *Grable*, 545 U.S. 308?

## STATEMENT OF THE CASE

**A.     CFTC-regulated contract markets exercise delegated federal authority under federal law.**

Exchange trading is vital to the national economy.  Though the securities and derivatives industries are "extensive[ly]" regulated by the

federal government, day-to-day oversight is the job of "so-called self-regulatory organization[s]." *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005).

**1.** Perhaps the most familiar self-regulatory organizations are those that run and regulate securities exchanges—for example, the New York Stock Exchange or the National Association of Securities Dealers (the former parent company of Nasdaq). *DL Cap.*, 409 F.3d at 95.

Self-regulatory organizations play dual, sometimes-overlapping roles. As for-profit exchanges, they act as "market facilitator[s]," encouraging—and profiting from—trading on their markets. *Sparta Surgical*, 159 F.3d at 1214–15. At the same time, they act as market regulators, "exercis[ing] a primary supervisory role subject to ultimate" "oversight" by the federal government. *Id.* at 1213–14.

In their supervisory role, these for-profit entities "perform[] a variety of regulatory functions that would, in other circumstances, be performed by a government agency." *Sparta Surgical*, 159 F.3d at 1214 (internal quotation marks omitted). "[A]cting on authority delegated by Congress," *id.* (internal quotation marks omitted), the securities exchanges "promulgate and enforce rules governing" the trading and

- 8 -

"conduct" of market participants, *DL Cap.*, 409 F.3d at 95, 98 (internal quotation marks omitted). This includes rules "governing listing and de-listing stock offerings," *Sparta Surgical*, 159 F.3d at 1214, "disciplinary proceedings," *DL Cap.*, 409 F.3d at 97, and "membership" qualifications, *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008).

"In this and other respects," securities exchanges "serve[] as a critical aid to the SEC in implementing and effectuating compliance with the securities laws." *DL Cap.*, 409 F.3d at 95. And, in recognition of the "important governmental functions" the exchanges "perform," this Court and others grant "self-regulatory organizations" a form of governmental "immunity" when they "exercis[e] quasi-governmental powers." *Sparta Surgical*, 159 F.3d at 1213 (internal quotation marks omitted).

**2.** This case involves the "very similar" regime for derivatives markets established by the CEA and CFTC regulations. *Effex Cap.*, 933 F.3d at 895. Through the CEA, Congress established "a system of effective self-regulation of trading facilities . . . under the oversight of the" CFTC. 7 U.S.C. § 5(b). At this system's center are contract markets, CFTC-designated nationwide exchanges that facilitate and oversee

derivatives trading. As both regulators and exchanges, contract markets "play a vital role in the national economy." CFTC, *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,843 (June 12, 2026).

Like securities exchanges, "contract markets" are "self-regulatory organizations." *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022); *see* 17 C.F.R. § 1.3 (categorizing contract markets as "[s]elf-regulatory organization[s]"). Like securities exchanges, contract markets "possess a form of delegated" government authority to oversee trading on their exchanges. *Barry*, 42 F.4th at 625.

And, like securities exchanges, designated contract markets undertake "a variety of regulatory functions that would, in other circumstances, be performed by" a federal agency—the CFTC. *Sparta Surgical*, 159 F.3d at 1214 (internal quotation marks omitted). Contract markets must, for example, "establish, monitor, and enforce compliance with the rules of the contract market," including market "access requirements," "the terms and conditions of any contracts to be traded," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A); *see also* 17 C.F.R. § 38.151(b) (requiring a contract

market to implement and enforce "impartial access" requirements for "its markets and services"). They have a delegated "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. § 7(d)(4). And they must "establish and enforce rules regarding . . . alternative dispute resolution." *Id.* § 7(d)(14).

Although contract markets have "reasonable discretion" in how to exercise their delegated federal authority, 7 U.S.C. § 7(d)(1)(B), they ultimately answer to the CFTC and are subject to the agency's "close scrutiny." *CFTC v. Savage*, 611 F.2d 270, 273 (9th Cir. 1979). To implement or revise a rule, for example, a contract market must either submit it to the CFTC for approval or certify that the rule complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A). The CFTC may allow the rule to go into effect, or it may stay the rule pending further review. *Id.* § 7a-2(c)(2)–(3). The same is true of contracts that a contract market wishes to list on its exchange: The contract market must seek CFTC approval or certify the contract's compliance with federal law. *Id.* § 7a-2(c)(1), (4)(A), (5)(C). The CFTC retains

- 11 -

authority to investigate, stay, or amend the contract after it has been listed.  17 C.F.R. § 40.2(c).

For its part, the CFTC enjoys "broad regulatory powers" over derivatives transactions and exchanges.  *CFTC v. Schor*, 478 U.S. 833, 836 (1986).  Among other things, the CFTC has "exclusive jurisdiction" over derivatives traded on a CFTC-"designated" "contract market." 7 U.S.C. § 2(a)(1)(A).  Congress centralized derivatives regulation in the CFTC because, "for decades, states had attempted to apply state gambling laws to derivatives trading."  91 Fed. Reg. at 35,808 n.24.

Today, exchange-traded derivatives within the CFTC's exclusive jurisdiction include commodity options, commodity futures, and "swaps." 91 Fed. Reg. at 35,808; *cf. Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 322 F.3d 1039, 1056 (9th Cir. 2003) (noting that the CFTC has been regulating "swap agreements" since at least the 1990s).  Swaps are financial instruments where the parties agree to swap payments based on an agreed formula, such as interest rates or the outcome of real-world events.  ER-256–57 ¶ 2.

### B. Polymarket US operates a CFTC-designated contract market specializing in event contracts.

Polymarket US is a CFTC-designated contract market. It received that designation in July 2025, after the CFTC determined that Polymarket US satisfied stringent requirements governing market integrity, transparency, financial safeguards, surveillance, and customer protection. *See* 7 U.S.C. §§ 7(a), 7(d), 8(a); ER-259 ¶ 9.

Polymarket US specializes in event contracts. ER-258 ¶ 8. Event contracts are a type of "swap." *Id.* As the name suggests, the payoff for an event contract "is based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane." ER-118. Covered events also include those "for which no traditional financial instrument exists," such as "politics," "cultural trends[,] and sporting events." 91 Fed. Reg. at 35,807 (internal quotation marks omitted). The CFTC has been regulating event contracts since 1992, when it permitted the trading of "contracts related to the outcome of elections." *Id.* at 35,813.

Contract markets that offer event contracts are sometimes known as "prediction markets," both because people trade based on their

- 13 -

prediction of the outcome of events and because these markets generate useful predictive information. 91 Fed. Reg. at 35,807. Contract markets like Polymarket US do not set the prices for the event contracts they list; instead, "[t]he underlying price for an event contract is determined by market participants' continuous buying and selling" of the contracts. *Id.* Because the prices reflect traders' aggregate view about the likelihood of the relevant event coming to pass, contract markets "yield[] forecasts" that "may rapidly incorporate new information" and "allocate probability . . . better than traditional financial derivatives or survey-based forecasts." *Id.* For example, the price of an event contract about whether the Democrats retake the House next election season will reflect traders' views about the likelihood of that event occurring. If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price. When the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, and the price will drop with it.

For that reason, according to the CFTC, "[e]vent contracts . . . provide economically useful or otherwise meaningful information and are a source of responsible financial innovation." 91 Fed. Reg. at 35,807.

- 14 -

Like any other CFTC-designated contract market, Polymarket US has exercised its delegated authority to promulgate and enforce rules governing market access, dispute resolution, and contract terms. ER-256 ¶ 6; ER-259 ¶ 11; ER-265 ¶ 39; *see* Polymarket US Rulebook §§ III.1, III.13, V.1, V.9, VIII.14, IX.1, X.2 (Dec. 30, 2025).[1] The rules, for instance, describe the circumstances that permit Polymarket US to "den[y]" or "restrict" a user's "access" and to "suspend trading." Polymarket US Rulebook §§ II.7(d), VIII.14(a). They permit trading only by customers who are "at least 18 years of age," are not "subject to a statutory disqualification," and satisfy other criteria. *Id.* § III.1(c). They provide for resolution of customer disputes through arbitration. *Id.* § IX.1(a). And they incorporate the "specifications for" each certified event contract, prohibiting the "modification" of those specifications "without [Polymarket US's] prior approval." *Id.* §§ X.1–X.2.

---

[1] Attachment to CFTC Designated Contract Market Rules No. 59101 (Dec. 30, 2025), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationRules/59101.

### C. Plaintiff sues Polymarket US and obtains an *ex parte* order preventing Polymarket US from exercising its delegated authority in Nevada.

The State of Nevada objects to the way the CFTC is regulating designated contract markets—and to the way those markets are exercising delegated governmental authority in the State. Rather than challenge the CFTC's position directly—say, through a request for rulemaking or an APA challenge—the State embarked on a campaign to shut down contract markets through *ex parte* "emergency" injunctions in state court. This maneuver, the CFTC later warned, represents "a seismic shift in the longstanding status quo between CFTC and state authority," and risks serious "destabilizing economic effects" by "upend[ing]" the national regulatory scheme Congress devised. ER-079; ER-105.

In January 2026, Plaintiff sued Defendants, claiming that Polymarket US's offering of federally regulated event contracts in the State violates Nevada gaming statutes. ER-247–48 ¶¶ 36–59. In Plaintiff's view, event contracts for "sporting events and other events" constitute "wagers" under Nevada law. ER-245 ¶¶ 20–21. And making trading on those event contracts "available to persons located in Nevada"

is unlawful because Polymarket US does not have a Nevada gaming license. ER-247 ¶¶ 41, 45. Plaintiff also alleges that Polymarket US acts unlawfully by "not employ[ing] adequate safeguards to ensure that wagers are not being placed on an event from owners, coaches, players, or officials participating in the event," by allowing "persons under the age of 21 years" to trade, and by "not pay[ing] taxes" to "Nevada." ER-246–47 ¶¶ 28–29, 32–33, 35.[2]

Plaintiff sought an *ex parte* temporary restraining order and preliminary injunction, urging the state court to issue relief without allowing Defendants to "be heard in opposition." ER-182. Once Polymarket US learned of the motion, it asked to file a full opposition brief on an expedited basis. ER-187–89. The state court refused. ER-231–32.

---

[2] Plaintiff also named Blockratize Inc. and Adventure One QSS Inc. as defendants. The complaint refers to all three entities collectively as "Polymarket," and the allegations do not distinguish between the companies. ER-166. Adventure One QSS Inc. does not operate in Nevada at all; it is a foreign corporation that operates an international market not offered in the United States. ER-261.

Instead, the state court entered a temporary restraining order. ER-236–37. The order enjoined Polymarket US "from operating or offering a market in Nevada that involves 'events-based contracts.'" ER-236.

### D. Defendants remove to federal court.

In February 2026, Defendants removed to the District of Nevada. The notice of removal invoked the district court's jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and federal question jurisdiction, *id.* § 1331; *see* ER-256. Defendants explained that the federal officer removal statute applies because Polymarket US "act[s] under" the CFTC by "assist[ing]" and "help[ing] carry out" federal responsibilities, *Watson*, 551 U.S. at 152 (emphasis omitted), including by regulating market access, promulgating and enforcing rules against market manipulation, and certifying contracts for listing, ER-264–65 ¶¶ 32–37.

The notice of removal also set out the basis for federal question jurisdiction. Under *Grable*, jurisdiction exists where a plaintiff's claims cannot be adjudicated without resolving contested questions of federal law. ER-267 ¶ 46. Because Nevada's licensing regime does not apply if "law" "otherwise provide[s]," Polymarket US explained, Plaintiff cannot

- 18 -

succeed on its claims without first addressing the CEA. Nev. Rev. Stat. § 465.086(1); *see* ER-267–68 ¶¶ 48–50.

Plaintiff moved to remand, and, on March 2, the district court granted the motion. ER-007; ER-016. The court held that Polymarket US's delegated authority to "regulat[e] access" to its market and "self-certify[] that its contracts comply with the CEA" demonstrated "mere compliance with[] regulatory standards," not "assistance" to the CFTC as required by section 1442. ER-010–11 (internal quotation marks omitted). According to the district court, the CFTC's "ability to override Polymarket's decisions" was dispositive. ER-011–12.

As for federal question jurisdiction, the district court rejected Defendants' argument that the Nevada provision "[e]xcept as otherwise provided by law" refers to both state and federal law, holding—without explanation—that the term "'law' as used in NRS § 465.086(1) refers" only to Nevada law. ER-014.

On March 12, the district court denied Defendants' motion for a stay pending appeal. ER-002. Defendants appealed and sought an emergency stay from this Court. ER-274; Dkt. No. 5.1. In late May, a motions panel denied Defendants' motion for a stay in an unpublished

opinion, repeating the district court's determinations. Dkt. No. 15.1. On remand, the state court entered a preliminary injunction.

## SUMMARY OF THE ARGUMENT

I.      Polymarket US properly removed this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

A.      Polymarket US "act[s] under" the CFTC. 28 U.S.C. § 1442(a)(1). An acting-under relationship arises when a private entity goes beyond "simple compliance with the law" and "help[s] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153. As the Supreme Court and this Court have explained, a private entity's receipt of delegated authority to perform government functions is a tell-tale sign of that acting-under relationship.

Just so here. As a "self-regulatory organization," Polymarket US exercises "quasi-governmental powers" through a "Congressional scheme of delegated regulatory authority," *Sparta Surgical*, 159 F.3d at 1213, "under the oversight of the Commission," 7 U.S.C. § 5(b). It "establish[es], monitor[s], and enforce[s] compliance with the rules of the contract market, including" "access requirements," "the terms and conditions of any contracts to be traded," and "rules prohibiting abusive

- 20 -

trade practices." *Id.* § 7(d)(2). These are "regulatory functions that would, in other circumstances, be performed by a government agency." *Sparta Surgical*, 159 F.3d at 1214. This is the classic acting-under relationship—one where an agency is "responsible for the overall administration of the program while sharing the day-to-day operating responsibility" with a private entity. *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1246 (9th Cir. 2017).

The district court's contrary conclusion rests on a misreading of *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981 (9th Cir. 2019). There, a private manufacturer did nothing more than certify compliance with a detailed, FAA-approved procedures manual; it was not a self-regulatory organization exercising delegated, discretionary rulemaking and enforcement authority. Nor does *Riggs* stand for the proposition that federal officer removal is unavailable whenever the government retains "ultimate oversight and control." *See* ER-011. According to the Supreme Court and this Court, "subjection, guidance, or control" by the government is suggestive of an acting-under relationship, not fatal to it. *Goncalves*, 865 F.3d at 1245. What's more, an agency is constitutionally *required* to retain ultimate authority over decisions delegated to private

- 21 -

entities—making the district court's rule a categorical bar on federal officer removal by private entities.  One of the main purposes of section 1442, however, is to *guarantee* a federal forum for federal defenses raised by private entities acting under federal officers.

B.    Polymarket US also satisfies the remaining requirements for federal officer removal.

*Relatedness*.  Plaintiff's suit seeks to prohibit Polymarket US from making event contracts available in Nevada, limit who may access its market, and challenge its safeguards and dispute-resolution procedures.  The lawsuit accordingly "relat[es] to" Polymarket US's promulgation and enforcement of rules regulating market access, contract terms, and dispute resolution—acts Polymarket US takes under the CFTC's delegated authority.  28 U.S.C. § 1442(a)(1).

*Colorable federal defense*.  Polymarket US's federal preemption defense—premised on the CFTC's "exclusive jurisdiction" over exchange-traded derivatives, 7 U.S.C. § 2(a)(1)(A)—is one endorsed by the CFTC and accepted by multiple federal courts.  It is far more than colorable.

II.    The district court independently has federal question jurisdiction, which is available where a plaintiff's state-law claims cannot

- 22 -

be adjudicated without resolving contested questions of federal law. *Grable*, 545 U.S. at 313–14.

A.      Plaintiff's claims necessarily raise a federal issue.  Plaintiff alleges that Polymarket US violated Nevada Revised Statutes § 465.086, which makes it unlawful to accept wagers "[e]xcept as otherwise provided by law."  The Nevada Supreme Court has held that, when used in a Nevada statute, the term "law[]" is "general and encompasses state and federal law."  *Ceballos v. NP Palace, LLC*, 514 P.3d 1074, 1077 (Nev. 2022).  The U.S. Supreme Court has said the same.  Because the state statute by its terms does not apply where federal law "otherwise provide[s]," Plaintiff cannot prevail without establishing that Polymarket US's contracts fall outside the CEA's scope—a federal question.  The district court's contrary conclusion is as unsustainable as it was unreasoned.

B.      The three other *Grable* elements—which the district court did not reach—are also satisfied:  *First*, the federal issue is actually disputed—it is the central point of contention between the parties. *Second*, the federal issue is substantial—it implicates the CFTC's exclusive authority over millions of transactions on national derivatives

- 23 -

markets. *Third*, Congress's decision to take the regulation of exchange-traded derivatives out of state hands confirms that questions about state interference with national derivatives trading belong in federal court.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's decision to remand a case." *DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th Cir. 2023). When performing that review, the Court "accept[s] the [notice of removal's] factual allegations as true and draw[s] all reasonable inferences in favor of the remover." *Id.* An unpublished motions-panel decision "is not binding" on a merits panel. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021).

## ARGUMENT

I. **Polymarket US Properly Removed Under The Federal Officer Removal Statute.**

The federal officer removal statute allows removal of an action against "any officer (or *any person acting under that officer*) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added).

The federal officer removal statute has long "protect[ed] the federal government from" States' "attempt[s] to nullify federal . . . laws."

- 24 -

*Durham*, 445 F.3d at 1252. Without the statute, the Supreme Court has explained, States might "impede through delay" "unpopular federal laws." *Watson*, 551 U.S. at 150. "And States may deprive federal officials of a federal forum in which to assert federal . . . defenses." *Id.* By guaranteeing access to a federal forum, section 1442 "secure[s] the efficient execution of [federal] laws and . . . prevent[s] interference therewith." *Maryland v. Soper*, 270 U.S. 9, 32 (1926).

Because this access is "so important to the federal government," section 1442 operates differently from other removal statutes. *Durham*, 445 F.3d at 1253. Instead of employing "the well-pleaded complaint rule" to determine federal jurisdiction, for example, *id.*, courts focus on the "plausible factual allegations by the *removing* party," *Plaquemines*, 146 S. Ct. at 1061 (emphasis added). In the same vein, courts must "credit" the *defendant's* "theory of the case for purposes of" the "jurisdictional inquiry." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999); *accord Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014). And "courts afford § 1442 a generous and liberal construction, interpreting the statute broadly in favor of removal." *DeFiore*, 85 F.4th at 553 (internal quotation marks omitted).

- 25 -

All told, "[r]emoval rights under § 1442 . . . are much broader than those under" other removal statutes. *DeFiore*, 85 F.4th at 554 (internal quotation marks omitted).

As its plain text indicates, "the removal statute applies to private persons who lawfully assist [a] federal officer in the performance of his official duty." *Watson*, 551 U.S. at 151 (internal quotation marks omitted); *see Ruppel*, 701 F.3d at 1180 ("[T]he statute has historically authorized removal by private parties without qualification."). The reason is a practical one: "If the federal government can't guarantee" those who act for it "access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf" at all. *Durham*, 445 F.3d at 1253.

To remove under the federal officer removal statute, a private entity "must satisfy three requirements." *Plaquemines*, 146 S. Ct. at 1057. "First, the removing defendant must be . . . a person 'acting under' a federal officer." *Id.* "Second, the suit must be 'for or relating to any act under color of such office.'" *Id.* (quoting 28 U.S.C. § 1442(a)(1)). "Third,

the removing defendant must assert a colorable federal defense." *Id.* at 1057–58 (internal quotation marks omitted).[3]

The Supreme Court recently admonished that the first and second requirements are "distinct" and should not be "conflate[d]." *Plaquemines*, 146 S. Ct. at 1063 (internal quotation marks omitted). That is, the relevant question at the first step is whether, at one time or another, the defendant acts under a federal officer—*not* whether "the defendant was 'acting under' a federal officer in taking the specific actions challenged in the suit." *Id.* at 1062. This is because the federal officer removal statute "contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits 'relat[e] to' such acts." *Id.* at 1063.

Polymarket US's notice of removal satisfies all three requirements. Polymarket US "act[s] under" the CFTC when it promulgates and enforces its rules—including rules regarding market access, the terms of

---

[3] Courts sometimes split up the first requirement, asking whether the defendant is a "person" and, if so, whether the defendant is "acting under" the federal government. *See Goncalves*, 865 F.3d at 1244. It is undisputed that Polymarket US is a "person" within the meaning of section 1442. *See id.* ("person" includes "companies"); ER-148–49; ER-009.

contracts, and dispute resolution. 28 U.S.C. § 1442(a)(1). Plaintiff's claims—which seek to limit market access, prohibit certain contracts, and take issue with Polymarket US's dispute-resolution mechanisms— are "for or relating to" the acts Polymarket US performs under the CFTC. *Id.* And Polymarket US's preemption defense is far more than colorable—it has been endorsed by circuit and district courts alike.

### A. Polymarket US acts under a federal officer.

1. "Although the federal officer removal statute is not limitless, 'the words "acting under" are broad.'" *Goncalves*, 865 F.3d at 1245 (alteration adopted) (quoting *Watson*, 551 U.S. at 147). "For a private entity to be 'acting under' a federal officer, the private entity must be involved in 'an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Id.* (quoting *Watson*, 551 U.S. at 152). The "relationship" between the federal officer and the private entity need not satisfy a "common-law agency" test. *DeFiore*, 85 F.4th at 554, 556. Instead, "[t]he relationship typically involves subjection, guidance, or control." *Goncalves*, 865 F.3d at 1245 (internal quotation marks omitted).

Of course, the private entity must do more than "simply comply[] with the law." *Goncalves*, 865 F.3d at 1245. That remains true "even if

the laws are highly detailed and thus leave the entity highly regulated." *Id.* (internal quotation marks omitted). To act under a federal officer, the Supreme Court has held, the private entity must "go[] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153.

The Supreme Court supplied additional guidance in *Watson v. Philip Morris Cos.* Philip Morris removed to federal court a lawsuit claiming that the company misleadingly marketed certain cigarettes as "light." *Watson*, 551 U.S. at 146. The company argued that it acted under the Federal Trade Commission because it followed the agency's "cigarette testing specifications" and was subject to "the FTC's detailed supervision." *Id.* at 147, 156. But the Supreme Court concluded that this was not enough: When Philip Morris tested its cigarettes, it did not "undertake testing on the Government agency's behalf." *Id.* at 156. Despite Philip Morris's argument to the contrary, there was "no evidence of any delegation of legal authority from the FTC . . . to undertake [that] testing." *Id.* And although it was true that the FTC had "detailed rules about advertising," those rules were "regulation, not delegation." *Id.* at 156–57.

- 29 -

Taking their cue from *Watson*, circuit courts—this Court included—have held that "[d]efendants receiv[ing] delegated authority" are acting under the federal government and are "not simply regulated by federal law." *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 137 (2d Cir. 2008); *see Wash. Dep't of Health v. GEO Grp., Inc.*, 2025 WL 2986482, at *2 (9th Cir. Oct. 23, 2025) (under *Watson*, "only 'delegation of authority'—not 'regulation'—can authorize removal under § 1442").[4]

In *Goncalves*, for example, this Court held that insurance carriers "'act[ed] under' a federal officer" because "the government ha[d] delegated . . . to the carriers" "th[e] responsibility" of "pursu[ing] subrogation claims" on the government's behalf. 865 F.3d at 1247 (citing

---

[4] *See also, e.g.*, *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 469 (3d Cir. 2015) ("Federal Community Defender" acted under the government because it was "delegated the authority to provide representation under the [Criminal Justice Act]"); *Bell v. Thornburg*, 743 F.3d 84, 89 (5th Cir. 2014) ("Unlike Philip Morris in *Watson*, [bankruptcy] trustees receive delegated authority; they do not merely comply with the law."); *Ray v. Tabriz*, 110 F.4th 949, 956–57 (7th Cir. 2024) (agreeing with *Goncalves* that insurance carriers act under the federal government because "the government delegated [its] responsibility" for pursuing subrogation claims); *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1233 (8th Cir. 2012) (similarly concluding that "[t]he carrier's assistance . . . in no way can be described as simple compliance with a federal law, but rather it has been delegated particular authority"), *abrogated on other grounds by BP P.L.C.*, 593 U.S. 230.

*Watson*, 551 U.S. at 156). As a result of this delegation, a federal "agency was 'responsible for the overall administration of the program while sharing the day-to-day operating responsibility with the insurance carriers.'" *DeFiore*, 85 F.4th at 555 (alteration adopted) (quoting and describing *Goncalves*, 865 F.3d at 1246). Through the exercise of "delegated" authority, then, the carriers went "well 'beyond simple compliance with the law and help[ed] officers fulfill other basic governmental tasks.'" *Goncalves*, 865 F.3d at 1246 (quoting *Watson*, 551 U.S. at 153).

By contrast, this Court in *Fidelitad, Inc. v. Insitu, Inc.* found "the absence of a 'formal delegation' of authority dispositive." 904 F.3d 1095, 1100 (9th Cir. 2018) (quoting *Watson*, 551 U.S. at 156). There, the defendant manufacturer argued that it was acting under the government when it "attempt[ed] to enforce specific provisions in [plaintiff's] export licenses." *Id.* Rejecting this argument, the Court noted that the defendant did "not claim that the federal government delegated its authority [to the defendant] to ensure [plaintiff's] compliance with the export license provisions." *Id.* The defendant was therefore "merely complying with federal regulations." *Id.*

- 31 -

Ordinarily, then, the existence of delegated authority is a sure sign that a "private person[]" is "involve[d] in an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152.

**2.** These principles make quick work of this case.

Polymarket US, like any other "contract market[]," is a "self-regulatory organization." *Barry*, 42 F.4th at 625. And like any other "self-regulatory organization," Polymarket US "exercise[s] quasi-governmental powers" through a "Congressional scheme of delegated regulatory authority." *Sparta Surgical*, 159 F.3d at 1213, 1215. Exercising this delegated authority, Polymarket US "establish[es]" and "enforce[s]" "rules," including by setting market "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2), (12); *see supra* at 15–16 (giving examples). As this Court explained when discussing similar delegated authority under the Exchange Act, these are "regulatory functions that would, in other circumstances, be performed by a government agency." *Sparta Surgical*, 159 F.3d at 1214 (internal quotation marks omitted).

- 32 -

Polymarket US performs those regulatory functions under the "direction," "supervision," and "guidance" of the CFTC, *Goncalves*, 865 F.3d at 1245—or, as the CEA puts it, "under the oversight of the Commission," 7 U.S.C. § 5(b); *see also Savage*, 611 F.2d at 273 (contract "markets operate under close [CFTC] scrutiny"). To implement or revise a rule, for example, Polymarket US must either submit it to the CFTC for approval or certify that the rule complies with federal law and the Commission's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A). The CFTC may allow the rule to go into effect, or it may stay the rule pending further review. *Id.* § 7a-2(c)(2)–(3). The same is true of contracts that Polymarket US seeks to list for trading. *Id.* § 7a-2(c)(1), (4)(A), (5)(C).

This case is therefore on all fours with *Goncalves*. Like the federal law in *Goncalves*, the CEA establishes an agency "responsible for the overall administration of the program while sharing the day-to-day operating responsibility with" private entities. *Goncalves*, 865 F.3d at 1245–46 (internal quotation marks omitted). The CEA achieves that division of responsibility by "delegat[ing] particular authority" to the private entities. *Id.* at 1247 (internal quotation marks omitted). And, like the insurance carriers in *Goncalves*, contract markets—

- 33 -

Polymarket US included—use this authority "to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 1248 (quoting *Watson*, 551 U.S. at 152).

For these reasons, Polymarket US "act[s] under" the CFTC. 28 U.S.C. § 1442(a)(1).

**3.** The district court's contrary conclusion rests almost entirely on its misreading of *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981. *See* ER-011–12.[5]

According to the *Riggs* court, "the controlling effect of *Watson*" resolved the appeal. 939 F.3d at 985 n.6. In *Watson*, the panel explained, the Supreme Court rejected the argument that the government "had 'delegated authority' to the manufacturer to determine compliance with [government] regulations"; in reality, the manufacturer was engaged in "*mere compliance* with federal regulations." *Id.* at 985 & n.6 (emphasis added). Similarly, the helicopter manufacturer in *Riggs* "contend[ed] that it was formally delegated legal authority from the FAA." *Id.* at 984–

---

[5] The motions panel similarly relied on *Riggs* when it stated, without explanation, that "Polymarket's actions merely demonstrate its own compliance with federal law, which cannot alone show that it is acting under a federal officer." Dkt. No. 15.1 at 2.

85.  But, in reality, the manufacturer was simply certifying its "compliance" "with a detailed, FAA-approved procedures manual." *Id.* at 988–89 (internal quotation marks omitted; emphasis omitted).  And the *Riggs* court "doubt[ed] that the [Supreme Court] would see a dispositive difference between certified compliance and ordinary compliance." *Id.* at 985 n.6 (internal quotation marks omitted).

The rigid compliance regime in *Riggs* bears little resemblance to the system of delegated regulatory authority the CEA establishes.  As Plaintiff itself has explained, *Riggs* involved a private entity that could do nothing more than "certify" that it had "followed 'a detailed . . . procedures manual.'"  Dkt. No. 9.1 at 10–11 (quoting *Riggs*, 939 F.3d at 985).  And, as Plaintiff has conceded, this means *Riggs* does not apply when the private entity has "the 'power to design the rules.'"  *Id.* at 12 (quoting *Riggs*, 939 F.3d at 988).

That is exactly why *Riggs* does not control here.  The CEA empowers Polymarket US to "establish . . . and enforce compliance with the rules of the contract market" concerning—among many other things—market "access" and "the terms and conditions of any contracts." 7 U.S.C. § 7(d)(2)(A).  And, unlike the rigid compliance in *Riggs*,

Polymarket US has "reasonable discretion" to fashion those rules. *Id.* § 7(d)(1)(B).

Although the *Riggs* majority explained that its decision was about certified compliance, the district court interpreted *Riggs* as standing for a different proposition entirely: that a private entity does not act under a federal officer when the government is able to exercise "ultimate oversight and control" over the entity's actions. ER-011. Applying that test, the court held that Polymarket US was merely complying with the law—not just when Polymarket US certifies contracts but also when it exercises its authority to "establish[,] monitor[,] and enforc[e] compliance with the rules of [its] contract market[,] including access requirements as to third parties." *Id.* (internal quotation marks omitted). And because "the CFTC has the ability to override Polymarket's decisions regarding access," the district court reasoned, "Polymarket's delegated functions fall within the 'simple compliance with the law' circumstance." ER-011–12.

That interpretation of *Riggs* conflicts with multiple precedents of this Court—and would ensure that federal officer removal by private

entities is available only where the authority they exercise is unconstitutional.

The district court's interpretation turns on its head the rule that the acting-under "relationship typically *involves* subjection, guidance, or control." *Goncalves*, 865 F.3d at 1245 (quoting *Watson*, 551 U.S. at 151) (emphasis added). That is, subjection, guidance, or control by the federal government is *indicative of* an acting-under relationship, not *fatal* to one. *See Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 728 (9th Cir. 2015) (the "significant flaw in" defendant's acting-under argument was "the lack of any evidence of the *requisite federal control or supervision*") (emphasis added).

Take *Goncalves*. There, the insurance carriers' delegated authority to pursue subrogation claims was "required" by the federal government. 865 F.3d at 1247. When pursuing those claims, the carriers were "subject to [a federal agency's] oversight," they "submit[ted] to [the agency's] regulatory requirements," and they "ultimately answer[ed] to federal officers." *Id.* (internal quotation marks omitted; alterations adopted). "Moreover," the agency enjoyed the power "at all times" to "withdraw approval of [a] carrier or terminate its contract." *Id.* (internal quotation

- 37 -

marks omitted). Yet it was *because of* that supervision, guidance, and control that federal officer removal was available. *See id.*

If the district court were right, however, *Goncalves* was wrong. The insurance carriers' "obligation to pursue subrogation claims," *Goncalves*, 865 F.3d at 1247, would have been "simple compliance with the law," ER-012. And the same "direct and extensive control" over the carriers that established an acting-under relationship would also have defeated it. *Goncalves*, 865 F.3d at 1246 (internal quotation marks omitted). *But see DeFiore*, 85 F.4th at 556 (explaining that the carriers could remove "[i]n *Goncalves*" "*because of* the government's overall control of the program" (emphasis added)).

The district court's decision also conflicts with other decisions of this Court. In *DeFiore*, for example, government contractors were "delegated . . . specific command and control supervision" over employees performing security services. 85 F.4th at 555 (internal quotation marks omitted). This Court held that the "'acting under' requirement" was "satisfie[d]" because the government "controlled the contractors' actions." *Id.* at 556–57.

- 38 -

At bottom, the district court's reading of *Riggs* was incorrect. *Riggs* does not hold that a private entity is "simpl[y] compl[ying] with the law" whenever an agency "has the ability to override [the entity's] decisions." ER-011.

For good reason. Under "the Constitution's nondelegation doctrine," an agency may not "give[] away its power to a private company." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 664 (2025). To avoid private-nondelegation problems, then, an "agency [must] retain[] decision-making power"—usually by keeping the power to "approv[e], disapprov[e], or modif[y]" the private company's delegated conduct. *Id.* at 692 (internal quotation marks omitted).

Under the district court's reading of *Riggs*, however, the same decision-making power that agencies are constitutionally required to retain would also prevent private entities from being able to remove under section 1442: Agencies will *always* have "the ability to override [those entities'] decisions." ER-011. Federal officer removal would be available only to those private entities that enjoy unfettered—and thus unconstitutional—delegated authority.

- 39 -

**B.** **The other requirements for federal officer removal are satisfied.**

Polymarket US satisfies the two other elements of federal officer removal. *First*, Plaintiff's claims relate to Polymarket US's exercise of delegated governmental authority in Nevada. *Second*, Polymarket US's preemption defense—accepted by the Third Circuit and multiple district courts and endorsed by the CFTC—is colorable.

**1.** **Plaintiff's efforts to shut down Polymarket US's platform relate to Polymarket US's regulation of that platform.**

Until fairly recently, section 1442 "required that the suit be 'for' an act under color of office." *Plaquemines*, 146 S. Ct. at 1060 n.3. Even then, the "hurdle erected by" this "causal nexus" (or "causal-connection") "requirement [was] quite low." *Goncalves*, 865 F.3d at 1244 (internal quotation marks omitted). For example, "[t]he statute d[id] not require that the prosecution . . . be for the very acts which the officer admits to have been done by him under federal authority." *Id.* (quoting *Soper*, 270 U.S. at 33). Instead, under the causal nexus test, defendants were required to "show only that the challenged acts occurred *because of* what they were asked to do by the Government." *Id.* at 1245 (internal quotation marks omitted).

- 40 -

In 2011, Congress lowered the hurdle further still. As the Supreme Court recently explained, "Congress broadened the statute by authorizing removal of suits 'for *or relating to*' an act under color of office." *Plaquemines*, 146 S. Ct. at 1060 n.3 (emphasis added) (quoting 28 U.S.C. § 1442(a)(1)). "The phrase 'relating to' sweeps broadly." *Id.* at 1060. "It means to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* (internal quotation marks omitted). So, although "'relating to' requires a connection that is not tenuous, remote, or peripheral," "a removing defendant need no[ longer] show that his federal duties . . . strictly caused the challenged conduct." *Id.* at 1060–61.

At times, Ninth Circuit case law has continued to nod in the direction of the pre-2011 "causal nexus" standard, requiring defendants to show that their "'actions under' a federal officer are causally connected to the dispute." *Goncalves*, 865 F.3d at 1244 (citing *Durham*, 445 F.3d at 1251, a decision from 2006). In the wake of *Plaquemines*, where the Supreme Court "jettisoned the causal nexus test" once and for all, this Court's use of that test is no longer tenable. 146 S. Ct. at 1064 (Jackson, J., concurring in judgment).

- 41 -

Still, Polymarket US satisfies the relatedness requirement under this Court's prior case law—and all the more so under *Plaquemines*. Plaintiff's lawsuit directly challenges the way in which Polymarket US exercises its delegated governmental authority in Nevada; there is nothing tenuous, remote, or peripheral about the connection.

At the heart of Plaintiff's claim is its belief that Polymarket US is unlawfully making "gaming activity . . . accessible in the State of Nevada" and "allow[ing] anyone over the age of 18 to . . . trade on its platform." ER-246 ¶¶ 25, 33. That is why Plaintiff sought an injunction prohibiting Polymarket US from making its event contracts available without the State's permission, as well as an injunction categorically prohibiting Polymarket US from making those contracts "available on its market to [certain] persons . . . in Nevada." ER-250.

And that is why the notice of removal alleged that "[t]he conduct Nevada challenges . . . falls squarely within the actions Polymarket US takes under . . . the CFTC." ER-265 ¶ 39: When Polymarket US "'establish[es], monitor[s], and enforce[s] compliance' with 'access requirements,'" *id.* (quoting 7 U.S.C. § 7(d)(2)), it performs "regulatory functions that would, in other circumstances, be performed by a

- 42 -

government agency," *Sparta Surgical*, 159 F.3d at 1214; *see supra* at 32–34. Yet Plaintiff's suit in effect contends that Polymarket US should have established and enforced *different* market-access rules and set *different* terms for its contracts. Even the relief Plaintiff seeks—"the suspension of trading"—requires Polymarket US to take a step this Court has described as "quintessentially regulatory." *Sparta Surgical*, 159 F.3d at 1214.

"This meets the low bar that the causal-connection prong requires," even under this Court's prior test. *Goncalves*, 865 F.3d at 1245. "The 'very act' that forms the basis for challenging" Polymarket US's conduct—regulating market access—"is an act that [Polymarket US] contend[s] [it] performed under the direction of federal officers." *Id.* (alterations adopted; internal quotation marks omitted).

And it certainly meets *Plaquemines*'s more generous standard: A suit challenging who may access Polymarket US's contracts has far more than a "tenuous, remote, or peripheral" "relation" to Polymarket US's regulation of market access. *Plaquemines*, 146 S. Ct. at 1060–61 (internal quotation marks omitted); *cf. id.* at 1062 ("'relating to' does not

require the defendant to show that his federal duties specifically invited his challenged conduct").

The same is true of Plaintiff's other theories. Plaintiff claimed, for example, that Polymarket US "does not employ adequate safeguards" to ensure fair transactions. ER-247 ¶ 35. But the obligation to "establish and enforce rules . . . to promote fair and equitable trading on the contract market" is one that Polymarket US exercises under its delegated government authority. 7 U.S.C. § 7(d)(2); *accord* ER-265–66 ¶ 39(c) (notice of removal). And Plaintiff complained that Polymarket US's dispute-resolution procedures do "not provide[] adequate protection to purchasers of event contracts." ER-176. But, again, it is through Polymarket US's delegated authority that the company "establish[es] and enforce[s] rules" addressing "dispute resolution . . . for[] market participants." 7 U.S.C. § 7(d)(14); *see* ER-264 ¶ 39(d) (notice of removal).

Plaintiff had nothing to say about any of this in the district court. Its argument about section 1442's "second element" began and ended with the following sentence: "[T]he Board's claims do not relate to any actions taken at the direction of a federal officer, because no such action

- 44 -

exists." ER-149; *see* ER-056 (limiting the section 1442 portion of its remand reply to whether Polymarket US was "'acting under' the CFTC").

For its part, the district court did not expressly address the relatedness element. But portions of its opinion suggest that the court "impermissibly conflate[d] the 'distinct' 'acting under' and 'connected or associated with' elements of the federal officer removal test." *Plaquemines*, 146 S. Ct. at 1063. That is, the district court appeared to believe (incorrectly) that "the removal statute requires that the defendant was 'acting under' a federal officer in taking the specific actions challenged in the suit." *Id.* (rejecting this argument). At a hearing on the remand motion, for example, the court asked "[w]hich of Polymarket's self-regulating functions" "the State [was] challenging." ER-038–39. And, on the theory that "the relevant inquiry does not concern all of Polymarket's delegated functions," the court in its remand order "look[ed] narrowly at functions" it believed to be "relevant to the Board's claims." ER-010.[6]

---

[6] As part of its acting-under argument, Plaintiff similarly asserted that "this case does not involve Polymarket's exercise of delegated authority to regulate the conduct of a third party." ER-056; *see also* ER-152 (asserting "Polymarket does not explain how the conduct at issue *in this*

The district court was mistaken. Because there is a direct connection between Plaintiff's claims and the acts Polymarket US performs under the CFTC, there is sufficient relatedness even under the district court's "narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). But even if that were not the case, the outcome would be the same because the federal officer removal statute "contemplate[s] removal of suits . . . for acts that were *not* done under" a government agency. *Plaquemines*, 146 S. Ct. at 1063. All that matters is that "the suits 'relate to' such acts." *Id.* (alteration adopted). To the extent the district court believed otherwise, it erred.

### 2. Polymarket US's preemption argument—adopted by courts around the country—is far more than colorable.

"In determining removal jurisdiction under § 1442(a)(1), the scope of the court's inquiry is only whether the defendant advanced a colorable federal defense, not whether the defense will be successful." *DeFiore*, 85 F.4th at 558 (internal quotation marks omitted; alteration adopted). A "federal defense alleged in a notice of removal is colorable for § 1442(a)(1)

---

*case* involves the sort of governmental tasks that the government would have to perform if Polymarket did not") (emphasis added).

purposes" unless it "clearly appears to be immaterial" or "is wholly insubstantial and frivolous." *Id.* at 560 (emphasis and internal quotation marks omitted).

Polymarket US's "federal defense" easily "clears th[at] low bar." *DeFiore*, 85 F.4th at 560. When it comes to exchange-traded event contracts, the CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market. 7 U.S.C. § 2(a)(1)(A). That exclusive jurisdiction leaves no room to target federally regulated markets with state licensing regimes, enforcement actions, or injunctive relief. The CEA therefore preempts Plaintiff's enforcement action against Polymarket US. ER-130.

Plaintiff does not dispute that preemption is material to the litigation. *See* ER-056; ER-009. And the position that the CEA preempts the application of state gaming law to contract markets is not just colorable—it is a position that the CFTC itself, as well as multiple federal courts, have endorsed. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228, 231 (3d Cir. 2026); *KalshiEX LLC v. Johnson*, 2026 WL

- 47 -

1223373, at \*1, \*5, \*8 (D. Ariz. May 5, 2026); *KalshiEX LLC v. Orgel*, 2026 WL 474869, at \*10 (M.D. Tenn. Feb. 19, 2026); ER-098.[7]

## II. Federal Question Jurisdiction Applies.

Federal-question jurisdiction extends to "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A "case can 'arise under' federal law in two ways." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (alteration adopted). The first is where "federal law creates the cause of action asserted." *Id.* The second is where a "state law claim" (1) "necessarily raise[s]" "a federal issue" that is "(2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting" the "'balance of federal and state judicial responsibilities.'" *Id.* at 258 (quoting *Grable*, 545 U.S. at 313–14).

---

[7] This Court is currently considering the merits of preemption claims brought by other contract markets against Nevada. *See Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831; *N. Am. Derivatives Exch., Inc. d/b/a Crypto.com v. Nevada*, No. 25-7187; *KalshiEX LLC v. Hendrick*, No. 25-7516. But because a defendant "need not win his case before he can have it removed," *Willingham*, 395 U.S. at 407, Polymarket US's preemption argument remains colorable even if the Court "ultimately reject[s]" the other contract markets' arguments on the merits, *Acker*, 527 U.S. at 431.

Plaintiff's claims satisfy the second standard because they cannot be adjudicated without resolving contested, vitally important questions of federal law.

### A. Plaintiff's case necessarily raises a question of federal law.

"The Supreme Court has often held that a case" necessarily raises a federal issue "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Hornish v. King Cnty.*, 899 F.3d 680, 688 (9th Cir. 2018) (internal quotation marks omitted; alteration adopted). This is one of those cases.

**1.** Plaintiff claims that Polymarket US has violated Nevada Revised Statutes § 465.086. *See* ER-246. That law states: "*Except as otherwise provided by law*, it is unlawful" to accept "wager[s]" "without having first procured, and thereafter maintaining in effect, all federal, state, county and municipal gaming licenses as required by statute." Nev. Rev. Stat. § 465.086(1) (emphasis added). The Nevada Supreme Court has held that, when a statute governs "except as otherwise provided by law," it does not apply if the conduct at issue is "squarely within the applicable provisions" of a different statute. *Harmon v.*

- 49 -

*Tanner Motor Tours of Nev., Ltd.*, 377 P.2d 622, 626 (Nev. 1963) (internal quotation marks omitted; alteration adopted).

So, if "law" in Nevada Revised Statutes § 465.086 encompasses federal law, Plaintiff will have to prove that Polymarket US's contracts fall outside the applicable provisions of the CEA.

In Nevada, "law" *does* encompass federal law. The Nevada Supreme Court has held that words like "law" and "lawful" are "general and encompass[] state and federal law." *Ceballos*, 514 P.3d at 1077; *see, e.g.*, *Edwards v. Emperor's Garden Rest.*, 130 P.3d 1280, 1286 (Nev. 2006) (interpreting "[e]xcept as otherwise provided by law" to encompass both "state" and "federal" law). "When the [Nevada] Legislature means to specify state law," the court added, "it does so." *Ceballos*, 514 P.3d at 1077. Similarly, the U.S. Supreme Court has held that, when a provision "incorporat[es] . . . state law," it incorporates "federal law," too. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157 (1982). After all, "[t]he Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution." *Id.*

- 50 -

To decide Nevada's state-law claims, then, a court must interpret the scope and effect of "the applicable provisions" of the CEA—which is a federal question. *Harmon*, 377 P.2d at 626.

**2.** The district court "rejected" this argument, but it did not explain why. ER-014 (at n.6). It apparently did not endorse Plaintiff's position that "when a statute refers to 'law' generally, the statute is presumed to refer 'only . . . to the laws of the government' that passed the statute." ER-061 (quoting *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 42 (1820) (Johnson, J., concurring in judgment)).

For good reason. Putting aside that Plaintiff was unable to cite a single case from Nevada's courts, Justice Johnson's view has not stood the test of time. In fact, the Supreme Court "rejected" that view in *Fidelity Federal Savings*, holding in 1982 that "the 'law of the jurisdiction' includes federal as well as state law." 458 U.S. at 157 n.12.

Even if Justice Johnson's presumption had somehow become the interpretive law of Nevada, the presumption would be overcome here. The second half of the state statute refers to "federal, state, county and municipal gaming licenses," indicating that federal law is just as relevant

to the provision—and to the "[e]xcept as otherwise provided by law" clause—as state law.  Nev. Rev. Stat. § 465.086.[8]

The district court accordingly erred in the sole reason it gave for rejecting federal question jurisdiction.  ER-014–15.  And the remaining *Grable* elements are satisfied too.

## B.  The remaining *Grable* elements are satisfied.

This litigation satisfies *Grable*'s three remaining requirements.

1.  *Actually disputed*.  "The federal issue is . . . 'actually disputed' here—indeed, on the merits, it is the central point of dispute."  *Gunn*, 568 U.S. at 259.  To prevail, the State must prove that federal law does not permit Polymarket US's event contracts.  "This is just the sort of dispute respecting the effect of federal law that *Grable* envisioned."  *Gunn*, 568 U.S. at 259 (internal quotation marks omitted; alterations adopted).

---

[8] The motions panel appears to have misapprehended this point.  The panel noted that "Nevada Revised Statutes § 463.160 makes it unlawful to operate a sports pool without the required 'federal, state, county and municipal gaming licenses.'"  Dkt. No. 15.1 at 1.  "[B]ut," the panel continued, "Nevada only challenges Polymarket's lack of a state license, and therefore its complaint does not trigger federal question jurisdiction."  *Id.* at 2.  Polymarket US's argument, however, is not that Plaintiff is challenging "Polymarket's lack of a [federal] license."  It is that the statute's reference to a federal license—and therefore federal law—confirms that "[e]xcept as otherwise provided by law" refers to both state *and* federal law.

**2.** *Substantial.* The federal-law issue is substantial because it is "importan[t]" to "the federal system as a whole." *Gunn*, 568 U.S. at 260. The CFTC has already told this Court as much: "[W]hether states can regulate or license trading on CFTC-registered Designated Contract Markets despite the CEA's grant of 'exclusive jurisdiction' to the CFTC to oversee the operators of, and participants on, these markets" is a "question of exceptional importance." ER-160. The dispute "directly draw[s] in question" the authority of the CFTC in "administering and enforcing" the CEA. *Gunn*, 568 U.S. at 261.

Additionally, the resolution of the federal issue is significant to more than just "the particular parties in the immediate suit," *Gunn*, 568 U.S. at 260: The answer will implicate the legality of millions of transactions across the country. And it presents a "pure issue of law" that is "dispositive of the case and would be controlling in numerous other cases." *City of Oakland v. BP PLC*, 969 F.3d 895, 905 (9th Cir. 2020). "Accordingly, the federal government has a strong interest in these [cases] being decided according to uniform principles." *Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 468 (7th Cir. 2015).

- 53 -

All told, the case raises "an important issue of federal law that sensibly belongs in federal court." *Grable*, 545 U.S. at 315.

**3.** *Federal-state balance.* The "congressionally approved balance of federal and state judicial responsibilities" also favors federal jurisdiction. *Grable*, 545 U.S. at 314. Congress has determined that "transactions subject to [the CEA] are . . . affected with a national public interest." 7 U.S.C. § 5(a). It has determined that "effective self-regulation of trading facilities" similarly "serve[s] the public interest[]," too. *Id.* § 5(b). It amended the CEA to supply "a comprehensive regulatory structure [for] oversee[ing]" the derivatives market, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (internal quotation marks omitted), and to subject exchanges to "uniform legal rules," *Effex Cap.*, 933 F.3d at 894 (internal quotation marks omitted), "under the oversight of the [CFTC]," 7 U.S.C. § 5(b). "The desirability of a uniform [treatment] of [event] contracts will best be achieved by allowing suit in federal court"—making the issues "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Evergreen Square*, 776 F.3d at 467–68 (internal quotation marks omitted).

- 54 -

## CONCLUSION

This Court should reverse the remand order and allow proceedings to continue in the District Court.

Dated:  June 25, 2026        By: /s/ *Thomas H. Dupree Jr.*

Mark A. Hutchison               Thomas H. Dupree Jr.
Joseph C. Reynolds              Jacob T. Spencer
HUTCHISON & STEFFEN, PLLC       Adam I. Steene
100 West Liberty Street         GIBSON, DUNN & CRUTCHER LLP
Suite 765                       1700 M Street NW
Reno, Nevada 89501              Washington, D.C. 20036
mhutchison@hutchlegal.com       tdupree@gibsondunn.com
jreynolds@hutchlegal.com        jspencer@gibsondunn.com
(775) 853-8746                  asteene@gibsondunn.com
                                (202) 955-8500
Adam P. Laxalt
COOPER & KIRK, PLLC             Orin Snyder
1523 New Hampshire Avenue       Matthew Benjamin
NW                              GIBSON, DUNN & CRUTCHER LLP
Washington, D.C. 20036          200 Park Avenue
alaxalt@cooperkirk.com          New York, New York 10166
(202) 220-9600                  osnyder@gibsondunn.com
                                mbenjamin@gibsondunn.com
                                (212) 351-4000

*Attorneys for Defendants-Appellants*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 26-1343

The undersigned attorney or self-represented party states the following:

[ ]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[x]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*State of Nevada v. KalshiEX, LLC*, 26-1304
Per Ninth Circuit Rule 28-2.6(b), this case raises the same or closely related issues. It concerns an appeal from a remand order in a parallel enforcement action brought by the same plaintiff under the same state gaming laws, and presents the similar question of whether another CFTC-regulated contract market may remove on the basis of federal question jurisdiction.

*State of Washington v. KalshiEX, LLC*, 26-3106
Per Ninth Circuit Rule 28-2.6(b), this case raises the same or closely related issues. It concerns an appeal from a remand order in a parallel state enforcement action against another CFTC-regulated contract market, and presents a similar question as to federal question jurisdiction.

**Signature** s/Thomas H. Dupree Jr.                    **Date** 6/25/2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**                                                            *New 12/01/18*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  26-1343

I am the attorney or self-represented party.

**This brief contains 10,279 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Thomas H. Dupree Jr. _____ **Date** 6/25/2026 _____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                         *Rev. 12/01/22*